**IN THE UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-CV-01673-KMT

2505 6TH STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

Now come Defendants, WestGuard Insurance Company and AmGuard Insurance Company (collectively "Guard"), and for their Response to Plaintiff's Motion for Summary Judgment, sates as follows:

## I. INTRODUCTION

Plaintiff seeks partial summary judgment on its bad faith claim based on a timeline devoid of context, and based on mischaracterizations of the record. Contrary to Plaintiff's arguments, coverage was not conclusively determined early in this claim, and Plaintiff did not even submit certain damages claims until May 7, 2020, just eleven days before filing suit.

Moreover, Plaintiff ignores the fact that Guard has disclosed a Report from claim handling expert Kearson Strong, who opines unequivocally that Guard acted reasonably in handling Plaintiff's claim. Plaintiff has not challenged or moved to strike this opinion. Given that this case

involves competing expert opinions on material issues, Plaintiff's motion must be denied.

Finally, Plaintiff claims Guard violated certain Colorado insurance claims practice standards and regulations. However, not only does the claim timeline establish that Guard's claim adjustment was reasonable, but any violation of a regulations and claim handling standards is not actionable or *per se* evidence of unreasonableness; it is merely *evidence* of unreasonable conduct. Thus, even if Guard violated any such standards or regulations (which it did not), it is insufficient grounds for summary judgment.

## II. RESPONSE TO STATEMENT OF MATERIAL FACTS

1. Undisputed.

2. Undisputed that the Policy covers direct physical loss or damage to covered property. However, coverage is subject to terms, conditions, limitations, and exclusions set forth in the Policy. (See Doc. 69, Ex. 1).

3. Undisputed.

4. Undisputed.

5. Disputed. The cited document indicates that previous owners were "lax on the overall maintenance of the building if it did not affect the guests directly." It also reported the roof to be in "average" condition, makes no other reference to damage, and contains no information regarding the scope of the inspection. (See Doc. 69, Ex. 3).

6. Undisputed.

7. Undisputed that Envista Engineering identified the subject damage as being caused by the storm at issue, but also identified extensive damage caused by wear and tear, deterioration, and faulty construction. (See Doc. 69, Ex. 4).

8. Undisputed.

9. Undisputed.

10. Disputed. In response to the question, Mr. Ardoline merely testified, “I mean, I've expressed, in team meetings -- I had different ideas, and so does everybody.” Moreover, he could not identify a single specific conversation in which he reported to management he had too many cases. (See Ardoline Deposition, 203:20 – 204:5, attached as Exhibit “1”).

11. Undisputed.

12. Undisputed.

13. Undisputed that Mr. Miller identified damage to the building. However, his report was inconclusive as to what damage was caused by the storm at issue, and he subsequently questioned whether damage might have been caused by prior storms. Moreover, subsequent reports from adjuster Brian Rubidoux identified a narrower scope of damage. (See Doc. 69, Ex. 8, See Miller Email, attached as Exhibit “2”; See Engle Martin Report, attached as Exhibit “3”).

14. Undisputed that Mr. Miller identified damage to the building. However, to the extent he believed it was caused by the storm at issue, Mr. Miller relied only on a hail report showing hail at the building on the date of loss. (See Deposition of Ted Miller, 132:11-15, attached as Exhibit “4”). Moreover, he subsequently questioned whether damage could have been caused by prior storms. (See Ex. 2).

15. Undisputed.

16. Undisputed.

17. Undisputed.

18. Undisputed. However, to the extent he believed it was caused by the storm at issue,

Mr. Miller relied only on a hail report showing hail at the building on the date of loss. (See Ex. 4, 132:11-15). Moreover, he subsequently questioned whether damage could have been caused by prior storms. (See Ex. 2).

19. Undisputed.

20. Undisputed.

21. Undisputed.

22. Undisputed.

23. Undisputed.

24. Defendants do not dispute that the subject email contains these representations. Defendants object to the email as hearsay, lacking foundation, and speculative.

25. Undisputed that Defendants received the referenced email. Defendants reassert their objection to Ms. Pendlay's statements as hearsay, lacking foundation, and speculative.

26. Undisputed.

27. Undisputed.

28. Undisputed.

29. Undisputed.

30. Undisputed.

31. Undisputed that both individuals identified hail damage. However, Mr. Rubidoux noted that he only observed damage to the south elevation of the building. (See Ex. 3).

32. Undisputed.

33. Undisputed that Defendants received a copy of the subject estimate. Disputed that the estimate accurately reflects covered damage to the property at issue. To the contrary,

subsequent reports and estimates from Envista Forensics and JS Held confirmed that the CJ Restoration estimate overstated the damage at issue. (See Envista Forensics Report and Authenticating Deposition Testimony, attached as Exhibit "5"; See JS Held Report and Authenticating Deposition Testimony, attached as Exhibit "6"; See JS Held Estimate, attached as Exhibit "7").

34. Disputed, based on the reports and estimates referenced above. (See Exs. 5, 6, 7).

35. Disputed, based on the reports and estimates referenced above. (See Exs. 5, 6, 7).

36. Undisputed.

37. Undisputed.

38. Undisputed.

39. Undisputed.

40. Undisputed.

41. Undisputed.

42. Undisputed.

43. Undisputed.

44. Undisputed.

45. Undisputed.

46. Undisputed that all identified hail damage. However, there were differences among the reports in the scope of damage identified and damage caused by other non-covered causes of loss. (See Exs. 3, 5; See Miller Report, attached as Exhibit "8").

47. Undisputed.

48. Undisputed.

49. Undisputed.

50. Undisputed.

51. Undisputed.

52. Undisputed that Plaintiff's counsel sent the demand letter attached as Exhibit 22 to Plaintiff's Motion for Summary Judgment.

53. Undisputed that Plaintiff's counsel sent the demand letter attached as Exhibit 22 to Plaintiff's Motion for Summary Judgment.

54. Undisputed.

55. Undisputed.

56. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

57. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

58. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

59. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

60. Undisputed that Mr. Kaszas prepared the subject report. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

61. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

62. Undisputed that the subject report included photographs. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

63. Disputed. Mr. Kaszas' report identified a much larger scope of damage than any individual who previously inspected the property. Defendants dispute Mr. Kaszas' findings, based on the reports and estimates generated by Envista Forensics and JS Held. (See Exs. 5, 6, 7).

64. Undisputed.

65. Undisputed that Plaintiff sent the referenced demand letter. Guard disputes that any water infiltration was caused by the storm at issue. (See Ex. 6).

66. Disputed. Plaintiff elected to file this lawsuit on May 18, 2021. Thereafter, the parties were engaged in litigation in which Defendants filed numerous pleadings and eventually issued a claim payment following inspection by consultants from JS Held. (See Exs. 6, 7; See Doc. 69, Plaintiff's Stmt. Mat. Facts, paras. 77-78).

67. Undisputed that Plaintiff sent the referenced demand letter.

68. Undisputed.

69. Undisputed that Plaintiff was sued by its property manager. Disputed that any water intrusion was caused by the storm at issue. (See Exs. 5, 6, 7).

70. Undisputed that Defendants retained JS Held. Disputed that JS Held is an independent adjusting company. Rather, Defendant retained a roofing consultant, Jeff Anderson, and a cost estimator, Mark Neufeld, from JS Held. (See Exs. 6, 7).

71. Undisputed.

72. Undisputed.

73. Undisputed.

74. Undisputed that JS Held found hail damage on the property. However, the scope of damage found differed from the scope of damage identified in previous reports. (See Exs. 3, 6-8).

75. Undisputed.

76. Disputed. Mr. Kaszas identified a broader scope of damage purportedly caused by the storm at issue. (See Exs. 5, 6, 7).

77. Undisputed.

78. Undisputed.

79. Undisputed.

80. Undisputed.

## III. Statement of Additional Material Facts

1. Plaintiff owns a Baymont Inn franchise location in Limon, Colorado. (See Doc. 63, p. 4).

2. The hotel building has a shingle roof and stucco exterior. (See Doc. 63, p. 4).

3. Plaintiff claims that, on or around August 2, 2020, a hailstorm struck the property. (See Doc. 63, p. 4).

4. On August 3, 2020, after Plaintiff reported its claim to Guard, Guard assigned third-party administrator Raphael & Associates to inspect the loss location. (See Raphael & Associates Claim Notes, attached as Exhibit "9").

5. Raphael & Associates assigned independent adjuster Ted Miller to inspect the loss. (See Ex. 8).

6. Mr. Miller finished his inspection on August 6, 2020, and found damage to the building, but did not provide a repair estimate. (See Ex. 8).

7. Following his inspection, he emailed Raphael & Associates, "Limon Colorado is one of the most hail hit towns in America. For this reason, I believe the carrier should look into the past claim history for this loss location even if the risk was insured by a different carrier." (See Ex. 2).

8. On August 11, 2020, Guard directed Raphael & Associates to return the file to Guard for handling, and Mr. Miller's involvement ended. (See Email, attached as Exhibit "10"; See Ex. 9).

9. Notably, Guard made the decision to return the file in-house before Mr. Miller issued any report of his inspection findings. (See Exs. 8 and 10).

10. On or around September 9, 2020, Guard assigned the claim to independent adjuster Brian Rubidoux of Engle Martin. (See Guard Claim Notes, attached as Exhibit "11").

11. Guard advised Plaintiff, "At this time the TPA previously assigned before my handling of the file has been removed from the file. I have reassigned this to Engle Martin & Associates and authorized them to retain Envista Engineering to perform a reinspection and report back to me on a rush basis." (See Email, attached as Exhibit "12").

12. Mr. Rubidoux inspected the property on September 18, 2020. (See Ex. 3).

13. He observed hail damage "to the south elevation of the building and the roof." (See Ex. 3, p. 5)[1].

[1] Page numbers reference the pdf page, not internal page numbers appearing on the document.

14. He also noted, "The insured and their contractor had pointed out several areas of damage which were either not consistent with hail damage and possibly due to defective construction or normal wear and tear." (See Ex. 3, p. 5).

15. After taking the file back in-house, Guard also retained an engineer, William Oviatt of Envista Forensics, to inspect the property. (See Exs. 5, 11).

16. Mr. Oviatt also inspected the property on September 18, 2020. (See Ex. 5, p. 7).

17. Mr. Oviatt concluded that hail and/or wind damaged the roof surface, stucco, window screens, and window wraps. (See Ex. 5, p. 7).

18. However, the windows also had damage due to over-prying, the windows themselves were undamaged, the stucco exhibited extensive cracking unrelated to hail, and the building's framing was not damaged by hail. (See Ex. 5, pp. 7-8).

19. Moreover, the building's pool room had extensive damage due to long term exposure to humidity unrelated to hail. (See Ex. 5. p. 8).

20. Envista's conclusions, as stated in its report, were as follows:

> 1. The subject building wood framing was not structurally damaged due to the reported storm on or about August 2, 2020.
>
> 2. The subject building asphalt shingle roof covering was functionally damaged due to hail impact from the reported storm on or about August 2, 2020. It is estimated that approximately 11,330 shingles were functionally damaged due to hail impact from the reported storm.
>
> 3. Exterior building elevation and roof elements were cosmetically damaged due to hail impact from the reported storm on or about August 2, 2020 in the form of small dents to soft metal roof vents, metal wall vents, and exterior metal doors.
>
> 4. Exterior building elevation elements were functionally damaged due to hail impact or wind forces from the reported storm on or about August 2, 2020 in the form of fractures in stucco siding, tears in window screens, fractured vinyl window

> wraps, fractured glass window panes, fractured vinyl fencing, fractured or completely removed exterior wall sconces, and three (3) racked metal door frames.
>
> 5. The subject building windows have several areas of observed damage due to over prying of window elements that were resistant to opening from either/or an installation issue, material defect, or a maintenance issue. These areas of observed damage were not consistent with a structural issue or deformation of the rough window opening due to excessive gravity or lateral loading to the underlying framing elements. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.
>
> 6. The subject building exterior stucco has damage in the form cracking that has propagated due to inadequate installation of horizontal and vertical movement joints in some areas. These areas observed are inconsistent with cracking caused from lateral building racking around rough framing openings, and is therefore not attributable to damage caused by the reported storm on or about August 2, 2020.
>
> 7. The subject building pool room has advanced deterioration to building interior finishes, wood framing members of supporting walls, and exterior finishes attached thereto from a long-term exposure to excessive interior humidity. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

(See Ex. 5, pp. 7-8).

21. Envista also found that hail impacted the south and west-facing building elevations, concluding, "The spatter marking observed had well defined edges indicative of a recent storm event. The spatter marking was also consistently observed on the west and south sides of building elements, indication of a storm direction coming from the southwest." (See Ex. 5, pp. 9-10).

22. Envista also concluded that the cracking defects in the stucco were caused by the absence of any movement joints, writing, "[T]he subject building exterior stucco has damage in the form of cracking that has propagated due to the inadequate installation of horizontal and vertical movement joints in some areas." (See Ex. 5, p. 10).

23. Envista completed its report on October 20, 2020, which contained the conclusions set forth above. (See Ex. 5).

24. However, Guard did not receive the Envista Report until November 30, 2020. (See Engle Martin Report, attached as Exhibit "13").

25. On or around October 20, 2020, Plaintiff provided an estimate from CJ Restoration for $434,949.90 replacement cost value. (See Email and Estimate, attached as Exhibit "14").

26. However, the estimate included numerous items outside the scope of damage identified by Envista Forensics. (See Ex. 14).

27. For example, the CJ Restoration estimate included $25,173.38 for a new sign, replacement of more than $76,989.18 for stucco repairs on **all** elevations, and $57,500 for replacement of windows on **all** elevations. (See Ex. 14).

28. Since the CJ Restoration estimate included items outside the scope of hail-caused damage identified in the Envista Report, Guard needed to obtain an estimate of items within Envista's scope. (See Ex. 11, p. 2)

29. Guard reassigned the claim to Raphael & Associates to obtain an estimate based on the scope of damage in the Envista Report. (See Assignment Form, p. 3, attached as Exhibit "15").

30. The first time Plaintiff or its counsel shared the conclusions of its engineer, GRK Consulting Engineers ("GRK"), was May 7, 2021. (See May 7, 2021 Email, attached as Exhibit "16").

31. GRK purported to identify a scope of damage far beyond Plaintiff's previous contractor, CJ Restoration. (See Ex. 16).

32. CJ Restoration's estimate included only exterior damages. (See Ex. 14).

33. GRK claimed to identify interior water intrusion as a result of the hail storm. (See Ex. 16).

34. GRK also claimed that there was hail damage on **all** exterior elevations, that damaged windows had to be completely replaced, rather than repaired, and that there was microbial growth on interior drywall related to the storm. (See Ex. 16).

35. Based on GRK's scope of damage and repair recommendations, Plaintiff claims $623,519.07 in damages, including (1) $246,573 to replace all windows on the property, including damaged windows and undamaged windows necessary to achieve a cosmetic match; (2) $142,642.21 for stucco repairs; (3) $63,425 for stucco painting; (4) $6,800.14 for new fencing; (5) $14,758.36 to repair doors; $4,430 to repair lighting; (6) $122,763.31 to repair the roofing system; and $22,127.05 to repair signage. (See Victory Construction Report, p. 30, attached as Exhibit "17")

36. Before the Raphael & Associates estimate was completed and before allowing any reasonable time to consider the findings of GRK, Plaintiff filed this lawsuit on May 18, 2021, just nine days after first sharing GRK's report. (See Doc. 1-1).

37. After this lawsuit was filed, Guard retained Jeff Anderson and Mark Neufeld of JS Held to reinspect the property to address GRK's findings, and complete an estimate of covered damage. (See Exs. 6, 7).

38. JS Held completed an inspection of the property on October 6, 2021, and issued a report and estimate on November 18, 2021. (See Exs. 6, 7).

39. The Report concluded in part that only two exterior elevations were damaged as a result of the storm at issue, and that interior water intrusion was unrelated to the storm at issue, but caused in part by improper installation of wall/window air conditioning units, which were sloped improperly toward the buildings windows. Moreover, the building's exterior was improperly maintained, allowing cracks to form in the stucco and water to permeate the cracks. (See Ex. 6, pp. 23-26).

40. JS Held's estimate totaled $315,796.44 replacement cost value ("RCV") and $268,237.98 actual cash value ("ACV"). (See Ex 7, p. 44).

41. Guard issued payment for the ACV amount on November 15, 2021, less the Policy's deductible. (See Doc. 63, p. 8).

42. In this litigation, Guard disclosed an expert report from Kearson Strong. (See Affidavit and Report, attached as Exhibit "18").

43. Ms. Strong has worked as an adjuster, large loss claims manager, supervisor, and claims consultant in the insurance industry for thirty-three years. (See Ex. 18, p. 11).

44. She reviewed numerous documents pertinent to this claim, and concluded, "In my review of the documents listed above, it is my opinion AmGuard acted within the standard and custom of the insurance industry in its investigation, coverage review, and overall handling of the claim submitted by 2505 6th Street, LLC." (See Ex. 17, p. 9).

45. The basis of Ms. Strong's opinion is set forth clearly in her Report, which includes a detailed timeline of events and summarizes communications between Guard, its representatives,

and the insured. (See Ex. 17).

## IV. <u>ARGUMENT</u>

### A. <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248–50 (1986). A fact is "material" if "it is essential to the proper disposition of the claim." *Wright v. Abbott Labs., Inc*., 259 F.3d 1226, 1231–32 (10th Cir. 2001). "An issue is 'genuine' if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party." *Sigstedt v. Colo. Mt. Local Coll. Dist*., Civil Action No. 20-cv-2704-WJM-GPG, 2022, U.S. Dist. LEXIS 137255, at *2 (D. Colo. Aug. 2, 2022)(citing *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997)). The court must "view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Id.* citing *Adler v. Wal-Mart Stores Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). "In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial." *Id.*

### B. <u>BAD FAITH STANDARD</u>

Colorado recognizes a statutory bad faith claim where an insurer unreasonably delays or denies payment of a claim for benefits owed to a first-party insured. Colo. Rev. Stat. § 10-3-1115(1)(a). An insurer's delay is unreasonable "if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." Colo. Rev. Stat. § 10-3-1115(2). "The determination of whether an insurer has breached its duties to the insured is one of reasonableness under the circumstances." *Thompson v. State Farm Mut. Auto. Ins. Co.*,

457 F. Supp. 3d 998, 1003 (D. Colo. 2020). "The reasonableness of an insurer's conduct must be determined objectively, based on proof of industry standards." *Id.*

Whether an insurer's delay or denial of insurance benefits was unreasonable is ordinarily a question of fact appropriate only for jury determination. *Baker v. Allied Prop. & Cas. Ins. Co.*, 939 F. Supp. 2d 1091, 1104 (D. Colo. 2013), as amended (June 12, 2013). Additionally, whether an insurer acted diligently in responding to an insured is a question of fact for jury determination. *Copper Oaks Master Home Owners Ass'n v. Am. Fam. Mut. Ins. Co.*, 416 F. Supp. 3d 1115, 1127 (D. Colo. 2019), opinion clarified, No. 15-CV-01828-MSK-SKC, 2019 WL 5310253 (D. Colo. Oct. 18, 2019) (insured not entitled to summary judgment on unreasonable delay claim, since whether insurer acted diligently in responding to appraisal demand was a question of fact for jury determination).

An insurer's violation of statutory requirements under C.R.S. § 10–3–1101, *et. Seq.* may only be considered evidence of whether an insurer acted unreasonably. *Peiffer v. State Farm Mut. Auto. Ins. Co.*, 940 P.2d 967, 971 (Colo. App. 1996), aff'd and remanded, 955 P.2d 1008 (Colo. 1998). Violations of statutes regulating an insurer's conduct do not create a private right of action. *Schnacker v. State Farm Mut. Auto. Ins. Co.*, 843 P.2d 102, 104 (Colo. App. 1992).

### C. GUARD HAD A REASONABLE BASIS FOR ITS COVERAGE POSITION AND TIMING OF CLAIM PAYMENTS

Plaintiff's motion is based primarily on repeated assertions that Guard knew there was covered damage on Plaintiff's building as of Mr. Miller's inspection, which was later confirmed by Mr. Rubidoux and Mr. Oviatt. However, Mr. Miller and Mr. Rubidoux are independent adjusters, not engineers. (SMOF, 5, 10). They observed damage, but did not complete an estimate,

and many coverage questions remained after their inspections. (SMOF, 13). For example, questions remained about the date of loss after Mr. Miller's inspection, as Mr. Miller's conclusions were based only on a single weather report showing hail in the area on the claimed date of loss, and he subsequently questioned whether the damage occurred from prior storms. (SOMF, 7). Moreover, in an email to Raphael & Associates, he questioned whether prior storms caused or contributed to the damage he observed. (SOMF, 7).

Thus, questions remained regarding whether and what damage was covered, warranting involvement of an engineer, Mr. Oviatt. Indeed, Mr. Rubidoux specifically informed Guard, "Based on our inspection and/or discussion with your office, we would recommend engaging the following experts/consultants: Per your authorization, Envista Forensics was engaged to complete an inspection and report of findings." (SOMF, 11). Additionally, questions remained regarding the scope of damage, as Mr. Rubidoux observed hail damage on only a single elevation of the building. (SOMF, 13).

Guard retained Mr. Oviatt to address these issues. Although Mr. Oviatt confirmed some damage due to the subject hail-storm during his inspection, he also confirmed that numerous building components had damage unrelated to the hail storm. (SOMF, 18, 19, 20). Thus, there were still coverage issues that remained even after his inspection, including segregating covered damage from non-covered damage, like wear and tear, deterioration, and faulty installation of the stucco surfaces.

With the Envista Report in hand, Guard sought an estimate through Raphael & Associates. (SOMF, 29). However, shortly after doing so, Plaintiff submitted GRK's findings, which differed dramatically from the findings of any engineer or consultant previously retained. (SOMF, 30-34).

Among other things, GRK concluded that all elevations were damaged, there was interior water intrusion, and all damaged windows had to be replaced. (SOMF, 30-34). GRK's findings increased the scope and amount of the parties' dispute dramatically, as Plaintiff seeks $623,519.07 based on GRK's scope of damage and recommended repairs. (SOMF, 35). By comparison, this is 97% higher than JS Held's $315,796.44 estimate, and 43% higher than Plaintiff's own $434,939.90 estimate from CJ Restoration.

Within eleven days of providing GRK's findings (for the first time in the claim), Plaintiff filed this lawsuit. (SOMF, 36). Despite the parties' ongoing litigation, Guard retained JS Held to address the new damage claims from GRK. (SOMF, 36-40). Once Guard received an estimate reflecting covered damages from JS Held, Guard issued payment on the claim within thirty days. (SOMF, 37-41).

As this timeline and the circumstances of this claim demonstrate, Guard worked closely with independent adjusters, building consultants, and engineers to evaluate damages which were a moving target, complete inspections, and issued timely payment based on JS Held's estimate. Guard acted promptly in assigning the claim to Raphael & Associates, which in turn assigned independent adjuster Ted Miller. (SOMF, 5-7). Mr. Miller inspected the building within a few days of the claim being reported. (SOMF 6). Upon taking the claim back in-house, Guard promptly assigned a new independent adjuster Mr. Rubidoux, and Envista completed its inspection by September 18, 2020. (SOMF, 8-10, 12). Moreover, Guard asked Mr. Rubidoux and Envista to complete the assignment on a "rush" basis. (SOMF, 11).

Contrary to Plaintiff's assertions, neither coverage nor the amount of loss was clear at the outset or even after Mr. Miller, Mr. Rubidoux, and Mr. Oviatt inspected the building. Mr. Miller

did not issue an estimate, and questioned whether there was damage already present from prior storms. (SOMF, 7). Mr. Rubidoux observed a much narrower scope of damage than Mr. Miller observed, noting that only one exterior elevation had hail damage. (SOMF, 13). Envista identified numerous areas of long-term wear and tear (which is not covered) and determined that the windows (other than window screens and wrappings) were not damaged by hail or wind. (SOMF, 18-20). In short, this was a complex claim justifying the time it took to complete the claim adjustment, particularly given that Plaintiff continued to expand the scope of the claim as recently as eleven days before filing suit. Accordingly, there are numerous disputes of material fact, precluding summary judgment.

### D. VIOLATIONS OF UNFAIR CLAIM PRACTICE STANDARDS AND INSURANCE REGULATIONS ARE NOT ACTIONABLE OR *PER SE* EVIDENCE OF UNREAOSNABLE CONDUCT

Guard disputes that it violated any claim handling standards or regulations. As discussed above, there were numerous justified reasons the claim adjustment continued through Guard's final payment. Nonetheless, even if Plaintiff were to establish a violation of claim handling standards or Department of Insurance regulations, such violations are merely *evidence of* unreasonable delay or denial. *Peiffer*, 940 P.2d at 971; *Schnacker*, 843 P.2d at 104. It is not independently actionable or *per se* unreasonable delay or denial. *Id.* Rather, a violation of claim handling regulations must be considered against other evidence regarding an insurer's conduct to determine if the insurer's position was reasonable. As discussed above, there is ample evidence from which a jury could conclude that Guard acted reasonably, even if Plaintiff were to prove a technical violation of a claim handling regulation.

## E. <u>KEARSON STRONG'S REPORT CREATES AN ISSUE OF MATERIAL FACT REGARDING PLAINTIFF'S BAD FAITH CLAIMS</u>

Plaintiff ignores the fact that Guard disclosed an expert report from claim handling expert Kearson Strong. Plaintiff does not dispute Ms. Strong's qualifications or methodology underlying the report, and has not moved to strike any of Ms. Strong's opinions. In fact, Ms. Strong has thirty-three years of relevant industry experience as a claim handler, large loss claim manager, and claim consultant with numerous insurance companies. (SOMF, 42-45). She reviewed numerous documents pertinent to this claim, and her Report includes a detailed timeline forming the basis of her opinion that Defendants acted reasonably in handling Plaintiff's claim. (SOMF, 42-45).

Courts have accepted similar opinions from claim handling experts in numerous cases. See. e.g., *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004); *Peden v. State Farm Mut. Auto. Ins. Co*., 841 F.3d 887, 890 (10th Cir. 2016); *Goodson v. Am. Standard Ins. Co. of Wisconsin*, 89 P.3d 409, 415 (Colo. 2004) ("The aid of expert witnesses is often required in order to establish objective evidence of industry standards."); *O'Sullivan v. Geico Cas. Co*., 233 F. Supp. 3d 917, 926 (D. Colo. 2017). Moreover, a court may not grant summary judgment when parties have conflicting expert testimony on the relevant subject. *Thompson v. State Farm Mut. Auto. Ins. Co*., 457 F. Supp. 3d 998, 1005 (D. Colo. 2020) ("Competing expert opinions present the classic battle of the experts and it is up to a jury to evaluate what weight and credibility each expert opinion deserves."). In this case, Ms. Strong's Report creates a genuine issue of material fact precluding summary judgment. Accordingly, Plaintiff's motion must be denied.

### F. DECLINING TO SHARE PROPRIETARY CONSULTANT REPORTS IS NOT BAD FAITH

Plaintiff repeatedly faults Guard for not sharing its engineering or adjuster's reports. However, Plaintiff fails to cite a single case or regulation requiring insurers to produce internal engineering and adjuster's reports while a claim is under investigation. Colorado's Unfair Claim Settlement Practices Act governs insurers' claim settlement conduct. C.R.S. § 10-3-1104(h) (2022). None of the seventeen acts the statute designates as unfair claim practices requires disclosure of such reports. At most, the statute requires an insurer to provide a "statement setting forth the coverage under which the payments are being made" when issuing a payment. C.R.S. § 10-3-1104(h)(X) (2022). Plaintiff cannot establish that a failure to disclose such reports violates any duty to an insured. Indeed, if Plaintiff's argument is accepted, it would mean that an insured is entitled to every communication or document contained in a claim file while the claim is being actively investigated. There is no legal support anywhere for such an absurd proposition.

### G. GUARD'S CONDUCT DID NOT HAVE A DETRIMENTAL EFFECT ON THE PROPERTY

Finally, Plaintiff repeatedly claims that Guard's conduct caused water intrusion into the building, and even caused the building manager to separately sue Plaintiff. However, **both JS Held and Envista Forensics concluded that the storm at issue did not cause water intrusion.** Envista Forensics concluded as follows:

> 5. The subject building windows have several areas of observed damage due to over prying of window elements that were resistant to opening from either/or an installation issue, material defect, or a maintenance issue. These areas of observed damage were not consistent with a structural issue or deformation of the rough window opening due to excessive gravity or lateral loading to the underlying framing elements. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

> 6. The subject building exterior stucco has damage in the form cracking that has propagated due to inadequate installation of horizontal and vertical movement joints in some areas. These areas observed are inconsistent with cracking caused from lateral building racking around rough framing openings, and is therefore not attributable to damage caused by the reported storm on or about August 2, 2020.

(SOMF, 20).

JS Held likewise concluded that interior water intrusion was caused by improper installation of window HVAC units, which actually sloped toward the building. (SOMF, 39). Moreover, the building's exterior was not maintained, allowing cracks to form in the stucco, which exacerbated leaks. (SOMF, 39).

Finally, Plaintiff claims it has been sued separately as a result of Guard's alleged delay. This is not accurate. Plaintiff's hotel managers, Ashley and Logan Clay, filed suit against Plaintiff because of its inaction, not Guard's. (See Doc. 25). Indeed, in responding to the Clay's Motion to Intervene in this lawsuit, Plaintiff described its subject matter as "far afield of the subject matter of this litigation," and argued,

> It is clear that the Clay's interests do not depend on whether Defendants are found in breach of the insurance contract but rather whether Plaintiff failed to exercise reasonable care in the maintenance of its Property. That is because the Clays' allegations stem from alleged misconduct of Plaintiff, unrelated to the insurance contract that is the subject matter in this case.

(See Doc. 26, pp. 7-8). Plaintiff cannot have it both ways, arguing in one pleading that the Clays' lawsuit is unrelated to the present action, and arguing in the present motion that Guard's alleged delay caused the Clays to bring suit. Under the doctrine of judicial estoppel, Plaintiff's argument must be rejected. *Eastman v. Union Pac. R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) ("purpose [of judicial estoppel] is to protect the integrity of the judicial process by prohibiting parties from

deliberately changing positions according to the exigencies of the moment."). At a minimum, there is a genuine dispute of material fact on this issue precluding summary judgment.

## V. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion for Partial Summary Judgment.

/s/ *Brian E. Devilling*
BRIAN E. DEVILLING
MATTHEW S. PONZI
FORAN GLENNON PALANDECH PONZI & RUDLOFF PC
222 North LaSalle St., 14th Floor
Chicago, Illinois 60601
(312) 863-5000
Attorneys for Defendants

**CERTIFICATE OF SERVICE**

I hereby certify that the appended document was filed electronically with the above-captioned court on September 16, 2022, with notice of case activity to be generated and sent electronically by the Clerk of said court to the following attorneys of record:

Jonathan Bukowski
Larry E. Bache, Jr.
Nathanael T. Archuleta
Merlin Law Group, P.A.
1001 17th Street, Suite 1150
Denver, CO 80202
jbukowski@merlinlawgroup.com
lbache@merlinlawgroup.com
narchuleta@merlinlawgroup.com
Attorneys for Plaintiff 2505 6th Street Limon, LLC
d/b/a Baymont by Windham Limon

/s/ *Brian E. Devilling*