# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

REMOTE VIDEOTAPE DEPOSITION OF:
WILLIAM ARDOLINE - July 8, 2022

---

Civil Action No. 1:21-cv-01673-WJM-KMT

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

Civil Action No. 1:21-cv-02136-RMR-NYW

WOODSIDE VILLAGE II CONDOMINIUM ASSOCIATION, INC. AND
CLAIM & CONSTRUCTION MANAGEMENT GROUP, LLC,

Plaintiffs,

v.

AMGUARD INSURANCE COMPANY and
WESTGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the videotape deposition of WILLIAM ARDOLINE, was taken remotely on behalf of the Plaintiffs, on July 8, 2022, at 6:51 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.

# WILLIAM ARDOLINE - July 08, 2022



A P P E A R A N C E S

For the Plaintiffs:

JONATHAN E. BUKOWSKI, ESQ.
NATHANAEL ARCHULETA, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com
narchuleta@merlinlawgroup.com

For the Defendants:

BRIAN E. DEVILLING, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
bdevilling@fgppr.com

Also Present:

Debi Boblitt, Videographer



I N D E X


| EXAMINATION OF WILLIAM ARDOLINE: July 8, 2022 | PAGE |
|---|---|
| By Mr. Bukowski | 9, 132 |
| By Mr. Devilling | 131 |
| By Mr. Archuleta | 139 |

DEPOSITION EXHIBITS: (2505 6th Street, LLC)

| Exhibit | Description | INITIAL REFERENCE |
|---|---|---|
| Exhibit 33 | Deposition Admonitions | 9 |
| Exhibit 34 | Introduction to Property-Casualty Insurance | 20 |
| Exhibit 35 | Coverage Highlights | 32 |
| Exhibit 36 | Raphael Field Adjusting report, 8/25/2020 | 53 |
| Exhibit 37 | 9-14-20 TPA report.msg | 54 |
| Exhibit 38 | 9-9-20 TPA can close.msg | 63 |
| Exhibit 39 | 9-9-20 IA assignment.msg | 68 |
| Exhibit 40 | IA Assignment(1).eml | 70 |
| Exhibit 41 | IA 1st report.eml, 10/6/2020 | 71 |
| Exhibit 42 | Letter to Berkshire Hathaway GUARD from Engle Martin & Associates (Rubidoux), 10/6/2020 | 72 |
| Exhibit 43 | 9-14-20 update to sales.msg | 79 |
| Exhibit 44 | Email to Ardoline and Rubidoux 9/29/2020, Subject: RE: [EXTERNAL] Re: NEBP030396-001-001-001 2505 6TH Street LLC, with various emails attached | 85 |




I N D E X (Continued)


| | | |
|---|---|---|
| Exhibit 45 | Restoration estimate.eml, 10/20/2020 | 88 |
| Exhibit 46 | 11-19-20 followup for engineer report.msg | 97 |
| Exhibit 47 | Letter to Berkshire Hathaway GUARD from Engle Martin & Associates (Rubidoux), 11/30/2020 | 100 |
| Exhibit 48 | IA 2nd report.eml, 11/30/2020 | 101 |
| Exhibit 49 | IA 3rd report.eml, 1/5/2021 | 113 |
| Exhibit 50 | Email to Ardoline from Bukowski, 4/8/2021, Subject: Claim No. NEBP030396-001-001-001 - 2505 6th Street, LLC DBA Baymont by Wyndham Limon | 114 |




I N D E X (Continued)

DEPOSITION EXHIBITS: (Woodside Village)


| | | |
|---|---|---|
| Exhibit 16 | 2019 IA Assignment.eml, 8/27/2019 | 140 |
| Exhibit 17 | 1-27-20 IA 1st report.msg | 142 |
| Exhibit 18 | Letter to Berkshire Hathaway GUARD from Engle Martin & Associates (Genest), 9/10/2019 | 144 |
| Exhibit 19 | Engle Martin Invoice, 10/16/2019 | 163 |
| Exhibit 20 | ASSURED PARTNERS 12-18-2019.eml | 166 |
| Exhibit 21 | 2-13-20 Tom email.msg | 167 |
| Exhibit 23 | 2-13-20 IA can close.msg | 173 |
| Exhibit 24 | Haag Request for Engineer Inspection, 4/30/20 | 175 |
| Exhibit 25 | 4-30-20 HAAG engagement letter.msg | 181 |
| Exhibit 26 | 5-1-20 PA estimate and pics.msg | 187 |
| Exhibit 27 | 5-4-20 update to Marc.msg | 189 |
| Exhibit 28 | 5-4-20 response to IA.msg | 193 |
| Exhibit 29 | 5-4-20 directions to HAAG.msg | 198 |
| Exhibit 30 | Haag report, 5/21/2020 | 200 |
| Exhibit 31 | Email to Ardoline from Higdon, 5/21/2020, Subject: WOBP997472-001-001-0 Woodside Village II, final report (Haag file 1120000061) | 201 |
| Exhibit 32 | 9-3-20 updated directions to all.msg | 208 |
| Exhibit 33 | Claim notes | 213 |

# WILLIAM ARDOLINE - July 08, 2022



I N D E X (Continued)


| | | |
|---|---|---|
| Exhibit 34 | 9-28-20 HAAG response.msg | 220 |
| Exhibit 35 | Email to Benglen and Ardoline from Higdon, 12/8/2020, Subject: RE: [EXTERNAL] WOBP997472-001-001-0 Woodside Village II assignment (Haag file 1120000061) | 222 |
| Exhibit 36 | 3-11-21 broken down repair estimate.msg | 226 |
| Exhibit 37 | Email to Champluvier and Ardoline from Higdon, 3/10/2021, Subject: RE: [EXTERNAL] WOBP997472-001-001-0 Woodside Village II assignment (Haag file 1120000061) | 230 |
| Exhibit 38 | Haag estimate, 1/28/2021 | 232 |
| Exhibit 39 | 3-11-21 directions to HAAG.msg | 234 |

DEPOSITION EXHIBITS: (Previously Marked)

| | | |
|---|---|---|
| Exhibit 2 | Engle Martin report, 10/10/2019 | 154 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

(At this time Mr. Archuleta was not present.)

THE VIDEOGRAPHER: We are on the record at 6:51 a.m., on Friday, July 8, 2022. We are conducting the virtual deposition of William Ardoline, in the matters of 2505 6th Street Limon, LLC, dba Baymont by Wyndham Limon, plaintiff, versus Westguard Insurance Company and Amguard Insurance Company, defendants; and Woodside Village II Condominium Association, Inc. -- Case No. 21-c-01673-WJM-KMT (sic) -- and case, Claim & Construction Management Group, LLC, plaintiffs, versus Amguard Insurance Company and Westguard Insurance Company, defendants, Case No. 21-cv-02136-RMR-NYW, in the United States District Court for the District of Colorado. The video technician is Debi Boblitt, the court reporter is Lori Aldrich.

If the parties and their counsel consent to this remote video arrangement and waive any objections to this manner of recording and allow the court reporter to swear in the witness remotely, please indicate your agreement by stating your name and whom



you represent, beginning with plaintiffs' counsel.

MR. BUKOWSKI: This is Jon Bukowski on behalf of the plaintiffs, and I am in agreement.

MR. DEVILLING: Brian Devilling for Amguard and Westguard; we agree.

THE REPORTER: Mr. Ardoline, do you understand that your statements in this matter today are under penalty of perjury?

THE DEPONENT: Yes.

THE REPORTER: Jonathan, you can go ahead.

MR. BUKOWSKI: Okay. Before we got started, counsel and I talked about we're here on two cases, 2505 6th Street and Woodside Village, and we have agreed to use this deposition interchangeably between those two cases. Is that -- are you in agreement with that, Mr. Devilling?

MR. DEVILLING: Yes.

MR. BUKOWSKI: Okay.

WILLIAM ARDOLINE,

having verbally declared that his testimony in this matter is under penalty of perjury, testified as follows:



EXAMINATION

BY MR. BUKOWSKI:

Q. Good morning, Mr. Ardoline. How are you doing?

**A. I'm all right.**

Q. Well, I appreciate you being here. I'm going to try to get through my portion as quick as I can. And then my colleague, Nathan Archuleta, will ask you some additional questions about the Woodside matter.

So I want to start first with Exhibit 33, which are several statements about the deposition. If you could just read the first page and let me know if you have any disagreement with any of the statements, and we'll go to page 2 and do the same.

(Exhibit 33, remotely introduced and electronically provided to the reporter.)

**A. Okay.**

Q. And any disagreement with any of the statements 1 through 10 on page 1?

**A. No.**

Q. Okay. And page 2.

**A. (The deponent perused the exhibit.)**
**Okay.**

Q. Okay. And any disagreement with any of

Page 10

the statements 11 through 17 on page 2 of Exhibit 33?
**A. No.**
Q. All right.
MR. BUKOWSKI: Brian, as we go, do you want me to drop these exhibits in the chat?
MR. DEVILLING: Yes, if you could.
MR. BUKOWSKI: Okay.
Q. (BY MR. BUKOWSKI) All right. So Mr. Ardoline, are you still residing in Dupont, Pennsylvania?
**A. Yes.**
Q. And is that where you're located today?
**A. Yes.**
Q. Okay. And Wilkes-Barre is where you were born and raised, right?
**A. No.**
Q. Okay. Where were you born and raised?
**A. Pittston.**
Q. And then you -- you understand you're here to discuss two separate claims, right?
**A. Yes.**
Q. Okay. And we have the 2505 6th Street Limon, LLC, claim, as well as the Woodside Village II Condominium Association claim, right?
**A. Yes.**

Page 11

Q. Okay. Do you recall that you were assigned to both of these claims during your time as an adjuster at GUARD?
**A. A little bit, yes.**
Q. Okay. And what did you do to familiarize yourself with your involvement in these claims?
**A. You mean prior to today?**
Q. Yeah. Prior to today, in anticipation of today's deposition, what did you do to familiarize yourself with those claims, if anything?
**A. Briefly, not much, looked over some of the stuff.**
Q. Okay. Apart from briefly looking over some things, what else did you do?
**A. Nothing.**
Q. Okay. What -- what things did you look at?
**A. I looked at claim notes and files.**
Q. And did you look at those through the Amguard system, or how did you come to receive those?
**A. However I -- Brian sent me an email yesterday, a couple emails. Like Dropboxes, I think.**
Q. And within there was just claim notes, or any other documents?
**A. From what I looked at is it looked like**

Page 12

**claim notes.**
Q. Okay. And how much time do you think you spent preparing for the two -- two cases?
**A. About two hours.**
Q. Did you speak with anyone?
**A. No.**
Q. Now, you've given a number of prior depositions, right?
**A. Yes.**
Q. Do you know how many?
**A. No.**
Q. Do you recall being deposed in the Greystone Condominium case in Wisconsin in 2020?
**A. I do not recall.**
Q. Okay. Well, at that time, in June 2020, you had testified that that was about your sixth deposition. Do you -- you don't recall that?
**A. I do not.**
Q. Okay. Since June 2020, can you recall any other depositions that you've given?
**A. I think I gave one other one since I left GUARD.**
Q. Okay. Was that in the Timm Grandview matter, out of Nebraska?
**A. It may have been. I don't remember which**

Page 13

**one.**
Q. Do you -- do you recall being deposed by an attorney at our office named Micah Cartwright, in March of 2021?
**A. I don't remember who it was.**
Q. Okay. Do you recall the -- being deposed in a case called Timm Grandview?
**A. I don't remember which -- which one it was.**
Q. Okay. Do you recall -- in all your depositions, you've been placed under oath, like you have today, right?
**A. Yes.**
Q. Okay. And is it fair to assume that the testimony you gave in these prior cases would be truthful and accurate?
**A. Yes.**
Q. Okay. And were you still employed by GUARD as of March 2021?
**A. Yeah.**
Q. You're not employed at GUARD today, right?
**A. No.**
Q. When were you last employed with GUARD?
**A. I believe it was April of 2021.**
Q. And you started with GUARD in June of

Page 14

2015, right?
A. **Correct.**
Q. Okay. And were you -- were you asked to leave GUARD, or did you leave on your own?
A. **I left on my own.**
Q. Okay. And, now, you're employed with the Wilkes-Barre City Police Department, right?
A. **Correct.**
Q. And what's your position there?
A. **Patrolman.**
Q. And when did you join the police department?
A. **April of 2021.**
Q. Did you leave GUARD to join the police department specifically?
A. **Yes.**
Q. Was there a reason that you wanted to leave GUARD to join the police department?
A. **Just another job.**
Q. Did -- did you have any issues with your employment at GUARD?
A. **No.**
Q. Would you say you were underpaid and overworked there?
MR. DEVILLING: Object to the form.

Page 15

A. **Could have been.**
Q. (BY MR. BUKOWSKI) I'm sorry. Did you -- you said, "Could have been"?
A. **Could have been. But, you know, that's -- you could say that about anywhere.**
Q. Now, have you ever been to Colorado?
A. **No.**
Q. So fair to assume you've never been to either of the -- the Baymont --
A. **Oh. That's false. I've been to Colorado.**
Q. Okay. Have you been to Colorado to adjust insurance claims?
A. **No.**
Q. When were you in Colorado?
A. **I was at the Denver airport.**
Q. Okay. So you just connected through the airport one time?
A. **Correct.**
Q. Okay. But with the exception of connecting through the Denver airport one time, you've never been in Colorado?
A. **No.**
Q. All right. And your -- your highest level of education is King's College, right?
A. **I would -- yeah, I have a bachelor's from King's, but, yeah, I could -- I guess you could say that that's the highest, if you don't count the police academy after that.**

Page 16

Q. Okay. So -- so in terms of education, you have a bachelor's from King's College, and then you've also went through the police academy training, right?
A. **Correct.**
Q. Okay. And I understand you graduated from King's College in 2015; is that right?
A. **Correct.**
Q. And you graduated with a bachelor's in criminal justice?
A. **Yes. It was -- as well as minors in sociology and business management.**
Q. Did you take any coursework in insurance while at King's College?
A. **No.**
Q. Any coursework in construction at King's College?
A. **No.**
Q. Any coursework in estimating at King's College?
A. **No.**
Q. Any coursework in engineering at King's College?

Page 17

A. **No.**
Q. And GUARD was your first job out of King's College, right?
A. **Correct.**
Q. Okay. But your actual employer, it would be Westguard, though, right?
A. **I just know it as GUARD Insurance. I know there's a bunch of different names, but I'm not sure what actually it is under.**
Q. Okay. And I understand you were -- you were coaching basketball for the Pittston School District, right?
A. **Correct.**
Q. Are you still doing that?
A. **Yes.**
Q. Okay. Now, prior to GUARD, did you hold any job in the construction industry?
A. **No.**
Q. Did you hold any job in engineering prior to GUARD?
A. **No.**
Q. And did you hold any job in the insurance industry prior to GUARD?
A. **No.**
Q. How did you come to learn of GUARD out of

# WILLIAM ARDOLINE - July 08, 2022



college?
A. **They were at a job fair.**
Q. A job fair at King's College?
A. **Yes.**
Q. And you just -- you submitted your resume, and they reached out to you, right?
A. **Yes.**
Q. Now, you started as a property adjuster trainee at GUARD, correct?
A. **Yes.**
Q. What were the duties and responsibilities of a property adjuster trainee, briefly?
A. **Just learn how to be an adjuster.**
Q. Okay. And your supervisor was whom at that time?
A. **I believe it was Nona Loftus.**
Q. And Nona Loftus has always been your supervisor, right?
A. **No.**
Q. Who -- who else has supervised you during your six years at GUARD?
A. **Nona, and then there was a guy named Awais. I forget his last name.**
Q. Do you -- could you spell that for the court reporter?



A. **A-w-a-i-s. I think his last name was Farooq.**
Q. Are you able to spell that?
A. **I think it's F-a-r-o-o-q, maybe. I'm not positive.**
Q. All right. Now, as a property adjuster trainee, were you handling your own claims?
A. **Yes.**
Q. Okay. And what was your authority level at that time?
A. **I don't recall.**
Q. And how long were you in that adjuster trainee position?
A. **I don't recall.**
Q. Now, when you started with GUARD in 2015, what type of training did they provide you?
A. **Insurance 101, and Texas adjuster licensing.**
Q. You had to take -- for the Insurance 101, you had to take some weekly coursework, right?
A. **Some what?**
Q. You took coursework and had to pass quizzes and tests and things of that nature?
A. **Correct.**
Q. Okay. I'm going to throw on the screen



Exhibit 34.
(Exhibit 34, remotely introduced and electronically provided to the reporter.)
Q. Does this look like a copy of the Insurance 101 coursework?
A. **I don't remember.**
Q. This doesn't -- this doesn't ring a bell?
A. **I don't -- I don't remember.**
Q. All right. Now, the -- the Insurance 101 course, that was your first exposure to insurance, correct?
A. **Correct.**
Q. Okay. And the Texas licensure that you mentioned, that was a self-study course, correct?
A. **Correct.**
Q. Did you obtain licensure in any other states?
A. **All the states that you need a license for.**
Q. Did you ever hold an adjuster license in Colorado?
A. **I don't believe you needed a license in Colorado.**
Q. Okay. So if -- if the state didn't have a mandatory requirement, then you didn't have to license;



fair?
A. **Correct.**
Q. Okay. And you also took some vendor training coursework, right?
A. **Some what?**
Q. You took coursework from various vendors that GUARD used, correct?
A. **Yeah.**
Q. Okay. Did you take any coursework from Haag?
A. **I don't recall.**
Q. Do you recall taking coursework from Envista?
A. **I don't recall.**
Q. Do you recall taking coursework from Engle Martin?
A. **I don't recall.**
Q. Now, you'd also attend the GUARD Claims Summit training, correct?
A. **Correct.**
Q. And these are four- to five-day conferences?
A. **Correct.**
Q. Where the claims adjusters and underwriters gather?

Page 22

A. **Yes.**
Q. Okay. And I understand you attended these conferences each year you were employed at GUARD, right?
A. **Correct.**
Q. And you've actually presented at these Claims Summits?
A. **Correct.**
Q. I read, in 2019, you presented on how to write claim denial letters?
A. **Correct.**
Q. Okay. And would you agree it's important to clearly explain claim decisions to policyholders?
A. **Yes.**
Q. Including what is being done to investigate and timely pay a claim?
A. **Yes.**
Q. Okay. Now, 2020 was held virtually, right?
A. **I believe so.**
Q. Do you -- did you attend the Claims Summit in 2021?
A. **No.**
Q. Now, were you trained and expected by GUARD to achieve results in an effective and timely

Page 23

manner?
A. **Can you restate that?**
Q. Were you trained and expected by GUARD to achieve results in an effective manner?
MR. DEVILLING: Object to form. Go ahead.
A. **I mean, can you explain what you mean by "effective"?**
Q. (BY MR. BUKOWSKI) Well, you're actually -- while you were at GUARD, you were evaluated on a yearly basis on your ability to thoroughly evaluate claims, correct?
A. **I guess so. I -- I wasn't involved in the review process.**
Q. During your -- well, during your annual reviews, would you not meet with the supervisor and walk through how you did for the year and what you could improve?
A. **Yeah.**
Q. Okay. And so you were also timely -- you were evaluated on your timely evaluation of claims, right?
A. **I don't recall if that's part of it.**
Q. Okay. Do you recall being evaluated on your timely payment of claims?
A. **I don't recall if that's part of it.**

Page 24

Q. Do you agree that an insurance company should timely pay claims?
A. **Appropriate claims, if they're needed to be paid.**
Q. Okay. You'd agree that an insurance company should timely pay appropriate claims?
A. **Yes, but they have to be investigated thoroughly.**
Q. What does that mean, investigate thoroughly?
A. **You -- you get all the information to be able to pay a claim.**
Q. Okay. What type of information would you need, as a claims adjuster, to pay a claim?
A. **IA reports, any other information that the insured or their representation presents. I mean, we could get an IA report and then they come back and send new documents, and they have to be reviewed. It's always changing.**
Q. Okay. But if you have -- when you say "IA," you mean independent insurance company adjuster?
A. **Correct.**
Q. Okay. And if you receive an IA report, does that give you enough information to pay a claim, generally?

Page 25

A. **Not always.**
Q. Now, you were trained and expected by GUARD to effectively communicate information to policyholders, correct?
A. **We weren't -- I don't recall getting specific training on that, no.**
Q. Okay. Would you say you were expected to communicate information to policyholders as it came in?
A. **Yes.**
Q. Okay. And you were -- you would also try to provide your policyholders with the best possible customer service you can, right?
A. **Yes.**
Q. Okay. Do you -- in your preparation of what you recall of your handling of these two claims, 2505 6th and Woodside, do you think you provided them with the best possible customer service that you could?
A. **Yes.**
MR. DEVILLING: Form.
Q. (BY MR. BUKOWSKI) Now, you were also trained on the importance of profitability to GUARD, right?
A. **No.**
Q. Okay. Do you understand it's one of the core values of GUARD?

MR. DEVILLING: Object to form.
**A. I don't recall their core values.**
Q. (BY MR. BUKOWSKI) Okay. Did GUARD provide you with any training on the standard of care that should be given to a policyholder?
**A. I don't recall.**
Q. Would you agree it would be wrong to ignore a policyholder?
**A. Yes.**
Q. Okay. And you -- you were trained and expected to understand applicable coverages under the policy, correct?
**A. Yes.**
Q. And you were trained that your fundamental purpose was to indemnify your policyholder?
**A. If they needed to be, or if it was appropriate, yes.**
Q. Meaning to bring them back to their pre-loss condition?
**A. As long as it's a covered loss.**
Q. And were you -- were you trained that time is of the essence when you're dealing with commercial policyholders?
MR. DEVILLING: I'll just object to form. Go ahead.



**A. I mean, there's -- like I said, you -- there's -- so every claim is different, and you're getting all different information. So there's not a set timeline that you have to follow for each claim that would be uniform.**
Q. (BY MR. BUKOWSKI) You agree you should be proactive in your adjustment, right?
**A. As best you can.**
Q. Okay. And on top of a claim at all times?
**A. As best you can.**
Q. Okay. And you were trained that GUARD has the final determination on a claim, correct?
**A. Correct.**
Q. And GUARD has the final authority on a claim?
**A. Correct.**
Q. You were also trained that an insurance company has to pay what they owe, based upon the information and facts presented?
**A. On a covered claim, yes.**
Q. Okay. Could policyholders trust you to provide a fair and accurate determination of a loss?
**A. Yes.**
MR. DEVILLING: Object to form.
Q. (BY MR. BUKOWSKI) Have you ever



evaluated -- you, yourself, in person, a commercial property for hail damage?
**A. No.**
Q. Now, you were an adjuster trainee for a year or so, right?
**A. Yeah, I don't recall exactly how long.**
Q. Okay. And then your next position was a Property Adjuster I, correct?
**A. Correct.**
Q. How long were you a Property Adjuster I?
**A. I don't recall.**
Q. Do you recall what the difference between a Property Adjuster I and an adjuster trainee is?
**A. I mean, they basically just blended together.**
Q. Well -- well, the pending caseload of a Property Adjuster I, I think you previously testified, is between 80 and 120 claims, right?
**A. I don't remember previous testimony.**
Q. Okay. Well, do you recall that -- handling between 80 and 120 claims at a -- at a time as a Property Adjuster I?
**A. I've handled that many, yes.**
Q. Okay. How -- how did you manage to stay on top of 80 to 120 claims open at one time?



**A. What do you mean, "stay on top of"? Like, we had . . .**
Q. Well, for the benefit of the jury, how would you manage between 80 and 120 claims at one time?
**A. Answer -- try to get to them the best I can, in order that they're coming in and going out. And if someone's calling in and wants an immediate update and -- try to get to them as soon as -- as best I can.**
Q. Now, was there additional compensation as a Property Adjuster I?
**A. Yeah, there was a pay raise.**
Q. Okay. And was there any potential bonus plan as a Property Adjuster I?
**A. No. There was no bonuses that we've ever received.**
Q. Okay. And then you moved into Property Adjuster II, right?
**A. Correct.**
Q. And that's the highest position you held at GUARD?
**A. Correct.**
Q. What's the difference between a Property Adjuster I and a Property Adjuster II?
**A. Yeah, they just blended together, again.**

# WILLIAM ARDOLINE - July 08, 2022

Page 30

Q. And do you recall when you became a Property Adjuster II?
**A. No.**
Q. Now, the pending caseload of a Property Adjuster II is between 150 and 220 claims, right?
**A. 220?**
Q. 220.
**A. I've handled more than that.**
Q. What would you say, on average, the number of open claims you handled at a time as a Property Adjuster II at GUARD was?
**A. Between 150 and 250. Sometimes getting to 3.**
Q. Okay. So you've handled up to 300 open claims at one time?
**A. Correct.**
Q. And did you supervise any adjusters as a Property Adjuster II?
**A. No.**
Q. Do you recall what your authority level was as a Property Adjuster II?
**A. No.**
Q. Okay. And I understand your direct report, as of April 2021, was Marc Dellario?
**A. It may have been. I don't recall.**

Page 31

Q. Okay. And then Melinda was your supervisor at that time, right?
**A. I don't recall the chain. We just all interacted together.**
Q. Explain to me what -- how you would interact together with these folks.
**A. We were just -- we were always a team, so we just worked together.**
Q. Well, when you were assigned a claim, would Marc also be responsible for the claim?
**A. How so?**
Q. Who -- if you're assigned a claim, who's ultimately responsible, you or everyone on the team?
**A. Whoever's name the claim is in.**
Q. So if the claim is in your name, you're the ultimate decision-maker, it's your responsibility?
**A. Yes. But if management gives me other direction, I go with management direction.**
Q. What do you mean by that?
**A. If they tell me something to do on a claim, I'm -- that's what I do.**
Q. Okay. And if they tell you something to do on a claim, would you note that within the claim file?
**A. Most likely.**

Page 32

Q. Where would you typically note that? Within the claim notes?
**A. Most likely.**
Q. I'm going to place on the screen Exhibit 35.
(Exhibit 35, remotely introduced and electronically provided to the reporter.)
Q. Do these look like the claim notes that you reviewed?
**A. They're kind of small. But, yeah, they look like claim notes.**
Q. And you would enter claim notes through the DocuNotes system, right?
**A. Correct.**
Q. And from your prior depositions, I understand you try, to the best of your ability, to document if something significant happens in a claim; is that true?
**A. To the best of my ability, yes.**
Q. Okay. Were you trained by GUARD that it's best practice to document all events or only significant events?
**A. I mean, just because it's in a -- a note doesn't mean that it's not documented, because you could drop a file into the -- I forget what it's**

Page 33

**called, but into the claim and it's not noted in a note, but it's still in the file.**
Q. The IIS system?
**A. I think that's what it was called.**
Q. Okay. You were also expected to clearly note the basis for all decisions within the DocuNotes system?
**A. What was that?**
Q. Were you expected to clearly note the basis for all your decisions within the claim notes?
**A. Yes.**
Q. And if something's not documented within the claim notes, is it fair to assume it didn't occur?
**A. No.**
Q. And why is that?
**A. Because, like I said, we could -- a document could have been dropped into IIS and just not a note made, but it's still in the file. It's still part of the file. The claim notes aren't the only part of the file.**
Q. If something is not documented within the DocuNotes system, or contained within the claim file, fair to assume it didn't happen?
MR. DEVILLING: Object to form.
**A. Not necessarily.**

WILLIAM ARDOLINE - July 08, 2022

Page 34

Q. (BY MR. BUKOWSKI) What do you mean by that?
**A. There could have been an email or document sent, just for whatever reason not dropped in the file and not noted, but it still happened.**
Q. If a document or a communication is within the claim file system, you would have access to that information as the primary adjuster, correct?
**A. Correct.**
Q. And is it equally fair to assume that you would have reviewed and given consideration to a document or communication within the --
THE REPORTER: I'm sorry, Jonathan. I didn't hear the last of that.
MR. BUKOWSKI: Sure.
Q. (BY MR. BUKOWSKI) If a document is within the claim file system, is it fair to assume that you would have reviewed and given consideration to that information while adjusting a claim?
**A. Yes.**
Q. How did you communicate with other adjusters and management at GUARD?
**A. Email, talk to them in person, phone calls.**
Q. And do you -- so I have three different

Page 35

emails for you. The first is William.Ardoline at GUARD. Do you recall that email?
**A. Yes.**
Q. And that would go directly to you, correct?
**A. Yes.**
Q. And then there is a ClaimsIII at GUARD. Do you recall that email address?
**A. Yes.**
Q. It's my understanding emails sent to that address go directly into the claim file, correct?
**A. Correct.**
Q. So anything sent to that ClaimsIII at GUARD, you would have had access to review?
**A. Yes.**
Q. And then the final email address is GUARDClaimsTeam at GUARD. Do you recall that one?
**A. No.**
Q. How did you make sure that each one of your email communications was saved to the file system?
**A. I tried my best to drop them every time I'd be in the claim.**
Q. And you guys used Microsoft Outlook, correct?
**A. Yes.**

Page 36

Q. Did you use Microsoft Teams?
**A. I believe so.**
Q. And would you use the chat feature on there to discuss claims?
**A. I'm sorry. I think so.**
Q. Okay. Did you guys use a program called Slack?
**A. No.**
Q. Did you guys use text messaging to discuss claims?
**A. I mean, we could have.**
Q. Okay. Were you given a company phone?
**A. No.**
Q. Did you -- can you recall any other methods of communication to discuss claims with personnel at GUARD?
**A. Not that we haven't mentioned, no.**
Q. Okay. And I know you haven't been there for a while, but do you recall the property and claims manual?
**A. No.**
Q. Okay. Do you -- do you recall there being a -- a property and claims manual that provides guidelines for handling claims?
**A. Yes.**

Page 37

Q. Okay. And you were trained on that manual, correct?
**A. I believe so.**
Q. And it would be discussed in various presentations, including the Claims Summit?
**A. Most likely.**
Q. Okay. Do you recall, that claim guideline -- you were trained that it would provide a -- strike that.
Do you recall GUARD expecting you to follow what was outlined in that guideline when handling claims?
**A. I don't recall.**
Q. Did you try to handle all your claims consistent with GUARD's property and claim guidelines?
**A. Yes.**
Q. Okay. Well, in your own words, what was your goal as a property claims adjuster?
**A. I -- my own words. Review claims and documents and provide the best service that I can and then pay a claim if it was a legitimate claim, and deny it if it needed to be denied.**
Q. Okay. And you were trained that an insurance company has to pay what is owed?
**A. If there is coverage and we owe it, and --**

# WILLIAM ARDOLINE - July 08, 2022

Page 38

**and the policy limits and terms and conditions of the policy provide for that payment, then, yes.**
Q. What do you recall of the 2505 6th Street claim?
**A. I don't know. Is there something you need me to look at, a document to refresh my memory?**
Q. I do have several documents as we go. I'm just curious, before we do that, is there anything that comes to mind, as you think about that claim?
**A. No.**
Q. Do you -- as you sit here now, do you recall anything of the property?
**A. No.**
Q. And there's nothing -- nothing that stands out about the 2505 claim?
**A. I don't recall, no.**
Q. Okay. Well, would you have investigated that claim fairly?
**A. Yes.**
Q. And would you have investigated this claim impartially?
**A. Yes.**
Q. Would you have investigated the claim with all reasonable dispatch?
**A. Can you rephrase that?**

Page 39

Q. Sure. Well, at all times, did you attempt to effectuate a fair and equitable settlement of the 2505 claim?
(At this time Mr. Archuleta was present.)
**A. If there is coverage, then yes.**
Q. Okay. Now, would you agree you have an obligation to be fair and reasonable with policyholders?
**A. Yes.**
Q. Do you believe you acted in a fair and reasonable manner with your policyholder here at 2505?
**A. Yes.**
Q. And you wouldn't mislead a policyholder, right?
**A. No.**
Q. And you wouldn't lie to a policyholder?
**A. No.**
Q. Do you recall your first involvement in the 2505 claim?
**A. No.**
Q. All right. I've placed on the screen Exhibit 35, the claim notes.
There is a claim note, Friday, August 7, William Ardoline. Do you see that?
**A. Yes.**

Page 40

Q. Okay. And that appears to be the first claim note from you. Is it fair to say August 7 would be your first involvement?
**A. If you can't scroll down any more, then yes.**
Q. Okay. Let's see. This appears to be underwriting. So the note preceding you is August 3, 2020. Can you see that?
**A. Yes.**
Q. And do you recall exactly when you left GUARD?
**A. April of 2021.**
Q. Do you recall -- do you recall having your review in April 2021?
**A. What kind of review?**
Q. An annual review.
**A. I don't recall.**
Q. Do you -- do you know the date that you left in April 2021?
**A. It was towards the end. I think it was like April 19 or something, 21st. Something around there.**
Q. Now, you -- you were assigned, as the Property Adjuster II, to the 2505 6th Street Limon claim, correct?

Page 41

**A. Yes, but there was a TPA on it, so they handled most of it.**
Q. Okay. What does that mean, TPA?
**A. Third-party adjuster. It's when we were getting inundated with claims and didn't have enough staff, we'd hire a third-party adjuster to basically handle the whole claim, and then just go by what they say.**
Q. Okay. And would there be a time where you'd let the third-party administrator go, and bring the claim back in-house?
**A. If management said to, then yeah.**
Q. Okay. Could you make that decision, or just management?
**A. Mostly management.**
Q. And when a claim comes back in-house or the third-party administrator is dismissed, do you become the decision-maker?
**A. Yeah.**
Q. Are you still the decision-maker if a third-party administrator is involved?
**A. Yes.**
Q. Okay. So whether or not a third-party administrator is involved, you have the ultimate authority to accept estimates or information?

Page 42

A. **Yes.**
Q. And you have the ultimate authority to retain independent adjusters?
A. **Yes.**
Q. And the ultimate authority to retain engineers?
A. **Yes.**
Q. And the ultimate authority to retain other consultants as needed?
A. **Yes.**
Q. Okay. Those consultants could report their observations and make recommendations to you, correct?
A. **Yes.**
Q. But ultimately you, not the consultants, have the authority to reject or accept a claim?
A. **Yes.**
Q. And you, not the consultants, had ultimate authority to recommend payment on a claim?
A. **Yes.**
Q. Do your consultants have authority to engage other consultants, or would they need your approval?
A. **I mean, they can -- from what I remember is they can ask if they want to have somebody else, and then we could approve or disapprove. I'm not sure if they had the authority, based on discussions or rules from management. I'm not involved in those contracts.**

Page 43

Q. So they could recommend to bring someone in, but ultimately you had to -- you had to give them the green light on that?
A. **I -- I believe so. Again, if they were allowed to have -- assign somebody without our approval, I don't remember.**
Q. Who -- who would have been tasked with communicating claim information to a policyholder?
A. **Myself or the TPA.**
Q. Do you recall sending any information on the 2505 6th claim to the estimate review team?
A. **I don't recall.**
Q. When would you send something to the estimate review team?
A. **When we get an estimate.**
Q. Just as a matter of course, when you received an estimate, you'd send it off?
A. **Yeah.**
Q. Okay. Do you -- do you recall conducting any recorded statements on 2505 6th?
A. **No.**
Q. Do you recall requesting any recorded statements?
A. **I don't recall.**

Page 44

Q. Is that something that you would have done, request recorded statements from policyholders?
A. **Yeah, it could have been.**
Q. Do you recall any information that you requested from 2505, but which you didn't receive?
A. **I don't recall.**
Q. Do you recall the 2505 representatives being uncooperative?
A. **I don't recall.**
Q. Okay. It was a standard of practice at GUARD to have a peer review process, right?
A. **Yes.**
Q. What is the peer review process you used on your claims?
A. **I believe the estimate review.**
Q. Okay. With the exception of the estimate review, was there any other type of peer review available to you?
A. **I don't recall.**
Q. Okay. And the peer review process, I think you previously testified, is where a more experienced adjuster would review a claim for a second opinion; is that accurate?
A. **Yeah. That happened.**

Page 45

Q. Okay. And you can use the peer review process at any time in a claim adjustment?
A. **Yeah.**
Q. Did you use the peer review process in the 2505 claim?
A. **I don't recall.**
Q. Did you use the peer review process in the Woodside Village claim?
A. **I don't recall.**
Q. Do you recall involving any other GUARD employees during your handling of the 2505 claim or the Woodside Village claim?
A. **I don't recall.**
Q. Did you do anything back in 2020 or 2021 to familiarize yourself with the 2505 property?
A. **I don't recall.**
Q. Okay. And you had been working at GUARD for a little over five years when you received this claim, on August 7 of 2020, correct?
A. **Yes.**
Q. And you'd handled commercial losses like this one before?
A. **Yes.**
Q. Did you consider the 2505 6th claim to be

Page 46

a complex claim?
**A. No.**
Q. What makes a property damage claim a complex claim, in your mind?
**A. If you need different engineers, building consultants, multiple estimate reviews, it's not straightforward, you need a bunch of reports, maybe a couple different property inspections.**
Q. Do you think you were qualified to handle commercial losses in August of 2020?
**A. Yes.**
Q. Okay. Of your 150 to 250 pending claims as a Property Adjuster II, how many would have been commercial losses like this one, in August of 2020?
**A. The majority.**
Q. Okay. And, then, how did you manage 150 to 250 commercial losses like this one at the same time?
**A. To the best of my ability.**
Q. Okay. How much time would you try to spend on each file each day?
**A. I don't recall.**
Q. Okay. You know, at 2 -- 200 claims, 30 minutes per claim, that's -- would take three weeks to go through?

Page 47

**A. Yeah.**
Q. Do you agree? So would you just line them up and go claim 1 through 200 and then start over three weeks later?
**A. Not really, but it could have got to that point. And if someone calls in, just go to their claim that they're calling about.**
Q. Okay. Do you agree it's difficult to manage 150 to 250 commercial claims at one time?
**A. Yes.**
Q. Is it -- would you agree with me it's almost impossible?
**A. Yes.**
Q. Would you agree it was reckless of GUARD to expect you to handle 150 to 250 commercial losses at the same time?
MR. DEVILLING: Objection to form.
**A. I -- I don't speak on behalf of GUARD.**
Q. (BY MR. BUKOWSKI) Okay. Do you think it was wrong to be expected to handle 150 to 250 commercial losses at the same time?
MR. DEVILLING: Form. Go ahead.
**A. I don't speak on behalf of GUARD.**
Q. (BY MR. BUKOWSKI) Well, on behalf of yourself, did you leave in part because you were

Page 48

overworked, with 150 to 250 claims at one time?
MR. DEVILLING: Objection to form.
**A. I mean, it wasn't fun. But I always wanted to be a cop, so I -- if I had one claim, I was still leaving to be a cop.**
Q. (BY MR. BUKOWSKI) Well, you had aspirations to be within management at GUARD, right?
**A. At one time.**
Q. When did that change?
**A. When I decided I didn't want to work at a desk my whole life.**
Q. Now, Melinda -- Melinda was your supervisor, correct?
**A. Again, I don't recall who my direct supervisor was towards the end. It got all jumbled around.**
Q. Would you agree the claims department was -- it's just disorganized and chaotic?
MR. DEVILLING: Object to form.
**A. I mean, there was a lot of turnover. We were doing the best that we can.**
Q. (BY MR. BUKOWSKI) So here -- here is a claim note that I've scrolled to, on page 3, May 25, 2021. Melinda Champluvier. Is that how you say her name?

Page 49

**A. Yes.**
Q. Okay. So Melinda Champluvier was your supervisor, at least based on this note?
**A. I mean, she could have had supervisory access. It doesn't mean she's my direct supervisor.**
Q. Okay. Would there be somewhere noted within this claim note document of -- that tells us who the supervisor is?
**A. I don't believe so.**
Q. Okay. Now, you also participated in team meetings once a week for one to two hours, right?
**A. Yes.**
Q. And you would discuss active claims in these meetings?
**A. Yes.**
Q. Would you memorialize the discussions you had anywhere within the claim file?
**A. Could have. Didn't have to.**
Q. If -- if you did, where would you have written notes from the team's meeting about a claim?
**A. I mean, there is -- it wouldn't say -- it wouldn't have a heading, Team Meeting. It would just be a regular note.**
Q. Okay. Do you recall having any discussions in the team meetings about the 2505

6th Street claim?
**A. I don't recall.**
Q. Do you recall discussing the Woodside Village claim in any of the team meetings?
**A. I don't recall.**
Q. Okay. So as of August of 2020, how many claims do you think you'd adjusted while at GUARD?
**A. Total, or at one time?**
Q. Total.
**A. Thousands.**
Q. I think, in your prior deposition, you said somewhere around 5,000; is that correct?
**A. It could have been. Could have been more.**
Q. But you didn't have authority to make payments on your own, correct?
**A. No. I could pay on my own.**
Q. How much could you pay up to on your own?
**A. I don't recall.**
Q. Well, you could only set reserves up to 50,000, right?
**A. I mean, technically within the system, I could put it more than that, but we would need authority more than that.**
Q. If something was 50 to 100,000, you would need management authority, right?



**A. Anything over 50.**
Q. Okay. And if it was over 100, the management actually had to input it, correct?
**A. I don't recall what number it made the management threshold.**
Q. The reserve process required you to proactively make a large loss notice for reserves over 50,000, correct?
**A. Yes.**
Q. Okay. And where would a large loss notice be located?
**A. In the notes.**
Q. And is that -- it's actually documented within the notes, or is it a separate document?
**A. In the notes.**
Q. I'm going to put the notes back on. I'm going to scroll through. And you -- you let me know if there is a large loss notice indicated in here. So here's August 7, which is when you were first involved. I'm going to scroll up.
**A. I mean, if you don't see a note that says Large Loss Notice, then it's not in there. It would say Large Loss Notice or Large Loss at the top of the note. So if it's not in there, it's not.**
Q. And for my benefit -- I'm sorry,



Mr. Ardoline. I'm not as familiar with these as you were. When it says Category, would it say -- that would still say adjuster, right?
**A. Yeah.**
Q. Okay. Would it be in this area where I'm circling my mouse, where it would say Large Loss Notice?
**A. It would be a big header that says Large Loss Notice.**
Q. Okay. So I'm just going to continue scrolling quicker, and you let me know if these claim notes indicate a large loss notice. That's the last note.
**A. I didn't see one.**
Q. So -- so in our review of Exhibit 35, the claim notes for the 2505 claim, you don't see any indication of a large loss notice, right?
**A. Nope.**
Q. Okay. And without you notifying management and presenting a large loss notice, they can't set the reserves for a large loss?
**A. No. They can set the reserves anytime they want, at whatever number they want.**
Q. Okay. But I thought the reserve process requires you to proactively notify them.



**A. Yeah, but if they go into a claim and work out, like, a thousand -- deem that there needs to be reserves, they can put them on whatever they want. They have the ultimate authority.**
Q. How often did you try to update reserves?
**A. Every time that I went into a claim.**
Q. All right. I've placed on the screen Exhibit 36.
(Exhibit 36, remotely introduced and electronically provided to the reporter.)
Q. This is an inspection report from independent adjuster Ted Miller, marked Raphael 90. Can you see this okay?
**A. Uh-huh. Yes.**
Q. I'm just going to scroll through this briefly. Have you seen this report before?
**A. I don't recall.**
Q. Okay. Do you recall working with an adjuster named Ted Miller?
**A. I don't recall.**
Q. Would you -- you've often worked with independent adjusters, correct?
**A. Uh-huh, yes.**
Q. What's -- what's an independent adjuster?
**A. Somebody that would go out to a claim**

WILLIAM ARDOLINE - July 08, 2022

Page 54

**property, inspect it, write reports, review it and give their recommendations.**

Q. And were you able to select the specific independent adjuster you'd want to work with?

**A. The company, not the adjuster.**

Q. And then -- so how did the company selection process work?

**A. There's a drop-down in the claim note -- or in the claim functions, what -- however you -- it goes, and you just pick somebody that has a territory in the region of that claim. And that's how it gets assigned.**

Q. Okay. And once the independent adjuster is assigned, did you do anything to make sure they were qualified to handle that loss?

**A. I mean, if they're on our list as an approved vendor and they work with that company, I would assume that they're qualified.**

Q. I'm going to place Exhibit 37 on the screen.

(Exhibit 37, remotely introduced and electronically provided to the reporter.)

Q. This is an email dated September 2, 2021, to William -- William Ardoline at GUARD. Do you see that?

Page 55

**A. Well, it's 2020, because I didn't work there in September of 2021.**

Q. I apologize. Exhibit 37 is marked Raphael 88, and it's an email from Raphael & Associates to you, dated September 2, 2020. Can you see that okay?

**A. Yes.**

Q. Okay. And would you agree, it says, I've attached the adjuster's report as requested?

**A. Yes.**

Q. And do you understand that's referring to the report we looked at just a second ago, from Mr. Miller?

**A. I'm not positive, from this right here, what it's referring to.**

Q. Okay. Well, it's from Raphael & Associates. You -- you see that, right?

**A. Yes.**

Q. Okay. All right. So I've placed Exhibit 36 back up on the screen. Can you see that okay?

**A. Yes.**

Q. Okay. Had -- do you recall receiving inspection reports in the past from Raphael & Associates?

**A. Yeah, but I didn't really work too much**

Page 56

**with TPAs, I don't believe. So . . .**

Q. Well, this one says Raphael Field Adjusting. Do you see that?

**A. Raphael & Associates was a TPA.**

Q. Okay. And then you would understand they'd send it out to a field adjuster, right?

**A. My best knowledge is that they were the field adjuster.**

Q. Okay. And so on this case, Ted Miller signed off on this report. Can you see that, on page 5?

**A. Yes.**

Q. Okay. And you have no -- you have no recollection of Ted Miller?

**A. No.**

Q. Okay. On page 3, marked Raphael 92, under Cause of Loss, can you see that okay?

**A. Yes.**

Q. And it says the cause of loss has been verified as a hail and wind loss from the August 2, 2020 storm. Do you see that?

**A. Yes.**

Q. And did you understand that the 2505 hotel was making a claim for hail and wind damage from an August 2, 2020 storm?

Page 57

**A. I don't recall.**

Q. Okay. Would you agree that at least here, on page 3 of this report, the field adjuster for Raphael & Associates is confirming a cause of loss from an August 2, 2020 storm event?

**A. That's what they're stating.**

Q. Okay. And if you go further down, do you see the heading Scope of Damage?

**A. Yes.**

Q. And if you want to just take a second to look at that.

**A. Okay.**

Q. Okay. You'd agree, on Raphael 92, page 3, the field adjuster reported observations of hail and wind damage to the shingle roof covering, stucco, fascia, 30 window frames, vinyl fencing. Do you see that?

**A. It looks like that's what they're stating.**

Q. Okay. And it continues on to page 4. He's confirming observed damage to four doors, 11 exterior lights, and a freestanding sign. Do you see that?

**A. Yes.**

Q. Okay. And on page 4, it says the -- they had not completed an estimate. Do you see that?

A. **Yes.**
Q. Okay. And do you see that the field adjuster Ted Miller's reporting an independent -- an independent estimate had not been prepared because the file was returned to GUARD?
A. **Yes.**
Q. Now I'm going to go to GUARD -- Raphael 96. Can you see these photographs okay?
A. **Yes.**
Q. And I've gone -- I've moved to Raphael 154. Do you see that we're on photograph 166?
A. **Yes.**
Q. Okay. So you'd agree that the field adjuster, within this report, reported his observations and also included 166 photographs?
A. **If that's the last photo, then yeah.**
Q. Now, I'm on Raphael 103. Can you see these photographs okay?
A. **Yes.**
Q. Okay. And so the field adjuster included a number of photographs to the shingle roof covering, right?
A. **Yes.**
Q. Okay. And you can see, on photographs 19 and 20 here, that the field adjuster notes hail damage



to a test square.
A. **Yes.**
Q. What -- you were familiar at this time of what a test square is, right?
A. **Yes.**
Q. Okay. A test square documents hailstone impacts within a 10-foot-by-10-foot area, correct?
A. **Uh-huh.**
Q. And a test square is a quicker way to assess the amount of hail impact damage to a shingle roof?
A. **Yeah.**
Q. And did GUARD have a threshold as to when a roof needed to be replaced based on the number of identified hailstone impacts within a test square?
A. **I don't recall.**
Q. In photographs 19 and 20, do you see that the field adjuster is reporting 10-plus hailstone impacts within his test square?
A. **Yes.**
Q. And you -- you understand 10-plus means more than 10, you stop counting?
A. **Yes.**
Q. Okay. And you also understood, as a GUARD adjuster, that 10-plus hits would require replacement



of a shingle roof covering?
A. **I don't recall.**
Q. Did -- did you ever speak to Ted Miller about his inspection of the hotel property?
A. **I don't recall.**
Q. Do you -- can you recall ever having spoken to field adjuster Ted Miller?
A. **I don't recall.**
Q. Would you agree that the Ted Miller field inspection report and photographs that we just reviewed are relevant to the 2505 claim?
A. **Yes.**
Q. And you would have considered that report and photographs in your evaluation?
A. **Yes.**
Q. Do you agree that those findings and photographs should have been documented in the claim notes?
A. **No.**
Q. Why is that?
A. **Because the claim notes aren't the only file -- or aren't the only part of the claim. Like I said before, you could drop something in the claim file, and it's still part of the file. It doesn't have to be in the notes. There could be zero notes, but**



**there's still a claim file with information in it.**
Q. When you are doing reviews with management, do they look at the claim notes or go through the entirety of the file?
A. **Both.**
Q. And you would agree that the claim notes are -- are going to bring a matter to the attention of management the easiest and quickest?
A. **I mean, if they're just scrolling through, then, yeah.**
Q. Okay. Would you have notified management of a field adjuster's report and photographs when it's received, like that Miller report?
A. **No, not necessarily. I mean, you could, but it's not required.**
Q. Okay. What -- when would you notify management of something like that?
A. **Define what you mean by "something like that".**
Q. Well, you -- you have a report and photographs showing hail damage extensively to a building, correct?
A. **Alleged hail damage.**
Q. Okay. Well, you have your own field adjusters confirming the alleged damage, right?

Page 62

A. **I mean, they could say it's damage; but, I mean, there could still be a need -- a need for engineers and building consultants to further confirm it.**
Q. Okay. What is the difference between an engineer's evaluation and what the field adjuster did?
A. **A field adjuster isn't an engineer. An engineer has more experience at whatever they're looking at.**
Q. Okay. And what is the difference between a field inspector's evaluation and a building consultant's evaluation?
A. **Same thing.**
Q. You're -- you're saying the building consultant has more experience than the field adjuster?
A. **Yeah. It may include estimates.**
Q. Okay. Does the field adjuster ever include estimates?
A. **It could, yeah.**
Q. Okay. Do you know what Mr. Miller's experience level is?
A. **I don't recall.**
Q. Do you know Mr. Miller's ability to create an estimate?
A. **I don't recall.**

Page 63

MR. DEVILLING: Jon, when you get to a good spot, I'd like to take about a five-minute break.
MR. BUKOWSKI: Yeah, just give me two minutes.
MR. DEVILLING: Sure.
Q. (BY MR. BUKOWSKI) All right. I've placed Exhibit 38 on the screen, which is marked Raphael 82.
(Exhibit 38, remotely introduced and electronically provided to the reporter.)
Q. This is an email from you to Raphael & Associates, dated September 9, 2020. Can you see that?
A. **Yes.**
Q. Okay. And in this email, you're instructing the field adjusting company to close their file, correct?
A. **Yeah.**
Q. Do you recall why you were instructing them to close their file?
A. **No.**
Q. I'm placing Exhibit 35 back on the screen, which are the claim notes. There's a claim note here dated September 9, 2020. Can you see that?
A. **Yes.**
Q. Okay. And it says, TPA didn't provide

Page 64

necessary information. Do you see that?
A. **Yes.**
Q. Advised them to close and will assign IA and engineer and request rush reporting, per management. Do you see that?
A. **Yes.**
Q. Okay. In review of the report and photographs from Mr. Miller, the field adjuster, what necessary information did you feel was not provided by him?
A. **I don't recall.**
Q. Okay. Where would it have been documented what you felt was necessary and not provided?
A. **It could have been in the notes. Could have just been what management advised me. I don't recall.**
Q. Okay. And what would be necessary information that you were looking for from a field adjuster like Ted Miller?
A. **I don't recall.**
Q. Not specific to the claim. In general, what information are you looking for when you assign a field adjuster to evaluate a claim?
A. **Specific cause of loss, date of loss, damage related to a covered loss. It all depends on**

Page 65

**what kind of loss it is.**
Q. Okay. Here we have a hail and wind loss, so you want the field adjuster to identify the cause of loss, correct?
A. **Yes.**
Q. And you want them to confirm the date of loss, correct?
A. **Yes.**
Q. Okay. And -- and you said damage related to the reported loss, which is hail and wind; that's the third thing, correct?
A. **Yes.**
Q. Is there anything else that you're looking for, with the exception of cause of loss, date of loss, and damage from the loss?
A. **Estimates, if we need them.**
Q. Okay.
A. **Any recommendations for engineers or other experts.**
Q. Anything else?
A. **There could be a lot of things.**
Q. What -- what else can you think of?
A. **I don't know at this time.**
Q. Okay. Well, in the Ted Miller report we reviewed, he identified the cause of loss as hail and

# WILLIAM ARDOLINE - July 08, 2022



wind, correct?
A. **Yeah. He said it was hail and wind.**
Q. Okay. And he also said that the date of loss was confirmed as August 2, 2020, right?
A. **Correct.**
Q. And he noted the damage that he believed was related to that loss, the storm of August 2, 2020, correct?
A. **Yes.**
Q. And he also notified you that he was not preparing an estimate, because you had not requested one?
A. **No. It said that he didn't prepare one because we told him to close his file.**
Q. My apologies. He didn't provide an estimate because you asked him to close the file, correct?
A. **Correct.**
Q. And there was no recommendation for experts within there?
A. **I don't recall.**
Q. Okay. Is there anything else you can think of, necessary information that you would want from a field adjuster, with the exception of those five things?



A. **No.**
MR. BUKOWSKI: Okay. Yeah, let's go ahead and take a break. We can go off the record.
(Recess taken, 7:54 a.m. to 8:05 a.m.)
THE VIDEOGRAPHER: The time is -- the time is 7:54 a.m. We're now off the record.
THE VIDEOGRAPHER: The time is 8:05 a.m. We're back on the record. Counselor, you may continue.
MR. BUKOWSKI: All right.
(BY MR. BUKOWSKI) So, Mr. Ardoline, I have these exhibits teed up a little bit better, so hopefully we can get through them quickly. I want to circle back really quick to Exhibit 37. So this is the email from Raphael & Associates dated September 2, 2020. Can you see that okay?
A. **Yes.**
Q. Okay. And this is the one where you saw, it says, I have attached the adjuster's report as requested. What I want to confirm is, this is your email, though, right? william.ardoline@guard.com?
A. **Yes.**
Q. Okay. And so this would have been an email that you would have received in September of 2020?



A. **Yes.**
Q. Now, I'm going to place on the screen Exhibit 39.
(Exhibit 39, remotely introduced and electronically provided to the reporter.)
Q. All right. Exhibit 39 is an email marked Raphael 8, and it's an email from you to Susan Herin, dated September 9, 2020. Can you see that okay?
A. **Yes.**
Q. Okay. And Susan Herin is someone with Engle Martin, correct?
A. **Correct.**
Q. Now, I just see you have a smiley face at the end, so I have to ask, did you know Ms. Herin beyond just being someone at Engle Martin?
A. **No. She was just like the go-to person that I would ask questions, and she'd help me out pretty quickly over there.**
Q. And, now, you mentioned, in this email of September 9, 2020, that the TPA did a poor job. Do you see that?
A. **Yeah.**
Q. Okay. And you would have been referring to the inspection and report and photographs of Ted Miller that we just reviewed a couple minutes ago?



A. **Yes.**
Q. Okay. And looking at this, can you recall why you thought Ted Miller did a poor job in his reporting and documenting of damage?
A. **I don't recall.**
Q. Do you recall if you provided Engle Martin with a copy of Ted Miller's inspection report and photographs?
A. **No, I don't recall.**
Q. Would you typically -- would it have been your practice to provide a second independent adjuster with prior reports and information?
A. **Not usually, no.**
Q. Okay. Now, in this email, September 9, 2020, you're also authorizing the retention of an engineer from Envista, correct?
A. **Yes.**
Q. Can you recall why you felt an engineer was necessary at this time?
A. **I don't recall.**
Q. Now, you -- you also mention that you -- this is a rush request. Do you see that?
A. **Yes.**
Q. What's the difference between a priority or rush basis versus a regular claim assignment?

# WILLIAM ARDOLINE - July 08, 2022



**A. Knowing that they understand that -- go out there, get us a report as soon as possible, rather than their normal timeline of things. Like, two weeks, I think it normally is.**
Q. And do you recall why, on this claim, you would have been asking for them to do something beyond their normal timeline?
**A. No, I don't recall.**
Q. I am going to place on the screen Exhibit 40.
(Exhibit 40, remotely introduced and electronically provided to the reporter.)
Q. This is a document marked Raphael 265, and it appears to be an independent adjuster assignment form. Do you see that?
**A. Yes.**
Q. Okay. Can you explain what the purpose of the independent adjuster assignment form is?
**A. It's just an automatic form that goes out to the IAs when we pick somebody to go.**
Q. Okay. And it notes, within here, that, Adjustment Type: Full adjustment. Do you see that?
**A. Yes.**
Q. What -- what is a full adjustment?
**A. I -- I don't recall what the parameters of**



**that means.**
Q. Okay. Would you have provided further instruction beyond what is contained within this independent adjuster assignment form?
**A. Could have.**
Q. If you provided further instruction, would that be noted within the DocuNotes system?
**A. Could have been, or it could have been in the email, like I told them to have an engineer and be on a rush basis. I don't think that's in those directions.**
Q. Okay. So if -- if there was some further instruction, it should be documented with an email, based on your practices?
**A. Yeah.**
Q. All right. Now, I've placed on the screen an email marked Raphael 946.
(Exhibit 41, remotely introduced and electronically provided to the reporter.)
Q. This is an email from Engle Martin & Associates to GUARDClaimsTeam@GUARD.com. Do you see that?
**A. Yes.**
Q. Okay. And it's an email that's addressed to you, right?



**A. Yes.**
Q. Okay. This is the email we were looking at earlier. Are you familiar with this email address?
**A. No.**
Q. Do you recall receiving a copy of this email?
**A. I don't recall.**
Q. If -- do you know what the practice is at GUARD; if emails are sent to -- generally to GUARD, would they put them into your claim file?
**A. If they send them to that Claims III, I know they go directly to it. I'm not aware if there's another one that does that.**
Q. At least on here, it's -- it's indicating that -- it has the claim number and the Engle Martin number and the -- and the policyholder. Do you see that?
**A. Uh-huh.**
Q. Okay. All right. So I've placed on the screen Exhibit 42.
(Exhibit 42, remotely introduced and electronically provided to the reporter.)
Q. This is a first report from Engle Martin. Can you see that okay?
**A. Yes.**



Q. Okay. And the first report's dated October 6, 2020. Do you see that?
**A. Yes.**
Q. Okay. And this report is marked Engle Martin 947 through 976. Now, you've previously worked with Engle Martin, right?
**A. Yes.**
Q. And I think you testified that you worked with Engle Martin over 300 times. Does that sound right?
**A. Probably, yes.**
Q. So would you say at this time, in October of 2020, you were very familiar with their reporting?
**A. Yes.**
Q. Did you find Engle Martin to be competent and qualified to investigate hail and wind damage claims?
**A. Yes.**
Q. And, now, the independent adjuster that signed this is Brian Rubidoux. Do you see that?
**A. Yes.**
Q. Had you worked with Brian Rubidoux in the past?
**A. I believe so, yeah.**
Q. Okay. Does anything stand out about his

# WILLIAM ARDOLINE - July 08, 2022



qualities or qualifications or abilities?
**A. I don't recall. I mean, he does have his AIC. But other than that, I don't recall anything special.**
Q. Okay. And what -- the AIC is the associate in claims, right?
**A. Yep.**
Q. Okay. Did you -- do you have your associate's in claims, or did you?
**A. No.**
Q. Did you take any coursework towards it?
**A. I don't believe so.**
Q. I think some of your personnel files mentioned that you wanted to do the CPCU. Did you ever take any coursework towards that?
**A. I don't recall.**
Q. Okay. Do you recall speaking to this independent adjuster, Brian Rubidoux, prior to his inspection?
**A. I don't recall.**
Q. Would it have been your practice at this time, in October 2020, to speak to an independent adjuster prior to their inspection?
**A. I mean, it could have. I -- I don't recall. It's not necessary. Like, they don't need me**



**to talk to them to go out there, if I give them the directions already.**
Q. Okay. And fair to say you're looking from -- for this second adjuster to do the same thing as the first one did, identify cause of loss, date of loss, damage related to the loss, provide an estimate, if asked, and a recommendation for any experts he believes are needed?
**A. Yes.**
Q. Now, on page 3 of Exhibit 42, which is Raphael 949, do you see the -- the loss description?
**A. Yes.**
Q. Okay. And would you agree that this independent adjuster confirmed wind and hail damage to the south elevation of the building and to the roof covering?
**A. Where does it say that? Okay. Loss -- oh, that's just a description. That's just what the insured's telling them.**
Q. I'm sorry, okay. So on page 3, the loss description is what's being reported by the insured, correct?
**A. Yeah. It's like -- yeah.**
Q. And then going further down on page 949, do you see it says, Building?



**A. Yep.**
Q. Okay. And if you just want to take a minute to read that first paragraph.
**A. Okay.**
Q. Would you agree that the independent adjuster Rubidoux is reporting broken windows and damaged cladding on several windows?
**A. Yep.**
Q. Okay. And the cladding is the window framing, right?
**A. Yes.**
Q. Okay. And he's also reported hail damage to PVC fencing on the south side?
**A. Yes.**
Q. And hail damage to three commercial doors?
**A. Yes.**
Q. And he's reported hail damage to the roof covering?
**A. Yes.**
Q. Now, on the second paragraph, he's talking about that the engineer will be completing and submitting his final report of findings, right?
**A. Yes.**
Q. All right. Now, on page 4, which is Raphael 950, do you see where it says Business Income?



**A. Yes.**
Q. Okay. And the second field adjuster here, Brian Rubidoux's reporting potential business interruption caused by the loss, right?
**A. Yes.**
Q. And he's recommending that you engage a forensic accountant?
**A. Yes.**
Q. Okay. What -- had you ever engaged a forensic accountant prior to this claim?
**A. Yes.**
Q. What does a forensic accountant do, to your understanding?
**A. They just gather the insured's records and paperwork relating to their sales and business, and review it, see if there's any trends in losses, see if they did suffer a business income loss.**
Q. Do you recall engaging a forensic accountant on this claim?
**A. I don't recall.**
Q. Would -- would there be a similar forensic accounting engagement form, like the IA form we looked at?
**A. No.**
Q. How -- what would be within the file to

Page 78

memorialize you engaging a forensic accountant?
**A. An email.**
Q. And so if there's no email within the claim file, and no report, then fair to say you didn't engage a forensic accountant?
**A. Yes.**
Q. All right. So on Engle Martin 951, which I can highlight, it says, Enclosures: EMA photos. Do you see that?
**A. Yes.**
Q. Okay. And I've scrolled through the 50 or so photographs that Engle Martin provided you. Did you see that?
**A. Yes.**
Q. Okay. And would you agree that the photographs that Engle Martin attached to its report illustrate hail damage to windows, vinyl fence, stucco, lights, metal vents, and the shingle roof covering?
**A. I mean, it could be hail or wind. But I -- that's why we were requesting the engineer to confirm it.**
Q. Okay.
**A. Like, some of the stuff wasn't . . .**
Q. Well, just as I scroll through the photographs, would you agree that they at least

Page 79

illustrate damage to the building?
**A. Yeah, there's damage to the building.**
Q. Okay. And it's your testimony at this point, when you received the report in October of 2020, you were waiting on the engineer to confirm these findings of the -- of the two adjusters?
**A. Yeah. It looks like that there is questions as to if it -- all the damage they're claiming is related to hail or if it's multiple times, or if it's not hail at all.**
Q. And then the engineer was -- he was the one tasked with separating out that cause of loss, right?
**A. Yep.**
Q. Okay. I'm going to show you Exhibit 43.
(Exhibit 43, remotely introduced and electronically provided to the reporter.)
Q. This is an email chain marked GUARD 774 through 775. And so the first email at the top here is an email from you to Mark Concklin, dated September 14, 2020. Do you see that?
**A. Yes.**
Q. And who is Mark Concklin?
**A. I don't know.**
Q. Do you know Steve Keshishian?

Page 80

**A. No. None of those emails I recall.**
Q. Okay. All right. On -- I am on GUARD 775, which is an email from Ashley Pendlay to Jerry Kukuchka, dated September 14, 2020. Can you see that?
**A. Yes.**
Q. Okay. And if you can just take a moment to read that paragraph.
**A. Uh-huh.**
(The deponent perused the exhibit.)
Okay.
Q. All right. Do you recall reviewing this email while you were adjusting this claim?
**A. I don't recall.**
Q. Okay. And fair to say, if you're handling 250 claims, it's hard to recall every single email, right?
**A. Yes.**
Q. Okay. And that's why you put things into the claim file?
**A. Yes.**
Q. Okay. Now, as I scroll up from this email, you can see that it was forwarded by Mark Concklin to you, on September 14, 2020. Do you see that?
**A. Yes.**

Page 81

Q. Okay. Now, going back to the email from Ms. Pendlay, do you know who she is?
**A. The insured.**
Q. Okay. Do you know who Jerry Kukuchka is?
**A. I don't recall him.**
Q. And so I've highlighted here the third sentence.
**A. Uh-huh.**
Q. Okay. And it says, I am getting statements drawn up from guests that have left and went elsewhere because of the damage to our building and them not feeling safe. Do you see that?
**A. Yes.**
Q. Okay. So you'd agree, in September of 2020, the hotel representatives are notifying that guests were leaving due to damage from the storm?
MR. DEVILLING: Objection to form. Go ahead.
**A. Yeah. It says damage to the building. It doesn't mean it was damage from the storm.**
Q. (BY MR. BUKOWSKI) Would you agree, as of September 2020, the hotel representative is notifying you that guests are leaving due to damage to the hotel property?
**A. Yes.**

# WILLIAM ARDOLINE - July 08, 2022

Page 82

Q. Did -- did you have any concern for your policyholder losing business in September 2020?
**A. I mean, concern? I -- it's not something I would jump at. I mean, people claim business income all the time, but it -- just because they're claiming something doesn't necessarily make me drop everything and -- and go to this, you know.**
Q. Well, you were at least -- you would agree, in September 2020, you are being placed on notice that there is potential interruption to business caused by damage?
**A. Yeah. And that's probably why we were talking about a forensic accountant.**
Q. Okay. And that's what I was going to say. You have the notice from Ashley Pendlay, a hotel representative, and then also a notice from the independent adjuster Brian Rubidoux, right?
**A. Yeah.**
Q. Okay. Did -- do you recall hiring anyone to investigate the amount of lost revenue caused by guests leaving?
**A. I don't recall.**
Q. Do you recall having anyone investigate whether the loss in revenue was related to damage from the August 2020 storm?

Page 83

**A. I don't recall.**
Q. Would you have done anything else to prioritize this loss and rush payment to them?
**A. No.**
Q. Now, there is an email from Rick Cline to Mark Concklin, dated September 14, 2020, on GUARD 774. Can you see that okay?
**A. Uh-huh.**
Q. Do you know who Rick Cline is?
**A. An agent.**
Q. Okay. Now, he says, This claim has been the three most inefficient claims I've had in 21 years. Do you see that?
**A. Yes.**
Q. Do you agree with this representation?
MR. DEVILLING: Object to form.
**A. No. I mean, that could just be him feeling heat from the insured, so he's just saying whatever to get the insured off his back. It could be anything.**
Q. (BY MR. BUKOWSKI) Now, in reading some of your prior depositions, it's my understanding that you would receive complaints often from insurance agents, right?
**A. I mean, that's an insurance agent's job,**

Page 84

**is to -- I'm sorry. That's the insurance agent's job to --**
MR. DEVILLING: Object to form. Go ahead.
Q. (BY MR. BUKOWSKI) Let me just re-ask to make it clear, and then Mr. Devilling can get in his objection.
**A. Yeah, I'm sorry. It's hard to see, because there's not -- with the objections, because there is -- I only see me on the screen, so I don't see anybody else, if there's going to be an objection or not.**
Q. Okay. I'm going to ask the question, and Mr. Devilling will lodge his objection, and you can respond, all right?
**A. Yeah.**
Q. All right. In reviewing your prior deposition transcripts, you did testify that you often had complaints from insurance agents, correct?
MR. DEVILLING: Object to form.
**A. I -- I testified that I said -- and I said I have a lot of complaints.**
Q. (BY MR. BUKOWSKI) That insurance agents would often make complaints about claims that you were handling?
MR. DEVILLING: Object to form.

Page 85

**A. I don't recall saying that.**
Q. (BY MR. BUKOWSKI) Okay. Well, in your -- to your recollection, when you were handling claims at GUARD, is it common for insurance agents to complain about the time it took for you to handle a claim?
**A. I mean, we did receive complaints, yeah.**
Q. And would you often receive complaints from insurance agents?
**A. We received complaints, yes.**
Q. Do you believe that this claim, the 2505 claim, you handled it inefficiently?
**A. I handled it --**
MR. DEVILLING: Object to form.
**A. -- to the best of my -- I handled it to the best of my ability.**
Q. (BY MR. BUKOWSKI) Okay. I'm going to place on the screen Exhibit 44.
(Exhibit 44, remotely introduced and electronically provided to the reporter.)
Q. Can you see that okay?
**A. Yes.**
Q. Now, this is a series of emails marked GUARD 327. The first one is from Rick Cline, dated September 28, 2020, to Brian Rubidoux and yourself. Can you see that okay?

# WILLIAM ARDOLINE - July 08, 2022

Page 86

A. **Yes.**
Q. All right. And do you recall receiving this email?
A. **No.**
Q. Okay. And you'd agree, on September 28, 2020, the agent's trying to receive some sort of update on the claim adjustment?
A. **Yes.**
Q. Okay. And then the next email is from you to the insurance agent, dated September 28, 2020. Do you see that?
A. **Yes.**
Q. Okay. And you noted that the engineer's inspection had taken place, but you were waiting for that report, right?
A. **Yes.**
Q. Okay. And, now, you next say, He stated the inspection revealed wear and tear and construction issues, along with possible hail damage. Do you see that?
A. **Yes.**
Q. And you're relaying something that the second independent adjuster, Brian Rubidoux, stated to you?
A. **Yes.**

Page 87

Q. Okay. Would you agree that this statement to the agent is inconsistent with the report we looked at from the first adjuster?
A. **Yeah, but that's probably why we took them off.**
Q. Would you agree that this statement is inconsistent with the report that you received from Brian Rubidoux?
A. **Yes, and that's why we had the engineer.**
Q. Okay. Did you ever go back and correct this statement to the agent?
A. **I don't recall.**
Q. Okay. Now, you also say, Once the engineer report is received, I will review and advise if any partial payments can be made for anything related to recent storm damage, and write a letter outlining policy language for the denial of the wear and tear and construction issues. Do you see that?
A. **Yes.**
Q. Why could you not issue a partial payment based on the damage documented by the first and second field adjusters?
A. **We didn't have an estimate.**
Q. And do you recall ever requesting anyone prepare an estimate for you?

Page 88

A. **No, but that's why I believe we had the engineer, because we have to parse out what actually is related to hail. And I believe this also added 2 percent wind/hail deductible. So I think it was like a $60,000 deductible. So if the damage didn't exceed 60,000, there would be no partial, or any payments.**
Q. Sure. So at this time, September 28, 2020, you're waiting on an engineer report and an estimate, right?
A. **Yes.**
Q. Can you recall anything else that you're awaiting, with the exception of the engineering report and an estimate?
A. **I don't recall.**
Q. Okay. I'm going to place on the screen Exhibit 45.
(Exhibit 45, remotely introduced and electronically provided to the reporter.)
Q. Can you see this okay?
A. **Yes.**
Q. So this is an email from Jeff Henke, with CJ Restoration, to ClaimsIII at GUARD, dated October 20, 2020. Can you see that okay?
A. **Yes.**
Q. All right. And it's marked Raphael 1117.

Page 89

Do you understand who Jeff Henke was?
A. **Yes.**
Q. Okay. Do you understand, he was a contractor working with the policyholder, correct?
A. **Yes.**
Q. And, again, it's true that the ClaimsIII at GUARD, this email would have been dropped into the claim file?
A. **Yeah, it could have been. I mean, if it's here, then it was dropped.**
Q. Okay. And you have complete access to the claim file, as the adjuster assigned to the file?
A. **Yes.**
Q. Okay. Now, in scrolling down, there is an estimate that begins on Raphael 1118 and goes through here, Raphael 1129. Do you see that?
A. **Yes.**
Q. Again, it's just over -- a little over $400,000, correct?
A. **Yes.**
Q. And that would be beyond the $60,000 deductible you mentioned?
A. **Yes.**
Q. Okay. Now, this estimate, it was prepared using Xactimate, correct?

# WILLIAM ARDOLINE - July 08, 2022

Page 90

**A. It looks like that, yes.**
Q. And Xactimate is an insurance estimating program?
**A. Yes.**
Q. And you've paid for repairs on claims using Xactimate estimates, during your time as an adjuster?
**A. Yes.**
Q. And -- and most of your claims, in fact, are paid using Xactimate estimates, correct?
**A. Correct.**
Q. Okay. And isn't it true that you're not necessarily proficient in Xactimate?
**A. Yes.**
Q. And you've never prepared an Xactimate estimate yourself?
**A. No. I have.**
Q. Oh, you have? Okay. How many have you prepared?
**A. I don't recall.**
Q. Okay. You've never gone through the Xactimate certification coursework offered by Xactimate?
**A. The intro.**
Q. Did you go through the level I certification?

Page 91

**A. No.**
Q. Okay. So you don't have any of the Xactimate certifications, right?
**A. No.**
Q. Now, your --
**A. Right here -- right here, I could see one thing right off the bat, that using a price list of October. We're required to use a price list of when the actual claim occurred. And that's just one thing on one page I see, just for a reference.**
Q. Okay. Being that you -- you pointed that out, do you understand that this is a replacement cost value policy?
**A. Yes.**
Q. Okay. And there are actual cash value policies, correct?
**A. Correct.**
Q. Would you agree that actual cash value provides for the cost to repair at the time of loss?
**A. No.**
Q. I'm sorry. Let me rephrase. Would you agree that actual cash value provides for the value of materials, given their age and condition at the time of loss?

Page 92

**A. No.**
Q. What is -- for the benefit of the jury, explain the difference between actual cash value and replacement cost value.
**A. So at GUARD, we paid everything on an actual cash value basis with depreciation, until the insured can prove that they actually paid the RCV value. And then once they prove the RCV value, we would pay up to that, provided they have canceled checks and -- and pictures of the completed work, to prove that they actually got work done. And if their policy allowed, then we would pay up to the RCV or -- limits or whatever.**
Q. And you pay replacement cost value or RCV at the time of repair?
**A. No. At the time of the loss.**
Q. So you're saying that the price list should always be backdated to the time of loss?
**A. Correct.**
Q. Okay. And that was a policy that GUARD had?
**A. Yes.**
Q. Even -- even if it was a replacement cost value policy?
**A. Yes.**

Page 93

Q. Do you understand that an insured pays an additional premium for replacement cost value coverage?
**A. I'm not in underwriting, so I'm not aware.**
Q. Okay. I've moved to -- on Raphael 1120, page 4 of the estimate, it says, Roof. Do you see that?
**A. Yep.**
Q. Okay. And -- and line items 9 through 31 outline the scope and costs to replace the roof covering, at least according to the contractor's Xactimate estimate.
**A. Yes.**
Q. Okay. And we had previously looked at two adjuster reports confirming hail damage to the roof coverings, right?
**A. Yes.**
Q. And they both said that the roof covering would require replacement due to the amount of hail damage?
**A. Yes, but then the engineer report said there was also stuff for wear and tear and construction issues, so we had to figure out what those wear and tear and construction issues were.**
Q. Okay. So -- so you'd agree here, you have a roof estimate, which is one of the things you were

Page 94

missing. You're saying, We still need the engineering report to separate out the things caused by hail versus the things that are unrelated.
A. **Correct.**
Q. Okay. Looking at page 4 of the estimate, which is Raphael 1121, do you see, it says, Front Elevation?
A. **Yes.**
Q. Okay. It starts on line 35, and it continues through line 96, here on page 7, Raphael 1124. Do you see that?
A. **Yes.**
Q. Okay. And would you agree that those line items, 35 through 96, detail a scope and cost to repair damage to windows, stucco and light fixtures?
A. **Yes.**
Q. And, again, you -- the independent adjuster reports we've looked at confirmed damage to those components, correct?
A. **Correct.**
Q. Okay. But you're still waiting on the engineering report, at least as of October 20, 2020?
A. **Yes.**
Q. Now, starting on page 1130 are a series of photographs from CJ Restoration. Do you see that?

Page 95

A. **Yes.**
Q. I want to go through these quick. Okay. Would you agree that based on what's showing in Exhibit 45, there is 221 photographs of the condition of the property?
A. **Yes.**
Q. Okay. Do you know if this estimate represented an accurate scope and cost to repair damage to the hotel property?
A. **No.**
Q. Normally you would send an estimate to an independent adjuster for review, correct?
A. **No.**
Q. Okay. What would you -- where would you send an estimate for review?
A. **We'd either send it to the engineer -- or, no, not the engineer. Scratch that. Yeah, we could send it to the engineer for them to tell us what is related to damage and not. But we would send estimates to our estimate review team.**
Q. Okay. And the -- if an estimate was sent to any of these folks, the -- the independent adjuster or the estimate review team, there would be an email memorializing that, right?
A. **Not necessarily.**

Page 96

Q. Okay. Would there be something that would document you sending it on or the action you took?
A. **If it's sent to the estimate review team, we would have just dropped it into a community folder. It wouldn't have been placed in a file.**
Q. How -- how do I tell if something's dropped into a community folder?
A. **I'm not sure.**
Q. So I've placed Exhibit 35 back on the screen, which are your claim notes. The estimate we looked at was dated October 20, 2020. Can you see here your claim note of October 15, 2020?
A. **Yes.**
Q. Okay. And then your next claim note is 9 -- or November 19, 2020. Do you see that?
A. **Yep.**
Q. Okay. And so you do know, Requested IA send engineering report ASAP, as restoration estimate totals 434-. Do you see that?
A. **Correct.**
Q. Okay. So at least you agree that you did have a copy of this estimate as of November 19, 2020?
A. **Yes.**
Q. Okay. And, again, the final thing that we're waiting on at this time is just a confirmation

Page 97

from the engineer of damage?
A. **Correct.**
Q. And if you get the confirmation of damage from the engineer, can you then pay the claim on your own?
A. **As long as it's within my authority and it exceeds the deductible, and it's covered.**
MR. DEVILLING: Hey, guys, I just need 30 seconds.
MR. BUKOWSKI: Okay.
MR. DEVILLING: Just a sec.
THE VIDEOGRAPHER: We're going to go off the record.
MR. BUKOWSKI: I think -- I think we can wait just a minute or so.
THE VIDEOGRAPHER: You got it.
MR. BUKOWSKI: If that's -- is that okay with you, Lori?
THE REPORTER: Uh-huh.
(Pause in the proceedings.)
MR. DEVILLING: Okay. Sorry guys. Thanks.
Q. (BY MR. BUKOWSKI) I'm going to place on the screen Exhibit 46 here.
(Exhibit 46, remotely introduced and

# WILLIAM ARDOLINE - July 08, 2022

Page 98

electronically provided to the reporter.)
Q. Are you able to see that okay?
**A. Yes.**
Q. Okay. And -- and this is an email from you to -- to the second adjuster, Brian Rubidoux, dated November 19, 2020. Do you see that?
**A. Yes.**
Q. And -- and you note, The restoration estimate totals $434,949.90 from CJ, so we will need to review this ASAP. Do you see that?
**A. Yes.**
Q. What -- what would you have meant by "review this ASAP"?
**A. The estimate and engineer report.**
Q. Okay. And do you recall ever contacting the contractor to discuss the estimate that he submitted?
**A. I wouldn't do that.**
Q. Is that an instruction from GUARD, that you're not to contact contractors?
**A. That's the job of the estimate review team.**
Q. Okay. Do you recall having any further discussion beyond this email with Brian Rubidoux, the second adjuster?

Page 99

**A. I don't recall.**
Q. And then we looked at your claim note indicating that there was that estimate. Do you recall having any further discussion with management about the estimate?
**A. I don't recall.**
Q. I've placed the claim notes back on the screen, Exhibit 35. You see there is a claim note, November 19, 2020, from Marc Dellario. Do you see that?
**A. Yes.**
Q. Okay. Who -- who is Marc Dellario?
**A. He would have been the complex team lead at the time, I believe.**
Q. What is a complex team lead?
**A. Basically the first person in charge of the complex team.**
Q. What is a -- what is a complex team?
**A. Just high-level claims, adjuster IIs, anybody else higher than that.**
Q. Okay. So would -- this claim, if Marc's on it, would have been considered a complex claim?
**A. Yeah.**
Q. Do you recall -- and, again, you said you would not have called the contractor back, right?

Page 100

**A. Correct.**
Q. But you do have, in here, December 2, 2020, claim note, it says, Response to contractor. Do you see that?
**A. Yes.**
Q. Okay. And so this appears to be you've copied in what you've sent in communication to the contractor; fair?
**A. Yes.**
Q. Is -- is there a reason you would -- how do you decide what communications you're going to drop into the document system?
**A. I mean, I try to put everything in. But, like I said, it doesn't always happen. So I would say it's my best practice to try to get everything, if that -- yeah.**
Q. Okay. I'm going to place on the screen Exhibit 47.
(Exhibit 47, remotely introduced and electronically provided to the reporter.)
Q. Can you see this okay on your screen?
**A. Yes.**
Q. So Exhibit 47 is report No. 2 from Engle Martin, dated November 30, 2020, and it's marked Raphael 979 through 1014. Could you -- have you seen

Page 101

this previously?
**A. Yeah, I don't recall.**
Q. I've placed on the screen Exhibit 48.
(Exhibit 48, remotely introduced and electronically provided to the reporter.)
Q. This is an email from Gabriella Armster, from Engle Martin, to GUARD'S ClaimsTeam@GUARD.com. Do you see that?
**A. Yes.**
Q. And it says, Mr. Ardoline, please find the attached report sent on behalf of Brian Rubidoux.
Do you see that?
**A. Yes.**
Q. Okay. So at least as of November 30, 2020, you're being provided with a report from the independent adjuster?
**A. Correct.**
Q. I'm going back to that report, Exhibit 47. On page 2, which is Raphael 980, do you see Investigation and Adjustment?
**A. Yes.**
Q. Okay. Would you agree that your second field adjuster, Brian Rubidoux, is memorializing the findings of the engineer?
**A. Yes.**

# WILLIAM ARDOLINE - July 08, 2022

Page 102

Q. And then on the next page, Raphael 981, do you see, in the first paragraph below the engineering findings, that your second field adjuster, Brian Rubidoux, is requesting a copy of the contractor's estimate?
**A. Yes.**
Q. Okay. Do you recall forwarding the contractor's estimate to this field adjuster, Brian Rubidoux?
**A. I don't recall.**
Q. On page 4, Engle Martin 982, do you see enclosures, Envista report?
**A. Yes.**
Q. And then we have -- on page Raphael 983 is a copy of the report of findings from Envista Forensics. Do you see that?
**A. Yes.**
Q. And it's dated November 20, 2020, right?
**A. Yes.**
Q. Okay. Had you ever worked with Envista engineering prior to this claim?
**A. Yes.**
Q. Had you ever worked with William J. Oviatt, the engineer assigned from Envista Forensics?
**A. I don't recall.**

Page 103

Q. Okay. Do you have any reason -- do you have any reason to doubt the ability of Mr. Oviatt to evaluate hail and wind damage to a commercial structure?
**A. No.**
Q. I'm on page 2 of the engineering report, which is Raphael 984. Do you see, it says Conclusions?
**A. Yes.**
Q. Okay. If you just want to take a second to review the conclusions.
**A. (The deponent perused the exhibit.)**
**Yes.**
Q. Okay. And Envista Forensics is the engineer that you had authorized Engle Martin to retain, back in September of 2020, right?
**A. Correct.**
Q. Would you agree that your professional engineer concluded, in this report, that the August 2, 2020 storm event caused damage to the roof coverings, roof vents, wall vents, metal doors, stucco siding, windows, vinyl fencing and metal door frames?
**A. Yeah. There's a mix of structural and functional versus cosmetic and not related stuff.**
Q. Well, in terms of what is covered under the policy, that would be direct physical damage,

Page 104

right?
**A. Yeah. Only direct physical damage is --**
Q. Okay. In terms of the direct physical damage identified by your engineer from the August 2, 2020 storm, that included the roof covering, correct?
**A. Correct.**
Q. It included roof vents and wall vents?
**A. Yes.**
Q. And it included metal doors?
**A. Yeah.**
Q. And it includes stucco siding?
**A. Uh-huh.**
Q. And it included windows?
**A. Yeah. The windows aren't damaged here.**
Q. It says fractured vinyl window wraps, fractured glass window panes. Do you see that?
**A. I was looking in 5.**
Q. Okay. Looking in 4, would you agree that the engineer identified functional damage from the August 2, 2020 storm, to the window vinyl wraps and the window panes?
**A. Yes.**
Q. And he also -- your professional engineer, he identified over 11,000 functionally damaged shingles?

Page 105

**A. Yes.**
Q. Okay. And functional damage, in the context of a shingle, means that there is fracturing or penetration through the shingle, right?
**A. Yes.**
Q. Okay. So the damage was quite severe to the shingle roof covering?
**A. Yes.**
Q. Now, the damage that's being reported here by your professional engineer is similar to the damage reported by the two previous adjusters who previously submitted their reports, correct?
**A. Yes.**
Q. Now, going to page Raphael 989, there are also a number of photographs that the engineer submitted with his report, illustrating the damage he identified, correct?
**A. Yeah.**
Q. Now, you would agree, as of November 30, 2020, you've received reports from two field adjusters and an engineer confirming damage to the property from the reported storm of August 2, 2020?
**A. Yes.**
Q. Okay. And you -- you did not -- you did not provide a copy of the first field adjuster, Ted

# WILLIAM ARDOLINE - July 08, 2022

Page 106

Miller's report to 2505 6th Street?
A. I don't recall.
Q. Okay. Did you provide a copy of the second field adjuster, Brian Rubidoux's report to --
A. You're talking about giving the reports to the insured?
Q. Yes.
A. Yeah, we don't do that.
Q. All right. Let me back up just to -- as tedious as this is, I just need to get it for the record, okay? So you have -- we looked at three reports, right? The first field adjuster report from Ted Miller, the second field adjuster report from Brian Rubidoux, and the third engineering report from William Oviatt, correct?
A. Yes.
Q. Did you provide a copy of the first field adjuster report from Ted Miller to 2505 6th Street?
A. No.
Q. Did you provide a copy of the second field adjuster report from Brian Rubidoux to 2505 6th Street?
A. No.
Q. Did you provide a copy of the professional engineer report from William Oviatt to 2505 6th Street?
A. No.

Page 107

Q. Okay. Isn't it true that GUARD management instructs you and other claim adjusters that the independent adjuster reports and the professional engineer reports cannot be shared with any policyholder?
A. Yes.
Q. Can you even think of a time where you've been allowed to send a report to an insured?
A. I don't recall.
Q. Now, you can share the findings verbally, correct?
A. Yeah, like summaries we could share, but we can't give the whole report.
Q. And when you say "summaries," do you mean you can summarize it, or you can read off the report?
A. Both.
Q. Okay. So what you're saying is GUARD would not allow you to share the analysis or the actual inspection of the consultant?
MR. DEVILLING: Object to form.
A. We can't share the actual physical report, like, Here is a copy of the report. But we could go over it.
Q. (BY MR. BUKOWSKI) Okay. So looking at Exhibit 47, which is the engineering report, could you

Page 108

read word for word these conclusions to an insured?
A. Yeah.
Q. Okay. But did you do that here?
A. I don't recall.
Q. Would that be memorialized somewhere?
A. It could have been.
Q. Where would that have been memorialized?
A. Notes, DocuNotes, IIS.
MR. BUKOWSKI: All right. We've been going another 50 minutes or so. Do you want to take about another five-minute break, and I'll try to reorganize some of these other exhibits?
MR. DEVILLING: Yeah. Top of the hour?
MR. BUKOWSKI: Yes.
MR. DEVILLING: Okay.
THE VIDEOGRAPHER: The time is 8:53 a.m. We're now off the record.
(Recess taken, 8:53 a.m. to 9:03 a.m.)
THE VIDEOGRAPHER: The time is 9:03 a.m. We're back on the record. Counselor, you may continue.
Q. (BY MR. BUKOWSKI) So we were looking at that engineering report of November 2020, and I'm moving to your claim notes now, and it says November 19, 2020. Do you see, Engineering report not

Page 109

on file?
A. Yes.
Q. Okay. And so the email we looked at came after. It was November 20, 2020 when the engineering report was sent over.
A. Uh-huh.
Q. So what I want to show you next is your claim note of March 10, 2021. It says, Need estimate per Envista report, damage related to storm only. Do you see that?
A. Yes.
Q. Okay. What -- what would you -- do you recall what you were trying to indicate there in your claim note?
A. That we need the Envista report for what is damage related to the storm.
Q. I'm sorry. I want to -- let me make sure I understand. Fair to say your claim note of March 10, 2021 confirms that you have the Envista engineering report in your possession?
A. I'm -- I meant the estimate.
Q. So the engineering report's in your possession as of March 10, 2021?
A. Yeah, I don't recall.
Q. Okay. And you're saying that now you need

# WILLIAM ARDOLINE - July 08, 2022

Page 110

an estimate for the damage that's identified within the engineering report; fair?
A. **Correct, yep.**
Q. You do have the -- you would agree that we looked at -- you have the estimate from the contractor from October 2020, correct?
A. **Yes.**
Q. So you did have an estimate in your possession as of March of 2021?
A. **Yes.**
Q. And the second part says, "damage related to storm only." What do you mean by that?
A. **Well, there was -- per that conclusions, there was -- that we looked at earlier, there was damage that was related to the storm, that function and structure stuff that we talked about; and stuff that wasn't related to the storm and --**
Q. So what you -- what you were looking for was an estimate that only included the damages that the engineer confirmed were from the August 2020 storm?
A. **Correct.**
Q. Okay. Looking back at Exhibit 47, which is the second report from Engle Martin dated November 30, 2020, Raphael 979, do you see it says at the top, Response requested?

Page 111

A. **Yes.**
Q. Okay. Do you recall ever reaching back out to this independent adjuster to discuss the findings of this engineering report?
A. **I don't recall.**
Q. And do you recall ever providing him with a copy of the estimate, as he was requesting?
A. **I don't recall.**
Q. Okay. And do you see that he's asking for your authorization to engage a building consultant?
A. **Yes, I see that.**
Q. Okay. And that would be something he'd need your authorization to go do?
A. **Yeah.**
Q. Okay. Did you authorize a building consultant?
A. **I don't recall.**
Q. Would that have been memorialized within the claim notes, if you had done so?
A. **Claim notes, email, somewhere.**
Q. All right. I've placed the claim notes back on the screen, Exhibit 35. You -- your note of March 10, 2021 says, This note was entered during a mandatory reserve review. Reviewed reserves, will update. Do you see that?

Page 112

A. **Yes.**
Q. Okay. What is a mandatory reserve review?
A. **I think it's just a system check on reserves.**
Q. Okay. And would you agree the purpose of setting reserves is to set aside sufficient money to pay a claim?
A. **Not necessary to pay a claim, but in case a claim needs to be paid.**
Q. Okay. So the purpose of the reserve is to set aside sufficient money in case a claim needs to be paid?
A. **Yes.**
Q. Is an estimate required for reserving purposes at GUARD?
A. **Not necessarily.**
Q. Did -- do you recall ever setting reserves in this case?
A. **I don't recall.**
Q. If reserves were set, would it be memorialized within the claim notes, the amount?
A. **Not necessarily, no.**
Q. Where -- where could I find the information on the amount of reserves that you set, if you had set reserves?

Page 113

A. **In the bottom of IIS, there should be a reserve history or a reserve tab. I forget what it's called.**
(Exhibit 49, remotely introduced and electronically provided to the reporter.)
Q. All right. I placed on the screen Exhibit 49. This is an email marked Raphael 1016. This is from Engle Martin to you, dated January 5, 2021. Do you see that?
A. **Yes.**
Q. And then it says that, Please see attached report sent on behalf of your field adjuster, Brian Rubidoux. Do you see that?
A. **Yes.**
Q. Okay. And -- and scrolling down to the next page, Raphael 1017, is a third report from Engle Martin dated January 4, 2021. Do you see that?
A. **Yes.**
Q. And on page Raphael 1018, it has Building, and it says that the second -- your second field adjuster again is requesting authorization to retain a building consultant. Do you see that?
A. **Yes.**
Q. Okay. If there is no such authorization in the DocuNotes or within email communications within

Page 114

the file, then it's likely you didn't authorize that?
A. **Most likely, yeah.**
Q. Okay. Now, you -- you left GUARD, you said, towards the end of April, right?
A. **Correct.**
(Exhibit 50, remotely introduced and electronically provided to the reporter.)
Q. Okay. I'm going to place on the screen Exhibit 50. This is an email from our office, marked GUARD 1156. And it's to you, dated April 8, 2021. Do you see that?
A. **Yes.**
Q. Okay. And do you recall receiving this -- this email?
A. **I don't recall.**
Q. Okay. And if you want to take a second just to look at the first paragraph.
A. **Yes.**
Q. Okay. If you could look at the second paragraph.
A. **Yes.**
Q. Would you agree that the first paragraph requests a certified copy of the policy?
A. **Yes.**
Q. Did you provide that?

Page 115

A. **I don't recall.**
Q. Do you see the first paragraph requests all correspondence related to the claim?
A. **Yes.**
Q. Did you provide that?
A. **I don't recall.**
Q. And do you see the first paragraph requests all engineering reports?
A. **Yes.**
Q. Okay. Would you be able to provide an engineering report to my office or -- or not?
A. **No.**
Q. Okay. So the policy at GUARD is that you can't share that engineering report with anyone, a policyholder or its representatives?
A. **Correct.**
Q. Could you share an engineering report with your own consultants?
A. **Yes.**
Q. Could you share an independent adjuster report with an attorney that represents a policyholder?
A. **No.**
Q. But, again, the independent adjuster reports could be shared with your consultants at GUARD?
A. **Yes.**

Page 116

Q. Do you see that the first estimate (sic) requests all estimates that were prepared on the claim?
A. **Yes.**
Q. And there were no estimates at that time, except for the contractor's estimate, correct?
A. **I believe so.**
Q. Okay. And the first paragraph all -- also requests all documents relied upon by Amguard in its evaluation?
A. **Correct.**
Q. But at this time, you had not finalized an evaluation, as of April of 2021, correct?
A. **Correct.**
Q. Did you provide -- do you recall providing any of this information in paragraph 1 to our office?
A. **I don't recall.**
Q. All right. Now, paragraph 2 requests your availability to meet on-site to discuss unpaid damages. Do you see that?
A. **Yes.**
Q. Are you allowed by GUARD to do on-site visits?
A. **No -- well, I mean, I could. But in this situation, I would have just had the engineer go out with you.**

Page 117

Q. So in the 5-1/2, six years that you were with GUARD as of April of 2021, had you ever met a policyholder or their representatives for an inspection at a property?
A. **Yes.**
Q. Okay. Would you have met, in your 5 to -- 5-1/2 to six years at GUARD, a policyholder or its representatives for a reinspection at a property?
A. **Yes.**
Q. On this case -- well, you never visited Colorado, so fair to say you never visited the property?
A. **Correct.**
Q. Okay. And then paragraph 2, would you agree, is putting you on notice that moisture is penetrating through the building through hail-caused openings?
MR. DEVILLING: Object to form.
A. **Yes.**
Q. (BY MR. BUKOWSKI) And that windows were also boarded up due to damage alleged to be from the storm?
A. **Correct.**
Q. Okay. And within your claim file, I'll represent to you that there's not a response message.

Page 118

Do you recall responding to this message?
**A. I don't recall.**
Q. Okay. Is there a reason, as of April of 2021, that you didn't --
THE REPORTER: I'm sorry, Jonathan. That you didn't --
Q. (BY MR. BUKOWSKI) Yeah. As of April of 2021, had you released any payment related to damage from the storm?
**A. I don't recall.**
Q. Okay. Is there somewhere that would memorialize if you made a payment?
**A. A payment history tab.**
MR. BUKOWSKI: Brian, is that something that you -- is that in the claim notes, or do you know?
MR. DEVILLING: I don't know, offhand. I think that would be part of the claim note document.
MR. BUKOWSKI: Well --
MR. DEVILLING: I'm looking at it now.
MR. BUKOWSKI: I'll just ask him some questions.
Q. (BY MR. BUKOWSKI) Mr. Ardoline, as of April 2021, would you agree, based on the information you had, a payment should have been issued?
**A. We didn't have enough information to issue the payment.**

Page 119

Q. Okay. You would agree, as of April of 2021, you had two field inspection reports, correct?
**A. Yes.**
Q. You also had an estimate from the contractor?
**A. Yes.**
Q. And you also had an engineering report confirming and separating out damage from the storm?
**A. Yes.**
Q. What additional information did you feel you needed to issue a payment in April of 2021?
**A. An estimate.**
Q. You had an estimate from the contractor, correct?
**A. Yeah, we didn't have our estimate to show what was related to the storm only.**
Q. What -- you recall we looked at the contractor's estimate, and it provided for a cost and scope to replace the roof, right?
**A. Yeah.**
Q. And your -- your two field adjusters and your engineer confirmed that the roof had damage from the storm?
**A. Yes.**

Page 120

Q. And your two field adjusters and your engineer confirmed that the roof needed to be replaced from damage from the August storm?
**A. Yes.**
Q. So why could you not issue a payment off the contractor's estimate, at least related to the replacement of the roof?
MR. DEVILLING: Object to form.
**A. That -- to the best of my knowledge, that estimate wasn't reviewed, and I pointed out from the beginning that they used the wrong price list. So if I paid off that, it would have been incorrect anyway.**
Q. (BY MR. BUKOWSKI) Okay. Did you ever ask them to correct the price list?
**A. I don't recall, and that would have been the estimate review team's responsibility.**
Q. Okay. But you would have had to place the estimate review team on notice that there was an estimate to review, correct?
**A. I believe so.**
Q. Okay.
MR. BUKOWSKI: Brian, were you able to find it?
MR. DEVILLING: No, I'm not seeing any -- anything under the description of a bill payment tab.

Page 121

I'm -- is it maybe, perhaps, a tab that's within the --
THE DEPONENT: A tab that's within IIS.
MR. DEVILLING: So is it possibly within a tab that's within the first two pages of the document I sent you yesterday, Jonathan? And if it's not there, I'm going to have to ask -- ask the client if there is such a tab.
MR. BUKOWSKI: Okay. We can come back to it.
Q. (BY MR. BUKOWSKI) All right, Mr. Ardoline, I'm just going -- I'm almost done. I'm just going to run you through sort of a summary of what we went through, okay?
**A. Yeah.**
Q. If you could just -- if you're able to pay attention to the exhibits I put up, this will be sort of a speed race through it, okay?
**A. Sounds good.**
Q. All right. So I'm going to put up exhibits and then ask you questions as -- as we go, and they're going to be the exhibits we reviewed, okay?
**A. (No verbal response.)**
Q. All right. The first exhibit I have up here is the email, Exhibit 37, the email dated

# WILLIAM ARDOLINE - July 08, 2022

Page 122

September 2, 2020, to you from Raphael & Associates. Do you see that?
A. **Yes.**
Q. Okay. And you agree, based on what we're seeing here, this is an email that you would have received?
A. **Yes.**
Q. And within that email, it's representing that the first field adjuster report, Ted Miller, is attached to the email?
A. **Yes.**
Q. Okay. And we looked at the first report from Ted Miller. Do you recall seeing that?
A. **Yes.**
Q. All right. And that report is dated August 25, 2020. Do you see that, on the screen?
A. **Yes.**
Q. Okay. So you would agree that within a month of the reported August 2, 2020 storm, you were put on notice by the company hired by Amguard to investigate the damage that there was potential hail and wind damage to the property from that storm?
A. **Yes.**
Q. I've placed on the screen Exhibit 38. As of September 9, 2020, you instructed that first field

Page 123

adjuster to close their file, correct?
A. **Correct.**
Q. And on September 9, 2020, you retained a second field adjuster, Engle Martin & Associates, to evaluate the claim?
A. **Correct.**
Q. But you did not provide a copy of the first field adjuster's report to your second field adjuster, Engle Martin?
A. **I don't recall.**
Q. And you authorized the second field adjuster, Engle Martin & Associates, to retain a professional engineer to evaluate the extent of hail damage from the August 2020 storm?
A. **Correct.**
Q. And we looked -- Engle Martin's -- Engle Martin & Associates engaged the professional engineer William Oviatt from Envista Forensics?
A. **Correct.**
Q. And we looked at Exhibit 41, which was an email from Engle Martin dated October 6, 2020, which provided you with a copy of the inspection report provided by the second field adjuster, Engle Martin, correct?
A. **Correct.**

Page 124

Q. And we looked at the second field adjuster's report, Brian Rubidoux from Engle Martin, that was dated October 6, 2020, and marked Raphael 947 through 976, correct?
A. **Correct.**
Q. Okay. And we went through the findings of that report, right?
A. **Yes.**
Q. And you were notified by the second field adjuster, Brian Rubidoux, that you hired, that there was hail and wind damage to the property from what he believed to be the August 2, 2020 storm event?
MR. DEVILLING: Object to form.
A. **Yes.**
Q. (BY MR. BUKOWSKI) And this form of damage identified by the second field adjuster, Brian Rubidoux, was consistent with the damage that was reported by the first field adjuster, Ted Miller?
MR. DEVILLING: Form.
A. **Some damage, I would think.**
Q. (BY MR. BUKOWSKI) So I have Exhibit 42, which is the second field adjuster's report, marked Raphael 949. And, again, under Building, first paragraph, do you see he's confirmed -- or he's reporting damage to the roof, the windows, the stucco,

Page 125

the fence, and three commercial doors?
A. **Yes.**
Q. And you would agree that your first field adjuster, Ted Miller, had also reported the same damages to the roof, the stucco, windows and several doors, among other things?
A. **Yes.**
Q. So you would agree that the second field adjuster from Engle Martin is reporting the same damages that were reported by the first field adjuster?
A. **Yes.**
Q. All right. Now, we looked at the email from the contractor dated October 2020, right?
A. **Yes.**
Q. And that estimate -- that email included a repair estimate and a number of photographs for what the contractor believed was a scope and cost to repair hail damage to the property.
A. **Yes.**
Q. Okay. But you did not issue a payment on the contractor's estimate?
A. **No.**
Q. All right. So I have the claim notes back up on the screen, and so we're looking at a claim note from November 19, 2020, which is a call from the

Page 126

contractor, trying to contact you, correct?
**A. Yes.**
Q. But you -- you never contacted him back?
**A. I did in that email.**
Q. Okay. So you are responding -- so you're pointing to the December 2, 2020 email?
**A. Yeah.**
Q. Okay. Did you ever have a verbal conversation, to your recollection, with the contractor?
**A. I don't recall.**
Q. Okay. And, again, that's because that -- your testimony is that's not really your job, it's the job of the independent adjuster?
**A. No. The estimate team.**
Q. The estimate team. But to your recollection, you don't know if that information was provided to the estimate team?
**A. Correct. I don't recall.**
Q. Okay. I've placed on the screen Exhibit 48, which is the email from Engle Martin dated November 30, 2020, to you, with a copy of the second report from Engle Martin that includes the engineering report. Do you remember seeing that?
**A. Yeah.**

Page 127

Q. I've placed on the screen the report No. 2 from Engle Martin, dated November 30 of 2020, which included a copy of that engineering report that -- that we looked at earlier. Do you recall going over this?
**A. Yes.**
Q. Okay. And that second report from your second field adjuster also included a memorialization of the findings of the engineer, correct?
**A. Correct.**
Q. All right. So as of November 30, 2020, you were notified that your professional engineer, William Oviatt from Envista, identified hail and wind damage to the property caused by the August 2020 storm?
**A. Correct.**
Q. And the damage identified by your professional engineer was consistent with the damage identified by the two prior field adjusters hired by Amguard?
**A. Yeah, that there is a mix of storm damage and not storm damage.**
Q. Okay. But the damage that your professional engineer reported was caused by the storm is consistent with the same damages identified by the two field adjusters hired by Amguard?
**A. Correct.**

Page 128

Q. Okay. Did you -- it's fair to say you did not instruct either independent field adjuster to prepare an estimate on the scope and cost to repair the damages to the property caused by the August 2020 storm?
**A. No. I've asked them to -- and told them that we needed an estimate based on what is storm related only.**
Q. Okay. Did you ever instruct the engineer to prepare an estimate on the scope and cost to repair damages to the property caused by the August 2020 storm?
**A. I don't recall.**
Q. Where -- where does your recollection come from that you instructed the field adjuster to prepare an estimate?
**A. I said that we need an estimate.**
Q. Okay. Just to be clear, you did not instruct -- during your time on the claim, which was August of 2020 through your departure in April of 2021 -- that's correct, right?
**A. Yes.**
Q. During the time you were on the claim, August 2020 through April 2021, did you ever instruct either of your field adjusters to prepare an estimate?

Page 129

**A. I don't recall.**
Q. And if you had instructed them to prepare an estimate, such instruction would be within the claim file?
**A. Yes.**
Q. And if it's not within the claim file, then it's likely you didn't instruct them to prepare an estimate?
**A. Yes, but it doesn't mean it didn't happen.**
Q. If -- if your field adjusters testify that they were never instructed to prepare an estimate, would you disagree with their testimony?
MR. DEVILLING: Object to form.
**A. I would say I don't recall.**
Q. (BY MR. BUKOWSKI) Okay. And so you'd defer to what -- their recollection, if they have one, of their instruction?
**A. Yes.**
Q. Okay. And then, finally, we looked at the email from my office requesting several documents and reports and such, right?
**A. Yes.**
Q. Okay. And that -- that message from our office also requested a release of insurance coverage, correct?

Page 130

**A. Correct.**
Q. And as we went over, at least until this point, you don't recall releasing any insurance coverage?
**A. Correct.**
Q. And if you had, it would be within the payments tab within the IIS system?
**A. Correct.**
Q. So -- so looking back on -- on the claim in the past few hours that we went through this, is there anything you would have done differently, based on the information you had?
**A. No.**
Q. Do you believe your handling of the 2505 6th Street claim was consistent with GUARD's standards?
**A. Yes.**
Q. Do you know if your handling of this claim was ever audited while you were employed with GUARD?
**A. No.**
Q. Are you aware that GUARD issued a payment in November of 2021 for hundreds of thousands of dollars related to the damages identified by your consultants?
**A. After my time at GUARD, I'm not aware of what happened.**

Page 131

Q. Okay. All right.
MR. BUKOWSKI: Let's just take a -- take like a one-minute break. We can go off the record really quick. I think I'm done with this portion, okay?
MR. DEVILLING: I have just one or two questions, all right?
MR. BUKOWSKI: Go ahead.

EXAMINATION

BY MR. DEVILLING:
Q. Mr. Ardoline, Brian Devilling representing GUARD. You testified a number of times during the deposition that Mr. Oviatt found different types of damage on the building. What did you mean by that?
**A. As we went through, it was damage related to storm damage and damage not related to storm damage.**
Q. All right. And did Mr. Oviatt identify damage that was caused by wear and tear and deterioration?
**A. Yes.**
Q. And did he identify other kinds of damages that were totally unrelated to this hailstorm?
**A. Yeah. It looked like the original construction was incorrect on some things.**
Q. Okay. And why are those items significant

Page 132

to you, from a coverage standpoint, as the adjuster?
**A. Because they're excluded by the policy.**
Q. Okay. And as of the time you left GUARD, what were you still waiting on before possibly issuing a payment on the claim?
**A. An estimate related to storm damage only.**
Q. Okay.
MR. DEVILLING: That's all I have. Thank you.
MR. BUKOWSKI: Okay. I have a couple follow-ups on that.

EXAMINATION

BY MR. BUKOWSKI:
Q. So Exhibit 47 is a copy of the William Oviatt engineering report. Can you see that okay?
**A. Yeah.**
Q. Okay. And we're on the Conclusions section. Conclusion No. 2, that relates to the shingle roof, correct?
**A. Yes.**
Q. And Mr. Oviatt, your professional engineer, is communicating to you that there is damage to the shingle roof caused by the August 2, 2020 storm, correct?
**A. Yes.**

Page 133

Q. And he identified over 11,000 damaged shingles, correct?
**A. Correct.**
Q. Did he state, within conclusion No. 2, that any of the damage he observed to the shingle roof was related to wear and tear?
**A. No. But in 3, he says that there was stuff related to cosmetic damage.**
Q. Right. So we're going to go through each one, since counsel made a point of this. I'm sorry. So looking at conclusion No. 2 related to the asphalt roofing covering and the hail damage identified by your engineer. Does he indicate that any of the damage to the roof covering was caused by wear and tear?
**A. No.**
Q. Okay. You'd agree, in conclusion No. 2, that all the damage reported by the engineer to the roof covering, he was reporting was caused by the August 2, 2020 storm?
**A. Correct.**
Q. Okay. Looking at conclusion No. 3. That relates to cosmetic damage to various metal components, correct?
**A. Yes.**
Q. Okay. And he's identifying dents to metal

Page 134

components caused by the August 2, 2020 storm?
**A. Correct.**
Q. Does he identify that any of the dents within conclusion No. 3, to the metal components, were caused by wear and tear?
**A. No.**
Q. Okay. And conclusion No. 4 talks about items where he identified functional damage caused by the August 2, 2020 storm, correct?
**A. Correct.**
Q. And within the number of items that he identifies within conclusion No. 4, does he state that any of them had issues of wear and tear?
**A. No.**
Q. Okay. Looking at conclusion No. 5. That's related to wear and tear on the windows, correct?
**A. Yes.**
Q. Okay. And he's talking about prying or separation of the windows from prying damage.
**A. Yes.**
Q. Okay. And you're -- and it's separated out from what was caused by hail to the windows, right?
**A. Correct.**
Q. Okay. And No. 6 talks about stucco

Page 135

issues, correct?
**A. Yes.**
Q. And he's talking about cracking to the stucco?
**A. Yes.**
Q. Is cracking to the stucco caused by wear and tear distinguishable from hailstone impacts to stucco?
**A. To an engineer, yes.**
Q. Okay. To you, are they distinguishable?
**A. They could be.**
Q. Okay. In your engineer's report here, within these paragraphs we reviewed, he does separate out the damage to the stucco caused by the hailstorm from the damage to the stucco caused by wear and tear.
**A. Okay.**
Q. Is that true?
**A. I don't see where it says -- oh, stucco -- fractures in stucco siding, yeah.**
Q. I'll walk you through it really quick.
**A. No, I -- I see it.**
Q. I know. I got to get a clean record, though. So in conclusion No. 4, can you see conclusion No. 4?
**A. Yep.**

Page 136

Q. Okay. Would you agree that in conclusion No. 4 from your engineer, he identifies fracturing to the stucco caused by hailstone impact?
**A. Yes.**
Q. And in conclusion No. 6, you're identifying -- your engineer is identifying cracking caused by wear and tear to the stucco.
**A. Yeah.**
Q. Okay. So he's separated out for you the damage to the stucco that was caused by hail versus the damage that was distinguishable and caused by wear and tear?
**A. Yes.**
Q. And he also, in paragraph 4, distinguishes the damage that was caused to the windows by hailstone impacts from the August 2020 storm.
**A. Yes.**
Q. And in paragraph No. 5, he distinguishes the damage to the windows that's caused by wear and tear?
**A. Yes.**
Q. Okay. So you would agree that as -- when you received this report in November of 2020, you knew exactly, from your engineer, what damage was caused by the August storm and what damage was caused by

Page 137

unrelated conditions?
MR. DEVILLING: Object to form.
**A. Yes, but we didn't have an estimate.**
Q. (BY MR. BUKOWSKI) Okay. And whose responsibility is it to go obtain an estimate?
MR. DEVILLING: Object to form.
**A. What do you mean, "obtain an estimate"? Like, one that we would be able to pay on?**
Q. (BY MR. BUKOWSKI) Would you agree that it's GUARD's responsibility to -- to obtain an estimate as to the scope and cost to repair damages that were identified by your two field adjusters and confirmed by your engineer?
**A. Yeah. Someone from GUARD would ask for it, and they would have to be reviewed by the estimate review team.**
Q. Okay. And so if someone from GUARD doesn't ask for that estimate, is it the fault of my client, 2505, that an estimate was not obtained by GUARD?
MR. DEVILLING: Object to form.
**A. Was somebody blaming your client?**
Q. (BY MR. BUKOWSKI) So I just need to re-ask the question. If someone from GUARD did not procure or proactively request an estimate from one of

# WILLIAM ARDOLINE - July 08, 2022

Page 138

its consultants, is there any fault on the part of your policyholder, 2505, for GUARD's delay in getting that estimate?
MR. DEVILLING: Object to form.
**A. No.**
Q. (BY MR. BUKOWSKI) And if you didn't proactively request an estimate, is there a reason you would not have done so?
**A. I don't recall --**
MR. DEVILLING: Object to form.
**A. -- if I had been -- or why I wouldn't have, what I did.**
Q. (BY MR. BUKOWSKI) You would agree that as of November 2020, you had two reports from field adjusters hired by GUARD and an engineering report from an engineer hired by GUARD, which separates out the damage?
MR. DEVILLING: Object to form.
**A. Correct.**
Q. (BY MR. BUKOWSKI) And you had -- you had sufficient information to go procure an estimate as of November of 2020?
MR. DEVILLING: Form.
**A. Yes.**
MR. BUKOWSKI: Okay. I don't -- Brian, do

Page 139

you have any further questions?
MR. DEVILLING: Nothing further.
MR. BUKOWSKI: Okay. Mr. Ardoline, so I -- I appreciate your time for 2505. Mr. Archuleta is going to have some questions for you on the Woodside Village claim. Do you need a break?
THE DEPONENT: Yeah. Do you know how long that's going to be?
MR. BUKOWSKI: Let me discuss with him. You want to take five, ten minutes?
THE DEPONENT: Yeah, uh -- yeah.
MR. BUKOWSKI: Let's go off the record really quick. So we can go off the record.
THE VIDEOGRAPHER: The time is 9:37 a.m. We're now off the record.
(Recess taken, 9:37 a.m. to 9:57 a.m.)
THE VIDEOGRAPHER: The time is 9:57 a.m. we're back on the record. Counselor, you may continue.
MR. ARCHULETA: Okay.

EXAMINATION

BY MR. ARCHULETA:
Q. All right. I want to talk to you about the Woodside Village II condominium case. Just some background for this case. So you understand that Engle Martin Associates was on this case as well?

Page 140

**A. I don't recall, like -- you're saying that, then I'll trust you.**
Q. EMA, Engle Martin Associates?
**A. Yeah, yeah.**
Q. Okay. And we'll look at a document. I'll go ahead and share my screen, just to get started.
**A. All right.**
Q. And this is at the beginning --
MR. DEVILLING: Hey, Nate, since we're now back on the record, maybe -- I just want to make a clear statement; at this point, we're transitioning to the Woodside case.
MR. ARCHULETA: Yes.
MR. DEVILLING: Just in case that's not clear on the record yet. Go ahead.
MR. ARCHULETA: Yes, we are on the Woodside case right now.
Q. (BY MR. ARCHULETA) I'm going to share the screen with you, kind of look at it. One second. Kind of get all this stuff out of the way. So this is Exhibit 16, I've labeled.
(Exhibit 16, remotely introduced and electronically provided to the reporter.)
Q. Do you see that right here, Woodside Village II Condominium Association, at the top of this

Page 141

email?
**A. Yep.**
Q. You see Engle Martin on this case?
**A. Yes.**
Q. Okay. Do you -- do you recall if you assigned this case to Engle Martin?
**A. If the -- if I was on it from the beginning, then I would have.**
Q. Okay. Do you recall being on this case from the beginning?
**A. I don't recall.**
Q. Okay. We'll look at the second page of this document. The first page is Bates GUARD 505, the second page is GUARD 506. I'm going to have to zoom out, because I think it's bigger than the screen.
All right. So I think we're looking at some kind of assignment information. It's got your information on this. You see that email right there, william.ardoline@guard?
**A. Yep.**
Q. That's your email, right?
**A. Yes. It was my email.**
Q. Okay. Did you fill out this -- I'm sorry. Go ahead.
**A. I said, it was my email.**

Page 142

Q. It was your email. And did you fill out this document?
**A. No.**
Q. Okay. So this is not your writing on this document, correct?
**A. No. It's just auto-populated.**
Q. Okay. Do you know who would have filled this document out?
**A. It's our automatic system send-out from when we assigned somebody on the claim.**
Q. Okay. And you did not write, Insured reports hail damage to the building --
**A. No.**
Q. -- correct? Okay. And just as a refresher, you see this date of loss, July 5, 2019? Do you see that?
**A. Yep.**
Q. Okay. Do you recall being on the case from the very first day?
**A. I don't recall.**
Q. Okay. I'll close that, and I'm going to show you what I've marked as Exhibit 17.
(Exhibit 17, remotely introduced and electronically provided to the reporter.)
Q. All right. Do you see this email from

Page 143

Engle Martin & Associates to you, William, in September?
**A. Yes.**
Q. Okay. You would agree with me, you were involved in this case at least as of September 10, 2019, correct?
**A. Yes.**
Q. And that is your -- you do recall receiving this email?
**A. I don't recall.**
Q. Okay. But if it's -- if you're on the To line, you have no doubt that you did receive it?
**A. Yeah, I would have received it.**
Q. Okay. And do you recall working with a Monica Hall from Engle Martin Associates on this case?
**A. I do not.**
Q. Okay. In the prior case, you talked about that you had worked with Engle Martin Associates over 300 times, correct?
**A. At least, yes.**
Q. Okay. You have a familiarity with who over at Engle Martin you were working with on a regular basis?
**A. I mean, if I saw a name that looked familiar, yeah.**

Page 144

Q. You worked with a Jaren Genest?
**A. He sounds familiar.**
Q. Okay. Do you have a recollection specifically of how many times you worked with him?
**A. I do not.**
(Exhibit 18, remotely introduced and electronically provided to the reporter.)
Q. And I'm going to show you what we marked as Exhibit 18 to this case, and we are going off the previous exhibit list from when Jaren Genest was previously deposed. So this is marked as Exhibit 18. All right. So this is a report that is, I guess, addressed to you, correct?
**A. Yes.**
Q. Okay. September 10, 2019?
**A. Yes.**
Q. Okay. Do you have any reason to doubt that you would have not received this report on that date?
**A. On the actual date that it has there, yeah, I probably wouldn't have received it on that day.**
Q. You probably would not have?
**A. Yeah. Would not have.**
Q. Okay. Going back to Exhibit 17, it looks like there, You will find the captioned report. I

Page 145

think this is referring to that report. Do you see that?
**A. Okay.**
Q. So is it fair to say that you did receive that report on September 10, 2019?
**A. Per this email, then yes.**
Q. And if we go down, did you give any instructions to Engle Martin & Associates on a regular basis about how to conduct their investigations?
**A. That's normally worked out in a contract with management and whoever over at Engle Martin, on what their expectations are.**
Q. So in terms of what they're supposed to investigate, that's not something that you would have instructed them to do?
**A. Not unless I had something unique to tell them.**
Q. Okay. So when they're assigned to a case, you're just -- you receive the first report. You are -- you have no input into that report, correct?
**A. I mean, I could. But most -- most likely, I just wait for the first report to see what's going on and then direct further from that.**
Q. Okay. It's got a date of inspection on this report, August 29, 2019. Do you see that?

**A. Yes.**
Q. Did you inspect the property with Engle Martin on that date?
**A. No.**
Q. Okay. In the prior matter that was -- this morning, the 2505 case, was it your typical practice -- I guess, strike that.
Was it your typical practice to do a first inspection with Engle Martin for properties that you were on?
**A. No. My main role was as a desk adjuster. I very limited would go out, and it would normally only be around Pennsylvania.**
Q. So you were operating claims in Colorado from Pennsylvania, correct?
**A. Correct.**
Q. Okay. And you had -- you don't recall having to fly to Colorado to do inspections?
**A. Never.**
Q. Okay. We can go down to this information. Do you recall having first contact on the claim with a Len Kaiser?
**A. I do not recall.**
Q. Okay. So you don't know if that's the -- that's the owner of -- that's someone that is



associated with Woodside?
**A. Yeah. I don't recall who I contacted from them.**
Q. Okay. When you receive a report like this, do you review it in detail?
**A. I try my best to, yes.**
Q. About how much time do you think you spend -- you spent reviewing Engle Martin reports when you worked there?
**A. It depends on what the contents of a report is and the detail of it is.**
Q. Did you at all document your time anywhere regarding how much time you spent doing different tasks at GUARD?
**A. No, I would never do that.**
Q. Was that an expectation of you?
**A. No.**
Q. So you -- you don't know if they were actually, I guess, auditing you on a daily basis to see what you were doing?
**A. No.**
Q. Do you know who your supervisor was at this time --
**A. I don't recall.**
Q. -- in 2 -- in September 2019?



**A. No, I don't recall.**
Q. I'm going to the second page of this document; EMA 99, that's the Bates. You'll see the -- the Insured section there. Did you at all reach out to Len Kaiser by phone when you received this report?
**A. I don't recall.**
Q. Okay. Did you -- was it your typical practice to try to make contact with the named insured when a file was opened?
**A. Yeah.**
Q. Okay. Were you -- strike that. You previously testified that Engle Martin & Associates was instructed to handle the adjustment of a claim when they were involved, correct?
**A. Correct.**
Q. And if they were investigating the claim, what was your task that's separate from theirs?
**A. Review the reports, and if the insured has any questions, try the best of my ability to answer them.**
Q. Did you at all delegate your responsibilities to Engle Martin & Associates to do the communications with the named insured?
**A. They're always allowed to talk to the insured.**



Q. Do they need permission from you to do so?
**A. No.**
Q. Okay. So they can talk to the named insured about their investigation without asking you?
**A. Correct.**
Q. And if we look at the next page, EMA 100, do you see the loss description?
**A. Yes.**
Q. Okay. It looks like EMA did a -- I guess a -- some kind of research to look for the hail size in that area. Did you have any kind of training at this time related to determining what kind of -- size hail hit -- hit the property?
**A. I don't recall.**
Q. Do you know how to look up that information?
**A. No, I don't recall.**
Q. Do you -- does the -- does the word CoreLogic report ring a bell with you?
**A. Yes.**
Q. Okay. What is that?
**A. It's a -- I believe it's a hail report.**
Q. Okay. That -- that would give you the size of hail, at least as reported by spotters, correct?

# WILLIAM ARDOLINE - July 08, 2022

Page 150

**A. Yeah, general -- in the general area.**
Q. Okay. Is that information that you would use to make coverage decisions?
**A. Could be, yeah.**
Q. And if you are provided information from, say, Engle Martin & Associates about the hail size, is there any kind of investigation you would do to confirm that information?
**A. Most likely have an engineer.**
Q. Okay. Would you actually go pull a hail report yourself?
**A. I could order one, but I'd normally have a field adjuster or engineer pull it.**
Q. Okay. If Engle Martin & Associates, for instance, tells you the size of hail on a claim, do you generally rely upon that information, or do you try to, I guess, check it?
**A. I mean, if it makes logical sense in relation to the entire report and findings and pictures and things, I would trust their expert -- or expertise.**
Q. Okay. So this is a general principle about when you receive a first report from Engle Martin & Associates; you do not inspect a property to confirm their findings, correct?
**A. Correct.**

Page 151

Q. Okay. So when you're making a determination about coverage, you're evaluating it solely on documentation, correct?
**A. Correct.**
Q. And do you think that that is a fair way to evaluate a claim?
**A. Yes.**
Q. Do you think that you can determine if a full and fair inspection of a property was done, based upon pictures alone?
MR. DEVILLING: Object to form.
**A. Yeah.**
Q. (BY MR. ARCHULETA) Does it matter to you the quality of the pictures when you're making an assessment of coverage?
**A. Yes.**
Q. That's something that you care about, correct?
**A. Yeah. I mean, they can't be -- I'm trying to think of a good word. They can't be of bad quality.**
Q. Okay. And so, for instance, in this report, if you look at the last paragraph of this page -- I'll say the Bates again, EMA 100. It says, No damage is visible on the soft metals, including the gutters. Do you see that?

Page 152

**A. Yes.**
Q. Okay. And you said you don't recollect reviewing this specific report, correct?
**A. Correct.**
Q. But it's your -- you would agree with me that had you -- that when you received this report, you did not verify the findings in the report, correct?
**A. I wouldn't necessarily say that.**
Q. Okay. How would you verify the findings in the report?
**A. In this specific report?**
Q. Generally. You already said you don't recollect, so I'm not trying to --
**A. Yeah.**
Q. -- make you remember something you don't know.
**A. I mean, you could look at Weather Underground, you could look at what you said, CoreLogic. You can have an engineer or another expert added to the file.**
Q. Okay. If -- if there's no engineer involved at this time, and you only received this report, what do you do to verify the findings?
**A. I mean, if I didn't agree with them, I'd have to look at other options, peer review, other things. But if there's nothing that's out of the ordinary, I wouldn't necessarily need to verify them.**

Page 153

Q. Okay. You don't expect Engle Martin & Associates to draft an estimate for a claim they find no damage, right?
**A. Correct.**
Q. Okay. When is an estimate requested?
**A. When coverage is confirmed.**
Q. Meaning there is any coverage at all, correct?
**A. Correct.**
Q. Okay. And going to the next page, if you look at the recommendation, it says that, As the damage to the roof does not appear recent, we recommend running a CoreLogic report. Do you see that?
**A. Yes.**
Q. When you receive a recommendation like that, do you actually -- do you respond in writing?
**A. Not all the time. Could be a phone call, could be in writing.**
Q. Well, if it was by phone call, would you document it somewhere?
**A. Most likely. Not -- doesn't have to, but I try my best to document a phone call.**
Q. Okay. If it's not documented, is it fair

# WILLIAM ARDOLINE - July 08, 2022

Page 154

to say we would have no idea if it was done?
**A. Yeah. If it's not in the claim file, then you wouldn't know it was done.**
Q. Right. Because you don't remember everything, right?
**A. Correct.**
Q. And do you think that you have a duty to put important information in the claims file?
MR. DEVILLING: Object to form.
**A. I mean, it's best practice to, and I try my best to.**
Q. (BY MR. ARCHULETA) I'm going to go to the next document. It's previously labeled as Exhibit 2. I am just going to bring it up. So we labeled this in the last deposition for Jaren Genest. If you look at this document, this is also addressed to you, correct?
**A. Correct.**
Q. Okay. And the date is October 10, 2019. Do you see that?
**A. Correct.**
Q. Okay. And do you have any reason to doubt that you didn't receive this report on or near that date?
**A. It would have been -- if it wasn't on there, it would have been close.**

Page 155

Q. Okay.
**A. Most likely some -- like, I don't remember this specific one, but sometimes they don't get to me.**
Q. The reports don't get to you?
**A. Yeah, because of some admin stuff. I've had it where there's stuff, say, that's time-stamped October 10 and I've never received it, either at all or months later, because there is some kind of issue.**
**But that's an anomaly, normally. Most of the time, I do get it.**
Q. Okay. Do you have a recollection of that issue appearing on this case?
**A. I don't recall.**
Q. When you have that kind of issue where you weren't getting stuff timely, was that something that you reported to management?
**A. Yes.**
Q. Okay. All right. And when you received this report, do you have any doubt that you reviewed it?
**A. Yeah, I would have reviewed it.**
Q. In detail?
**A. Yeah.**
Q. Okay. In terms of the findings of Engle Martin & Associates finding no damage to property, when

Page 156

they find no damage, is that pretty much the end of your investigation?
**A. I mean, not all the time.**
Q. Well, when you get a report that says no damage and requesting a CoreLogic report, what would be your next step?
**A. Get a CoreLogic report.**
Q. And do you know if you did that in this case?
**A. I don't recall.**
Q. And so for this case, between October 9 -- or October 10, 2019 and the prior report, September 10, 2019, do you recall taking any actions on this case?
**A. I don't recall.**
Q. Okay. If we go to the second page of this report, EMA 126, you'll see that the Investigation Adjustment section is a little bit different. Do you see that?
**A. Yes.**
Q. They say, Recall no damage was found to the elevations. Do you see that?
**A. Yes.**
Q. Okay. In terms of -- on a coverage analysis, it says, Shingles are heavily worn and appear to have issues with wear and tear. Do you have any

Page 157

kind of background to be able to determine if that was an accurate statement?
**A. I mean, I've gone to trainings and seen many claims where there was that kind of issues.**
Q. Okay. But in this case, you didn't inspect the property, correct, at this time?
**A. I did not.**
Q. And do you have any recollection of visiting Colorado in 2019?
**A. I've never visited Colorado other than being at the airport one time in Denver.**
Q. Never been to Colorado?
**A. No.**
Q. If you look at -- in terms of the report, you see that it says, The size of hail has not caused the issue the shingles are exhibiting. Do you see that?
**A. Yes.**
Q. Okay. Do you recall at all ordering a CoreLogic report to confirm the size of the hail?
**A. I don't recall.**
Q. Okay. And in general -- in general terms -- I just want to ask you some knowledge terms here. So when a roof is old, does that affect its ability to withstand hail hits?

A. Yes.
Q. Okay. So if a roof -- and we're talking general principles here, right?
A. Uh-huh.
Q. So if the -- a roof is, say, 30 years old, could it be damaged by smaller hail?
MR. DEVILLING: Object to form.
A. Yes. It could be damaged by anything, because the brittleness would be up to, if not exceeding, its life span.
Q. (BY MR. ARCHULETA) And so do you understand that if GUARD accepts premiums for a roof, they're insuring it?
A. I have nothing to do with writing policies or premiums. So . . .
Q. And in terms of just -- just -- again, just broad principles here, so when you read a statement in this report, for instance, that says wear and tear, that the roof had wear and tear and that the damage exhibited was not from hail damage, do you go and do more investigation to figure out how old the roof is? Is that important to you?
A. Not unless an issue comes up.
Q. Okay. But would the age of the roof inform your decision about whether or not the report



findings are accurate, that 1-inch hail did not cause the damage?
MR. DEVILLING: Object to form.
A. If I get -- if I get overwhelming evidence or suggestions that there's issues with the roof, then I'm not going to -- or I wouldn't have went further. It's the -- it's the insured's job to prove the claim.
Q. (BY MR. ARCHULETA) And what do you mean by "prove the claim"?
A. It's their -- their job to prove the loss. So if we're saying from the beginning that there's issues with the roof and we tell them there's issues -- and, again, this is just in broad, not to this claim specifically, because I don't remember exactly what happened here -- but then it's their job to tell us, Well, we don't believe that, or, Here is other documents. It's not our job to get recommendations from a field adjuster and then go ahead and explore that further, if it's already telling us there's most likely no coverage.
Q. Okay. But specifically your job -- your role at GUARD, your job was to determine if coverage was owed, correct?
A. Yes.
Q. Okay. And that wasn't the named insured's



job, correct?
A. No.
Q. Okay. Their job was, as you said, to present evidence of --
A. Correct.
Q. But in terms of your job, did you think that the conclusion of a claim, for instance, receiving a report saying no damage -- correct?
A. Yeah. I have concluded many claims with one report that states similar things.
Q. Okay. And do you think you have any kind of duty to try to go look for coverage?
MR. DEVILLING: Form.
A. I mean, if I have any discrepancies and I -- and I don't believe what the field adjuster is stating, then I -- I would go further. But if not, then I would go with what they say and what the evidence is presenting to me.
Q. (BY MR. ARCHULETA) And in terms of getting an engineer involved, is that something that you would do at the outset of most claims?
A. Not -- not until there's either a -- well, let me back up. If it's a huge claim, like it comes in as a total loss or a significant loss from the beginning, then I would assign an engineer from the



beginning. Other than that, you normally wait until we get some information from a site inspection and if there's any coverage questions or anything.
Q. Okay. By big loss, do you mean like a big storm? Like it caused widespread damage, or you just mean that you have some reserve set that makes it a big claim?
A. No. Like it -- say we get a total loss fire and the building is completely gone, or I guess you can say a hurricane or a widespread storm, in your terms, where the building is obviously very well damaged.
Q. Okay. And in terms of, I guess, setting a reserve -- for instance, if you receive a report from EMA that says there is no damage, what does that mean for your reserves?
A. There would be no reserves.
Q. There would be zero, correct?
A. Correct.
Q. Okay.
A. I -- I have a quick question.
Q. I don't answer questions. This is my deposition. I'm sorry.
A. Well, this is like a --
Q. You want to go off the record?

**A. It's just a quick question about how I'm viewing this.**
Q. Okay.
**A. If you're not going over a document, can you just click out of it, so I could see when you're talking and not just talking to a screen?**
Q. Sure, sure. I will click out of a document if we're not talking about it.
**A. Thank you.**
Q. That's fine. All right. And in terms of --
**A. Yeah, I still can't see you.**
Q. Yeah, thank you.
**A. There we go.**
Q. Okay.
**A. That's -- that's what I meant.**
Q. Okay. So if a reserve is set to anything other than a zero, does that mean that you have some kind of assessment that there is coverage or potential coverage?
**A. Not necessarily.**
Q. When would you set a reserve for anything other than zero where you get a report that says no damage?
**A. I mean, you could put minimal. I don't**



**recall, but I think there might have been a protocol where you set a minimal reserve. But I -- I don't recall specifically. I mean, you could have no coverage and put $100 on a claim or $1 or $10,000. It doesn't matter. I mean, normally what I would have done is get a claim, and based on what I'm seeing from the beginning, or hearing from people, I'm going to put 10,000 on it, I'm going to put 20,000 on it. And that has no indication if there is coverage or no coverage or if it's ever going to get paid 20,000 or if it's going to be 2 million. It's just from what I'm getting from first -- very first baseline information.**
Q. Okay. So the reserves, are they set some kind of way for you to analyze the value of a claim?
**A. Yeah, I guess you could say that.**
Q. And if you value it at zero, that means you don't think there's coverage, correct?
**A. Correct.**
Q. All right. I'm going to share another document with you. I've labeled it as Exhibit 19.
(Exhibit 19, remotely introduced and electronically provided to the reporter.)
Q. Let's see. So this is an invoice from Engle Martin & Associates, addressed to you, correct? You see that, William Ardoline?



**A. Yep.**
Q. Okay. You received invoices, correct, from Engle Martin?
**A. Not all the time. We had a bill-pay department.**
Q. Was it your job to review the invoices prior to issuing payment?
**A. No. We had a bill-pay department.**
Q. Okay. And so when you received an invoice for Engle Martin & Associates, what did you usually just do with it?
**A. I forget what we did. It was either email somebody or drop it in a file somewhere.**
Q. Okay. And so did you at all review it for accuracy?
**A. Most likely, no.**
Q. I want to ask you about just a few lines on here.
**A. Okay.**
Q. So related to the first report, you see the dates here, September 10, 2019?
**A. Uh-huh.**
Q. Do you recall we talked about that first report?
**A. Yep.**



Q. I don't see any billing related to a conversation with you about that first report, Engle Martin & Associates. Did you have any verbal conversation with Jaren Genest related to this?
**A. I don't -- I don't recall.**
Q. Okay. But --
**A. And I -- and I also don't know what their guidelines are for billing. So I don't know if they don't bill for phone calls or there has to be a phone call of a specific length. So just because they didn't bill it doesn't mean it didn't happen. I don't know what their billing guidelines are.**
Q. Okay. And I'm only asking for, looking at this, if you recall a conversation with them. So, for instance, the October 10, 2019 entry, it says, Telephoned adjuster and discussed the status. Do you recall talking with Jaren Genest related to a second report?
**A. I do not.**
Q. All right. And I'm going to show you the next document. All right. ClaimsIII at GUARD, is that another email you had?
**A. No. That's just if you email that, it automatically goes to the file. It doesn't come to me.**
Q. So if it's addressed to you, it doesn't

Page 166

necessarily go to you, correct?
**A. If it's addressed to William.Ardoline, then it goes to me. If it's directed to ClaimsIII, then it goes directly to the file.**
Q. And just to be clear, I'm labeling this document as Exhibit 20. It doesn't have a Bates on it; I don't know why.
(Exhibit 20, remotely introduced and electronically provided to the reporter.)
Q. If you look at -- Dana Moore. Do you recall talking with a Dana Moore related to this case?
**A. I do not.**
Q. Okay. And so in terms of the claim file, if it goes to ClaimsIII, it goes into the specific file, correct?
**A. Correct.**
Q. Okay. And when it goes into the file, you do review the files, correct?
**A. Yeah.**
Q. Okay. So if there was an email in here that says, "Hello, William," is it fair to say you would have reviewed that at some point?
**A. Most likely, yeah.**
Q. Okay. And this one says that there was a reserve of 45,000. Do you recall setting a reserve of

Page 167

45,000 for this case --
**A. No.**
Q. -- as of --
**A. I don't recall.**
Q. Okay. Do you recall having any reserve for this case other than zero?
**A. I don't recall.**
Q. All right. And if we go to -- I'm going to label the next exhibit, Exhibit 2- -- 21.
(Exhibit 21, remotely introduced and electronically provided to the reporter.)
Q. All right. You see this email from Thomas Malloy?
**A. Yes.**
Q. Okay. Who is Thomas Malloy?
**A. He was another GUARD adjuster.**
Q. Was he -- it looks like his role was a Property and Casualty Claims Adjuster II. Do you see that?
**A. Yes.**
Q. Was that your title as well?
**A. Yes.**
Q. It looks like he's giving you direction in this email. Do you see that?
**A. Yes.**

Page 168

Q. Okay. Was Thomas Malloy, I guess, in a supervisory role to you on this claim?
**A. No.**
Q. Did you generally take directions from people with the same title at GUARD?
**A. No.**
Q. Okay. Do you know why Thomas Malloy would have written an email to you to follow up with the named insured?
**A. He probably got a phone call from him.**
Q. Let me see if I can find --
**A. And it says, Please follow up with the insured upon your return to the office. So he got this when I was out of office.**
Q. Okay. So this is just a note to you that when you get in, follow up, correct?
**A. Yes.**
Q. Okay. When you receive a no coverage decision like we had reviewed previously with the EMA reports, do you communicate those findings to the named insured?
**A. Yeah, in a denial letter.**
Q. Okay. And that's what I was asking about previously with EMA. So does EMA communicate the coverage decision, that there's no coverage, or do you

Page 169

do that?
**A. No. Amguard does.**
Q. Okay. When there -- when Amguard receives a -- or when Amguard makes a decision of no coverage, do they attach engineering reports to those letters?
**A. No.**
Q. They don't -- they don't provide any analysis of their coverage letters?
**A. The findings are within the letter, but the actual report is not provided.**
Q. So it is your testimony that in the -- for instance, like a coverage letter, you would maybe copy and paste the findings of whoever helped you make that decision, in the letter, correct?
**A. Correct.**
Q. Was that policy that you had to do that?
**A. Yes.**
Q. Even if there -- so if there is -- if there is coverage, you would do that, correct?
**A. I'm sorry?**
Q. So if -- if you did find coverage, you would put the same information in a coverage letter, correct?
**A. If there is coverage, there is no coverage letter sent out.**

Q. So if there is coverage, you don't send a letter about coverage out?
**A. No.**
Q. How do you communicate to your named insured when there is coverage?
**A. Phone call, emails, payment.**
Q. No -- no letter explaining the basis for the payment?
**A. Nope.**
Q. No -- and was that your policy to not issue any letters related to explaining payment?
**A. Correct.**
Q. But you would send a letter out that would say the basis for denial, including potentially copying and pasting the findings in the letter, correct?
**A. Correct.**
Q. So if you did find -- if you did receive a report that does have coverage, how does that get communicated to a named insured?
**A. Phone call, email, payment.**
Q. If a named insured does not answer their phone, how would you communicate coverage?
**A. Email or payment.**
Q. So when you do -- when you do find coverage, you put in the email the findings?



**A. I mean, most likely. I'm just saying, Hey, there's coverage, we're going to be sending you a proof of loss; please sign it so you can get paid.**
Q. Okay. But you wouldn't -- you wouldn't copy and paste the findings in the letter showing coverage, correct?
**A. Most likely, no.**
Q. Do you have any reason for -- strike that. When you receive like a report that does, for instance, show coverage, would you have any reason to not share the -- that finding with the named insured somehow, either email or verbal?
**A. I've never been questioned, Why am I receiving this payment.**
Q. You've never had anyone ask you what the basis for the payment is?
**A. I don't recall, no.**
Q. Okay. When you issue -- when you issue payment to a named insured, you expect them to use the money to complete repairs, correct?
**A. Correct.**
Q. And as part of that, I guess, communication that you want them to complete repairs, do you think that you have a duty to explain what repairs you want them to do?



**A. We send them an approved estimate, and they share that with their contractor, and the contractor is supposed to follow the estimate.**
Q. Okay. And if there was, say, not an estimate, but you have a report that says the type of repair to do, would you want to share that with your named insured so they understand how to do the repair?
**A. I mean, I'm not making a payment without an estimate, so I would send the estimate. And then if the contractor had any questions, then I would tell them to speak to whoever made the recommendations, or, as you're stating, send them what is approved.**
Q. Do you ever get permission to share reports with -- with named insureds?
**A. No.**
Q. Is that something you can ask?
**A. What do you mean?**
Q. I mean, have you ever asked anyone to be allowed to share a report with a named insured, meaning a supervisor?
**A. Yeah. We're not allowed.**
Q. Under any circumstance, correct?
**A. I can't recall any circumstance where I did send a report, other than discovery, in something like this.**



Q. I'm going to share with you what I've marked as Exhibit 23.
(Exhibit 23, remotely introduced and electronically provided to the reporter.)
Q. All right. This looks like an email from you to Jaren Genest. Do you see that?
**A. Yes.**
Q. Dated February 13, 2020. You made a note to close a claim -- to close his file; is that right?
**A. Yes.**
Q. Okay. And when you do that, does that mean you want them to close the file?
**A. Correct.**
Q. Is -- is there any kind of instruction you get from GUARD on when to inform Engle Martin & Associates to close a file?
**A. When it's done.**
Q. Meaning when -- when you think that there's no more analysis, correct?
**A. Correct.**
Q. Okay. And just to be clear, Engle Martin & Associates -- I'm getting the words mixed up in my head, but they're a third-party administrator?
**A. A third-party adjuster.**
Q. Adjuster, thank you. And in the 2505

Page 174

case, you did testify that you were involving them on claims, because at some point, there was too many claims for internal adjusters to handle, correct?
**A. No, that's Raphael & Associates, which is a third-party adjuster. They handled the whole claim as if they worked at GUARD. An independent adjuster is -- we work with them, and we're still working the file.**
Q. So Engle Martin & Associates had a different role in this case than, say, Raphael & Associates would?
**A. Correct.**
Q. Okay. And can you explain that role, just for the record?
**A. I mean, Engle Martin's an independent adjuster. They inspect and provide estimates and recommendations.**
Q. Okay. And so do you treat the findings of, say, Ralph (sic) & Associates different than, say, Engle Martin & Associates?
**A. Again, I never -- I didn't really work with Raphael & Associates, not much. Only if the claims ever came back in-house, as did the other claim we just talked about.**
Q. Okay. Were they more involved towards the

Page 175

end of your employment at GUARD?
**A. What do you mean?**
Q. I mean, you said you didn't work very much with them, and I'm just asking, was it because they were just like a new vendor for GUARD by the time you left?
**A. No. There's -- there is an adjuster, not myself, that handled TPA claims.**
Q. Okay. So at some point, if a claim goes -- strike that. Do you -- do you have the name of that? Would that be Melinda Champluvier -- Champluvier (pronouncing)? Would that be --
**A. It would be Melinda Champluvier, but I'm not sure if she was the one that's involved in that. I don't know. I didn't do it, so . . .**
Q. Okay. All right. I'm going to share with you what I've marked as Exhibit 24.
(Exhibit 24, remotely introduced and electronically provided to the reporter.)
Q. You recall hiring Haag Engineering for this case?
**A. I don't recall.**
Q. Okay. But this is a document; it looks like a request for engineering inspection. Have you seen that?

Page 176

**A. Yeah.**
Q. Have you seen forms like this before at GUARD?
**A. Yes.**
Q. Okay. When are these forms used?
**A. When we're requesting an engineer.**
Q. Okay. And do you recall the specific reason you would be requesting an engineer for this case?
**A. I do not.**
Q. Okay. But this information on this form, was this filled out by you?
**A. I don't recall.**
Q. Okay. Did you ever fill out a form like this before at GUARD?
**A. I don't recall.**
Q. Okay. Because what I'm looking at -- I guess I'm curious on a few things here. First, purpose of work. It looks like there is a description, Inspect 16 buildings, hail and wind damage; do you see that? Determine cause/extent, and update, provide an estimate.
**A. Uh-huh.**
Q. Was that directions you provided to Haag?
**A. Most likely.**

Page 177

Q. Okay. And that would include drafting an estimate, from the moment they were involved, correct?
**A. For any covered damages.**
Q. Okay. So as of April 30, 2020, you would agree with me that you -- there was a direction to Haag in this case to get an estimate drafted, correct?
**A. If there was coverage.**
Q. Meaning, after they drafted a report, and if there's coverage, they should draft an estimate, correct?
**A. Correct.**
Q. Okay. And if you look at the bottom, you see that Berkshire GUARD Hathaway section?
**A. Yes.**
Q. This looks like form text. Can you tell me why this was highlighted? We received it highlighted.
**A. I have no idea.**
Q. Okay. You did not highlight this, do you recall?
**A. I did not highlight it, and I did not send you guys any forms or documents.**
Q. Okay. And when I'm saying "you," I mean GUARD. So --
**A. Oh. Then, yeah, I don't know why.**

# WILLIAM ARDOLINE - July 08, 2022

Page 178

Q. Okay. And when you look at this, it says, Cycle expectations. Was there an expectation by you that engineers would perform timely inspections of the property?
**A. Yes.**
Q. What does that mean to you, "timely"?
**A. 14 days to inspection, 21 days to engineering report.**
Q. How many days to provide an estimate?
**A. 21 -- usually about -- I usually went about four weeks.**
Q. Four weeks from the date of assignment, or some other date? Can you say that again for the record?
**A. Date of inspection.**
Q. Okay. If it went longer than that, would you need to follow up with them?
**A. Yes.**
Q. How often would you need to follow up with them?
**A. As often as they could.**
Q. Okay. And you said, in the 2505 case, you handled, at some point, 300 cases, is that right, at one time?
**A. Correct.**

Page 179

Q. Okay. In terms of follow-up appointments, did you have some kind of method of tracking when you needed to follow up on specific claims at this time?
**A. Tried to keep a diary.**
Q. Did you have a written diary?
**A. No.**
Q. Where would that diary have been kept?
**A. The system.**
Q. What system?
**A. IIS claim notes.**
Q. Okay. Did it -- do you know if that system provided you, like, reminders of specific follow-up dates for cases?
**A. Yes.**
Q. Who was -- whose responsibility was it to put reminder dates in that system, related to your cases?
**A. Adjusters or anybody going in the file.**
Q. Okay. So if you, for instance, retained Haag Engineering, would you be setting the reminder dates of when to follow up to meet these 14- and 21-day deadlines?
**A. I tried my best.**
Q. Did you have any kind of -- it doesn't say the amount of time for an estimate. So did you -- do

Page 180

you recall putting in any kind of reminder system the amount of days for following up, for an estimate?
**A. I don't recall.**
Q. Do you recall doing that ever in any -- any claim?
**A. I don't recall.**
Q. And when a -- in this system that showed reminders, if you, for instance, did the follow-up, how would you mark that in the system to show it was complete?
**A. In a claim note.**
Q. A claim note would summarize if a -- if a follow-up call was made, correct?
**A. Correct.**
Q. And if there is no claim note, is it fair to say that you did not do a follow-up? Correct?
**A. No. Again, it doesn't have to be in the notes to have occurred.**
Q. Okay. But it's your testimony that your way of -- your personal way of tracking if a follow-up was completed for the reminder system that we're talking about, would be to do a claim note, correct?
**A. I tried my best to do it, yes.**
Q. Okay. All right. I want to show you Exhibit 25.

Page 181

(Exhibit 25, remotely introduced and electronically provided to the reporter.)
Q. All right. Do you see this letter from Robin Wolfe, at Haag Engineering, to you?
**A. (No verbal response.)**
Q. William? All right. Are you typing?
**A. (No verbal response.)**
Q. Can you hear me, William?
**A. Yeah.**
Q. Okay. I'm going to ask the question again. Do you recall receiving this email from Robin Wolfe to you on April 30, 2020?
**A. I do not.**
Q. Okay. And if we go down, this letter is addressed to you, correct, William Ardoline?
**A. Correct.**
Q. Okay. There's a description in here that looks like it mirrors mostly that prior exhibit we looked at, Exhibit 24. Inspect 16 buildings, determine the cause/extent.
Is that what you would typically hire an engineer to do, to determine the cause of loss?
**A. Yes.**
Q. Okay. And just to be clear, your testimony today is that you did not inspect this

# WILLIAM ARDOLINE - July 08, 2022

Page 182

property at all related to any report produced in this case?
**A. No. No.**
Q. Okay. So in your -- to confirm the findings of Haag, did you do any specific task, for instance?
**A. I don't recall.**
Q. Okay. If an engineer provides you a report, how would you go about confirming the findings?
**A. I review the report.**
Q. What would you review the report for?
**A. See if it makes sense.**
Q. So you're just looking to see if it's logical?
**A. Yeah, logical with what's being reported, and then what evidence has been sent, documents received, pictures.**
Q. Okay. Prior to, say, this letter of engagement going out, my understanding is that you made the decision to hire Haag in this case; is that right?
**A. I don't recall.**
Q. Who had decision-making authority to hire an engineer at GUARD? Did you have that authority?
**A. Yes.**
Q. Okay. Did Engle Martin & Associates have

Page 183

that authority?
**A. They could recommend it.**
Q. They could recommend it, but it would be your job to make the decision, correct?
**A. Correct.**
Q. Including approving the budget?
**A. Correct.**
Q. So at this time, was there any other adjusters on this claim that you know of that would have adjusted it with you?
**A. Don't recall.**
Q. At the time frame of April 30, 2020, were you working claims with multiple adjusters?
**A. Multiple GUARD adjusters?**
Q. Yeah. For instance, Thomas Malloy.
**A. No.**
Q. Do you recall working with Thomas Malloy on any cases in 2020?
**A. We don't work claims together.**
Q. You don't --
**A. We don't -- it would just be a peer review. Like, Hey, Tom, what do you think of this? But it's not like he could make payment on my claim or anything, or any decisions on my claim. It's just the most we would do is, What do you think about this,**

Page 184

**or . . .**
Q. Okay. And I'm asking that simply because what you're saying is he would not be the one that would say, I'm going to hire an engineer on this case?
**A. Correct. It was either -- it would either be me or management.**
Q. Okay. At the bottom of this page, GUARD 124, it says, Haag does not perform insurance adjusting services. Do you see that?
**A. Yes.**
Q. Was that your understanding, that they did not adjust the claim for you?
**A. Correct.**
Q. Okay. Same if they're determining the cause of loss; is that something that you can delegate to others? Is that your understanding?
**A. What do you mean?**
Q. Was it your understanding that you were allowed to delegate adjustment of the claim to other parties?
**A. I make the final decision. They just report the facts.**
Q. Okay. But it's not your job to find the facts, correct?
MR. DEVILLING: Object to form.

Page 185

**A. I mean, that's just -- that's weird. That's worded weird, because technically I am finding facts.**
Q. (BY MR. ARCHULETA) I'll ask it differently. Was it your job at GUARD to discover the facts related to a claim?
**A. Again, it's -- I am discovering facts.**
Q. Through people that you assign that to, correct?
**A. Correct. They present the facts. So I'm looking at the facts that they're presenting to me.**
Q. Okay. And if you don't have any counter evidence, you just accept those facts, correct?
**A. Again, as long as they make logical sense in the totality of the circumstances.**
Q. Do you know if Haag does any work for named insureds in Colorado?
**A. I do not know.**
Q. Have you ever asked that question to anyone?
**A. I don't recall.**
Q. How did you go about selecting Haag for this case?
**A. They're just an engineer that we've used for roofs.**

Page 186

Q. Why -- I guess what I'm asking more specifically, is there some kind of list you're provided of who to select from?
**A. I'm not sure if there was an engineering list. There's IA lists, but I'm not sure if there's engineer lists.**
Q. Okay. But in terms of knowing that Haag is one of the choices, is that something that was verbally told to you?
**A. Most likely.**
Q. Is there any specific list at GUARD that you know of, of engineers not to use?
**A. I do not know.**
Q. You don't have any specific understanding of any lists like that, correct?
**A. Nope.**
Q. Okay. And approximately how many cases in Colorado did you handle that you hired Haag?
**A. A lot.**
Q. Can you ballpark it for me?
**A. 50 to 100.**
Q. And is this specifically -- when you are hiring Haag, are you actually hiring a specific engineer or just assigning it to Haag to assign to a specific engineer, for them to assign?

Page 187

**A. Well, I believe that they have adjusters in this specific area. So if the claim was in, say, Denver, they'd have to assign the Denver area person.**
Q. What I'm asking is, when -- the assignment of your retention of Haag, are you actually seeking out a specific engineer, or you're letting Haag make that decision?
**A. No. Haag does.**
Q. And do you recollect why you hired Haag in this case?
**A. No.**
Q. Do you know if it was in response to a public adjuster?
**A. I don't recall.**
Q. Okay. Do you know who -- I'm showing you what I've marked as Exhibit 26.
(Exhibit 26, remotely introduced and electronically provided to the reporter.)
Q. It's an email with Scott Benglen -- actually, it's an email chain with Scott Benglen from May 1, 2020. You were copied on that, correct?
**A. Yes.**
Q. Okay. Do you recall ever working with a Scott Benglen in Colorado cases?
**A. I don't recall.**

Page 188

Q. You don't recall any specific claim, or you don't recall this specific one?
**A. I don't recall Scott Benglen in any claim.**
Q. In terms of Haag's assignment, I just want to ask a question about this. It's my understanding that Haag assigned two individuals to this; one of them is on this page, Jason Boehm, and another one is Jason Plasters. Do you know why there were two individuals at Haag assigned to this claim?
**A. I do not recall.**
Q. Okay. That's not something that you specifically asked for, correct?
**A. I don't recall.**
Q. Okay. Would you ever ask for Haag to assign, for instance, an estimator and then an -- I guess a field engineer separately?
**A. Could have been, yeah.**
Q. Okay. Would you expect that, from that form we looked at, the Haag assignment form, the request, that Haag would know, as of April 30, 2020, that you wanted an estimate done on the claim?
**A. Yeah, they would know. Should know.**
Q. They should know. Did you ever give assignment information to Haag Engineering by phone only?

Page 189

**A. I don't recall.**
Q. Is that something that you might have done?
**A. Yes.**
Q. In other -- in other instances, correct?
**A. Yeah.**
Q. Okay. And when -- if -- let's just say you give an assignment detail to Haag where you say, I want you to do this. Is that something that you would have put into a claims note?
**A. Probably.**
Q. But not for certain, correct?
**A. Correct.**
Q. Let me show you what I've marked as Exhibit 27.
(Exhibit 27, remotely introduced and electronically provided to the reporter.)
Q. It's an email with a Marc Dellario. Do you know who that is?
**A. Yes.**
Q. Who is Marc?
**A. The complex team supervisor.**
Q. Was he your supervisor on this claim?
**A. Well, complex team -- complex team --**
THE REPORTER: I'm sorry, I didn't

# WILLIAM ARDOLINE - July 08, 2022

Page 190

understand.

**A. Complex team lead.**

Q. (BY MR. ARCHULETA) And what is that in relation to you? Is that your direct supervisor or --

**A. Team lead.**

Q. A supervisor of some sort, correct?

**A. Yeah, but his title's not supervisor, it's team lead.**

Q. Okay. But you did report to him, correct?

**A. Yes.**

Q. In terms of reporting with Marc on -- say, like a claim like this, was Marc at all making any kind of coverage decisions for you?

**A. Not normally.**

Q. What were your -- do you know what your authority level was in 2020?

**A. No.**

Q. You don't remember the specific dollar amount?

**A. I do not.**

Q. Okay. Is it -- do you have any understanding that if you went above a certain authority level, you'd have to get permission from, say, Marc?

**A. Yeah.**

Page 191

Q. That is your understanding, that that's how the adjustment of claims works, correct?

**A. Yes.**

Q. Okay. And this email looks like you were making him aware of the claim for the first time as of May 4, 2020; is that right?

**A. Yes.**

Q. So prior to May 4, 2020, was he overseeing this claim with you?

**A. I don't believe so. I -- I don't recall.**

Q. Okay. And this email says, I was going to deny it, meaning the claim, but then the PA was added. Do you see that?

**A. Yes.**

Q. Do you recall when the public adjuster got involved in the claim?

**A. I do not.**

Q. In February of 2020, you did ask Engle Martin to close their file, correct?

**A. I don't recall.**

Q. I think we looked at an email together where you -- where you asked them to close their file. Do you recall seeing that?

**A. Okay, yeah.**

Q. It's Exhibit 21. Do you want me to show

Page 192

you?

**A. No. I remember now.**

Q. Okay. So when you closed your file with Engle Martin & Associates, does it also mean the file was closed with GUARD?

**A. No.**

Q. It can still be open, even though Engle Martin closes it, correct?

**A. Yeah.**

Q. What, in the file, would indicate -- GUARD's file -- that a file is closed?

**A. In the claim, at the top, it says Open and Closed.**

Q. Would there be anything in the claims file that says a specific date on when that decision was made?

**A. What decision?**

Q. To close a file.

**A. I don't recall.**

Q. Well, I'm asking more generally. When you do close a file, will you make a note with a specific date?

**A. Sometimes.**

Q. Okay. And you look a little tired. Do you want to take a break?

Page 193

**A. Yeah, I guess we could take five, ten minutes.**

Q. Okay. How much time do you want?

**A. Five after 1:00?**

Q. Five after 1:00. I'll see you back.

**A. All right.**

MR. ARCHULETA: Off the record.

THE DEPONENT: Thank you.

THE REPORTER: Debi?

MR. ARCHULETA: Are you talking to me?

THE VIDEOGRAPHER: My microphone -- my microphone dropped. I called time off at 10:57, but it's not on the recording, so I didn't realize that it wasn't picking up until you started calling me.

(Recess taken, 10:57 a.m. to 11:06 a.m.)

THE VIDEOGRAPHER: The time is 11:06 a.m. we're back on the record. Counselor, you may continue.

Q. (BY MR. ARCHULETA) Let me show you what I've marked as Exhibit 28.

(Exhibit 28, remotely introduced and electronically provided to the reporter.)

Q. If you look at this document, this is an email from you to Scott. Do you see that?

**A. Yes.**

# WILLIAM ARDOLINE - July 08, 2022

Page 194

Q. At some point, Scott submitted to you his estimate of repairs, which I am going to tell you -- I'm going to guess you're going to tell me you don't recall; is that right?
**A. Correct.**
Q. But this email, I'm going to ask you about the contents of it. You had mentioned, in the 2505 case, that you have to use the price list from the date of loss; is that right?
**A. Correct.**
Q. I have some questions about that. So if the cost of repairs changes over time, meaning it goes up, let's just say labor and material goes up, do you -- are you still required to use the price list at the time of the loss?
**A. Yes, because they should have reported it at that time.**
Q. Okay. But in this case, this case was reported timely, correct?
**A. Okay.**
Q. I'm asking you. Was it reported timely?
**A. I -- I'm not sure. I don't recall.**
Q. Okay. Let's go back to Exhibit 18.
**A. And just so we -- we don't waste time on this, I don't know why they want us to do that, but**

Page 195

**that was a practice by GUARD, and I -- I had no bearing in that decision. That's what they told us to do, and I always did it.**
Q. Okay. Well, actually, that does save me time, so I won't ask about that.
**A. All right.**
Q. All right. So if you look at the other items on here -- I'm just going to ask a few of them. Based on this email, would you agree that you did review Scott Benglen's estimate at some point?
**A. Yeah. I probably -- probably briefly.**
Q. Okay. Because it's got, like, stuff in there for high and steep roof charges. Do you see that?
**A. Yes.**
Q. And you said they weren't warranted?
**A. Correct.**
Q. Was that your policy or GUARD's policy to not pay high and steep roof charges?
**A. Well, if they're not like a roof that has an extreme pitch, they shouldn't be charging for it.**
Q. Can you tell me what that means? Like, when that item would be owed or not and, like, what the pitch has to be?
**A. If there's a 50-story building with a roof**

Page 196

**that's with a peak like this (indicating).**
Q. Okay. And for purposes of what you just showed, cause the record -- she won't record that. It looks like --
**A. Yeah, I made --**
Q. You were making a triangle --
**A. Correct.**
Q. -- with like a 45 degree angle?
**A. Yeah.**
Q. Okay. Is your decision about when to pay high and steep roof charges based upon your review of the dimensions of the property?
**A. Yeah.**
Q. From photos only, correct?
**A. Correct.**
Q. Okay. What about if a roof is high off the ground? Would you pay that amount?
**A. Yeah, again, but it has to be, like, ten stories high.**
Q. What is your understanding of the -- strike that. You had mentioned previously you understand how to use Xactimate, correct?
**A. Yeah. Not too proficiently, but I understand it.**
Q. Okay. And do you understand what the high

Page 197

and steep roof charges means in that line item in Xactimate?
**A. What I explained to you is just what GUARD explained to us, so that's what I was going off of.**
Q. So GUARD did give you training on that line item, correct?
**A. Yeah. Basically what I just told you is what they told us.**
Q. And what -- you say when they told you; we're talking like specific written guidelines, a verbal conversation, what?
**A. I don't recall. I just know that's what standard practice was through claims.**
Q. Okay. So, for instance, the line item on here, Overhead and profit should be removed on the roof. Do you see that?
**A. Yeah. On the roof-only claims, we weren't allowed to use overhead and profit.**
Q. And that was -- you don't recall if that was a written guideline or just a verbal conversation, correct?
**A. Correct.**
Q. Would that have been at some kind of Claims Summit, for instance, when they told you not to do that?

# WILLIAM ARDOLINE - July 08, 2022



**A. No.**
Q. Did you ever attend a Summit for GUARD where they would give instructions on how to adjust claims?
**A. I have been to a lot of Summits; I don't remember all the topics.**
Q. Okay. Just in terms of the list on here, the seven line items that are listed there, are those decisions you made based solely on guidelines provided by GUARD?
**A. Correct.**
Q. Okay. They would not be your individual opinion, correct?
**A. No.**
Q. And if I want to ask how they came up to that, I need to go ask GUARD, correct?
**A. Correct.**
Q. See, that's how we save time.
**A. Yes. Is there 45 minutes of that we could save?**
Q. I'm going to go to Exhibit 29, labeled that.
(Exhibit 29, remotely introduced and electronically provided to the reporter.)
Q. All right. If you look at this, this is



an email from you to Jason Plasters. Do you see that?
**A. Yes.**
Q. I'm going to ask you about Jason again. Did you specifically know Jason before this claim, before May --
**A. I may -- I may have worked with him, but I don't recall.**
Q. What about Jason Boehm?
**A. I don't recall.**
Q. Do you recall any specific engineers at Haag that you worked with quite a lot?
**A. No.**
Q. Okay. And -- but this email to Jason Plasters, it looks like you gave him bullet points of what you wanted him to inspect, correct?
**A. Correct.**
Q. Okay. And you asked him, again, to construct an estimate per building with separate deductible and depreciation per building, correct?
**A. Correct.**
Q. That's a little bit more detailed of instruction than the April 30 request for engineering inspection we looked at, correct?
**A. Correct.**
Q. Okay. Is there a reason why you gave



him -- put more detail on this email versus that request for engineering inspection, Exhibit 24?
**A. I don't recall.**
Q. Okay. Did you expect him to draft an estimate within four weeks of his inspection?
**A. Normally that's about the timeline, yes.**
Q. Okay. And if it ran too much over that, you would be following up to ask why, correct?
**A. Correct.**
Q. Okay. I'm going to look at what I'm marking as Exhibit 30.
(Exhibit 30, remotely introduced and electronically provided to the reporter.)
Q. All right. So this is Haag Engineering's report, addressed to you, William Ardoline, correct?
**A. Yes.**
Q. Dated May 21, 2020, correct?
**A. Correct.**
Q. And you would have reviewed this report on or near the time it was drafted, correct?
**A. Depends on when it was sent to me and received, yeah.**
Q. Well, let's go ahead and look at that, just to confirm that day. I'm going to mark an email -- one second. All right.



(Exhibit 31, remotely introduced and electronically provided to the reporter.)
Q. So Exhibit 31 looks like an email from Heidi Higdon at Haag to you, with the report. Do you see that?
**A. Yes.**
Q. Okay. Would -- so you would agree you had received the report by May 21, 2020, correct?
**A. Yeah.**
Q. Okay. And was it your standard practice to review the reports timely when they came in?
**A. As best I can.**
Q. Okay. With a caseload of 300, is it sometimes difficult to do?
**A. Definitely.**
Q. Okay. Is there any kind of feedback you ever gave to any --
MR. DEVILLING: Object to -- object to the form on the last question, I'm sorry. Go ahead.
Q. (BY MR. ARCHULETA) Is there any kind of feedback you gave to GUARD that you had too many cases?
**A. I mean, I've expressed, in team meetings -- I had different ideas, and so does everybody.**
Q. Sure. Like, specifically, did you ever

# WILLIAM ARDOLINE - July 08, 2022

Page 202

say, I have too many cases to handle timely?
A. **I've said things like that, yeah.**
Q. Do you recall when you would have had those conversations?
A. **No.**
Q. Was it more than once?
A. **Yes.**
Q. Would it have been in 2020?
A. **Yeah.**
Q. 2021?
A. **Yeah.**
Q. 2019?
A. **Yeah.**
Q. Did they increase your caseload between 2019 and 2021?
A. **I think it did.**
Q. Can you ballpark how many cases you had in 2019?
A. **No. I don't recall.**
Q. Okay. Was it less than 300?
A. **Probably.**
Q. Okay. So 300 is the --
A. **I mean --**
Q. Okay.
A. **It depends; if there is a CAT with a**

Page 203

**hurricane, it could have been more than that.**
Q. Okay. Did it ever go above 300?
A. **I don't recall. I want to say 3- was the top, but it very well could have.**
Q. In 2021, do you recall getting an evaluation by Melinda -- I'm going to butcher her last name.
A. **Champluvier.**
Q. Champluvier (pronouncing)?
A. **I don't recall, no.**
Q. You don't recall her evaluating you and saying something like you had complaints related to timely communications with people?
MR. DEVILLING: Object to form.
Q. (BY MR. ARCHULETA) What's that? What was your relationship to Melinda?
THE REPORTER: I'm sorry, I didn't hear the answer.
A. **I said no.**
THE REPORTER: Thank you.
Q. (BY MR. ARCHULETA) What was your relationship to Melinda at GUARD? Was she your boss?
A. **She was a coworker. And then right before I left, I believe she was promoted to supervisor.**
Q. Were you ever a supervisor at GUARD?

Page 204

A. **No.**
Q. Did you ever have anyone working under you?
A. **No.**
Q. Did you ever assign any tasks you had to do to anyone else at GUARD?
A. **No.**
Q. Did anyone at GUARD help you on your caseload?
A. **I mean, again, we've all been on each other's claims.**
Q. Were you -- were you ever allowed to ask for help at GUARD if you felt you couldn't get to everything?
A. **Yeah.**
Q. And that would be in the team meetings?
A. **Yeah.**
Q. Anything in writing?
A. **No.**
Q. Did you ever make a single written communication with anyone at GUARD discussing the stuff we talked about with the team meetings, that you had too many cases?
A. **I don't recall.**
Q. You don't recall ever reaching out to,

Page 205

say, your supervisor about that?
A. **Not in writing, I don't recall.**
Q. I'm going to go back to Exhibit 30; that's the engineering report we discussed. Do you recall how long you reviewed this report?
A. **No.**
Q. Okay. Do you -- when you receive an engineering report like this, do you have any specific background or training to evaluate whether or not his findings are accurate, generally? I'm not trying to spend hours on this.
A. **I mean, just going over it briefly, not like I have any engineering degrees or construction background.**
Q. Okay. Is it solely based on what you talked about before, is it logical?
A. **Yes.**
Q. Prior to May 21, 2020, did you have any kind of reason to doubt the findings of any of your reports you received from anyone?
A. **No.**
Q. Okay. When you receive a -- for instance, when you receive a -- an estimate from a public adjuster that substantially changes the scope of what you think is covered, how do you go about resolving the

# WILLIAM ARDOLINE - July 08, 2022

Page 206

conflict between, say, an estimate or a report you receive and one provided by a public adjuster?

A. **Our engineer has to talk with the public adjuster and see what the discrepancies are, and they have to work it out.**

Q. Okay. Is the engineer making the final decision on that?

A. **No.**

Q. Who's making the decision?

A. **Me.**

Q. So you're the referee; is that the right word?

A. **No, not really. I mean, they talk about it. And then once they come to an agreement, then it gets sent to me. And if it all, again, seems okay, then I'll approve it.**

Q. Okay. And related to this report, you do -- do you have any reason to doubt that you did not review it completely?

A. **No.**

Q. Would it be wrong to prefer the opinions of your consultant over countering opinions of an insured or their consultants?

A. **Would it be wrong, are you saying, to, no matter what, take our consultant's opinions over**

Page 207

**someone else's?**

Q. Yes.

A. **Yeah. I mean, if our consultant is blatantly wrong and someone else is right, then we -- we take people off and switch people, if that happens.**

Q. Okay. Did GUARD expect you to give preference to your consultants?

A. **No, just whatever the facts are. If there -- if a claim has to be paid, and the facts are that it has to be paid, then it's getting paid. If the facts are deny, then it's got to be denied. If there's --**

Q. Okay. But there is any --

A. **It's the facts.**

Q. Okay. But when you get, say, a report from a public adjuster that shows that there may be coverage or that something might -- should -- might be possibly covered, how do you resolve that when you have your engineer saying it's not?

A. **Then the public adjuster has to get an engineering report to dispute our engineer.**

Q. Okay. So at that point, you step -- you step out of the investigation, and you let the engineer dispute it?

A. **Well, if we have an engineer and then it's**

Page 208

**just a public adjuster who's not an engineer saying something else, I'm going to go with the engineer.**

Q. So is it --

A. **So, like, they basically have to match our level of expertise with their level of expertise. Not technically terms, but . . . you know what I'm trying to say?**

Q. All right. How do you resolve a conflict between opinions of your engineer over the countering opinions of a policyholder engineer?

A. **That would be up to management.**

Q. So that's a decision that goes above you, correct?

A. **Yeah.**

Q. Would that decision be documented in the claims file?

A. **Should be.**

Q. Okay. Do you recall if that happened on this case, that you had to have management get involved?

A. **I don't recall.**

Q. I'm going to go to what I'm marking as Exhibit 32.

(Exhibit 32, remotely introduced and electronically provided to the reporter.)

Page 209

MR. ARCHULETA: One second. All my windows closed. All right. So I think I got it fixed. That was weird. Maybe we'll go off the record for a second. My computer is doing something weird.

THE VIDEOGRAPHER: The time is 11:23 a.m. We're now off the record.

(Discussion off the record.)

THE VIDEOGRAPHER: The time is 11:24 a.m. We're back on the record. Counselor, you may continue.

MR. ARCHULETA: Thank you. Sorry for that pause. I'm trying to get through this for you.

THE DEPONENT: No, that's all right. I appreciate it.

Q. (BY MR. ARCHULETA) All right. I'm going to share my screen with you. If you look at this, this is an email from you to Scott Benglen on May 4. I think we talked about this one.

A. **Yes.**

Q. I did mark it -- this is the wrong one. I meant to mark -- open a different one. One second. Okay. There it is. This is an email marked September 3, 2020, do you see that, from you to Haag?

A. **No. It looks like the ones that we went over before.**

# WILLIAM ARDOLINE - July 08, 2022

Page 210

Q. Oh, this is a different one. This is September 3, 2020. We haven't got to that date yet.
**A. Can you scroll up?**
Q. Scroll up? That's the top of it.
THE VIDEOGRAPHER: Counsel, it still shows Exhibit 28 on the screen.
MR. ARCHULETA: Oh, weird, okay.
THE DEPONENT: Yeah, it's frozen; that's why I was wondering what's going on.
MR. ARCHULETA: All right. I'm going to try to fix that. I'm sorry about that.
Q. (BY MR. ARCHULETA) Okay. How about now?
**A. Yeah.**
Q. It may be something I clicked. I'm sorry about that. All right. So you see this email from September 3, 2020, from you to Haag?
**A. Yeah, yes.**
Q. Okay. You told Jason Boehm at Haag to prepare an estimate. Do you see that?
**A. Uh-huh.**
Q. Now, you recall that previously you had told Haag Engineering to draft an estimate on the -- April 30; is that right?
**A. Yeah. That was in the directions when I first gave the assignment, correct?**

Page 211

Q. Correct.
**A. Okay.**
Q. And do you know why that wasn't done by September 3, 2020?
**A. I don't recall.**
Q. Would you expect -- and if we go back -- I don't have to open it, but I can just tell you, the Haag report is dated May 21, 2020, correct?
**A. Okay.**
Q. So after you received that report on May 21, 2020, what did you do to follow up with Haag between that date and September 3, 2020, to make sure they were doing -- drafting an estimate, as you requested?
**A. I don't recall.**
Q. If there was a communication related to a follow-up, would that be in the claim file?
**A. It should be.**
Q. And we talked about your reminder system.
**A. Yes.**
Q. You did use that to -- for these kind of reminders, correct? To do follow-ups, correct?
**A. Yeah, tried -- tried my best.**
Q. Okay. So September 3, 2020 is four months after getting the Haag report, correct?

Page 212

**A. Correct.**
Q. And they still haven't drafted your estimate. Did you take an issue with that?
**A. Most likely. But I don't recall.**
Q. You said that four weeks after inspecting would have been what you would expect, correct?
**A. Correct.**
Q. And this is 16 weeks after an inspection, correct?
**A. Correct.**
Q. Does it bother you at all, today, sitting here, that 16 weeks after you requested -- or even longer than that -- strike that. 19 weeks after you drafted -- or after you first requested they do an estimate, they hadn't drafted it?
MR. DEVILLING: Objection to form. Go ahead.
**A. No.**
Q. (BY MR. ARCHULETA) Why not?
**A. Because they're -- something might have happened that I don't recall.**
Q. So you think there must be some excuse for this?
**A. I just -- I think something must have happened, or there's something that happened in the**

Page 213

**investigation that I'm not recalling.**
Q. Okay. And if we go to the claims notes, you usually -- let me strike that. You utilize claim notes to detail important events in the claim; is that right?
**A. Yes.**
Q. Okay. I'm going to mark the claim note as Exhibit 32 -- or 33, I'm sorry.
(Exhibit 33, remotely introduced and electronically provided to the reporter.)
Q. Let me go to this document. Okay. Do you recognize this document?
**A. It's claims notes.**
Q. Okay. And just to clarify, I want to make sure that you agree with me, this is for this claim here.
**A. Well, the stuff you were showing me was after I worked at GUARD. So, no, I don't recall it.**
Q. Okay. I'm going to show you a note, and then you can tell me if you recall the -- the notes, okay?
**A. All right.**
Q. There's a little bit of a delay in this stuff, so . . .
**A. Yeah.**

# WILLIAM ARDOLINE - July 08, 2022

Page 214

Q. I'm going to try not to delay here, okay. Okay. So see this note, September 3, 2020? You entered that note, correct?
**A. Yes.**
Q. That was you, William Ardoline?
**A. Yep.**
Q. Okay. To pay a Haag invoice, correct?
**A. I don't see where it says that.**
Q. It says, Haag invoice --
**A. Oh, oh. Right there, okay. I was looking at the highlighted stuff.**
Q. Oh, yeah. I'm sorry. I'm distracting you with the highlighting I added. If you look at the note above, September 3, 2020, you see your next note is that you did a review?
**A. Yes.**
Q. Okay. Do you recall that the Haag report was drafted May 21, 2020?
**A. Yeah.**
Q. Is there a reason why your review of that report is four months later?
**A. I don't recall.**
Q. Is it possible that you did not actually review the Haag report you received in May until September 3, 2020?

Page 215

**A. Yes.**
Q. But you don't -- you don't know specifically if that's true, correct?
**A. Yeah. I don't recall.**
Q. Okay. If you had reviewed the Haag report prior to September 3, 2020, would I -- should I expect that there would be a claim note in here reflecting that?
**A. Most likely.**
Q. Okay. Because when I look here, if you look, May 7, 2020, there's a claim note that you spoke to Haag and confirmed their inspection directions. Do you see that?
**A. Yes.**
Q. And the next note, you pay their invoice September 3, 2020, correct?
**A. Yes.**
Q. Okay. Do you have any reason to believe that you reviewed the report prior to September 3, 2020?
**A. I don't recall.**
Q. Okay. If you -- if your first review of the Haag Engineering report was four months later, on September 3, 2020, do you think that that would be a delay in evaluating the claim?

Page 216

MR. DEVILLING: Object to form.
**A. Again, it depends on what was going on in the claim, and I don't recall.**
Q. (BY MR. ARCHULETA) Okay. But if you did not review it for four months, would you think that that is a problem?
**A. I mean, again, I was doing the best I can with my caseload and what was going on at the time.**
Q. Okay. Is it possible also, since this claims log reflects no notes between May 7, 2020 and September 3, 2020, that you also did not follow up with Haag regarding their estimate, between those dates?
**A. It's possible.**
Q. Okay. And would that be an issue with you to not have followed up?
**A. Again, I was doing the best that I could at the time.**
Q. Okay. And when I look at the September 3, 2020 claims note, it has a copy and paste of the conclusions of Haag in it, correct?
**A. Yes.**
Q. Is there any evaluation you did related to this note, or is it simply just copying and pasting it into the claims note?
**A. I don't recall.**

Page 217

Q. Well, how about, let's look at Exhibit 33, and then I'll look at the -- let's see if I can do this correctly. Exhibit --
**A. If it's word for word, then I copied and pasted it.**
Q. Okay. I'm telling you, it's word for word. That might save us some time.
**A. All right. Then I copied and pasted it.**
Q. Would it be -- is it your typical practice to do so, to just copy and paste in the claims notes?
**A. Yes.**
Q. Okay. But when you're doing a review, should you be doing something other than copying and pasting?
MR. DEVILLING: Object to form.
**A. Not necessarily.**
Q. (BY MR. ARCHULETA) Okay. What does it mean for you to do a claim review of an engineering report?
**A. Just look at it and see what their findings are.**
Q. Okay. What about provide an analysis of those findings?
**A. No. I usually look at the conclusions.**
Q. And when you look at the conclusions, if

# WILLIAM ARDOLINE - July 08, 2022

Page 218

you have any analysis, would you have put it into the claims notes?
**A. No.**
Q. You would not have put your analysis in the claims note, correct?
**A. I wouldn't have put an analysis, no. I put the conclusions that came from the analysis -- analysis.**
Q. Okay. So is this actually a review of the claim -- of the engineering report, or is it just you posting something to the file?
**A. I don't recall.**
Q. Okay. All right. And if we go back to Exhibit 32, the directions, you would agree with me, that you gave regarding the estimate and how to -- how to draft it, are the same as what we looked at in the -- let me pull this out correctly, the May 1 -- or the April 30 directions to Haag?
**A. Yes.**
Q. Okay. And you wrote here, If you need assistance, please contact me or Jaren. Do you see that?
**A. Yes.**
Q. Okay. So if Haag needed help with their estimate, you would expect them to reach out to you?

Page 219

**A. Yeah.**
Q. Okay. And if you didn't hear from them, you would expect that it would be being drafted actively, correct?
**A. Correct.**
Q. Now, what did you mean here, Jaren, if we need assistance to produce an estimate -- your assistance to produce this estimate? Were you expecting Jaren, that he was going to work with Haag to draft an estimate?
**A. If they needed him to, yeah, because he was another person that was at the property.**
Q. Okay. Because you would not have visited the property by September 3, 2020, correct?
**A. Correct. I never visited the property.**
Q. Do you find it at all problematic that you did not inspect the property, when making decisions on this case?
**A. No.**
Q. Is that something that GUARD allowed you to do, to make decisions without visiting the property?
**A. Yeah. That's what desk adjusters are.**
Q. Is that something that GUARD told you is appropriate, to make decisions without having inspected the property yourself?

Page 220

**A. Yes. I've done it thousands of times.**
Q. Okay. Is the only properties you would have inspected be in your home state?
**A. No. I've gone to other states.**
Q. Okay. What would be the reason you would go to those inspections?
**A. Whatever management advises.**
Q. So is the decision about what -- who -- about inspecting out-of-state property, is that made by management?
**A. Inspecting any properties is made by management.**
Q. Not you?
**A. Correct.**
Q. Okay. And I'm going to look at Exhibit 34.
(Exhibit 34, remotely introduced and electronically provided to the reporter.)
Q. We're cruising.
**A. Just keep cruising.**
Q. Yep. If you look at the last -- the last exhibit we looked at, Exhibit 30 -- actually, it was Exhibit 32, was the September 3 communication with Haag. If you look at this one, it looks like Scott Benglen is following up with you on September 28. Do

Page 221

you see that?
**A. Yes.**
Q. Okay. Had you -- do you know if you made any kind of attempt to get the estimates prior to September 28, 2020?
**A. I don't recall.**
Q. But if you did, it would be in the file, correct?
**A. Not necessarily. Well, in the file, yeah.**
Q. Okay. Because there's an email here, the follow-up email you wrote. I'm just awaiting Haag to separate out the estimate per building, correct?
**A. Yes.**
Q. So that would be meaning that it hadn't been drafted before September 28, 2020, to your knowledge, correct?
**A. Correct. Well, it could have been drafted, it says there, per building. So we probably had a whole overall estimate, but it needed to be separated out per building.**
Q. Do you -- are you making -- are you speculating, or do you know that for a fact?
**A. I'm just using my best knowledge.**
Q. Okay. If I told you I don't have any estimates with any dates around this time period, would

# WILLIAM ARDOLINE - July 08, 2022

Page 222

you have -- would you have any reason to doubt that?
A. **No. I don't think you'd lie to me.**
Q. I would not.
A. **All right.**
Q. All right. If we go to -- I'm going to mark the next one as Exhibit 35. We're getting close.
A. **Perfect.**
Q. All right. Actually, I don't need to do this one, so let me take that out. That was duplicative. All right. I'm going to mark the next one as Exhibit 35.
(Exhibit 35, remotely introduced and electronically provided to the reporter.)
Q. If you look at this email, I'll show you the chain so we can get some context here. It -- the email we're looking at is the one we just saw, September 28, 2020, correct?
A. **Correct.**
Q. Okay. And right above that is an email from Scott Benglen, December 7, 2020. Do you see that?
A. **Yes.**
Q. And he asked you, since it's -- the last email has been four months, he wanted an update about the Haag estimate, correct?
A. **Yes.**

Page 223

Q. Do you know why the Haag estimate had not been drafted by December 7, 2020?
A. **I do not.**
MR. DEVILLING: Nate, can you give me just 30 seconds? I just got to turn something off.
MR. ARCHULETA: Sure. We can go off the record.
THE VIDEOGRAPHER: The time is 11:38 a.m. We're now off the record.
(Pause in the proceedings.)
THE VIDEOGRAPHER: The time is 11:38 a.m. We're back on the record. Counselor, you may continue.
MR. ARCHULETA: Thank you.
Q. (BY MR. ARCHULETA) All right. Do you have any recollection of contacting Haag between December -- between September 28, 2020, and December 7, 2020?
A. **No.**
Q. Okay. Do you think it would be a problem if you had not communicated with Haag between those dates?
A. **Again, I -- again, I don't recall what was going on.**
Q. All right. I asked you, do you think it

Page 224

would be a problem if you hadn't communicated with them. It's just a yes or no question.
A. **Yes.**
Q. And so your follow-up policy was, again, to follow up how often, if possible?
A. **Follow up on a claim?**
Q. Sure.
A. **Depends. Two to three weeks.**
Q. Okay. If you did no follow-up on this claim between -- between September 28, 2020, and December 3 -- or December 7, 2020, would that be a problem with you?
MR. DEVILLING: Object to form.
A. **No.**
Q. (BY MR. ARCHULETA) It would not be a problem for you?
A. **No.**
Q. Do you think it is unreasonable for the claim to have not been touched in three months?
MR. DEVILLING: Object to form.
A. **No.**
Q. (BY MR. ARCHULETA) Why not?
A. **Again, my caseload didn't allow me to do that.**
Q. Do you think that the policyholder should

Page 225

have to wait for you to get ahold of them or to adjust the claim for that long?
MR. DEVILLING: Object to form.
A. **No, but I was doing the best that I could.**
Q. (BY MR. ARCHULETA) All right. And if you look at this email above that, it's the December 8, 2020 email from Haag -- Heidi at Haag to you and Scott. Do you see that?
A. **Yes.**
Q. Okay. The email notes that at some point in November, there was a -- an inspection; is that right?
A. **Yes.**
Q. Okay. You were not at that inspection, correct?
A. **No.**
Q. Prior to December 8, 2020 -- actually, let's read the email first. Strike that. Scott said, If my memory serves me correctly, Jason Plasters from HCC advised you of his backlog on the site on November 11th and that he would do his best to complete it -- I'm guessing the estimate -- by the end of the year. Do you see that?
A. **Correct.**
Q. Okay. Were you ever told, after

# WILLIAM ARDOLINE - July 08, 2022

Page 226

November 11 and before December 8, that Jason Plasters could not draft his estimate before the end of the year?
A. **I don't recall.**
Q. Okay. If you had known that, would you have hired a different party to do an estimate?
A. **Possibly. That would have been a management decision.**
Q. So if you were to, say, fire someone for not doing their job timely and hiring a new party, that would be a decision you could make?
A. **It would be calling for management.**
Q. Okay. Would you be -- would you be playing a role in that decision?
A. **I could.**
Q. Do you recall making any kind of decision to terminate Haag for not drafting timely in this case?
A. **I don't recall.**
Q. Okay. If that decision was made or if you had any kind of opinion on that, would it be in the file?
A. **Could be in a note or an email.**
Q. Okay. And I'm going to go to my next one, Exhibit 36.
(Exhibit 36, remotely introduced and

Page 227

electronically provided to the reporter.)
Q. There is only two more exhibits after this. All right. If we look at it, this is from Haag, Heidi, to you and Jason -- Jason Boehm and Jason Plasters. Do you see that?
A. **Yes.**
Q. It looks like they submitted their estimate to you on this date, correct?
A. **Yes.**
Q. Okay. Do you have any reason to doubt you received it on January 28, 2021?
A. **Yeah, I don't -- I mean, no, but I don't see any attachments there. So . . .**
Q. I -- I attached it, don't worry.
A. **Oh, all right. There we go.**
Q. Okay.
A. **I was looking for it in the subject.**
Q. Yeah, I'm not hiding the ball from you. So this is the estimate, correct?
A. **Yes.**
Q. Okay. It is attached at the bottom of Exhibit 36. If we go to Exhibit 33, the claims notes again, I'm going to try to scroll to the relevant part here. If you look at this, do you see where it says -- september 28, 2020; that's the note you wrote --

Page 228

Advised agent, awaiting estimate, correct?
A. **Yes.**
Q. That aligns with the email we saw, correct?
A. **Yes.**
Q. Okay. And do you see the next note above that is May -- March 10, 2021. Do you see that?
A. **Yes.**
Q. That is by Melinda Champluvier, correct?
A. **Yes.**
Q. I do not see a note in between there for anything from you, correct?
A. **Correct.**
Q. Do you know why you have no follow-up notes in the file between September 28, 2020 and March 10, 2021?
A. **I don't recall.**
Q. Okay. Is it possible that you did not touch the file between September 28, 2020 and March 10, 2021?
A. **I mean, it's possible, but I don't recall if I did or not.**
Q. Okay. Because when I -- and the previous document we looked at, right, we'll go back to -- I'm trying not to get these mixed up. The December email

Page 229

was to you. I don't see a response in the claims notes saying you responded to the email, correct?
A. **Yeah. I don't have to put in the notes every time I respond to an email, though.**
Q. Okay. But if you had responded by email, would that then get attached to the file later?
A. **Yeah.**
Q. Okay. So if it's not attached, is it fair to say that it didn't happen?
A. **I mean, it could have just been an email that I sent that I never attached to the file, as well. Like I said, I tried my best to drop everything.**
Q. Well, let's talk about that for a second. So if you draft a document or, say, like an email and you don't attach it to the file, is it stored somewhere, that you know?
A. **I do not know.**
Q. Would it be stored on a computer that you used?
A. **I do not know.**
Q. When you drafted emails, what kind of software did you use to draft emails?
A. **Microsoft Outlook.**
Q. Okay. And you don't know what happened to your computer after you left the company, correct?

Page 230

**A. No.**
Q. You don't know if Outlook stores all of your communications?
**A. No.**
Q. Okay. I'd have to ask GUARD about that, correct?
**A. Yeah.**
Q. Okay. And if we go back to the claims log, do you have any reason -- one second. Do you have any recollection of working on this file between September 28, 2020 and March 11, 2021?
**A. No. I don't recall.**
Q. Okay. Do you know if Melinda Champluvier was promoted sometime in March 2021?
**A. I don't recall.**
Q. Okay. You don't -- you don't recall?
**A. Yeah, I don't recall.**
Q. I'm going to look at -- I'm going to mark Exhibit 37.
(Exhibit 37, remotely introduced and electronically provided to the reporter.)
Q. I only have one more exhibit after this.
**A. All right.**
Q. So . . . all right. If you look at this email chain -- I'll try to get to the relevant part.

Page 231

So we saw that September 28, 2020 email before. See this one from Heidi to Jaren? Do you see that?
**A. Yep. Yep.**
Q. Okay. And if you go up from there, the next one is Melinda's email to Haag. Do you see that?
**A. Yes.**
Q. She's asking Haag if they have an updated estimate. Do you see that?
**A. Yes.**
Q. Do you know if -- if you had given the January 28, 2021 Haag estimate to any party between January 28, 2021 and March 10, 2021?
**A. I don't recall.**
Q. Okay. So you don't know if she even had the estimate by this date, March 10, 2021?
**A. Well, she would have been able to look in the file, and it would have been there.**
Q. Unless you didn't attach the January 28, 2021 email to the file, correct?
**A. Yeah, unless I didn't get to the email yet.**
Q. Okay. If you look at the top email, she -- Heidi is -- it looks like she is attaching the estimate, correct?
**A. Yep.**

Page 232

Q. Okay. And do you know if the estimate that was attached -- because I don't -- I don't have a copy of what was attached here. I've tried opening it. I don't think it'll let me. Maybe it will. No.
Do you know if the estimate attached to this email -- well, actually, one second. I'm sorry. It did let me open it. I'm going to open this attachment to the March 10, 2021 email; I tried opening that email previously, it didn't work. If you look at this, I'm going to mark this as Exhibit 38, this estimate.
(Exhibit 38, remotely introduced and electronically provided to the reporter.)
Q. Just to be clear, it looks like the date of it is January 28, 2021, correct?
**A. Correct.**
Q. So this -- on March 10, 2021, would you agree that Heidi was sending the January estimate to Melinda, in March?
**A. Yes.**
Q. Okay. Is it possible, in your opinion, that the estimate was not attached to the file prior to March 10, 2021?
**A. Yes, it's possible.**
Q. If we go back to the claims note, you

Page 233

entered a note on March 11, the next day, correct?
**A. Correct.**
Q. And requested Haag break down the estimate per building, correct?
**A. Correct.**
Q. And that is a direction you gave them on April 30, 2020, correct?
**A. Correct.**
Q. And May 1, 2020, correct?
**A. Correct.**
Q. And September 28, correct?
**A. Correct.**
Q. Okay. So you had given the direction to them for almost a full year, to draft an estimate, correct?
**A. Correct.**
Q. Do you know why the estimate was not drafted the way that you wanted, as of March 11, 2021?
**A. I do not.**
Q. Okay. Do you think it's a problem that you had to ask them four times?
MR. DEVILLING: Object to form.
**A. Yes.**
Q. (BY MR. ARCHULETA) All right. And if we go to my last exhibit I'm going to mark as Exhibit 39.

# WILLIAM ARDOLINE - July 08, 2022

Page 234

(Exhibit 39, remotely introduced and electronically provided to the reporter.)

Q. I'm sorry. I'm usually the one with my phone off. All right. This is an email from March 11, 2021 from you to Haag, correct?

**A. Correct.**

Q. And you're telling them the directions we talked about in the claims notes, right, about how to break it out, correct?

**A. Correct.**

Q. Okay. Did you give this specific detail to them prior to March 11, 2021?

**A. To Haag?**

Q. Yes.

**A. To break it down per buildings?**

Q. Yes.

**A. Yes.**

Q. All right. A few follow-up questions. What was your last day at GUARD? I don't recall.

**A. Sometime late April 2021.**

Q. Okay. Did you leave GUARD voluntarily, or were you terminated?

**A. Voluntarily.**

Q. Okay. Do you have a document that reflects that?

Page 235

**A. No.**

Q. Did you receive a severance?

**A. Like, money to leave?**

Q. Yes.

**A. No, just my time that I built up.**

Q. Any kind of release that you signed as part of your leaving the company?

**A. I don't recall.**

Q. You don't recall -- you don't recall signing any kind of settlement release?

**A. No.**

Q. Any kind of waiver?

**A. No.**

Q. Okay. Did -- do you recall if GUARD conditioned you receiving your final pay, like the extra pay, on some kind of signing of a document waiving rights?

**A. No, I don't recall.**

Q. Okay. But you didn't -- you don't recall being terminated, correct?

**A. I definitely wasn't fired.**

Q. Okay. And would you -- just as a general question, would you agree that having to wait an entire year for Haag to draft an estimate is a problem?

MR. DEVILLING: Object to form.

Page 236

**A. Yes.**

Q. (BY MR. ARCHULETA) Okay. That is not timely, correct?

**A. Correct.**

Q. And based on our review of the file and the communications you've had with Haag, did you follow up with them as you would have wanted to?

**A. Yes.**

Q. As often as you would have wanted to?

**A. Yes.**

Q. You don't have an issue with the multiple gaps in time in the file with how often you communicated with Haag?

MR. DEVILLING: Object to form.

**A. No.**

Q. (BY MR. ARCHULETA) Okay. And if you were going to -- based on how long Haag took to draft their estimate, do you think that you had a duty to get someone else to draft an estimate in that time period?

MR. DEVILLING: Objection to form.

**A. I guess I could have.**

MR. ARCHULETA: That's all my questions.

THE DEPONENT: Perfect.

MR. DEVILLING: Okay. I don't have anything. Thank you.

Page 237

THE REPORTER: Mr. Devilling, did you need a copy of the transcript?

MR. DEVILLING: Yes, please.

THE VIDEOGRAPHER: And would you like a copy of the video as well, sir?

MR. DEVILLING: Sure.

THE REPORTER: I'm sorry. Jonathan and Nate, are you ordering?

MR. ARCHULETA: We are. We're ordering the same.

MR. DEVILLING: Guys, I got to jump off of here. I got a court appearance that I got to get ready for.

THE DEPONENT: Thank you.

THE VIDEOGRAPHER: The time -- the time is 11:53 a.m. This now concludes today's deposition.

WHEREUPON, the within proceedings were concluded at the approximate hour of 11:53 a.m. on the 8th day of July, 2022.

* * * * *

(It was stipulated and agreed by counsel, with the consent of the deponent, that the reading and signing of the within deposition is waived.)

**WILLIAM ARDOLINE - July 08, 2022**



REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, LORI A. MARTIN, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public ID 19974020552, State of Colorado, do hereby certify that previous to the commencement of the examination, the said WILLIAM ARDOLINE verbally declared that his testimony was under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 20th day of July, 2022.

My commission expires June 2, 2024.

_____ Reading and Signing was requested.
__X__ Reading and Signing was waived.
_____ Reading and Signing is not required.

Lori A. Aldrich
Registered Merit Reporter
Certified Realtime Reporter