# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

REMOTE DEPOSITION OF: THEODORE LYNDON MILLER, JR.
March 21, 2022

---

Civil Action No. 1:21-cv-01673-WJM-KMT

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

Civil Action No. 1:21-cv-02523-CMA-SKC

PACIFIC OCEAN ALAMEDA, LLC,

Plaintiff,

v.

AMGUARD INSURANCE COMPANY and
WESTGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the deposition of THEODORE LYNDON MILLER, JR., was taken remotely on behalf of the Plaintiffs, on March 21, 2022, at 10:02 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiffs:

JONATHAN E. BUKOWSKI, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com

For the Defendants:

MATTHEW S. PONZI, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
mponzi@fgppr.com



I N D E X


| EXAMINATION OF THEODORE LYNDON MILLER, JR.: March 21, 2022 | PAGE |
|---|---|
| By Mr. Bukowski | 6, 159 |
| By Mr. Ponzi | 157 |

| DEPOSITION EXHIBITS: (Pacific Ocean Alameda) | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 1 | LinkedIn Profile | 40 |
| Exhibit 2 | Raphael & Associates Invoice to Berkshire Hathaway GUARD, 7/31/2020 | 53 |
| Exhibit 3 | Independent Adjuster Assignment by Berkshire Hathaway GUARD, 5/11/2020 | 57 |
| Exhibit 4 | Inspection Summary/Initial Report, 5/19/2020 | 63 |
| Exhibit 5 | Compilation of photographs | 68 |
| Exhibit 6 | Strong Contractors, Inc., estimate, 5/19/2020 | 73 |
| Exhibit 7 | Raphael & Associates Initial Report, 5/25/2020 | 78 |
| Exhibit 8 | OMG Roofing Products report, 1/2/2020 | 80 |
| Exhibit 9 | B.R. McCracken report on pull test, 12/5/2019 | 82 |
| Exhibit 10 | Rimkus Report of Findings, 6/19/20 | 97 |
| Exhibit 11 | Raphael & Associates Status report, 6/29/2020 | 101 |




I N D E X (Continued)


| | | |
|---|---|---|
| Exhibit 12 | Report to John Larson, 7/09/2020 | 107 |
| Exhibit 13 | Raphael and Associates Claim Diary/ Note List, 7/10/2020 | 108 |
| Exhibit 14 | Email to Field Support, Support 2 and Brockway from Larson, 7/15/2020, with email attached | 108 |
| Exhibit 15 | Raphael & Associates Third Report, 8/29/2020 | 111 |
| Exhibit 16 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action | 115 |

| DEPOSITION EXHIBITS: (2505 6th Street, LLC) | | |
|---|---|---|
| Exhibit 31 | LinkedIn Profile | 125 |
| Exhibit 32 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action | 156 |

| (Previously Marked Exhibits - 2505 6th Street, LLC) | | |
|---|---|---|
| Exhibit 22 | Raphael Field Adjusting report, 8/25/2020 | 129 |
| Exhibit 23 | Raphael and Associates Photo Sheets | 149 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record. And I will start with plaintiffs' counsel.

MR. BUKOWSKI: Sure. So this is Jonathan Bukowski, on behalf of Pacific Ocean Alameda and also 2505 6th Street, LLC, and I am in agreement.

MR. PONZI: And this is Matthew Ponzi, on behalf of the defendants in this case, and I am in agreement.

THE REPORTER: Mr. Miller, do you understand that your statements in this matter are

Page 6

under penalty of perjury?
THE DEPONENT: Yes.
THE REPORTER: And if you could hold your driver's license up to the camera right now. Hold it very close.
(Deponent complied.)
THE REPORTER: Perfect. Thank you so much. Jonathan, you can go ahead.
MR. BUKOWSKI: Okay.
THEODORE LYNDON MILLER, JR., having verbally declared that his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. BUKOWSKI:
Q. Would you please state your full name for the record.
**A. Theodore Lyndon Miller, Jr.**
Q. All right. Have you ever given a deposition before?
**A. Yes.**
Q. How many times?
**A. Twice.**
Q. When was the last time?
**A. More than 20 years ago.**

Page 7

Q. Okay. So a couple of ground rules for your deposition today. Most importantly, you know, we're by Zoom; if you can't hear me, please let me know, or if I cut out, let me know so we can get a clear question across, okay?
**A. Yes.**
Q. I'm going to share some exhibits. I'll put them into the chat. I'll also put them up on the screen. If you need me to zoom in or highlight something, just let me know and I can certainly do that, okay?
**A. That's fine.**
Q. If you don't understand a question, please let me know. Otherwise, I'm going to assume that you did understand the question and your response is in response to that question, okay?
**A. Yes.**
Q. I try to take a break every hour or so, but if you need a break at any time, let me know and we can take a break.
And then, finally, you may anticipate some of the questions that I ask you. As hard as it can be as we go, I would just ask that you hold off responding until I complete the question, so that we can keep a clean record with the court reporter, okay?

Page 8

**A. Yes.**
Q. Okay. What did you do to prepare for your deposition today?
**A. I talked to Matt, and I talked to Brian.**
Q. Who is Brian?
**A. Brian is another attorney with the same firm that Matt is with.**
Q. Okay. So you spoke with Mr. Devilling and Mr. Ponzi?
**A. Right.**
Q. And how long did you spend speaking with them?
**A. Between the two -- well, an hour and a half.**
Q. Okay. And did you do anything on your own, apart from the hour-and-a-half discussions with Mr. Ponzi and Mr. Devilling, to prepare for your depositions today?
**A. No.**
Q. Did you review any documents for your deposition today?
**A. No.**
Q. Have you ever been convicted of a felony?
**A. No.**
Q. Have you ever been convicted of a

Page 9

misdemeanor involving dishonesty?
**A. No.**
Q. What -- what was your highest level of education?
**A. High school.**
Q. And that was at Centennial High?
**A. Yes.**
Q. Okay. Did you take any coursework through any colleges or anything like that after high school?
**A. No.**
Q. Do you hold any insurance adjuster licensure?
**A. No.**
Q. Have you ever held any insurance adjuster licensure?
**A. Yes.**
Q. Okay. Tell me about what -- what licenses did you hold?
**A. Florida, Arkansas, Idaho, Oklahoma.**
Q. Anywhere else?
**A. I feel that I am missing one, but I can't recall what state.**
Q. Maybe Texas?
**A. No, because you get either Texas or you get Florida, and then you have reciprocity --**

Page 10

Q. Okay.
A. **-- to most of the others.**
Q. So you've been previously licensed in four to five states, right?
A. **Yes.**
Q. Have any of those licenses ever been suspended or revoked?
A. **No.**
Q. Have you ever been licensed in Colorado?
A. **No.**
Q. Do you hold any insurance designations?
A. **Not presently.**
Q. And you know what I mean, like the designations offered by, say, The Institutes, AIC, things of that nature?
A. **No. But I'd like to go back to the last question. You asked me about if I've ever had any licensing in the state of Colorado.**
Q. Yes, sir.
A. **I did hold a public adjuster's license for one year, but I never practiced as a public adjuster.**
Q. All right. So you held a public adjuster license in Colorado?
A. **Yes.**
Q. Did you ever hold a public -- public

Page 11

adjuster license in any other states?
A. **No.**
Q. Did you ever have any clients while holding a public insurance adjuster license?
A. **No.**
Q. Have you ever testified in trial?
A. **No.**
Q. Have you ever served as an appraiser?
A. **Yes.**
Q. How many times?
A. **Once.**
Q. Have you ever served as an umpire?
A. **Yes.**
Q. How many times?
A. **Approximately -- approximately 12 times.**
Q. The one time you served as an appraiser, was that for an insurance company?
A. **Yes.**
Q. Do you know which one?
A. **If I recall correctly, it was Shelter.**
Q. And then have you -- have you received training in insurance claim principles?
A. **Through licensing, yes.**
Q. Okay. So you're familiar with the duty of good faith and fair dealing?

Page 12

A. **Yes.**
Q. Are you -- who is your current employer?
A. **I am self-employed.**
Q. And what is your -- what are you self-employed as? What do you do, if -- what do you do?
A. **I'm a -- I'm an independent adjuster and claims supervisor.**
Q. And how do you obtain work as an independent adjuster?
A. **How am I paid?**
Q. No. How do you -- how do you receive assignments?
A. **I receive assignments from a company called Specialty Adjusting International.**
Q. Do you receive assignments from any other companies?
A. **No.**
Q. And then when you say "claims supervisor," describe to me more what that means.
A. **It means that if a -- a claim is assigned to a field adjuster somewhere in -- in the United States and -- then a supervisor is assigned as well to oversee that claim and make sure that the -- the file is in order.**

Page 13

Q. So would you receive a claim supervisor assignment through Specialty Company (sic) International as well?
A. **Specialty Adjusting International, yes.**
Q. And so what is your -- do you have any connection to Raphael & Associates?
A. **Specialty Adjusting International is contracted with Raphael & Associates.**
Q. So do you -- I'm trying to better understand how you would receive an assignment. So is there a portal or something of that nature where you would go onto Specialty Adjusting International, see the available assignments, and then you could select if you want to take one on?
A. **I receive an email saying -- you mean as an adjuster; is that correct?**
Q. Yeah, as an independent adjuster --
A. **I receive an email. I'm sorry. Go ahead.**
Q. That's okay. That's okay. So as an independent adjuster, you receive your assignments from Specialty Adjusting International through an email, correct?
A. **Through an email and -- and then it'll -- it'll show up on a program, a claims management program called Filetrac.**

Page 14

Q. And in that -- that email, do you have the opportunity to turn down a claim?
**A. No, not in the email.**
Q. When -- when you go onto Filetrac, could you turn it down?
**A. No.**
Q. When -- when you receive the assignment, are you aware of what insurance company is involved?
**A. Yes.**
Q. And then when you receive the assignment, are you aware of what -- or strike that. What -- how would you categorize Raphael & Associates? Are they an independent adjusting company?
**A. A third-party administrator.**
Q. Okay. So when you receive an assignment, are you aware of who the third-party administrator will be?
**A. Yes.**
Q. In the assignment, when it comes through in an email, are there usually instructions? What's contained within there?
**A. There are claims -- claims handling instructions. There is a loss notice.**
Q. A loss notice, okay. So the initial email, it'll have claims handling instructions that

Page 15

include a loss notice. Anything else?
**A. Usually the -- the declarations page is -- is attached as well.**
Q. And any additional information generally?
**A. No.**
Q. And then when you receive an assignment in this manner, where you're the independent adjuster and then you have a TPA, who are you reporting to?
**A. I am reporting to the claims supervisor for Specialty Adjusting International.**
Q. And if you were assigned as the claim supervisor, who then would you be reporting to?
**A. The claims examiner with Raphael & Associates.**
Q. Do you ever report to the specific insurance company?
**A. No.**
Q. Okay. Now, do you receive any training from Specialty Adjusting International?
**A. I'd like to go back to the last question, if I may.**
Q. Yes, sir.
**A. I have had a claim that was a large fire loss, and it was pulled from Raphael & Associates. But I was -- I was kept on as a field adjuster. So at that**

Page 16

**point, then I was answering to a desk adjuster of Guard Insurance.**
Q. Okay. And -- and that just occurred on the one large fire claim, that you can recall?
**A. Yes.**
Q. So the general practice is, when you're assigned as an independent adjuster, you'll receive the assignment from Specialty Adjusting International. It'll include some claims handling instructions, and you report directly to the claims handling supervisor?
**A. Yeah, the -- the supervisor that is contracted with Specialty Adjusting International.**
Q. Sure. And if you receive an assignment where you're going to be the claims supervisor, then you would report directly to Raphael & Associates, or another similar third-party administrator?
**A. Yeah, yeah. For the most part, I would be reviewing files for completeness. And if -- if there were any questions in it, then I might contact the examiner.**
Q. When you say for the most part you'll be reviewing files for completeness, that -- that's when you're the claims supervisor, correct?
**A. Yes.**
Q. Okay. Because when you -- when you were

Page 17

the independent adjuster, you're actually putting together the complete file and investigation, right?
**A. Right.**
Q. Do you -- have you received any training from Specialty Adjusting International?
**A. Yes.**
Q. What type of training have you received from Specialty Adjusting International?
**A. Reporting guidelines and how to use Filetrac.**
Q. Have you received any training from Amguard Insurance Company?
**A. No.**
Q. Have you received any training from Raphael & Associates?
**A. No.**
Q. Are you trained and expected to be honest with an insured?
MR. PONZI: Form.
**A. Of course.**
Q. (BY MR. BUKOWSKI) Do you agree that if you submit an estimate related to one of your investigations, that it should be accurate?
MR. PONZI: Objection to form.
**A. (No verbal response.)**

Page 18

Q. (BY MR. BUKOWSKI) I'm sorry, Mr. Miller. So --
MR. PONZI: Just so you know, I am going to make objections from time to time. Unless I instruct you not to answer, then you can just go ahead and answer after I state my objection for the record.
**A. Okay. Please ask the question again.**
Q. (BY MR. BUKOWSKI) Yes, sir. Do you agree that if you submit an estimate related to your investigation, that it should be accurate, based on the available information?
**A. Yes.**
Q. Are you trained and expected to consider all available information related to a claim?
**A. Yes.**
Q. Are you trained and expected to conduct an objective investigation of a claim?
**A. Yes.**
Q. Are you trained and expected to conduct a thorough investigation of a claim?
**A. Yes.**
Q. Are you trained and expected to share the results of your investigation with a property owner?
MR. PONZI: Object to form.
**A. No.**

Page 19

Q. (BY MR. BUKOWSKI) Do you receive any type of guidelines from Specialty Adjusting International specifically with regard to sharing the findings of your investigation with the insured or property owner?
MR. PONZI: Same objection.
**A. Occasionally somebody will want -- such as the examiner will want me to come up with an agreed scope and value of loss with -- with an insured or their contractor or public adjuster.**
Q. (BY MR. BUKOWSKI) And so in that circumstance, you would share the findings of your investigation to reach some sort of agreement, correct?
**A. Yes.**
Q. Outside of that situation where you're specifically asked to come up with an agreed scope, would you share your investigation findings?
**A. Sometimes.**
Q. Okay.
**A. My findings.**
Q. Under what circumstances would you share the findings of your investigation?
**A. If I inspect something and I find no damage, there is a chance that -- a good chance that I may end up telling the -- the owner, the insured, that there is no damage.**

Page 20

Q. What is the -- what is your basis or understanding for maybe sharing the circumstances -- the findings of your investigation in that scenario as opposed to when you do see damage?
**A. Because when I find damage, I -- I generally am required to write an estimate. So, you know, when I -- when I do an inspection and there is damage, I'll, you know, tell them that I'll be writing a report and it will be reviewed for accuracy.**
Q. And, then, so your general practice is to submit the report to your claims supervisor, and then it is sort of out of your hands from that point?
**A. Yes.**
Q. When you're involved in a claim, do you -- are your emails sent from a personal email account, or are they tied to Specialty Claims?
**A. Well, up until a few months ago, I was utilizing a personal email address.**
Q. And then do you keep track of those e-mails, or are they still saved --
**A. I do.**
Q. Okay. What made you change from a personal email address to something else?
**A. I was offered to have a Specialty Adjusting email address, and I thought that that would be a good idea. So therefore, I have a Specialty Adjusting email address.**

Page 21

Q. Now, when you receive an assignment from Specialty Adjusting International, are you paid on -- I don't want to know the amount.
**A. Right.**
Q. But what I'm asking is, are you paid for the assignment, like a flat rate, or are you paid based on how much the estimate is, or are you paid based on how many hours you put in?
**A. I am T&E, Time and expense.**
Q. And then do you keep track of your time and expense somewhere?
**A. Yes.**
Q. Where -- where would that be? Where would you keep track of that?
**A. As an adjuster, it generally is on an Excel spreadsheet.**
Q. And then do you turn that in to Specialty Adjusting International?
**A. Yes.**
Q. Do you keep any sort of claim notes?
**A. Those would be in Filetrac.**
Q. What -- what's your practice in terms of claim notes? Do you track every movement you have, or

what do you do?
A. **Can it be more specific?**
Q. Sure. Well, I don't think I've seen your claim notes, so I don't really know how you would keep track. Do you -- what is your practice in terms of what you put into your claim notes? Is it every time you speak to someone? Is it every time you work on an estimate? Is it similar to the time and expense that you keep track of? What generally would you put into the -- the claim notes?
A. **Well, let's say I receive a phone call from an insured. I'll -- I'll put the basic information into Filetrac as to what we -- we discussed.**
Q. What about, do you put any of your substantive analysis into -- into Filetrac; for instance, if you're provided with information showing damage that you previously didn't think was damage, would you put your analysis of why you believe it is or is not damage into there?
A. **So if you're referring to -- let's say that I feel that -- well, you better ask the question a different way, please.**
Q. Sure. And it's not a trick, it's just to understand what your practice is. So let's say you



have a -- a metal roof, right? Because it doesn't involve either claim.
A. **Okay.**
Q. And you inspected it, you didn't see any damage, in your opinion. But then you're presented information from a contractor or a public adjuster or an insured of what they believed was damage to the metal roof. Would you then look at that compared to your photographs and somehow note it within your claim notes whether you thought it was damaged or not and why?
A. **Yes. Sometimes I'll say I've received a -- an estimate from a contractor. Assuming that I've already notated, I've -- I saw no damage, I might -- I'll go ahead and put that information in Filetrac.**
Q. And if you have a conversation with a, let's say, claim -- a policyholder representative, a contractor, public adjuster, owner, et cetera, you would note what that -- the substance of that conversation is within the claim notes, correct?
A. **Yes.**
Q. Do you consider yourself an expert in anything?
MR. PONZI: I'll object to the form of the question.



A. **No.**
Q. (BY MR. BUKOWSKI) Do you have experience applying insurance policy language to -- to a loss?
A. **Yes.**
Q. Do you consider yourself an expert in the application of insurance policy language to a property damage loss?
MR. PONZI: Same objection.
A. **I will read the appropriate documents and -- and write an estimate, but that's about it.**
Q. (BY MR. BUKOWSKI) Do you have experience in interpretation of insurance policy language in the context of a property damage loss?
A. **Yes.**
Q. Do you consider yourself an expert in the interpretation of insurance policy language in the context of a property damage loss?
A. **No.**
Q. Do you have experience identifying hail damage?
A. **Yes.**
Q. Do you have experience identifying hail damage to shingle roofs?
A. **Yes.**
Q. Do you have experience identifying hail



damage to TPO roofing systems?
A. **Yes.**
Q. Do you have experience identifying hail damage to stucco?
A. **Yes.**
Q. And do you have experience identifying hail damage to EIFS stucco systems?
A. **Yes.**
Q. And do you have experience identifying hail damage to windows?
A. **Hail damage to windows, yes.**
Q. Both wood or aluminum clad?
A. **Yes.**
Q. Do you consider yourself an expert in identifying hail damage to any of the components that -- that we just went through?
MR. PONZI: Object to form.
A. **No.**
Q. (BY MR. BUKOWSKI) How long have you been adjusting property damage claims?
A. **The better part of 29 years.**
Q. So you -- you've obviously evaluated hail damage claims, correct?
A. **Yes.**
Q. What other types of claims have you

Page 26

evaluated in your 29 years?
A. **Flood claims, water damage claims, fire losses, settling claims, sewer backups, wind damage, theft, vandalism. That's pretty much it.**
Q. The first one, did you say flint?
A. **Flood.**
Q. I'm sorry. What did you say?
A. **Flood.**
Q. Oh, flood, okay. How many insurance companies have you evaluated property damage claims on behalf of?
A. **I have no idea.**
Q. Would you say it's over 50?
A. **Probably, yes.**
Q. Would you say you've evaluated property damage claims on behalf of 75 insurance companies?
A. **I wouldn't know.**
Q. Well, can you say it's over 100?
A. **No, I wouldn't -- I don't know.**
Q. But you're confident that you've evaluated property damage claims on behalf of over 50 insurance companies?
A. **Probably.**
Q. Have -- so we're here today on two claims involving Amguard. Pacific Ocean Alameda and 2505 6th

Page 27

Street, LLC. You're familiar with both of those properties?
A. **Yes.**
Q. Okay. Prior to your involvement with these two properties, had you ever evaluated a property damage insurance claim on behalf of Amguard Insurance Company?
A. **Yes.**
Q. How many previously had you evaluated on behalf of Amguard?
A. **I would be taking a guess. Maybe 50 claims.**
Q. And do you know whether -- on those 50 prior claims that you evaluated on behalf of Amguard Insurance Company, did you prepare estimates on any of those?
A. **Yes.**
Q. Do you know approximately how many?
A. **The majority -- almost all of them.**
Q. And do you know, on the claims that you have previously provided estimates on behalf of Amguard Insurance Company, whether any of them were paid based on your estimate?
A. **That, I do not know.**
Q. Now, of those 50 or so other insurance

Page 28

companies you've worked for, what -- what are some of the companies you worked for?
A. **What was that question again?**
Q. The 50 or so plus insurance companies that you've evaluated property damage claims on behalf of, what are some of the insurance carriers that you've done that work for?
A. **In my past, I've handled claims for -- as an independent adjuster, for USAA, Federated National -- yeah, I couldn't remember.**
Q. How long have you been adjusting hail damage claims?
A. **Probably since 1993.**
Q. Since first evaluating hail damage claims in 1993, how many do you think you've evaluated?
A. **More than a thousand.**
Q. Have you ever evaluated any hail damage claims on behalf of a policyholder?
A. **Yes.**
Q. Okay. How many times?
A. **One.**
Q. Is that when you were the appraiser? Oh, I'm sorry, that was for an insurance company. Strike that. Can you tell me about the one time that you handled a claim on behalf of a policyholder?

Page 29

A. **I was contacted by a -- a property management company that sustained hail damage to either an apartment complex or an HOA, and they wanted me to more or less be an estimator for them on the loss.**
Q. Okay. And did you accept that job?
A. **Yes.**
Q. Was that claim in Colorado?
A. **It was.**
Q. And how long ago was it?
A. **Probably at least 20 years.**
Q. And so in the last 20 years, you've not handled any claims for policyholders?
A. **That's correct.**
Q. Have you ever been hired as an expert on a claim that's in a lawsuit?
A. **Yes.**
Q. And you understand separately today, you're here as a witness to your involvement in the claim prior to the lawsuit. So what I mean is, where a claim is in a lawsuit and you're actually being brought in to give expert opinions. You've had that occur before?
A. **Yes.**
Q. Okay. Can you explain to me -- well, how many times have you been hired as an expert on an

Page 30

insurance claim in litigation?
A. One.
Q. And were you retained for the insurance company, or on behalf of the plaintiff or policyholder?
A. You might as well say the insurance company's lawyer.
Q. How long ago was this?
A. Maybe 15 -- 12, 15 years ago.
Q. Okay. Have you been retained to serve in a similar capacity since this one occasion 12 to 15 years ago?
A. No.
Q. And were you just -- what were you providing an opinion on?
A. The value of loss.
Q. In terms of just the estimate, or were you actually doing a cause-and-origin analysis as well?
A. Just the estimate. Estimate and report on it.
Q. And then you've never testified in trial, so I'm assuming the case didn't go to trial?
A. They were able to settle out.
Q. Okay. Do you know if your opinions were challenged in that case?
A. I do know the -- whether they were or not.

Page 31

Q. You -- you do know?
A. I do know.
Q. Okay. Were your opinions challenged in that case in court?
A. No.
Q. Do you have any construction experience?
A. No.
Q. Would you consider yourself an expert in estimating property damage?
A. An expert? No.
Q. But you have experience estimating property damage, correct?
A. Yes.
Q. I'm assuming you've handled a hundred -- a thousand-plus hail damage claims, so you've probably put together at least a thousand-plus repair estimates, correct?
A. Yes.
Q. How many -- overall in your 29 years of doing property damage claims for all -- a variety of perils, how many estimates do you think you've put together?
A. That's something that I have never given any consideration to, and I'm merely guessing on the number of hail claims, and I should not do that. But

Page 32

I -- I gave you a number, and whether it's a thousand -- over a thousand or under a thousand, I don't know. And how many other types of claims, I just don't keep track of that.
Q. Okay. Fair to say you've handled thousands of claims?
A. Over a thousand, yes. I'd say that would be safe.
Q. Do you have any -- what -- did you receive any training in preparing an estimate to repair property damage on an insurance claim?
A. Yes.
Q. Can you tell me about some of that training you've received specific to estimating?
A. Well, you have estimating software training, okay? And also I went through Crawford Property School.
Q. Anything else?
A. I was a staff adjuster for Ohio Casualty, so I went through their property school.
Q. All right. Any other training?
A. Just small seminars where you -- you know, where you end up somewhere and -- in Florida or Texas or whatever or, you know. I met Chip -- Chip Merlin at one several years ago.

Page 33

Q. Are you Xactimate certified?
A. No.
Q. What -- just generally, what type of estimating software training did you receive?
A. Xactimate.
Q. But did you -- but did you go through their certification program?
A. No. I -- I believe that you should know how to use the program, but to -- to pay them money to have proof that I know how to use the program, no, I did not do that.
Q. Okay. Have you received any training on the interpretation of applicable codes and ordinances?
A. Off and on. Tidbits.
Q. Is that -- does that just mean from the various seminars that you would attend throughout the country?
A. Yes.
Q. Now, when you're asked to prepare an estimate by an insurance company, do you generally do so within Xactimate, or do you use bids?
A. I try to use Xactimate as much as possible.
Q. Why do you try to use Xactimate as much as possible when preparing an estimate?

Page 34

A. Because the prices are in there, and I want to handle the claim as efficiently and quickly as possible so it can get -- the estimate and the report can get to the carrier for payment consideration.
Q. Do you use any other estimating programs outside of Xactimate?
A. No.
Q. Do you know -- do you have an understanding as to how Xactimate pricing works?
A. Do I know how they come up with the formula for -- for the prices of -- of a specific zip code?
Q. Sure. It sounds like you have some working knowledge of how the pricing is computed within Xactimate, correct?
A. Yes.
Q. Okay. What is your general understanding of how Xactimate determines the pricing specific to a zip code?
A. My understanding is that Xactware has a team of individuals who somehow contact contractors in specific areas each month in order to keep track of the pricing of labor and material.
Q. Is it -- is it your understanding that Xactimate gives fair and reasonable pricing?

Page 35

A. I believe it does, in most cases.
Q. It tries to give a middle ground, correct?
A. Actually, it -- it depends on -- it depends on the trade.
Q. What do you mean?
A. Most roofers are very happy with the pricing of Xactimate.
Q. In terms of when you're selecting a price list on Xactimate, how do you make that determination?
A. It depends on carrier guidelines.
Q. What -- what do you mean, "carrier guidelines"?
A. If -- if there are no guidelines pertaining to which price list to use, I will use a current price list for that -- that area, or that area code -- not area code, but zip code.
Q. But on some occasions, you will be given a specific instruction by the insurance company to use a different price list?
A. On occasion, yes.
Q. Okay. And then on that occasion, you'd -- obviously, you'd follow the instruction of who you are being retained by, correct?
A. Well, by -- by the carrier guidelines.
Q. Now, if -- if there is no specific

Page 36

instruction from the carrier guidelines, why do you use a current price list?
A. Because why would I use a price list from a different time?
Q. Well, do you mean that the current price list would give the most accurate reflection of the current market for labor and materials?
A. Yes, in areas. I -- I would say yes.
Q. In your experience, is Xactimate the standard insurance estimating program used in this industry?
A. Yeah, I would say that it's used more than -- than any other insurance company, but also it's used by more contractors than any other program.
Q. Now, when you're putting together an estimate in Xactimate, do you determine the amount of depreciation to apply?
A. I prefer to use it based off of the -- the age and condition of the item.
Q. All right. Do you depreciate labor?
A. I prefer not to depreciate labor.
Q. And, now, you're familiar with general contractor overhead and profit?
A. Yes.
Q. What is your understanding of general

Page 37

contractor overhead and profit?
A. What is my understanding of it?
Q. Yes, sir. Yes, sir.
A. My understanding is, is it's for general contractor overhead and general contractor profit.
Q. What -- have you applied general contractor overhead and profit to an estimate you've prepared?
A. Yes.
Q. How do you determine whether general contractor overhead and profit is warranted under a specific scope of repairs in an estimate you've prepared?
A. Generally, it's three trades or more.
Q. And, then, would you agree that the industry standard for general contractor overhead and profit is 10 percent overhead and 10 percent profit?
A. Yes.
Q. Now, are you familiar with commercial supervision?
A. Yes.
Q. How is commercial supervision different from general contractor overhead and profit?
A. In my eyes, it -- it would be the same.
Q. Well, what is your understanding of the

Page 38

purpose of commercial supervision on a project?
A. **On a commercial property, I think there are different circumstances that are necessary to have a commercial supervisor, such as customers -- the protection of customers going in and out of a business, as an example.**
Q. Can you think of any other examples on a commercial project when it would be important to have commercial supervision?
A. **Safety monitor.**
Q. Any other circumstances when you would want to have commercial supervision?
A. **No.**
Q. And, then -- well, in the two examples you gave, customers coming in and out of a business or a safety monitor, you're saying that that's something that the general contractor could -- could perform as opposed to an independent person doing commercial supervision?
A. **I think the general contractor would have somebody that would handle that job.**
Q. So, then, in your opinion, the commercial supervision is built into the general contractor overhead and profit?
A. **No.**

Page 39

Q. Okay. So would there be a separate line item or trade for commercial supervision, when warranted?
A. **When warranted.**
Q. When warranted, there would be a separate line item for commercial supervision as opposed to general contractor in an Xactimate estimate, correct?
A. **Ask the question again, please.**
Q. When warranted, commercial supervision is separate and distinct from a line item for general contractor overhead and profit within an Xactimate estimate?
A. **Yes.**
MR. PONZI: Hey, Jon?
MR. BUKOWSKI: Yes, sir.
MR. PONZI: Is this a convenient stopping point for a comfort break?
MR. BUKOWSKI: Yeah, I was just going to go quickly through his LinkedIn and then go into the claim. Do you want to stop, or do you want me just to go quick through that and then take a break before I go into the claims?
MR. PONZI: Let's -- let's do that. Go -- go through the LinkedIn.
MR. BUKOWSKI: Shouldn't take more than

Page 40

five or ten minutes.
MR. PONZI: You got it.
Q. (BY MR. BUKOWSKI) So, Mr. Miller, I'm going to do the first exhibit. This is Exhibit 1.
(Exhibit 1, remotely introduced and electronically provided to the reporter.)
Q. Can you see it okay?
A. **Yes.**
Q. Okay. And this is a -- a copy of your LinkedIn profile that I obtained from the -- the LinkedIn.com website. Would you agree this is -- is this something you prepared?
A. **Yes.**
Q. Okay. In looking at your -- your experience -- well, first, you have General Adjuster/ Insurance Appraisal Umpire/Expert Witness for -- since 1992. Do you see that?
A. **Yes.**
Q. And is that sort of -- that's the experience that we just went over of your handling of thousands of claims and the process by which you receive an assignment as an independent adjuster, correct?
A. **Right.**
Q. Now, this says General Adjuster. Is there

Page 41

something different between a general adjuster and an independent adjuster?
A. **Not necessarily.**
Q. And then you have Powur PBC Solar. Is that something you're still doing?
A. **No.**
Q. It sounds like you were selling -- or somehow involved with solar panels for -- for Tesla?
A. **Well, Powur was contracted with Tesla -- well, Solar City. And then -- then they broke off their -- their agreement, I believe.**
Q. Fine. Through Powur, you didn't do any type of insurance claim work, correct?
A. **No.**
Q. Are you still involved as a partner in this company?
A. **I don't know.**
Q. Okay. Roof Brokers. What is Roof Brokers, Inc.?
A. **It is a -- a roofing -- a roofing consulting firm, I guess, is probably the best way of looking at it.**
Q. In your role at Roof Brokers, would you evaluate potential damage to roofing systems?
A. **I have done it, but that's really not my**

Page 42

job. My job was more in marketing and -- primarily marketing. Then a storm did hit, and so I was asked to look at a roof and -- and evaluate it.
Q. Who were you marketing to?
A. Real estate agents and property managers.
Q. Okay. You were trying to -- and then what -- briefly, what's your understanding of what Roof Brokers would do, if you -- if a real estate agent wanted you involved?
A. Roof Brokers has relationships with various roofing contractors.
Q. Okay. So if Roof Brokers identifies damage, they may bring in a roofing contractor to make the repairs?
A. They would actually give an estimate from a few different contractors.
Q. Okay. But at Roof Brokers, you gave maybe one example of a roof you evaluated. Did you evaluate any other roofs?
A. No.
Q. And then at Farmers Insurance Group, you were just -- you were an insurance agent, correct?
A. I was.
Q. Okay. And is that -- did you sell that business?

Page 43

A. No. That was right at the beginning of the Great Recession, and I was focused on commercial business, and those businesses were -- were going -- were going belly-up, so I was getting charged back on everything that I sold. So . . . it's not something I could sell anyhow.
Q. Okay. So you just let it go, or did you have to file bankruptcy? What did you do?
A. I let it go.
Q. Okay. And then NuBilt Restoration & Construction. What is NuBilt?
A. It's a fire and water restoration company.
Q. Okay. So nothing to do with hail damage evaluations?
A. No.
Q. Okay. And were you actually working in the construction field at all?
A. Estimating.
Q. Okay.
A. Scheduling -- some scheduling. I wasn't very good at it.
Q. And then you said you -- you worked for Ohio Casualty?
A. I did.
Q. When was that, approximately?

Page 44

A. It's on my resume. Should be on there.
Q. So I only --
A. I was there for five years, between 1998 and 2003.
Q. Okay. And you were handling -- were you a property claims adjuster?
A. Yes.
Q. What type -- did you have a certain threshold of claims you were handling, up to?
A. My check writing authority was 25,000, but I was handling larger losses as well.
Q. Okay. And then the approval would just go to the supervisor?
A. Yes.
Q. Were you handling any commercial claims?
A. Some commercial claims.
Q. Were you handling claims involving hailstone impact?
A. Yes.
Q. Were you handling claims involving asphalt shingle roofs?
A. Asphalt shingle roofs?
Q. Yes, sir.
A. Yes.
Q. Did you handle claims involving TPO roofs?

Page 45

A. Back then? For Ohio Casualty, I don't recall.
Q. When you were employed with Ohio Casualty, were you based in Colorado?
A. I was.
Q. And why did you leave Ohio Casualty?
A. They changed their philosophy from 70 percent residential to -- and 30 percent commercial to just the opposite. So they sold off -- or let go, nonrenewed a huge portion of their business and focused on more commercial claims, which means less claims adjusters. So I was laid off.
Q. Okay. And then did you work for any other insurance companies like Ohio Casualty, directly?
A. No.
Q. All right.
MR. BUKOWSKI: Let's -- let's go ahead and take a break. Matt, is ten minutes okay?
MR. PONZI: Ten minutes is good, thank you.
MR. BUKOWSKI: That's okay with you, Mr. Miller?
THE DEPONENT: Yes.
MR. BUKOWSKI: Okay. Perfect. See you in ten minutes.

(Recess taken, 10:59 a.m. to 11:07 a.m.)
Q. (BY MR. BUKOWSKI) All right, Mr. Miller. So we're back on the record, and we're going to discuss the Pacific Ocean Alameda property, which is located at 2200 West Alameda Avenue in Denver, Colorado. Are you familiar with that property?
**A. Yes.**
Q. Okay. And it's -- is it your understanding that the Pacific Ocean Alameda property is a commercial specialty food market?
**A. Right. I do remember that.**
Q. What -- what was your role in the claim involving the Pacific Ocean Alameda property?
**A. Well, it started out as being a field adjuster.**
Q. And did that change at some point?
**A. Yes, because the -- the claim threshold had -- I don't know what GUARD's guidelines are on pulling files and that kind of thing. I -- I'm still confused to a certain degree on that. So it -- it was brought back in-house with GUARD, was my understanding.**
Q. So your involvement in the Pacific Ocean Alameda claim, however, was only as a field adjuster, until the claim was brought back in-house?
**A. Right.**



Q. And what are your duties and responsibilities as a field adjuster?
**A. What are my duties, or what was I able to accomplish on that particular claim?**
Q. Not what you were able to accomplish. Generally, when you're assigned as a field adjuster on a claim similar to the Pacific Ocean Alameda, what are your duties and responsibilities?
**A. To make an appointment with the insured or their representative, inspect the property, write an initial report with a reserve amount, estimate the loss, if it is a covered loss, or if I feel that it is a covered loss. And make a recommendation to the carrier, and that's pretty much it. I'm an independent adjuster.**
Q. Okay. So you said you write an initial report with a reserve amount. What does that mean, "reserve amount"?
**A. Money set aside by the carrier so they have an indication as to what the potential claim value is.**
Q. And do you -- do you have -- is it your practice to provide a reserve amount on the claims that you handle as a field adjuster?
**A. If it is large loss, yes.**



Q. Okay. And how do you generally arrive at the amount you're going to reserve?
**A. We discussed it with the -- the roofer who has been working on it for a long period of time, as to what he thought the -- it would cost to replace the roof.**
Q. So that's what you did here on this claim, correct?
**A. Yes.**
Q. Generally, when you're giving a reserve amount on an assignment, how do you make that determination?
**A. I look at the amount of damage, and I -- and I give it my best faith guesstimate.**
Q. You give it your best faith guesstimate as to the amount of loss at the property?
**A. Yes, sir.**
Q. Okay. And then in this circumstance at the Pacific Ocean Alameda, specific to the reserves, you had a discussion with the roofer as to what he believed the costs would be to repair the roof?
**A. Right.**
Q. Did -- and then ultimately you included a certain amount within your initial report to the carrier, correct?



**A. I believe I did.**
Q. And then would you just put in the number that the roofer says, or do you do some analysis to determine if you agree with it or if it's reasonable?
**A. No, I -- I just took it for what it was, for what the roofer is stating, and recommended a -- an engineer look at it.**
Q. In the Pacific Ocean Alameda claim, were you tasked with making any coverage determinations or decisions?
**A. As an independent adjuster, I don't make coverage decisions.**
Q. As an independent adjuster on the Pacific Ocean Alameda claim, did you have any settlement authority?
**A. None.**
Q. Do you have an understanding as to who the decision-maker was on the Pacific Ocean Alameda claim?
**A. Not really, no.**
Q. Did you prepare any estimates on the Pacific Ocean Alameda claim?
**A. No.**
Q. Did you reach any agreements on any estimates with the insured or its representatives regarding the estimate of repair?

Page 50

A. **No.**
Q. Did you inspect the Pacific Ocean Alameda property?
A. **Yes.**
Q. How many times?
A. **I think I went out there twice.**
Q. Did you have a point of contact at Amguard Insurance Company regarding the Pacific Ocean Alameda claim?
A. **No.**
Q. Did you have a point of contact at Raphael regarding the Pacific Ocean Alameda claim?
A. **Well, I knew -- I recall at the moment -- I mean, to be perfectly honest, because of the deposition prep, I realize that John Larson, I think, if I remember right, was the examiner at Raphael. But that's all I remember. That's all I know.**
Q. So in preparing for your deposition, it came to your attention that you were -- your point of contact at Raphael was John Larson?
A. **Yes. Well, he was the examiner. Remember, I've got a supervisor in between.**
Q. Okay. So did -- but, I'm sorry, above or below John is the claim supervisor?
A. **Technically, I guess below.**

Page 51

Q. Okay. So it would go Ted Miller is the field adjuster, you have a claim supervisor, then above that you have John Larson at Raphael?
A. **Correct.**
Q. Do you know who the claim supervisor was on the Pacific Ocean Alameda claim?
A. **No. I would be guessing.**
Q. Did you have -- well, when you're handling a claim like this, is Specialty Adjusting International involved at all after the assignment comes out?
A. **Specialty Adjusting International does the field inspection and reserve recommendation. And then we will, generally speaking, handle the claim and -- as far as coming up with an estimate. And when it becomes a larger claim, then we get further instructions as to whether or not we just estimate the loss or negotiate with the -- with the -- the contractor involved.**
Q. Now, you've said, "when it becomes a larger claim." Is there a threshold as to when it becomes a larger claim, as you're describing it?
A. **Not really. I mean, I -- once a claim gets to 75,000, I'll generally fairly quickly put together a reserve report and -- and an initial report with reserves and request further handling instructions.**

Page 52

Q. Is there a reason that $75,000 is where you typically do that?
A. **Not really. I mean, I can't say that there is -- perhaps it's in GUARD guidelines, but I -- I'm not certain.**
Q. Were you provided with any guidelines from GUARD for the Pacific Ocean Alameda claim?
A. **Not specifically for that claim, but just GUARD guidelines that are for all of their claims.**
Q. I'm sorry. You were provided with guidelines for all of the claims?
A. **Yes.**
Q. Are you -- are those provided with the assignment from Specialty Adjusting International, or is it just something you have from prior claims?
A. **I don't recall if -- if they're attached to the file on every file, or -- yeah, I don't know.**
Q. Now, at Specialty Adjusting International, is there a point of contact or someone you need to report to for that company?
A. **The claim supervisor for that particular file.**
Q. And here, on the Pacific Ocean Alameda, you don't recall who that is?
A. **No.**

Page 53

Q. Do you know when you first became involved in the Pacific Ocean Alameda claim?
A. **You want the date?**
Q. Well, approximately.
A. **No.**
Q. Okay. I'm going to put on the screen Exhibit 2.
(Exhibit 2, remotely introduced and electronically provided to the reporter.)
Q. This is an invoice from Raphael & Associates dated July 31, 2020. Can you see that?
A. **Yes.**
Q. And it's five pages. As I scroll down, the first entry on here is from May 11, 2020. Can you see that?
A. **Yes.**
Q. And there is an entry from DBERTOT. Do you know who that is?
A. **Yes.**
Q. Who -- who is that?
A. **It is one of the owners of Specialty International.**
Q. So as I scroll through the five pages of this document, do you see any entries that you would have made?

A. No. I didn't make any of those entries, no.
Q. So on May 18, 2020, it says, Traveled to meet insured's roofer for inspection of the property. Drove from risk. Do you see that?
A. Yes.
Q. Do you recall the -- the owner of Specialty driving to the property at all, or is this something he would have entered on your behalf?
A. He entered -- I didn't enter that.
Q. What is the owner's name, or what does DBERTOT stand for?
A. Damian Bertot.
Q. Bertot is spelled just like it is on -- on the sheet?
A. Right.
Q. Do -- and just looking at these, do any of these look like tasks that you would have performed, that were just entered in here on your behalf?
A. I didn't enter anything on that form.
Q. Okay. Would these have been entered -- does it look like something that -- the style that you entered into your Excel spreadsheet that maybe was transferred into this form?
A. It looks like template entries.



Q. And so what I'm just trying to figure out is, I don't think I have your claim notes, so is this something that documents your time?
A. (No verbal response.)
Q. I mean, for instance, it says May 18, 2020, developed a preliminary report with photos. That's something you did, correct?
A. A preliminary report with photographs is something that I have developed.
Q. Okay. And then it says, Left voice message with examiner to give reserve amount.
Is that something you would have done?
A. Probably, yes.
Q. Okay. In looking at the second page, if -- if you just look through these, I mean, do these look like tasks that you performed or that were performed by Damian Bertot?
A. (No verbal response.)
Q. I'll zoom in a little bit for you.
A. Emails with adjuster. I'm the -- I would be the adjuster, so that, frankly, would be something from the supervisor/file reviewer. Reviewed, revised -- Reviewed, revise report and uploaded photos; that would most likely be the claims supervisor. Left voice message with desk adjuster; that could be -- that



could be me, that could be the claims supervisor, that could be Damian.
Q. Okay. Would you agree you'd have a better record of specifically the tasks that you performed through the time and expense invoice you would have submitted to Raphael?
A. I submit the time and expense report Excel spreadsheet to -- through email to Damian.
Q. Are you familiar -- do you know someone by the name of Linda Nassar, at Raphael?
A. Yes. So she probably was the claims supervisor on this.
Q. Okay. Do you recall speaking with Linda Nassar on this claim, Pacific Ocean Alameda?
A. No.
Q. Do you know who Kelley Brockway is?
A. I believe she is an employee of Raphael & Associates.
Q. Do you know what her role was, if any, on the Pacific Ocean Alameda claim?
A. No.
Q. And then earlier, you -- you believe that John Larson was the claims examiner on this claim?
A. Yes, I believe so.
Q. Do you know what role, if any, Damian



Bertot served on this claim?
A. He -- he works as a claims manager, so I -- no, I don't.
Q. Okay.
(Exhibit 3, remotely introduced and electronically provided to the reporter.)
Q. I am going to place on the screen Exhibit 3. This appears to be an independent adjuster assignment by Berkshire Hathaway GUARD regarding the Pacific Ocean Alameda, LLC claim. Do you see that?
A. Yes.
Q. Is this something that -- that you've seen before?
A. It would be what I would print out and put into a file. So the answer is yes.
Q. Is this -- does this document, Exhibit 3, encompass the claims handling instructions that you described earlier that you receive on a new assignment?
A. No.
Q. Okay. So you would actually -- you receive something different than this?
A. Not necessarily with the file, but there are GUARD guidelines.
Q. Okay. Do you recall receiving any other notice of loss or anything separate from this document

Page 58

on the Pacific Ocean Alameda loss?
**A. No, I don't recall.**
Q. Okay. And this document is dated May 11, 2020. Do you see that?
**A. No, I don't.**
Q. Oh, I'm sorry. You see it says, Date Prepared down here?
**A. Yes.**
Q. May 11, 2020?
**A. Yep.**
Q. Is that approximately the time that you -- you think you would have become involved in the claim?
**A. Well, either that day or the day after.**
Q. So sometime in May 2020, right?
**A. Oh, absolutely.**
Q. Okay. Now, did -- did you speak with any -- during the handling --
**A. You broke up.**
Q. I'm sorry. Did -- did you speak with any attorneys during your handling of the Pacific Ocean Alameda claim?
**A. No.**
Q. Did you speak with a -- an adjuster named Paul Prislupsky during your handling of the Pacific Ocean Alameda claim?

Page 59

**A. No.**
Q. Did you speak with an adjuster named Thomas Malloy during your handling of the Pacific Ocean Alameda claim?
**A. I don't believe so.**
Q. Did you speak with an adjuster named Sonja Pervez during your handling of the Pacific Ocean Alameda claim?
**A. Yeah, it doesn't sound familiar.**
Q. During your handling of the Pacific Ocean Alameda claim, did you at any point anticipate a lawsuit being filed?
**A. No.**
Q. We went over some of the folks from Raphael that we think may have been involved. Do you recall speaking to anyone else at Raphael about the Pacific Ocean Alameda claim?
**A. No. I -- I don't -- I don't necessarily believe I talked to anybody over the phone. It's possible that I could have made a phone call to advise the -- the examiner of -- that it's a large loss, just to give a heads-up.**
Q. Okay. Now, the -- are you familiar with the contractor who was on this claim?
**A. I met with him.**

Page 60

Q. And I'm trying to find his name. Mateo Mazullo; is that the contractor?
**A. I remember Mateo.**
Q. Okay. Had you worked with Mateo prior to this claim?
**A. Have not.**
Q. Do you have any opinions of Mateo, good or bad?
**A. Nice guy.**
Q. All right. Did you think that he was competent?
**A. Can't be sure.**
Q. Did you form an opinion -- opinion as to his experience with the type of roofing system at the Pacific Ocean Alameda property?
**A. I think he -- he probably was experienced in that type of roofing product, because he did get a core sample, evidently.**
Q. Was there anything else that leads you to the opinion that he was probably experienced in this type of roofing system?
**A. No, not really.**
Q. I'm sorry. I have Exhibit 3 back on the screen, which is that independent adjuster assignment form. It says, Adjuster assigned, Anthony Bartoli. Do

Page 61

you see that?
**A. Yes.**
Q. Did you ever speak with adjuster Anthony Bartoli on the Pacific Ocean Alameda claim?
**A. I don't know, no. I have not.**
Q. Do you recall being provided with any documents along with your assignment, on the Pacific Ocean Alameda claim?
**A. No, I don't recall anything other than something that might have been developed by Linda Nassar and perhaps the declarations page. And, you know, within the email there could be the -- you know, a partial policy.**
Q. And that information would have come through an email from someone like Linda Nassar?
**A. Probably Damian Bertot.**
Q. Did anyone from Amguard Insurance Company communicate the insurance company's expectations for your assignment?
**A. No.**
Q. Did anyone at all communicate verbally the expectations for your assignment on the Pacific Ocean Alameda claim?
**A. No.**
Q. Were you provided with any documents from

Page 62

the insurance company?
A. **Not directly.**
Q. Were you provided with any instruction directly from Amguard Insurance Company?
A. **No.**
Q. Did you request any documents from Amguard Insurance Company?
A. **I don't believe so.**
Q. Did you request any documents from Raphael & Associates?
A. **I don't believe so.**
Q. Did you request any information from Pacific Ocean Alameda?
A. **No.**
Q. Did you speak with the owner of Pacific Ocean Alameda?
A. **Possibly my initial contact might have been the owner. It could have been a manager, I don't know.**
Q. Do you recall anything of the initial contact?
A. **No.**
Q. All right. Were you provided with any underwriting inspection documents from anyone?
A. **No.**

Page 63

Q. Did you request that information?
A. **No.**
Q. Did you understand your role to be assisting Pacific Ocean Alameda or the insurance company, in the investigation?
MR. PONZI: I'll just object to the form of that question. You can answer.
A. **Both.**
Q. (BY MR. BUKOWSKI) Why do you say, "Both"?
A. **Because I -- I'm an independent adjuster. I believe that an insured should be indemnified under the direction of the policy.**
Q. Did anyone communicate any threshold for damage for you to use during your investigation?
A. **No.**
Q. All right. I've placed on the screen Exhibit 4. This says Inspection Summary/Initial Report.
(Exhibit 4, remotely introduced and electronically provided to the reporter.)
Q. And it has your signature on the second page. Can you see that okay?
A. **Yes.**
Q. Okay. What is -- what is an Inspection Summary/Initial Report document? What is the purpose

Page 64

of this?
A. **I've never seen that document.**
Q. You've never seen this document?
A. **No.**
Q. Okay. So I'm on page 2, where it says Remarks. Can you see that okay?
A. **Yes.**
Q. Okay. If you just want to take a second to just read through that and let me know when you've got through it.
THE REPORTER: I'm sorry, I didn't hear you.
A. **I said, I would be glad to.**
(The deponent perused the exhibit.)
Okay.
Q. (BY MR. BUKOWSKI) Is this -- the Remarks section, is this something that you recall putting together?
A. **I'm not going to speculate. I mean, it's -- actually looks like something that -- that I might have copied and pasted from Strong Contractors, and then may have recommended an engineer at that point.**
Q. And so the type of roofing system that's on this property is a single-ply mechanically attached

Page 65

PVC membrane, correct?
A. **From what I remember, it was either PVC or TPO.**
Q. Okay. And what's the difference between PVC and TPO roofing membranes?
A. **I don't remember the -- they're both very similar materials. One is just a little more elastic than the other.**
Q. And do you have experience adjusting hail damage to a PVC roofing system?
A. **Yes.**
Q. Do you know approximately how many claims you've handled with -- involving hail damage to a PVC roofing membrane?
A. **I would say one.**
Q. One before this?
A. **Yeah, one before or after.**
Q. Okay. But, again, this is something that's very similar to a TPO, which you have a lot of experience with, correct?
A. **Which I have slightly more experience with.**
Q. "Slightly more," as in maybe two claims, or --
A. **I believe, yeah.**

Page 66

Q. Okay. Do you have any experience putting together a repair estimate for damage to a PVC or TPO roofing membrane?
A. **Yes.**
Q. If you need a different document to answer my question, just let me know, but this may help you.
A. **I already answered it.**
Q. Oh, I'm sorry.
A. **I said yes.**
Q. I was prefacing my next question for you.
A. **Gotcha.**
Q. Do you know how the PVC roof on the Pacific Ocean Alameda property is constructed?
A. **No.**
Q. Do you recall what type of decking is on this property?
A. **I think it says gypsum board right here, and I remember the roofer talking about the issues with the gypsum board.**
Q. What do you mean?
A. **Well, apparently the gypsum board is -- falls apart, I guess.**
Q. Do you have experience with gypsum board?
A. **Not for decking, no.**
Q. Okay. What would usually be used as

Page 67

decking, in your experience, on a roof like this?
A. **Plywood sheathing or solid wood.**
Q. So from your recollection, you have a frame, so to speak. And then on this property you have gypsum board decking above that frame, correct?
A. **I don't know. I couldn't see it.**
Q. Did you go into the interior of the property?
A. **I did.**
Q. Okay. Were you able to see the type of decking from the interior?
A. **I could see the decking from the -- what I believe was decking, from inside. But the ceiling was probably 25, 30 feet up. I don't recall. It wasn't something that I could really inspect.**
Q. Okay.
A. **Which is why you get a core sample as a roofer.**
Q. Okay. And did the roofer obtain a core sample?
A. **Evidently.**
Q. Could you see a core sample during your handling of the claim?
A. **No.**
Q. Have you seen photographs of the core

Page 68

sample since your handling of the claim?
A. **Jon, I don't recall.**
Q. Do you recall whether there was a concrete deck on this roofing system?
A. **No, I do not.**
Q. Can you say for certain one way or the other whether there was a concrete deck?
A. **No, I cannot.**
Q. Do you recall whether there was a taper system on this roof?
A. **No, I don't -- I don't know.**
Q. Okay. Do you know what a taper is in terms of a PVC roof like this?
A. **No.**
Q. You've never heard of the term "taper"?
A. **T-a-p-e-r?**
Q. Yes, sir. Tapering of a flat roof.
A. **No.**
Q. Did you confirm any hail damage to the PVC roof at the Pacific Ocean Alameda property?
A. **I saw what -- what could very well be hail damage, what I thought was probably hail damage.**
Q. I'm going to place on the screen Exhibit 5.
(Exhibit 5, remotely introduced and

Page 69

electronically provided to the reporter.)
Q. Which is nine photographs. I am going to scroll through them really quick. Okay. Have you seen these photographs before?
A. **I've seen photographs like that before.**
Q. Okay. Are these -- do you know whether you took these photographs?
A. **I can't be certain.**
Q. Do you recall taking photographs on this claim?
A. **Yes.**
Q. Do you recall how many photographs you took?
A. **No.**
Q. Do you recall taking more than nine photographs in your inspection?
A. **I don't recall, but I -- I would say yes.**
Q. Would you have -- do you recall sending your photographs to Raphael?
A. **Probably, with my initial report. I probably provided a -- a photo sheet for their review.**
Q. Would you have provided the initial report and accompanying photo sheet through email to Raphael?
A. **I would have uploaded it to Filetrac, and then the file supervisor would have reviewed it, would**

Page 70

**make changes in the wording of the initial report as needed, and then sent it to -- forward. Send it forward.**
Q. In looking at the first photograph on Exhibit 5, you can see -- does this accurately depict the decking on the roof?
**A. Well, I can't quite tell what it is, but I can -- I can see what would be probably the decking.**
Q. Okay. Does that -- can you tell what type of decking that is, from photograph 1 on Exhibit 5?
**A. No, sir.**
Q. Can you tell whether photograph 1 on Exhibit 5 illustrates concrete decking?
**A. I can't tell.**
Q. I'm sorry. I've placed Exhibit 5 back on the screen. Going through some of these photographs -- for instance, No. 5 says, PVC equals 61. Do you see that?
**A. Yes.**
Q. Does this look like your handwriting on photograph 5 on Exhibit 5?
**A. No, it is not.**
Q. And then photograph 6 has a hand with a watch. Does this look like your hand?
**A. Yes.**

Page 71

Q. Okay. Does that look like your watch?
**A. Yes.**
Q. Okay. And then photograph 7, does this look like your hand?
**A. Yes.**
Q. And then photograph 8 has a hand and watch, as well. Does this appear to be your hand and watch?
**A. Yes.**
Q. So looking at photographs 6, 7, and which have your hand, do those at least look like photographs that you would have taken?
**A. Yes.**
Q. In photograph 6 on Exhibit 5, you're pointing to something. Do you recall what you're pointing to?
**A. I must be pointing at a -- a hail mark.**
Q. And then --
**A. Or what I believe to be a hail mark.**
Q. Photograph 7, you're pointing to -- to something here as well.
**A. Correct.**
Q. Do you recall what you're pointing to?
**A. That could be a hail mark, but it also looks a bit like a fastener --**

Page 72

Q. Okay.
**A. -- protruding outward.**
Q. And then around what -- what you're describing as a fastener appear to be several little circles. Do you see that?
**A. Yes.**
Q. Are those -- to your recollection, is that the result of a hailstone impact, or is this something that would have been circled to make it more defined in the photograph?
**A. Can you ask that question again, please?**
Q. Sure. My question is just, I see -- if we assume this is a fastener next to your finger, okay?
**A. Okay.**
Q. To the left of it, here is a circle right here, to the immediate left. Do you see that?
**A. I do see the -- I do see a line, a circle.**
Q. That circle or line, is that something that you would have drawn there, or is that just a condition that's already on the roof that you're photographing?
**A. That's a condition on the roof where -- where your -- your target mark is, and that's not what I'm pointing at.**
Q. Okay. So there is a variety of circles

Page 73

similar to that one to the left of what we think is the fastener in this photograph. Do you see that?
**A. Yes.**
Q. Are those hailstone impact marks, in your opinion?
**A. I would say that they're probably spatter marks from hail.**
Q. Okay. And then photograph 8, you have three fingers out. Do you know what you're trying to illustrate here?
**A. Further spatter marks.**
Q. Okay. Okay. I'm going to place on the screen Exhibit 6.
(Exhibit 6, remotely introduced and electronically provided to the reporter.)
Q. This is a repair estimate with a heading from Strong Contractors, Inc., that's dated May 19, 2020. Can you see that okay?
**A. Yes.**
Q. Okay. And this repair estimate, I'll scroll through it really quick for you. All right. So we've -- I've scrolled through the 22 pages of Exhibit 6. Is this a document you recall receiving during your handling of the claim?
**A. I don't recall the photographs, but that**

**doesn't mean that they weren't there.**
Q. Okay.
**A. It just means that I don't recall it.**
Q. So the first two pages are an Xactimate estimate totaling approximately $809,000. Do you recall receiving at least these first two pages?
**A. I recall getting an estimate from Strong Contractors, or at least a verbal dollar amount.**
Q. And this -- this initial repair estimate has 12 line items, correct?
**A. Yes.**
Q. Do you disagree that any of these line items are required should this roof need to be replaced?
**A. Yeah, I don't know. I mean, that's part of the reason why I recommended an engineer do an inspection as well.**
Q. Line item 4 has, Insulation ISO board, 4 inches. Do you see that?
**A. Yes, sir, I do.**
Q. And it says below it, Existing insulation is 4.5 inches. Do you see that?
**A. Yes.**
Q. Do you recall whether the existing insulation on this roof was 4-1/2 inches?



**A. I would have no way of knowing.**
Q. Do you have experience evaluating core samples?
**A. No.**
Q. Would -- have you seen -- you've seen a core sample before, correct?
**A. I might have seen a picture of it.**
Q. Well, you've been doing this for 30 or so years. Have you ever had a core sample performed in front of you?
**A. No.**
Q. Have you ever requested that a core sample be performed?
**A. No.**
Q. Do you have an understanding as to what the purpose of a core sample is on a flat roof like the one at Pacific Ocean Alameda?
**A. I believe it's to determine what the material is underneath.**
Q. So that you can accurately -- well, strike that. Why would -- why would you want to know what material is under the roof?
**A. To determine what -- what the construction of the roof's -- roofing system is.**
Q. Okay. So looking at Exhibit 6, I'm



going to go -- I've gone to photograph 10, which is on page 12. And can you see that photograph okay?
**A. Yeah.**
Q. Okay. Would you agree that that illustrates the insulation on the Pacific Ocean Alameda roof?
**A. Yes.**
Q. Okay. From -- from that photograph, are you able to, for the benefit of the jury, describe what type of insulation is existing, as depicted in photograph 10 on Exhibit 6?
**A. No.**
Q. Are you familiar with -- well, towards -- there is a black sort of bottom here, right? Can you see that okay?
**A. Yes.**
Q. Is it your understanding that that's an existing built-up roofing system?
**A. I knew there was a built-up roofing system, or I was reminded of there being a built-up roofing system. But from looking at that photo, I would not have -- I would not -- I would have had to look at that a long time to -- to determine that that was a built-up roofing system.**
Q. Okay. And just above that is sort of a



yellowish color that's going around. Do you see that?
**A. Yep. Yeah.**
Q. Does that look like insulation?
**A. I would say, if I was an examiner, I would assume that that is insulation.**
Q. Okay. Do you -- are you able to tell what type of insulation that is?
**A. It looks like a foam insulation of some sort.**
Q. Okay. Like a -- a -- would you call it polystyrene insulation?
**A. Yes, I believe so.**
Q. And then above it is -- is a white insulation. Do you see that?
**A. Yeah. I don't know if that's insulation.**
Q. Okay. Does that look like what is termed as poly ISO?
**A. I don't know.**
Q. Did you ask the contractor to provide you with any more information on the type of insulation below the membrane?
**A. No. I recommended a -- an engineer.**
Q. Did you draft any estimates related to the Pacific Ocean Alameda property?
**A. No.**

Page 78

Q. With the exception of this estimate that we looked at in Exhibit 6 from May 2020, do you recall receiving or -- or reviewing any other repair estimates related to this property?
**A. Other than that -- that estimate -- I probably saw that estimate. Other than that estimate, no.**
Q. Okay. I'm going to place on the screen Exhibit 7.
(Exhibit 7, remotely introduced and electronically provided to the reporter.)
Q. Okay. Exhibit 7 says Raphael Field Adjusting Initial Report, and then it has your signature at the bottom. Do you see that okay?
**A. Yes.**
Q. Okay. And this initial report appears to be dated May 25, 2020. Can you see that?
**A. Yep.**
Q. Is this a report that you have seen before?
**A. Is that a report what?**
Q. Is this a report that you've seen before?
**A. Can you scroll down? I will tell you if it was potentially changed. Can you go up, please?**
Q. Yes, sir. You tell me where you'd like me

Page 79

to go.
**A. Right there. Yeah, the only thing that -- that I can say is -- is not from me would be the -- the electronic signature.**
Q. Are you saying that's not something -- down here?
**A. Actually, above. Above my name.**
Q. Okay. That -- you don't recall signing this report?
**A. I don't do that. We -- we don't do that. Somehow that -- that gets done from -- not even the claim supervisor does that.**
Q. Well, is this a report that -- I mean, are you saying that you wish your name wasn't on there, or is this a report that you drafted and you're fine, they just added it for you?
**A. No. I don't have a problem with that report.**
Q. Okay. You're just saying you didn't apply that section?
**A. Correct.**
Q. Okay. So now that we've looked at Exhibit 7, the initial report from May 25, 2020, is this a report that you prepared?
**A. For the most part, yeah.**

Page 80

Q. Okay. And it says, 1, Enclosures, Roofer's Estimate. Do you see that?
**A. Yes.**
Q. And then, Two, Adhesive pull test. Do you see that?
**A. Yes.**
Q. What is an adhesive pull test?
**A. I would have to see the -- the report.**
Q. Okay. I'm going to place on the screen Exhibit 8.
(Exhibit 8, remotely introduced and electronically provided to the reporter.)
**A. I seem to recall that there was a pull test to see whether or not it -- it met a certain threshold as far as being pulled up.**
Q. Is this -- is the adhesive pull test something you ordered?
**A. No.**
Q. Do you know who -- who ordered it to be performed?
**A. I would say most likely the roofer.**
Q. Was it beneficial to your evaluation of the claim?
**A. It would be something that -- that I would provide the carrier in making their coverage decisions.**

Page 81

Q. Had you been provided with an adhesive pull test similar to Exhibit 8 prior to this claim?
**A. No, I don't recall.**
Q. Okay. Are you familiar with OMG Roofing?
**A. No.**
Q. Are you familiar with the type of adhesive pull test that was performed?
**A. No, I've never seen that type of test performed.**
Q. Do you recall what the results of the OMG Roofing adhesive pull test were?
**A. Other than what's in the report, if -- if I looked at it. I'm not an engineer, so that's something that I would -- if I received, I would give it to the decision-makers, as far as coverage.**
Q. Okay. There is a few photographs here on Exhibit 8, page 5. Do these help you with evaluating the type of insulation that we were looking at earlier?
**A. It looks -- still looks like a foam or a Styrofoam-type insulation.**
Q. And in the first photograph on page 5, there appears to be something on top of the foam. Do you know what that is?
**A. I can't tell.**
Q. Did you -- in terms of that pull test, did

Page 82

you evaluate it in any way, or did you more or less just take it and include it in your initial report for the handler's evaluation and consideration?
A. **I took the information that the roofer gave me. I put together an initial report. I sent it forward, and then the carrier eventually decided to handle it indoors, inside.**
Q. I'm sorry. What I meant is when you received what we looked at, Exhibit 8, the OMG Roofing pull test, did you do anything -- any type of analysis with it, other than to just include it in your report?
A. **Just include it in the report.**
Q. Your report, Exhibit 7, your initial report also mentions an RPI pull test. Do you know what that means?
A. **No.**
Q. I am going to place Exhibit 9 on the screen.
(Exhibit 9, remotely introduced and electronically provided to the reporter.)
Q. Do you recall receiving this report marked Exhibit 9 from BR McCracken?
A. **It really doesn't look familiar, but this is long before anything that -- I mean, yeah, I -- I don't recognize it.**

Page 83

Q. Do you know what the purpose is behind the pull test that BR McCracken performed?
A. **No.**
Q. Had you ever seen a pull test report, similar to the one here by BR McCracken, prior to the Pacific Ocean Alameda claim?
A. **No.**
Q. Did you do any type of analysis of the BR McCracken pull test report, other than to just include it in your report and forward it on?
A. **No.**
Q. Okay. So I've placed back on the screen Exhibit 7, your report. Below the Enclosure section, it says Estimates/Reserves. Do you see that?
A. **Yes.**
Q. And it says $809,000. And so that's the reserve that we were discussing earlier that you established with the assistance of the roofer's estimation of the cost to repair, correct?
A. **Correct.**
Q. At the time that you provided this initial report, May 25, 2020, was it your belief that the roof needed to be replaced?
A. **Do I believe that the roof needed to be replaced?**

Page 84

Q. As of May 25, 2020, was it your opinion that the roof needed to be replaced?
MR. PONZI: Object to the form, it calls for an expert opinion.
A. **You know, I requested an engineer to make that call.**
Q. (BY MR. BUKOWSKI) You requested an engineer to make the call of whether the roof needed to be replaced or how to replace it?
A. **Both.**
Q. Okay. On page 2 of Exhibit 7, the next section is called Adjustment and Claim Details. Do you see that?
A. **Yes, sir.**
Q. And -- and so fair to say, based on this, you conducted an inspection on May 18, 2020?
A. **I'm sorry. Go ahead. I -- I didn't hear your question.**
Q. I'm sorry. Is it fair to say that you conducted an inspection, an initial inspection of the property on May 18, 2020?
A. **That's what it says, yes.**
Q. And you think you may have been to the property on one other occasion, correct?
A. **I believe I did.**

Page 85

Q. Do you know when that second occasion would have been?
A. **No.**
Q. Thinking back to your initial inspection on May 18, 2020, according to this report, can you walk me through your recollection of your inspection and observations?
A. **Simply started the inspection -- well, you know what, I went there and -- and took a picture of the front of the building, took a verification photograph. Met with the roofer. We probably went on the roof at that time. He showed me what I -- what appeared to me to be damage from hail.**
Q. Okay. So --
A. **So then we -- we went downstairs, you know. We went back down the ladder and looked at the interior.**
Q. What happened after you looked at the interior?
A. **I left.**
Q. Do you know how long you would have spent at the property on the initial inspection?
A. **Probably a little over an hour.**
Q. Would you have recorded the time that you spent at the property in your time and expense sheet

Page 86

submitted to Raphael?
A. **Yes.**
Q. Now, you said you -- you went downstairs and looked at the interior. What exactly were you looking at?
A. **I think the roofer wanted to show me something about the decking, but I don't recall.**
Q. Well, if we look further down your report, under Risk, second sentence, could you just read that second sentence to me?
A. **"Interior consists of an open steel frame system supporting the roof. The roof decking can be viewed from the interior of the large market. The decking is gypsum board."**
Q. Okay. So does that refresh your recollection as to your observations of the decking from the interior of the property?
A. **That is what -- what the roofer said it was.**
Q. Well, you don't -- would you agree your report doesn't say here, "the roofer says," correct? It's representing a comment from you.
A. **Yes. I would agree that it is a very generic statement.**
Q. Okay. And in looking at this statement

Page 87

that's on the photographs we looked at, as you sit here, you can't recall whether this is an accurate statement in describing the decking of the property?
A. **Well, I -- I believe that it probably was gypsum board. I -- I just wouldn't know if I would know what -- what -- since gypsum board, as it pertains to drywall, is encapsulated with a cardboard substance or material, I wouldn't know what a gypsum board -- what gypsum board on a roof decking, as it pertains to roof decking, would look like.**
Q. Well, had you ever seen, prior to this, a roof decking on a commercial structure with gypsum board?
A. **Not that I am aware of.**
Q. Okay. Now, you said -- did you look at anything else in the interior?
A. **I -- I looked at the -- due to the -- if the roof needed to be replaced -- you remember I'm still thinking I'm going to handle this claim, so I'm looking at what is inside and what would need to be potentially removed. So I'm looking at everything for the purpose of what is necessary -- what's going to be necessary in order to -- to protect the contents and people and -- and that type of thing, if the roof needs to be replaced. So I'm looking -- looking around.**

Page 88

Q. Well, in looking around, how would you describe the operations within the Pacific Ocean Alameda property?
A. **It was a market.**
Q. When you say "a market" --
A. **It was a market with -- with shelves and food, if I remember right, and people shopping.**
Q. Based on your -- from what you recall of the interior inspection with the roofer, here in May 2020, did it appear to be an active market?
A. **I don't recall how many people were in there.**
Q. Okay. And do you take any field notes while you're inspecting?
A. **Do I take field notes?**
Q. Yes.
A. **Yes, I take field notes.**
Q. Okay. And is that something that you would provide in your materials to Raphael?
A. **No.**
Q. What -- what is the -- what is the purpose of you taking field notes?
A. **I might do a drawing of -- of a roof. I might do a drawing of the interior. I might measure things out. I might comment on the number of hours**

Page 89

**that would be necessary to -- for content manipulation.**
Q. Did you review your field notes in preparing for your deposition?
A. **No.**
Q. Do you recall the last time you looked at your field notes relating to the Pacific Ocean Alameda inspection?
THE REPORTER: I'm sorry?
Q. (BY MR. BUKOWSKI) I'm sorry, you broke up.
A. **No.**
Q. Do you recall whether you put in your field notes the amount of hours that would be required for content manipulation?
A. **No. I don't think I did, because it was still way, way early in the claim process.**
Q. Okay. Would you agree, if the roof was being replaced and you were tasked with preparing that estimate, that there would be a need for associated content manipulation, given the market below?
A. **Yes.**
Q. As you sit here today, do you have any idea as to the type of content manipulation that would be required?
A. **No.**

Page 90

Q. What -- do you have experience estimating for content manipulation when a roof is being replaced on a market like this one?
**A. I would rely on experts to assist me in that.**
Q. What type of experts?
**A. The roofer probably would submit a company that -- that are experts in content manipulation, packing, moving items, and then replacing them.**
Q. Do you -- do you have experience estimating for the replacement of a roof the size of the Pacific Ocean Alameda property?
**A. This size? No.**
Q. Do you have any idea as to the number of hours or -- or days or weeks or months that it would take to replace a roof like this?
**A. No.**
Q. Based on what you recall from your observations of the market below the roof, what are some things you believe may be required for content manipulation if the roof was replaced?
**A. Once again, I would rely on -- on an expert to -- to give a detailed estimate as to the amount -- what materials would be needed, the number of man-hours, the number of labor hours.**

Page 91

Q. Would you agree that if this roof is replaced, given the market below, that there is going to be a disruption on the business?
MR. PONZI: Object to form. Calls for speculation.
**A. I don't know.**
Q. (BY MR. BUKOWSKI) All right. Is this the type of active business that you described earlier may warrant additional commercial supervision?
**A. I would think so.**
Q. Okay. Looking at -- at your cause of loss on page 2 of Exhibit 7, it says, The cause of loss has been verified as a hail loss from 5/8/2020. Hail damaged PVC roofing and parapets.
Do you see that?
**A. Yes.**
Q. Okay. Is this a statement that -- that you wrote?
**A. Yes.**
Q. Is this -- does this statement, under Cause of Loss, encapsulate your opinions at the time of this initial report regarding the hail damage that you observed?
**A. Yes.**
MR. PONZI: Object to form.

Page 92

Q. (BY MR. BUKOWSKI) Okay. Okay. And you agree, you confirmed that there was hail damage to the PVC roofing?
**A. Yes.**
Q. Did you have an opinion, as to this point, whether that hail damage would require replacement of the PVC roofing?
MR. PONZI: Asked and answered. Same objections as before. Calls for speculation and expert opinion.
**A. No, and that's just what I was about to say is, is that when I did the initial inspection -- and whether I went out a second time or not, I don't remember -- but I was certain that an expert was needed. In fact, not only did an expert such as -- as an engineer need to be involved in the inspection and estimation and evaluation, but other experts would necessarily need to be involved.**
Q. (BY MR. BUKOWSKI) Okay.
**A. So I'm not an expert.**
Q. Sure, okay. So on page 3, it says Expert Involvement. Can you see that?
**A. Yes.**
Q. And it says, The value of loss is extreme. What does that mean?

Page 93

**A. It means that it's a high-dollar loss.**
Q. And below this is a scope of damage. Do you see that?
**A. Yes, sir.**
Q. Okay. And so does this accurately depict -- or, I'm sorry, accurately document the damage that you observed to the property?
**A. In my opinion, yes.**
Q. And so here, it just says, Hail damage to PVC portion of roof. Do you see that?
**A. Correct.**
Q. But you did observe some damage to various metals at the property, correct?
**A. That's true.**
Q. Okay. Is there a reason something like that would not be noted in here?
**A. Yes.**
Q. And why is that?
**A. Because the roof needed to be evaluated by an expert, regardless.**
Q. Okay. And looking at your next section, Recommendations. If you just want to take a second to review that.
**A. (The deponent perused the exhibit.) Okay.**

Page 94

Q. Is it fair to say your intent here was to refer an engineer to determine the methodology of repair for the roofing system?
**A. As part of his responsibilities, yes.**
Q. Okay. Is there any reason you could not give an opinion as to the methodology of repair?
**A. Because I'm not an expert, yes.**
Q. Now, you also -- in here, you note that the roof is four years of age, correct?
**A. Right.**
Q. How did you make that determination?
**A. I don't believe that the -- the roofer that was there installed that roof, but I think that he asked the insured, and the insured said that the roof was -- was installed about four years ago.**
Q. Okay. All right. That initial report, Exhibit 7, did you provide a copy of that report to Pacific Ocean Alameda?
**A. No.**
Q. Did you provide a copy of your initial report, Exhibit 7, to the insurance agent for Pacific Ocean Alameda?
**A. No.**
Q. Did you provide a copy of your initial report, Exhibit 7, to the contractor for Pacific Ocean

Page 95

Alameda?
**A. No.**
Q. The findings and comments that were contained within your initial report, Exhibit 7, did you communicate any of those to Pacific Ocean Alameda?
**A. Could you ask that last question again, please?**
Q. Sure. The -- did you verbally communicate any of the findings and recommendations contained within your initial report, Exhibit 7, to Pacific Ocean Alameda?
**A. Only to their contractor, if I recall.**
Q. Okay. Did you communicate any of the findings and recommendations contained within your report, marked as Exhibit 7, to the contractor for Pacific Ocean Alameda?
**A. I advised the contractor that I believe an engineer should be involved and that person would -- should coordinate with -- with the contractor.**
Q. Apart from advising the contractor that you believed an engineer should be involved, did you communicate any of the recommendations and findings contained within your initial report, marked as Exhibit 7, to the contractor for Pacific Ocean Alameda?
**A. I don't think I made any other**

Page 96

**recommendations.**
Q. Here, I just -- I'll say information within your report, okay?
MR. PONZI: Go ahead. I'm going to object to form, but go ahead.
MR. BUKOWSKI: Well, I'm going to re-ask. I'm going to re-ask. I'm just letting him know I'm going to say "information."
Q. (BY MR. BUKOWSKI) With the exception of advising the contractor that you believed an engineer should be involved, did you communicate any of the additional information contained within your initial report, marked as Exhibit 7, to the contractor for Pacific Ocean Alameda?
**A. No, I don't believe so.**
Q. Did you discuss any of the findings or recommendations contained within your report, marked as Exhibit 7, with anyone from Amguard?
**A. No.**
Q. Did anyone from Amguard contact you to discuss your findings and investigation following your initial inspection of the property?
**A. No.**
Q. I put your report back up here. On the last page, there is a management review signature. Do

Page 97

you know whose signature that is?
**A. No.**
Q. Do you -- are your reports typically reviewed by management?
**A. Yes.**
Q. Okay. But you don't know who -- do you know who the manager is that typically reviews reports like this?
**A. Once I get done with a report, it goes to field -- to Filetrac. Then the field supervisor reviews the file, and then it is sent forward from Specialty Adjusting International to what's called field support, which is Raphael & Associates.**
Q. Okay. Thank you.
MR. BUKOWSKI: We've gone another hour, so would you like to take a ten-minute break?
MR. PONZI: I would.
THE DEPONENT: Sure.
MR. BUKOWSKI: Okay.
(Recess taken, 12:27 p.m. to 12:49 p.m.)
Q. (BY MR. BUKOWSKI) I'm going to show you Exhibit 10.
(Exhibit 10, remotely introduced and electronically provided to the reporter.)
Q. So Exhibit 10 is a report prepared by

Page 98

Rimkus Consulting Group, dated June 19, 2020, Attention: John Larson. Can you see that okay?
A. **Yes.**
Q. Okay. Have you -- were you ever provided with a copy of this report?
A. **I don't -- I don't believe so.**
Q. If you could just -- I'm on page 12 of this report -- I'm sorry, strike that. I'm on page 10, marked Raphael 418. If you could read this full paragraph, starting with, "Rimkus was also asked," just to yourself.
A. **(The deponent perused the exhibit.)**
**Okay.**
Q. Okay. So it's tough for me to highlight this, from how it was scanned in, but regarding where my cursor is here in the second sentence, would you agree that Rimkus, based on this report, is recommending removal and replacement of the PVC roof?
A. **Yes.**
Q. Okay. And that was one of the opinions that you were seeking from an engineer, correct?
A. **Yes, even though I had my own opinion that it -- it needed to be replaced.**
Q. Okay. So you -- so the engineer's opinion, as represented here on page 10 of Exhibit 10,

Page 99

is consistent with yours, in that the PVC roof at the Pacific Ocean Alameda property needs to be replaced?
A. **Right.**
Q. Would you agree, based on this paragraph on page 10, that the engineer also opined that a new roof assembly could not be adhered to the existing gypsum DensDeck?
A. **I think that, you know, since I haven't -- I haven't seen this report, I'm not going to comment on anything that relates to an expert's opinion.**
Q. Okay.
A. **I'm not an expert.**
Q. All right. So I will just point you to this. You don't have to agree, but I just want to point it out. Midway through this, According to a telephone conversation with a technical representative from Carlisle Syn Tec System, a roofing membrane manufacturer, the existing gypsum DensDeck was not compatible with adhering a new membrane to the existing DensDeck. Thus, new DenzDecking would need to be installed. Do you see that?
A. **I do see that.**
Q. Okay. And the DenzDecking is the -- is serving as the deck on this roof, correct?
A. **I believe so.**

Page 100

Q. Okay. And if the DensDeck that's serving as the deck on this property needs to be removed, it then exposes the market below, correct?
A. **Correct.**
Q. That's because the ceiling is an open-beam system with the gypsum DensDeck being exposed?
A. **Right.**
Q. Okay. Removal of the gypsum DensDeck would cause interruption to the business?
A. **Yeah, I -- I would -- I would think that it would.**
Q. What precautions, based on your 30 years of experience, would need to be taken to avoid or mitigate the interruption of business below to replace this roof?
A. **I would rely on an expert's opinion as to what needs to be done. But I would think that stock would need to be removed and the system replaced, and then stock re -- you know, replaced.**
Q. Now, are you -- are you familiar with -- in your experience, do roofers typically work or replace roofs in the middle --
THE REPORTER: I'm sorry --
Q. (BY MR. BUKOWSKI) Mr. Miller, do roofers routinely replace roofs during the middle of the night,

Page 101

or do they typically work during normal business hours?
MR. PONZI: Object to form.
A. **During the daytime.**
Q. (BY MR. BUKOWSKI) And have you ever estimated a loss where maybe an accommodation was made to replace the roof during the night, given the -- the business operations?
A. **No.**
Q. I am going to place on the screen Exhibit 11.
(Exhibit 11, remotely introduced and electronically provided to the reporter.)
Q. Exhibit 11 is on the screen; it's a report dated June 29, 2020. It's a status report, with your signature at the end. Do you see that?
A. **Yes.**
Q. Okay. I'm going to go -- I'm going to scroll slowly through it. You just tell me when to go to the next page to verify that this is information you put into the report.
A. **Yeah. Yeah, that's the gist of it, yes.**
Q. Okay. Okay. What is the purpose of providing a status report?
A. **Well, we're -- we're required to give a status report after a certain length of time, depending**

Page 102

**upon the carrier.**
Q. And does it just sort of give you -- provide an update to the third-party administrator as to where you were in your investigation?
**A. Not necessarily. Sometimes we're waiting on -- on the engineer or some other expert, and the report really is a formality that -- that we're required to complete.**
Q. Okay. So looking at the enclosures, it says engineer's report, No. 1. Do you see that?
**A. Yes, I do.**
Q. Okay. And engineer's recommendation for repair, page 27. Do you see that?
**A. I do.**
Q. Okay. So looking at this, would you agree that you had a copy of the engineering report as of June 29, 2020?
**A. Yes.**
Q. Now, on page 2, scrolling to page 3, it says Adjuster Concerns. Do you see that?
**A. Right.**
Q. What is the purpose of this section?
**A. Sometimes I'll put in adjuster's concerns, and then -- then -- which is something that I type in to advise the insurance company or the TPA of any**

Page 103

**concerns that I may have.**
Q. Now, in here, under Adjuster Concerns, the first paragraph, you're communicating your agreement that the PVC roof needs to be removed and replaced, correct?
**A. Along -- I did, yes.**
Q. Now, you also say, "but that may not be what the policy owes for." What did you mean by that?
**A. Well, I think the -- I think there is only $10,000 worth of ordinance and law coverage, or so I thought. And when it comes to other things, that -- if it was improperly installed, I leave all those coverage decisions to the carrier.**
Q. What is --
**A. I don't make those decisions.**
Q. What is ordinance and law coverage?
**A. Well, if the building department requires certain things to be installed or to be different, there are limits on some policies as to how much money can be spent for those code upgrade requirements.**
Q. Here, the roof is being recommended for removal and replacement due to the damage, correct?
**A. Yeah. The roof covering, yes.**
Q. And the insulation or materials that already exist there would fall under the building

Page 104

coverage as opposed to law and ordinance, correct?
MR. PONZI: Object to form of the question.
**A. That is -- that is for the -- for the insurance company to decide, not me.**
Q. (BY MR. BUKOWSKI) Well, in your experience, if -- are existing materials applied to law and ordinance?
MR. PONZI: Same objection; form, calls for speculation.
**A. I'm going to leave it to the carrier. I'm an independent adjuster.**
Q. (BY MR. BUKOWSKI) Okay. On page 3, the third paragraph, We would appreciate direction from the carrier or examiner as to whether an adhered system is covered through (sic) the present system is not adhered.
Do you see that?
**A. Yeah.**
Q. What was your purpose of writing this?
**A. I don't know. That doesn't even look like something that I would have written.**
Q. Did -- this third paragraph that I just read, the first sentence, is this -- do you recall writing this paragraph?

Page 105

**A. I don't recall.**
Q. Would you have submitted this report through an email, or through the system -- the Filetrac system?
**A. Filetrac.**
Q. And is there -- do you submit it in a Word document, or is it published in a PDF format, like on this Raphael heading on Exhibit 11?
**A. Word document template.**
Q. And if any changes are made, do you have the opportunity to review those changes before they've accepted?
**A. No.**
Q. If any changes are made to the Word document you submit through the Filetrac system, are you notified of those changes?
**A. No, not -- probably not.**
Q. And, again, there is a signature for management review. Do you have any idea who that is?
**A. No.**
Q. The fourth paragraph on page 3 talks about ice and water shield included in the roofer's estimate. Do you see that?
**A. Yes.**
Q. Do you recall writing this paragraph?

A. **I don't recall writing it.**
Q. Okay. It indicates that -- well, it says, In talking with a local roofer this adjuster knows, implying it's you. You signed the report?
A. **That's right.**
Q. Do you recall speaking to a local roofer about ice and water?
A. **No.**
Q. Did you do any investigation, to your recollection, about the requirement for ice and water shield?
A. **No, I don't recall -- I don't -- I don't recall that being an issue whatsoever.**
Q. Did you -- Exhibit 11, the report that we just looked at here, dated June 29, 2020. Did you provide a copy of that to Pacific Ocean Alameda?
A. **No.**
Q. Your status report dated June 29, 2020, marked as Exhibit 11, did you provide that -- a copy of that report to the contractor for Pacific Ocean Alameda?
A. **The report?**
Q. Yes, sir.
A. **No.**
Q. Did you communicate verbally any of the



information contained within the status report dated June 29, 2020, marked as Exhibit 11, to either Pacific Ocean Alameda or the contractor for Pacific Ocean Alameda?
A. **No.**
Q. After submitting this report, did you receive any contact from Amguard Insurance Company?
A. **No.**
Q. After submitting this report, did you receive any contact from Raphael & Associates to discuss the information?
A. **Not that I recall.**
Q. Okay. I want to place on the screen Exhibit 12.
(Exhibit 12, remotely introduced and electronically provided to the reporter.)
Q. This is a document dated June (sic) 9, 2020. It Says, Name of Adjuster: John Larson. Can you see this okay?
A. **Yes.**
Q. Okay. I'm just going to scroll through it. Have you seen this report marked Exhibit 12?
A. **No.**
Q. Have you seen -- not necessarily this report, but a report similar to this, in other claims?



A. **No.**
Q. Okay. I've placed on the screen Exhibit 13.
(Exhibit 13, remotely introduced and electronically provided to the reporter.)
Q. This is titled Raphael & Associates Claim Diary/Note List, dated July 10, 2020. Can you see this okay?
A. **Yes.**
Q. Okay. Have you seen these notes -- this claim diary before?
A. **No. There would -- I would assume that -- I'm not sup -- that looks like a Raphael document. I -- I wouldn't have seen anything like that.**
Q. There is someone noted, C. Bader. Do you have encapsulated who that is?
A. **No, sir, I don't.**
Q. And you -- again, you don't keep notes similar to this through the Raphael system, correct?
A. **Nothing like that, no.**
Q. I've placed on the screen Exhibit 14.
(Exhibit 14, remotely introduced and electronically provided to the reporter.)
Q. This is an email from Linda Nassar to Support 2 at Raphael, John Larson, and Kelley Brockway,



dated July 15, 2020. Can you see that okay?
A. **Yes.**
Q. Now, above -- above this is a response from John Larson dated July 15, 2020. Can you see that okay?
A. **Yes.**
Q. Have you seen this email chain before?
A. **No, I don't recall.**
Q. On the -- on the email from Linda Nassar from July 15, 2020, it says, The insured is pressuring the adjuster to find out the claim status.
Can you see that okay?
A. **Yes.**
Q. Do you know if they're referring to you as the adjuster?
A. **Probably, yes.**
Q. Do you recall the insured trying to find out the claim status from you?
A. **No.**
Q. Do you recall the contractor trying to find out the claim status from you?
A. **Yes.**
Q. Okay. Do you recall anyone else that was -- that was eager to find out the claim status from you?

Page 110

A. No.
Q. What do you recall of the contractor and his efforts to try to figure out the claim status from you?
A. He would just either call or send an email that -- I would assume. I -- he just wanted to know what -- what the status is. I don't know.
Q. Well, did you communicate back with the contractor regarding his concerns?
A. I would not leave him hanging, so I would let him know that others are involved, and that's all I can say. I -- I don't know.
Q. Had -- had you communicated back to the contractor, would that have been through email?
A. Probably calls. He -- he is -- he had my phone number.
Q. Would you log any calls you had with the contractor into your time and expense report?
A. Occasionally. Sometimes I don't.
Q. Well, would you document any of the calls or conversations with the contractor anywhere?
A. Yeah, I might say something like, Received a -- a call from the contractor.
Q. If you were to send back any emails to the contractor or the insured or -- or their agent, would

Page 111

you save those emails to the Filetrac system?
A. That's what I mean by making a note in Filetrac, would be through -- through Filetrac. And if the contractor calls, I don't necessarily put it into Filetrac. I might just leave a message -- you know, a message to the examiner that the contractor is trying to find out what the status of the claim -- claim is and -- and leave it at that.
Q. I guess my question is, when you send an email on the file, say, to the contractor, do you then upload a copy of that email into the Filetrac system?
A. Back then, probably what I would do is, is I would carbon-copy the claims examiner -- or the -- not the claims examiner, the supervisor.
Q. But --
A. And she would put it into Filetrac.
Q. Okay. And you think here the supervisor was Linda Nassar?
A. Yes.
Q. All right. All right. So I've placed on the screen Exhibit 15.
(Exhibit 15, remotely introduced and electronically provided to the reporter.)
Q. This is a report dated August 29, 2020, third report, with your signature. Do you see that?

Page 112

A. Yes.
Q. Okay. Do you recall preparing this third report?
A. (The deponent perused the exhibit.)
I don't recall it.
Q. What was the purpose of putting together this third report?
A. Most likely, it was just filing requirements, because there really isn't much information or anything there that is new.
Q. Okay. As of the time of this report, August 29, 2020, had anyone from Amguard Insurance Company contacted you to discuss the claim?
A. No.
Q. And did you hear from anyone at Amguard Insurance Company after submitting this report?
A. No.
Q. Did you hear from anyone at Raphael & Associates after submitting this third report?
A. I don't believe so.
Q. Do you know whether a repair estimate was prepared by Amguard Insurance Company?
A. No, because I -- I don't -- yeah, no. I don't know.
Q. Did you do anything else on the Pacific

Page 113

Ocean Alameda claim after this report in August of 2020?
A. I don't believe so.
Q. Did you provide a copy of this third report to Pacific Ocean Alameda?
A. No.
Q. Did you provide a copy of this third report to the contractor for Pacific Ocean Alameda?
A. No.
Q. Did you communicate verbally any of the information contained within this third report to Pacific Ocean Alameda or the contractor for Pacific Ocean Alameda?
A. No.
Q. Would you agree that the replacement of the roofing system covering the Pacific Ocean Alameda property would be a complex job?
MR. PONZI: Object to the form, calls for speculation.
A. Yeah, I really don't know how complicated it would be, because I'm not a roofer, and I'm not an engineer.
Q. (BY MR. BUKOWSKI) Do you have an opinion as to whether a general contractor would be needed to coordinate the various trades involved in replacing the

Page 114

roof at the Pacific Ocean Alameda property?
A. **You were breaking up badly.**
Q. Do you have an opinion as to whether a general contractor would be reasonably likely to be needed to complete the repairs at the Pacific Ocean Alameda property?
MR. PONZI: I'll object to form. It calls for speculation.
A. **A roofer submitted an estimate, and that's it. I -- and I didn't --**
THE REPORTER: Did I miss something?
MR. BUKOWSKI: No. I think he broke up.
A. **I don't think a roofer would be calling a general contractor.**
Q. (BY MR. BUKOWSKI) Mr. Miller, I'm sorry to interrupt you. The first part of your answer, you -- your Internet cut out. So you had said -- what we heard was, "A roofer submitted an estimate."
A. **A roofer submitted an estimate, and I assume that that would be who would be acting as the contractor in the work.**
Q. Did you observe any heating and air-conditioning units on the roof?
A. **I don't recall.**
Q. Okay. I am going to place Exhibit 16 on

Page 115

the screen.
(Exhibit 16, remotely introduced and electronically provided to the reporter.)
Q. This is a copy of a subpoena that was issued to you by our office, relating to the Pacific Ocean Alameda matter. Do you see this?
A. **Yes. Yes.**
Q. Okay. And you did -- in fact, you received this, correct?
A. **I did.**
Q. Okay. And on page 4 of the request, it has documents to be produced pursuant to the subpoena. Do you see that?
A. **Yes.**
Q. Okay. And isn't it true that you've not produced any of the documents related to the subpoena, correct?
A. **Any of them? Are you kidding?**
Q. Okay. Well, I'm sorry. Did you produce directly to my office any of the documents related -- or asked for in the subpoena?
A. **I actually went to your office, but that's besides the point.**
Q. Did you drop off any documents when you visited my office?

Page 116

A. **Ryan Devilling requested my CV.**
Q. Okay.
A. **So I submitted my CV. He asked me, Is there any additional documentation, other than the actual file from Raphael & Associates? And I said no. So he said that he would submit everything to your office.**
Q. So you -- you did -- you gathered a copy of your current CV and submitted that, correct?
A. **Yes.**
Q. And that current CV, that's different than the Exhibit 1 LinkedIn we looked at, right?
A. **Yes.**
Q. Okay. No. 2 relates to any terms of compensation. Do you see that?
A. **Yep.**
Q. Okay. I'm assuming that there is something outlined in the assignment that you received initially, correct, regarding the compensation terms?
A. **Did I get paid?**
Q. Not if you got paid. The agreement of how you would get paid. You would receive that in the initial assignment, correct?
A. **No.**
Q. Okay. Well, I think you testified earlier

Page 117

that you get paid based on time and expense, right?
A. **That's correct.**
Q. Is there something in the assignment that outlines that that's the agreement?
A. **No, I don't believe so.**
Q. Okay. Now, do you keep records of the other claims that you've handled for Amguard Insurance Company?
A. **I put my information into Filetrac of that -- of each specific claim.**
Q. Okay. Is that something you have access to?
A. **If it is an open claim.**
Q. Okay. So the information pertaining to the other claims that you've handled for Amguard Insurance Company, that's information that's not contained within the claim file here, right?
A. **If there is anything that someone else did, I wouldn't have access to it.**
Q. Well, you have personal knowledge of what other claims you've handled for Amguard Insurance Company?
A. **Yes.**
Q. And -- but you didn't -- you didn't do anything to gather that information responsive to the

Page 118

subpoena, correct?
A. **No, because it was already -- Ryan Devilling said that he already had it.**
Q. Okay. Now, No. 5 says your entire file regarding your inspection and involvement with the Pacific Ocean Alameda property. Do you see that?
A. **Yeah. It's not my file.**
Q. So you're saying if -- if I just -- if we reissued it and just said any information you have relating to the property that's the claim of the subject litigation, that would prompt you to gather this document -- this documentation?
A. **No, it would not.**
Q. Okay. Did you produce all the emails that you sent from generaladjuster@Outlook.com?
A. **(No verbal response.)**
Q. I guess my question is, did you produce any emails from your personal email address that you used related to the claim, to Mr. Devilling or Raphael & Associates?
A. **All of my emails were put into Filetrac.**
Q. Well, I don't have any --
A. **Unless -- unless -- I'm sorry. Go ahead.**
Q. I don't have any of your emails. That's -- that's the problem.

Page 119

A. **Well, I may not have sent any emails.**
Q. So I have at least one email here that Mateo, the contractor, sent to you that was not produced in your file. So I'm aware of several that would have been sent and received by you that were not produced. So did you take any efforts to search your email for communications sent related to the claim?
A. **I will discuss that with counsel and -- and go from there.**
Q. Okay. And the same -- that's your cell phone number listed in Exhibit B, correct?
A. **Yes.**
Q. Okay. And did you search for any text messages that you sent related to the claim?
A. **All my text messages from back then are gone.**
Q. But my question is, did you search for any and -- after receiving this subpoena?
A. **No.**
Q. Okay. Were they gone after you received the subpoena, or before?
A. **They were gone before.**
Q. Okay.
A. **If there were any. But I doubt that there were any text messages. I -- you know, I don't know.**

Page 120

Q. You didn't send any text messages with the contractor?
A. **Not that I recall.**
Q. Okay. And then C, it says all written communications, letters or correspondence sent or received by you. So that's -- that's -- did you look for all the written communications that you had?
A. **So that would either be text messages or emails.**
Q. Okay. And then D is electronically stored information. So I know that some information is uploaded to the Filetrac system, which you said Raphael would have access to, right?
A. **Yes.**
Q. Did you use any other third-party electronic storage system for -- related to your involvement in this claim?
A. **No.**
Q. And then the photographs or video recordings. Did you search and produce those to Mr. Devilling or Raphael & Associates?
A. **Yeah, I -- I don't have any documentation on this file, and --**
Q. You don't still have your photographs?
A. **-- email -- what's that?**

Page 121

Q. You still have your photographs?
A. **No, I got rid of the photographs.**
Q. When did you get rid of them?
A. **A year after.**
Q. Because the only photographs I have are the eight that I showed you. But you think there is much more?
A. **I don't know.**
Q. And then handwritten field notes. Did you produce those?
A. **I don't have them. I get rid of the file one year after -- after I have -- you know, start the handling of the claim.**
Q. You get rid of the file one year after?
A. **Yes.**
Q. For what purpose?
A. **Because I don't want it.**
Q. Okay. Do you have an obligation to maintain the file?
A. **No.**
Q. Okay. So you're saying under oath here, you have -- your handwritten field notes are gone?
A. **They're gone.**
Q. No. 7 is all bills, time records, invoices et cetera, memorializing the time you spent on the

Page 122

file. Now, you still have that, correct?
A. **No.**
Q. Well, you still -- you sent that in by email. So you're telling me you don't have the email that you sent it in by?
A. **Can you make that statement again, please?**
Q. Sure. Do you have any record of the time that you --
A. **No. I mean, the second statement that you just made.**
Q. Sure. Did you -- isn't it true that you submitted your time and expense report by email?
A. **Yes.**
Q. Okay. And isn't it true that you still have that email?
A. **No.**
Q. You delete -- you went into the sent box and deleted your sent emails as well?
A. **Yes. For that matter, I have a new computer.**
Q. Okay. What email system did you use?
A. **Well, that was Google. Now I'm on Specialty Adjusting International's program.**
Q. Okay. Well, I'm going to put you on notice to preserve any information that you have

Page 123

related to the subpoena and not delete it. Do you understand that?
A. **I understand it. It's gone.**
Q. Okay. Well, if it turns out that I go into your emails through a court order and find out that you deleted it after this deposition, there is probably going to be an issue, okay?
A. **Okay.**
Q. No. 8 is all payments that you received related to the claim. Did you produce that information?
A. **Yeah, as far as I know.**
Q. Okay. Well, I have no records of how much you've been paid related to the claim. So is that something that you can go reproduce to Mr. Devilling?
A. **No. I can ask somebody else to give it to me.**
Q. That's fine. I'm just asking, can you gather it?
A. **Yes, I can ask for it.**
Q. Okay. Now, section --
MR. PONZI: Hey, Jon, before -- before we get off that topic, just so we're clear, Ted, who would you ask for it? And are they obligated to give it to you? I guess we should get that clarified.

Page 124

THE DEPONENT: I would have no clue, especially under -- Specialty Adjusting International has that information.
Q. (BY MR. BUKOWSKI) Okay. Section 9 asks you to look for specific communications with specific email addresses. Did you do that?
A. **You want me to read this whole thing?**
Q. If you need to. I'm just summarizing it for you, that it asks for specific communications with specific individuals and specific email addresses.
A. **I don't believe I have any information -- any additional information, any additional documentation, whether it's electronic or -- or hard copy.**
Q. My question is, did you search your communications to confirm that?
A. **No, I did not.**
MR. BUKOWSKI: All right. Well, I'm going to move into the other claim. Do you -- do you want to take a five-minute break or so?
MR. PONZI: Yeah. Can we take a five-minute break? That would be great.
MR. BUKOWSKI: Sure.
(Recess taken, 1:31 p.m. to 1:38 p.m.)
Q. (BY MR. BUKOWSKI) Okay. All right,

Page 125

Mr. Miller. So we're going to, on this portion of the deposition, discuss the property located at 2505 6th Street, in Limon, Colorado. Are you familiar with that property?
A. **Yes.**
Q. And do you understand it to be a hotel property?
A. **Yes.**
Q. In fact, it's a -- so if I say -- it's a Baymont Hotel. So if I say "Baymont Hotel" --
A. **It is.**
Q. -- fair to understand I'm referring to this property?
A. **Yep.**
Q. Okay. The first exhibit that I'm going to mark, to keep a clean record, is Exhibit 31. And that's just a copy of the LinkedIn that we looked at earlier in your testimony, that we marked as Exhibit 1 in the Pacific Ocean.
(Exhibit 31, remotely introduced and electronically provided to the reporter.)
Q. So I have it on the screen. This is the same LinkedIn that we discussed earlier, correct?
A. **Yep.**
Q. Which -- and this Exhibit 31, the LinkedIn

Page 126

profile, outlines your experience and qualifications, right?

A. **Yes.**

Q. Now, in terms of the Baymont Hotel property, what was your role in that claim?

A. **My role in that claim was to -- to inspect the property for -- for hail damage, and develop an estimate under the guidelines of the policy, document the entire file, including photographs, and submit it for review.**

Q. Did you have authority to make any coverage decisions on the Baymont Hotel claim?

A. **No.**

Q. Did you have settlement authority on the Baymont Hotel claim?

A. **No.**

Q. Do you know who the decision-maker was on the Baymont Hotel claim?

A. **No.**

Q. Did you prepare any estimate on the Baymont Hotel claim?

A. **No.**

Q. And then did you, in fact, inspect the property?

A. **I did.**

Page 127

Q. Do you know how many times?

A. **One time, I believe.**

Q. Did you have any point of contact at Amguard Insurance Company?

A. **No, I did not.**

Q. Did you have any point of contact at Raphael & Associates?

A. **There was a claims examiner on the claim.**

Q. You were the claims examiner?

A. **No, no, no. There was a claims examiner with Raphael & Associates; I don't recall who that person is. But, frankly, my point of contact would be the supervisor, whoever that was, for SAI. In other words, I -- it's a limited assignment. I put together my report and submit it for review.**

Q. Your role was that of a field adjuster on this claim, correct?

A. **Of a what?**

Q. Your role on the Baymont Hotel was that of a field adjuster?

A. **Yes.**

Q. Okay. Do you know when you were first involved?

A. **No, I don't.**

Q. Did you have any involvement -- strike

Page 128

that. You submitted one report related to your involvement with the Baymont Hotel?

A. **I believe that's true.**

Q. Did -- do you recall having any other involvement after submitting that single report?

A. **Can you define "involvement"?**

Q. Well, you prepared for your deposition today. But with the exception of this, have you done anything else on the Baymont Hotel after submitting your report?

A. **After submitting my initial report, my involvement, I would have to say, is somebody advising me that the file has been returned back to GUARD.**

Q. Okay.

A. **And to close the file.**

Q. Do you know who your supervisor was on this claim?

A. **I don't know who the supervisor is, or was.**

Q. And you don't know who -- strike that. Do you know who the claims examiner was?

A. **No.**

Q. What did you do to prepare for the -- your deposition on this 2505 6th Street property?

A. **I discussed the file with the -- with --**

Page 129

**with Matt and Brian.**

Q. And how long did you spend discussing the file with Mr. Ponzi and Devilling?

A. **This particular file, probably a half-hour.**

Q. Did you review any documents for this particular file?

A. **No.**

Q. Would you have kept a time and expense report relating to your involvement in the 2505 property?

A. **Yes.**

Q. And that would have been submitted to Raphael & Associates for payment?

A. **Correct.**

Q. Were you, in fact, paid on -- for your involvement in this claim?

A. **Yes.**

Q. All right. I've placed on the screen what's been previously marked as Exhibit 22. This is a report prepared by you, the initial report dated August 25, 2020. Can you see this okay?

A. **Yes.**

Q. Okay. And does this look like, just through scrolling through, a copy of the report you

Page 130

prepared relating to your investigation?
A. **The majority of it, yes. The substantive part of the claim, yes.**
Q. Okay. So we'll go through most of these, and you can let me know what -- what you put in or what you disagree with, et cetera.
On page 1, under the second heading, Estimate/Reserves, it indicates a reserve of $150,000. Do you see that?
A. **I do.**
Q. How did you establish a reserve of $150,000?
A. **I think I -- I inspected that with a roofer, and that was his preliminary estimate of damage, or value of damage.**
Q. All right. Do you recall any written communications with him to that effect?
A. **No, I don't.**
Q. On the next page, 2, Adjustment and Claim Details. Do you see this section?
A. **Yes.**
Q. Okay. And it indicates that you contacted the insured -- the insured on August 4, 2020. Do you see that?
A. **Yes.**

Page 131

Q. Can you recall who you spoke with or what was discussed?
A. **No.**
Q. And then you also -- it indicates, Conducted an inspection on August 6, 2020, correct?
A. **Inspected on August 6, 2020, correct.**
Q. And you -- from your recollection, you believe that was the only date that you inspected this property, correct?
A. **Yes. Yep.**
Q. Can you walk me through your -- what you recall of your inspection of August 6, 2020 at the Baymont Hotel?
A. **I believe it's out in Limon, Colorado. And so I drove out there, pulled up, took a picture -- overview picture of the structure. Took a picture verifying the location.**
**And then I don't remember -- I don't remember the roofer at all. I remember certain aspects. You know, I remember getting on the roof, inspecting the roof. I remember going around the building, searching for hail damage. I recall there being -- I recall damage on the roof and some minor damage, what I consider minor damage to stucco.**
Q. All right. Do you recall inspecting the

Page 132

interior of the property at all?
A. **I requested if there was interior damage, and I was advised that there wasn't any.**
Q. So is it fair to say you did not inspect the interior of the property?
A. **I did not. At least, I don't believe so.**
Q. And, again, it's not a guessing game, so if there is something in here you want to see, just let me know.
A. **Right. Thank you.**
Q. Okay. Page 3, the cause of loss. You confirmed that the cause of loss was hail from a storm on August 2, 2020, correct?
A. **Yeah, I believe it was confirmed with a hail history or report.**
Q. And the next section on page 3, Expert Involvement, you indicated, There is no concerns which require an expert at this time, correct?
A. **Yes.**
Q. What type of concerns on a property like this, in your experience, would warrant bringing in an expert?
A. **None.**
Q. Okay. On page 3, next is a scope of damage where -- this is where you outline your

Page 133

observations of damage, correct?
A. **Yes.**
Q. In terms of the roof, you indicate that you observed functional damage, correct?
A. **Yes.**
Q. Okay. What -- what is that -- what is the difference between cosmetic-in-nature damage versus functional damage to a shingle roof like the one at the Baymont Hotel?
A. **The mat material, the membrane is affected to where the elements will eventually eat at it, and the roof would -- could possibly leak at some time. Whereas, cosmetic -- the term "cosmetic," as far as I'm concerned, should not even apply to a shingle roof, but I guess it would be if you want to say granule loss.**
**Granule loss happens naturally, but also some granules could be knocked off of a shingle roof. So perhaps -- that would be the functional damage -- or non-functional damage, I'm sorry.**
Q. Okay. When you say "elements," what do you mean by "elements"?
A. **Rain, snow, wind. Normal wear and tear.**
Q. Would the element of sunshine or UV light also affect a shingle?
A. **Yes.**

Page 134

Q. Now, you said cosmetic should not apply to a shingle. Why do you say that?
**A. Because there really is not cosmetic damage to a shingle, in my opinion.**
Q. Well, what do you mean by that?
**A. It's either damaged or it's not.**
Q. Let me see if I understand you. The shingle has multiple layers, correct?
**A. No. You're talking about a laminated shingle?**
Q. Yeah. The top layer is granules, right?
**A. Yes.**
Q. And then there is an asphalt waterproofing material?
**A. Yes.**
Q. And then there is a fiberglass mat?
**A. Yes.**
Q. And then below that is asphalt waterproofing material, correct?
**A. You have -- basically, you have the granules sitting on top of a fiberglass material.**
Q. Correct. And the removal of the --
**A. The material is soaked in asphalt and fiberglass.**
Q. And the removal of the granules exposes

Page 135

the asphalt waterproofing material to the elements, correct?
**A. Yes.**
Q. And if --
**A. But there are -- there is an excess of granules.**
Q. Well, if you have acute or new removal of granules from a hailstone impact that removes the granules and the asphalt waterproofing material, you've now exposed the fiberglass base mat to the elements, correct?
**A. You have a functional damage situation.**
Q. Would -- the damage that you observed to the roof of the Baymont property, you believed that it required replacement, correct?
**A. Yes.**
Q. Did you perform any sort of test squares?
**A. Yes.**
Q. Just for the benefit of the jury, what is a test square and what is the purpose?
**A. A test square is a -- is a 10-foot-by-10-foot area marked off with chalk, usually. And within that test square, you -- you circle a certain amount of hail hits, functional damage, and you get to a certain point where it -- it is sufficient to**

Page 136

**justify replacing that directional slope. So that would be approximately eight-plus hits.**
**So I circled it, and I took pictures of the test square of each directional slope.**
Q. Do you consider reasonable uniform appearance when determining whether a roof needs to be replaced?
MR. PONZI: Object to form.
**A. Yes. You can actually see from the ground that it would be sufficient that it would be functional damage.**
Q. (BY MR. BUKOWSKI) What I mean is, if you had four damaged shingles within a -- within a test square, that wouldn't warrant replacement, in your mind, right? Because it doesn't hit the eight-plus?
**A. It would not warrant replacing of the roof. That would be a repair.**
Q. But if the shingles were no longer manufactured, how does that come into consideration --
**A. That's a different issue, and that -- that, I'll rely on experts.**
Q. Like a roofing expert?
**A. Not a roofer.**
Q. Who -- who would you rely on?
**A. An engineer.**

Page 137

Q. Now, looking back at page 3 of your report, you also observed damage to the stucco on the back wall, correct?
**A. Yeah, I'd like to go back to the last question.**
Q. Sure.
**A. If you don't mind.**
Q. Uh-huh.
**A. If -- if it is, let's say, four shingles within a test square, if the material is -- is still available, then there are still matters that would cause -- may constitute replacement of that roof. So I take that into consideration, like whether it is too brittle or there is -- the material is not available.**
Q. If you identified less than eight hits per square, do you then inspect the remainder of the directional slope to determine the full amount of damage?
**A. I'll look at -- I'll look for the area that has the most damage, to draw my test square.**
Q. And then if you're going to put together an estimate for a repair, do you inspect the remainder of the roof to determine the full amount of shingles that need to be replaced, or do you just extrapolate the surface area --

**A. No.**

Q. -- of your test square?

**A. No. I'm going to go -- I'm going to do a thorough inspection of all directional slopes, and I'll pick out the areas that are -- that appear to be most affected. And -- and I take into consideration the amount of repair that's necessary for the entire roof and whether or not it -- it can be replaced or -- I mean, it must be replaced or if it can be repaired.**

Q. Okay. Now, moving on to the -- your observation, where it says, Siding Observed Damage. You observed damage to the stucco on the back wall, correct?

**A. I did.**

Q. And when you say "the back wall," do you mean the opposite side of the entrance?

**A. Yes.**

Q. Do you -- did you give an opinion or do you have an opinion as to how the damage you observed on the back wall stucco could be repaired?

**A. Yeah. I think I commented on that, that a repair needs to be made on the stucco and then a skim-coat of the stucco.**

Q. What is a skim-coat?

**A. A skim-coat is a color coat of stucco.**



Q. What would be the purpose behind doing a skim-coat over the repaired damage?

**A. To make it -- things uniform, the appearance uniform.**

Q. Do you take into consideration how the new skim-coat on the back wall would look in appearance to the other three walls that are different color?

MR. PONZI: Object to the form.

**A. Under guidelines that are typical in insurance, you would -- I would do that one wall.**

Q. (BY MR. BUKOWSKI) Are you familiar with the line-of-sight rule?

**A. Role?**

Q. Are you --

**A. Role?**

Q. I call it the rule. Are you familiar with the concept of line of sight in terms of determining if there is a reasonable uniform appearance on repairs?

**A. Yes.**

Q. Do you take in -- do you take in line of sight when considering whether a repair will match other areas of the property?

**A. Yes, if you're -- you know, I go to the edge of the -- of the side and -- and I stop, and I -- I don't have issues with contractors coming back to me**



**and saying that it doesn't match.**

Q. Now, you also observed damage to the wood fascia, correct?

**A. I don't recall, but that would be reasonable.**

Q. What's --

**A. Oh, yeah. Well, you know, I don't -- I don't remember. But I -- that's reasonable.**

Q. Would you say that the findings that you have in this report would best document your opinions at the time you inspected the property?

**A. Oh, definitely.**

Q. Now, your report also indicates that you observed hail damage to more than 30 windows, correct?

**A. Correct.**

Q. And the damage that you observed to the 30 windows would require replacement of the entire window, based on your opinion in this report?

**A. Yes. That's what it says.**

Q. Do you know if replacement of the 30 windows at the property would have any effect on the surrounding stucco?

**A. Well, it is a matter of opinion, and I'd be open-minded to a contractor that has a discussion on that. But it didn't get that far.**



Q. So the next -- these are just your preliminary figures of the damage you observed and quick opinions --

**A. Yes.**

Q. -- on how you think it should be repaired?

**A. I'm not an expert, so I -- I just answer the question.**

Q. Sure. Well, your next step, if you were to prepare an estimate, is to determine the methodology of repair for the damages you observed, correct?

**A. Yes.**

Q. And that's where, specific to the windows, you might determine or look, How is it going to affect the surrounding stucco?

**A. Yeah, if I -- if I gave that consideration. But I'm human, and, you know, if I -- if I didn't give that any -- any consideration and somebody brought it to my attention, I would -- I would certainly listen to them.**

Q. Now, did you keep some sort of field notes or something where you documented which -- which 30 windows you saw were damaged from the hailstorm?

**A. Not exactly.**

Q. Did you take --

**A. I write down -- I count the number of**

Page 142

**windows, and wrote it down in field notes.**
Q. Do you still have access to the field notes?
**A. They'd be gone by now.**
Q. Would you have submitted the field notes to -- to Raphael in the document system?
**A. My handwritten notes, I would not.**
Q. Now, you also observed damage to the vinyl fencing, correct?
**A. That's what it says. So, yes.**
Q. Okay. And you indicate in your report that that damaged vinyl fencing would require replacement, correct?
**A. Yes.**
Q. Going to page 4, you talk about the doors, and you identified four doors which were damaged by the wind from the August 2020 storm, correct?
**A. Right, yes.**
Q. Do you know which four doors you're referring to?
**A. At this point, no.**
Q. Now, you also made a comment that the doors were damaged as people were trying to escape the storm. Do you know where you learned of that information?

Page 143

**A. That would come from management. The management on-site.**
Q. Do you recall your discussions with management on-site?
**A. No, not exactly, because I don't even -- I don't recall the contractor on-site. And unfortunately, a lot of these claims, you start -- your mind plays tricks on -- on each claim.**
**And so I can't -- you know, from this particular claim, I recall -- I seem to recall a husband and wife managing it. The wife was actually the manager, and -- and the husband dealt with the repairs, and he was the one that brought to my attention the wind catching the doors, or a door, when a guest opened the door and -- and caused damage.**
Q. Okay. All right. Now, next you also identified hail damage to 11 exterior lights, correct?
**A. Yes.**
Q. Do you know which 11 exterior lights you're referring to?
**A. Yeah, I don't quite understand the question. I'm not going to say it's -- you know, I'm counting wind -- I'm counting lights. So I'm not going to be able to say that one of them is -- is above such-and-such window, another one is -- you know, I'm**

Page 144

**counting. You know, I'm counting that. And maybe, in my field notes, I might have said that four of them were on the right elevation, and eight of them might have been on the back elevation, and two on the left. I don't know for sure. I'm sorry for such a long answer.**
Q. You also observed hail damage from the August 2020 storm to the freestanding sign out front, correct?
**A. Yes, at least it was -- that was claimed.**
Q. Okay. Now, on page 4, you discuss the estimate, but you -- you indicate you've not completed one yet, right?
**A. Right.**
Q. And do you often prepare a corresponding estimate with your initial report?
**A. Most of the claims I'm able to give a final report, along with the estimate and photographs. On an initial report, I might submit an initial report rather quickly in order to advise the carrier of a larger claim. So usually when it's like when I suspect it'll over $75,000.**
Q. And would you -- did you consider this to be a larger claim, over $75,000?
**A. Yeah. I think I put reserve 150, as a**

Page 145

**guesstimate.**
Q. Okay. So you were trying to get this report quickly over to Amguard Insurance Company to notify them of the large loss?
**A. Yes.**
MR. PONZI: Object to the form.
Q. (BY MR. BUKOWSKI) Are you capable of creating a repair estimate for the damage you observed at the Baymont Hotel?
**A. At the time, I could.**
Q. Were you ever asked by Amguard Insurance Company to create a repair estimate for the damages you identified in this report, marked as Exhibit 22?
**A. No.**
Q. Did you provide a copy of this report, Exhibit 22, to Baymont Hotel?
**A. No.**
Q. Did you provide a copy of this report, Exhibit 22, to the insurance agent, Rick Cline, for Baymont Hotel?
**A. No.**
Q. Did you provide a copy of this report, Exhibit 22, to the contractor for Baymont Hotel?
**A. No.**
Q. Did you communicate any of the findings or

Page 146

information contained within this report, Exhibit 22, to Baymont Hotel?

A. **No.**

Q. All right. Did you communicate any of the findings in this report, Exhibit 22, to the insurance company --

A. **Let's go back to the last question, if you don't mind.**

Q. Sure.

A. **As I'm going around, I am explaining to the contractor, their representative, or the -- or the insured or the manager what I have found as to what I feel is -- is hail damage.**

Q. Okay. Do you recall, during your inspection of the Baymont Hotel, who accompanied you?

A. **No. I mean, it -- it clearly states that a contractor was there. So the contractor was aware of my findings, because we -- if he's there, then we would have inspected together.**

Q. Do you recall what you represented to the contractor, during the inspection, that was damaged from the August 2020 hailstorm?

A. **Everything that's listed there.**

Q. So you believe that you communicated to the contractor or a Baymont representative that there

Page 147

were damages from the August 2020 hailstorm that are consistent with what's reported in this report, Exhibit 22?

A. **Yes.**

Q. Okay. Do you agree that it's reasonable for the contractor to rely upon the information you provided about the damages from the August 2020 storm?

A. **Well, you know what --**

MR. PONZI: Objection -- let me object. Let me just object. It calls for speculation. You can answer.

A. **He can form his own opinion, and he's more than welcome to discuss with me his opinion. And he -- he did not deviate from my opinion.**

Q. (BY MR. BUKOWSKI) Meaning that it appeared he was in agreement with the damages that you were observing?

A. **Yes.**

Q. All right. Do you think it's reasonable for Baymont or its representatives to rely upon the findings that you communicate to them?

MR. PONZI: Same objection.

A. **Is it reasonable for them to believe what I say is -- is basically what you're saying, what you're asking me? And I would say yes.**

Page 148

Q. (BY MR. BUKOWSKI) Did you verbally communicate the information in your report, Exhibit 22, to the insurance agent, Rick Cline, for the Baymont Hotel?

A. **No.**

Q. Did anyone from Amguard Insurance Company contact you to discuss your findings outlined in Exhibit 22?

A. **Amguard? I never have communications with Amguard. Almost never. So, no.**

Q. You did take a pause or a moment to think about that. Is there someone that came to mind that you think might be from Amguard that discussed this report with you?

A. **No. I was trying to formulate whether you were talking about my communications with Baymont or -- or GUARD.**

Q. Were -- are you aware that a second independent adjuster was hired after you?

A. **I found that out recently.**

Q. Okay. Has anyone from the firm Engle Martin & Associates contacted you at any point to discuss your findings that were contained in Exhibit 22?

A. **No.**

Page 149

Q. Were you aware that an engineer was retained after your report?

A. **No.**

Q. Did anyone from Envista Forensics contact you to discuss your findings?

A. **No.**

Q. Okay. I've placed on the screen Exhibit 23. This is a photo sheet of approximately 59 photos and are labeled, Taken by Ted Miller. Do you see that?

A. **Yes.**

Q. I am just going to scroll through them so you can confirm these appear to be your photos. Okay. Do the photographs throughout the 59 pages in Exhibit 23 appear to be yours?

A. **Yes.**

Q. Okay. I'm on page 6, photographs 11 and 12. What are you trying to illustrate here?

A. **The north test square well exceeded what I considered enough damage for -- to total out that slope.**

Q. And on photograph 11, it says 10 plus. What does that mean?

A. **It means that I stopped circling hail damage at ten shingles. But there were more.**

Q. Why -- why did you choose to stop at ten?
**A. No particular reason.**
Q. Do you have an idea as to how many hits you were seeing per test square?
**A. No, because I -- because that really, when you're -- when you're looking at it in a 10-by-10 area, I mean, you can get into 30, 40, 50 hits easily. And so when you get to a satisfactory number, you're -- you're just -- you're documenting and wasting time for no good reason.**
Q. Photograph 49 says, Paint on fascia shows damage from hail. Do you see that?
**A. Yes.**
Q. Is that the fascia that you were referring to in your report?
**A. Evidently.**
Q. You don't recall, as you sit here, if you saw damage to any other areas of fascia?
**A. No, I don't recall.**
Q. Photograph 98 says, Front doors, no hail damage. Closers affected by strong wind during storm.
Do you see that?
**A. Yes.**
Q. Okay. So is it fair to say these front doors are at least one of the four doors you observed



were damaged from wind?
**A. There was damage to a door closer, and I have no reason to -- to feel that the -- that management was lying to me that it was -- that it was from a windstorm that occurred at the same time that the hail occurred.**
Q. Okay. And then photograph 99 appears to be a window that's on the right side, as you walk into the doors, correct?
**A. 99?**
Q. It appears to be this window --
**A. Yeah, it -- yeah. You're probably right, yep.**
Q. Okay. So, then, photograph 100 says, Screen was damaged by hail. I guess my question for you is, if we go front doors in 98, window to the right side of the front doors in 99, is -- 100 would be -- would that be the next window in line? Is that how you take your photographs?
**A. I start at the front left elevation, and I work my way to the right. And I go in a counterclockwise -- I go counterclockwise around the building during my inspection.**
Q. Okay. So I am going to cut it off and start at 96, which appears to be the windows just left



of the entry door. Do you see that?
**A. Yes.**
Q. Okay. And then we move down to 98, and it is the front door. Do you see that?
**A. Uh-huh.**
Q. And then 99, we think, is the next window around the right side of the front door, correct?
**A. Right.**
Q. So far we've looked at three photographs and we're following that counterclockwise inspection, right?
**A. Correct.**
Q. Okay. So then would it make sense that 100 and 101 are going to come in line next to that window next to the door, counterclockwise?
**A. Yeah. At least it's further down going kind of clockwise.**
Q. Okay. And you observed -- it still says 100 and 101, front elevation, right?
**A. Yes.**
Q. So you observed hail damage to the windows on the front elevation illustrated in photograph 100 and photograph 101?
**A. Yes.**
Q. Now, you have 103. Warping of vinyl



window bead. Do you see that?
**A. Yeah, I can see it.**
Q. Okay. So that's just -- that's a condition that's unrelated to hail, right?
**A. It's a condition not related to hail.**
Q. Now, I guess my question for you is, what is window bead?
**A. It is a piece of vinyl that goes around the window in order to help keep moisture out of the interior.**
Q. Would you evaluate, in each of the windows you looked at, whether or not there was damage to the window bead?
**A. Yes, I would look at that. I would look for it.**
Q. Isn't it true, if there was hail damage to the window bead, it could allow for the penetration of water into the interior?
MR. PONZI: Objection; that calls for speculation.
**A. Yeah, I'm not an expert on that. I'm not an expert.**
Q. (BY MR. BUKOWSKI) Okay. Well, based on your lay opinion and your 30 years of experience, would you agree that if the bead is damaged, it could allow

Page 154

for the penetration of moisture into the window?
MR. PONZI: The same objection.
A. **I don't know.**
MR. PONZI: Calls for speculation.
Q. (BY MR. BUKOWSKI) You don't know?
A. **Don't know.**
Q. Okay. So if I see -- if I see a report in the future, I can reference this in terms of windows; you wouldn't know, right? I'd just throw out your opinion?
MR. PONZI: Same objection.
A. **Same answer.**
Q. (BY MR. BUKOWSKI) Okay. So going --
A. **I don't know.**
Q. Okay. Well, did you tell Amguard Insurance Company that you don't know about window bead and the effects on a window?
MR. PONZI: It lacks foundation. He doesn't communicate directly with Amguard, so the question lacks foundation.
Q. (BY MR. BUKOWSKI) Do you communicate to Raphael & Associates that you don't know the effects of damage to window bead?
A. **Of course I don't discuss these issues with them.**

Page 155

Q. Okay. Photograph 155, Window bead damaged by hail. Do you see that?
A. **Yes.**
Q. Okay. So you -- you're just documenting the damage that you observed, but not necessarily the possible consequence of that damage; is that fair?
A. **Correct.**
Q. Do you recall seeing any other window bead damage at the property?
A. **Other than what I've documented in 160-something photos?**
Q. Yes. Do you recall, as you sit here today, if you observed any other windows with bead damage?
A. **Can't remember, sorry.**
Q. Okay. Did you -- do you remember if you provided these photographs to Baymont Hotel?
A. **I'm sure I did not.**
Q. Did you provide these photographs marked as Exhibit 23 to the contractor for Baymont Hotel?
A. **No.**
Q. Did you provide the photographs marked as Exhibit 23 to the insurance agent for Baymont Hotel?
A. **No.**
Q. All right. I'm going to mark Exhibit 32.

Page 156

(Exhibit 32, remotely introduced and electronically provided to the reporter.)
Q. This is a copy of the subpoena you received in this file, right?
A. **Yep.**
Q. Okay. And I -- I don't want to go through it line by line again like we did on the Pacific Market -- or the Pacific Ocean, but you understand the purpose of the subpoena is just to make sure we have all information that's relevant to the claim. You understand that, right?
A. **Yes.**
Q. Can you make me the promise that you're going to go back and look and see if you have any of this information relevant to the requested line items in here?
MR. PONZI: Well, Jon, I'll promise you that Ted and I will discuss it and report back.
MR. BUKOWSKI: Okay. Well, I appreciate that, Matt. But I just don't want to go set a hearing on this and drag him down to the courthouse to go over this.
MR. PONZI: Well, I am quite confident he doesn't want that, either. So -- so, I mean, I don't know what else to tell you. We'll review it, and if

Page 157

he's got anything that's responsive that you don't already have, we'll produce it.
MR. BUKOWSKI: All right. All right. Just give me a minute to go through my materials here really quick.
MR. PONZI: While you're doing that, can I just ask a few questions of my own?
MR. BUKOWSKI: Sure.
MR. PONZI: I will be really brief, Ted.

EXAMINATION

BY MR. PONZI:
Q. I just want to go back to the series of questions you were asked about the use of experts on this Baymont claim and -- and your answer that, in your view, experts were not needed. Do you recall that line of questioning?
A. **Yes.**
Q. All right. So I just want to confirm a few things. At the time of your inspection, there was no claim being made to you, at least, by the -- by the owners of the property for interior water infiltration or mold, correct?
A. **That's correct.**
Q. And there was no claim, at the time of your inspection, that you were aware of, that

exterior -- exterior stucco was water-saturated; is that correct?
A. **That -- there was no mention of that. That is correct.**
Q. And there was no -- nothing mentioned to you at the time of your inspection that the foundation had shifted from wind force; is that correct?
A. **That is correct.**
Q. And -- and while you were accompanied by a contractor during the course of the inspection, the policyholder of the Baymont Inn folks had not yet hired any sort of engineer; is that right?
A. **That's right.**
Q. Okay. And is it also fair to say that at the time you inspected, you just viewed this as a straightforward exterior hail damage claim?
A. **Absolutely a straightforward hail damage claim.**
Q. And because of that, that's -- if I understand your testimony, that's why you felt an expert was not necessary; true?
A. **That's right.**
Q. All right. Then my last question relates to the back wall stucco damage. You were asked questions about whether there was back wall stucco



damage, and you said there was, right?
A. **Right.**
Q. I want to confirm -- because there is only a few photographs of stucco damage in your report, I want to confirm that when you were doing your observations, you made a point of trying to document and photo -- photograph any exterior stucco damage that you observed that you thought was hail-related; is that fair?
A. **Yes.**
Q. And so if there is not a photograph of it in your report, it's not something that you witnessed or observed?
A. **Yes, to a certain degree. I mean, if -- if it was shotgun and it -- I would -- I would take more photos showing, you know, damage over the entire walls. But I didn't observe that.**
MR. PONZI: That's all I've got.

EXAMINATION

BY MR. BUKOWSKI:
Q. What do you mean, this is a straightforward insurance claim?
A. **Straightforward insurance claim? I'm not sure how I --**
MR. PONZI: I think I said hail. I think



I said hail claim. Exterior -- I think the question I asked, Jon, was that a straightforward --
MR. BUKOWSKI: I will clean it up. I will clean it up.
MR. PONZI: You bet.
Q. (BY MR. BUKOWSKI) What did you mean that this was a straightforward hail damage claim?
A. **I know what he meant.**
Q. No, you agree that it was a straightforward --
A. **I know what he means.**
Q. No. What did you mean in your agreement? What did you understand this -- why did you understand this to be a straightforward hail damage claim?
A. **That it was hail damage and not what -- all of a sudden it becoming a shifting of the building and interior water damage. It was a straightforward hail claim.**
Q. Right. What does that mean, "straightforward hail damage claim"?
A. **It was hail damage only.**
MR. PONZI: Form.
Q. (BY MR. BUKOWSKI) Okay. Straightforward meaning the hail damage was open and obvious to you?
A. **There wasn't any additional damage from**



**other causes of loss.**
Q. Okay. But you did observe hail damage to the stucco in the rear elevation, correct?
A. **You know that.**
Q. Okay. And that stucco damage you observed in the rear elevation created an opening for moisture to get into?
MR. PONZI: Objection. That --
A. **I have no idea about that.**
MR. PONZI: Well, let me just object. It goes beyond the scope, and it's -- it calls for speculation. You can answer.
A. **I -- I don't know if there is any water damage in -- inside there.**
Q. (BY MR. BUKOWSKI) Well, did you evaluate it?
A. **Did I evaluate it? Did I inspect it --**
Q. Did you evaluate -- did you --
A. **I inspected it. Did I take a -- the precaution of -- or the action of opening up the wall to look for water damage? No. I -- I don't -- I looked at it, I documented it, just as any other adjuster would.**
Q. Well, you could use a moisture meter to evaluate it for moisture, without opening the wall,

Page 162

correct?
MR. PONZI: Objection, calls for speculation. You can answer it, Ted.
**A. I saw minor damage to the back wall, and I documented it, and that's all I did.**
Q. (BY MR. BUKOWSKI) Okay. And the damage you observed to the windows also can create an opening for water to get into?
MR. PONZI: Same objection. It's been asked and answered, calls for speculation.
**A. Yeah, I already answered the questions.**
Q. (BY MR. BUKOWSKI) The question before was specific to window bead. I'm asking you about damage to the window generally.
MR. PONZI: Same objection. And -- and beyond the scope.
MR. BUKOWSKI: Well, my questions weren't done. So . . .
MR. PONZI: Oh, I'm sorry. I wasn't sure if you were still answering.
MR. BUKOWSKI: You're kicking me over here.
Q. (BY MR. BUKOWSKI) The window damage you observed to the frame of the window has the potential to create an opening for water to get in?

Page 163

MR. PONZI: Same objection. It calls for speculation.
**A. Yeah, I don't know.**
Q. (BY MR. BUKOWSKI) And, again, you evaluated the property just weeks after the hailstorm, right?
**A. Yeah, I don't remember the date of loss.**
Q. Now, did you evaluate --
**A. I evaluated it on the date of inspection.**
Q. Did you evaluate the property with a lift or a ladder, or what did you have with you?
**A. It wasn't my ladder. It was the roofer's ladder.**
Q. Okay. So --
**A. It would had to have been, or it was a boom.**
Q. Did you evaluate both the lower and upper level of the hotel during your inspection?
**A. Yes.**
Q. All right.
**A. Yeah, I'm looking for damage.**
MR. BUKOWSKI: Well, I don't have any further questions. Do you have anything, Matt?
MR. PONZI: No, I'm good. I appreciate your time, Ted, Jon, and Lori. I appreciate it.

Page 164

Thanks.
THE REPORTER: Matt, did you need a copy of the transcript?
MR. PONZI: Yes, ma'am.
THE REPORTER: Jon, are you ordering this?
MR. BUKOWSKI: Yes. I will send you the exhibits here shortly.
WHEREUPON, the within proceedings were concluded at the approximate hour of 2:34 p.m. on the 21st day of March, 2022.
* * * * *

Page 165

I, THEODORE LYNDON MILLER, JR., do hereby certify that I have read the above and foregoing deposition and that the same is a true and accurate transcription of my testimony, except for attached amendments, if any.
Amendments attached ( ) Yes ( ) No

______________________________
THEODORE LYNDON MILLER, JR.

The signature above of THEODORE LYNDON MILLER, JR. was subscribed and sworn to or affirmed before me in the county of ________, state of Colorado, this ________ day of ____________, 2022.

______________________________
Notary Public
My commission expires

2505 6th Street Limon, LLC and
Pacific Ocean Alameda, LLC
3/21/2022 (laa)

Page 166

REPORTER'S CERTIFICATE

STATE OF COLORADO )
) ss.
CITY AND COUNTY OF DENVER )

I, LORI A. ALDRICH, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public ID 19974020552, State of Colorado, do hereby certify that previous to the commencement of the examination, the said THEODORE LYNDON MILLER, JR., verbally declared that his testimony was under penalty of perjury; that the said deposition was taken in machine shorthand by me at the time and place aforesaid and was thereafter reduced to typewritten form; that the foregoing is a true transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not employed by, related to, nor of counsel for any of the parties herein, nor otherwise interested in the outcome of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 6th day of April, 2022.

My commission expires June 2, 2024.

__X__ Reading and Signing was requested.
_____ Reading and Signing was waived.
_____ Reading and Signing is not required.

_______________________
Lori A. Aldrich
Registered Merit Reporter
Certified Realtime Reporter