# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01673-WJM-KMT

---

REMOTE DEPOSITION OF: WILLIAM JAMESON OVIATT
March 8, 2022

---

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the deposition of WILLIAM JAMESON OVIATT was taken remotely on behalf of the Plaintiff on March 8, 2022, at 9:02 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiff:

JONATHAN E. BUKOWSKI, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com

For the Defendants and the Deponent:

MATTHEW S. PONZI, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
mponzi@fgppr.com



I N D E X


| EXAMINATION OF WILLIAM JAMESON OVIATT: March 8, 2022 | PAGE |
|---|---|
| By Mr. Bukowski | 5, 126 |
| By Mr. Ponzi | 124 |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 25 | Envista Consulting Services Invoice, 2/17/21 | 8 |
| Exhibit 26 | Document entitled "2505 6th Street LLC - Notes" | 10 |
| Exhibit 27 | Compilation of photographs | 16 |
| Exhibit 28 | LinkedIn profile of Will Oviatt, MSCE, PE | 51 |
| Exhibit 29 | Photocopy of Matter Detail Listing | 63 |
| Exhibit 30 | Invoice provided by Mr. Oviatt (Exhibit not provided) | 71 |

| DEPOSITION EXHIBITS: (Previously Marked) | | |
|---|---|---|
| Exhibit 4 | Envista Report of Findings, 11/20/2020 | 12 |
| Exhibit 22 | Raphael Field Adjusting report, 8/25/2020 | 118 |
| Exhibit 24 | GRK Consulting Engineers Storm Damage Assessment (Kaszas), 4/23/2021 | 114 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record. And I will start with plaintiff's counsel.

MR. BUKOWSKI: Sure. This is Jonathan Bukowski, on behalf of the plaintiff; and I am in agreement.

MR. PONZI: This is Matthew Ponzi, on behalf of the witness and the defendant; and I am in agreement.

THE REPORTER: Mr. Oviatt, do you understand that your statements in this matter are under penalty of perjury?



THE DEPONENT: I do understand.

THE REPORTER: And if you could hold up your driver's license to the camera right now. Maybe back it up just a little bit. A little closer, I'm sorry.

(Deponent complied.)

THE REPORTER: I think that's good.

Jonathan, you can go ahead.

MR. BUKOWSKI: Okay.

WILLIAM JAMESON OVIATT,

having verbally declared that his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. BUKOWSKI:

Q. Would you please state your full name for the record.

**A. Yeah. William Jameson Oviatt.**

Q. And, Mr. Oviatt, have you ever given a deposition before?

**A. I have not.**

Q. Okay. A couple quick ground rules. The first is, if you don't -- well, we're doing this by Zoom, so if you can't hear me or don't understand a question, please let me know so I can re-ask or

rephrase, okay?
A. **(Deponent nodded head up and down.)**
Q. I -- I'm going to put the exhibits -- I have a few -- onto the screen so you'll be able to see them. I'll also put them into the chat, if you want to download them. I can also give you access or control so you can move through them, if you'd like; just let me know.
And as we go through the -- as we go through the exhibits, if you can't see something, let me know so I can zoom in or do what I need to do to make it more clear, okay?
A. **Okay.**
Q. I'm going to -- I'm going to try to go through this as quick as I can, but if at any time you need a break, let me know. And, lastly, I think I have most of your file materials, so if there is something you think you need, let me know and I'll certainly look for it, okay?
A. **Okay.**
Q. All right. So today, we're here on a -- on a claim titled 2505 6th Street, LLC, versus Westguard Insurance Company and Amguard Insurance Company. Are you familiar with the 2505 property in Limon?



A. **I am.**
Q. Okay. And you -- you were -- your involvement with that property was as a professional engineer, correct?
A. **Correct.**
Q. Now, as we -- as we go on today, if I say "the property," fair to assume, as we go, that I'm referring to that 2505 6th Street property in Limon, okay?
A. **Okay.**
Q. And the same if I -- it's your understanding it's a -- it's a Baymont Hotel, right?
A. **Correct.**
Q. Okay. So I may use those terms interchangeably, "Baymont Hotel" or "the property," okay?
A. **Okay.**
Q. What is your professional address?
A. **So I actually work out of my house.**
Q. Your -- so you're located in Colorado Springs, correct?
A. **Correct.**
Q. Okay. And so do you have -- do you have a professional address that is -- would be your house?
A. **Yes. It's my residence.**



Q. Okay. And what is that address?
A. **It's 8804 Briar Brush Lane, Colorado Springs.**
THE REPORTER: Hey, Jon, can we go off the record?
MR. BUKOWSKI: Sure.
(Discussion off the record.)
THE REPORTER: All right, Jon. I'm ready, if you're ready, to go back
MR. BUKOWSKI: Perfect.
Q. (BY MR. BUKOWSKI) All right. So I'm going to place the first exhibit for today on the screen, which is Exhibit 25.
(Exhibit 25, remotely introduced and electronically provided to the reporter.)
Q. Are you able to see this?
A. **Yep, I can see it.**
Q. Okay. And this appears to be an invoice from Envista for the time spent on this project; is that correct?
A. **It appears to be, yes.**
Q. Okay. And some -- some of the time is entered by you, but some of it is also entered by someone named Trevor LeDoyt and Elizabeth Castillo. Do you see that?



A. **I do.**
Q. Did you know Trevor LeDoyt?
A. **I do know him.**
Q. Okay. And what was Trevor's role in this claim?
A. **So Trevor is the project manager.**
Q. Do you have an understanding of what the duties and responsibilities of a project manager are?
A. **Yeah. So typically when I'm contacted to do an inspection or an investigation, I will be contacted most often by a project manager from Envista. And the project manager is the one who typically takes the information from the client, figures out scope, gets contact information. And then they relay that information to me, giving me a clear objective and scope.**
**And then throughout the project, they handle -- they handle the file -- file structure, sending a report out to the client, and they're typically the first point of contact for the client to the company.**
Q. Okay. And then in terms of the time you bill on a file, it's billed in increments of six minutes, correct?
A. **Yes. So it's -- it's, yeah, tenths of an**

Page 10

hour.
Q. I'm going to put on the screen Exhibit 26.
(Exhibit 26, remotely introduced and electronically provided to the reporter.)
Q. These appear to be notes of some sort. Can you see these okay?
**A. I can see them, yes.**
Q. Okay. Did -- did you have -- are any of these notes that you would have entered?
**A. I'm sorry, I'm going to have to read through this. This is the first time seeing this particular document. So these are not notes generated by me, no.**
Q. Do you have notes that you generate on -- when you're handling a claim for Envista?
**A. Say that -- I'm sorry. Could you repeat the question?**
Q. Yeah. Do you keep field notes or claim notes of what you do, or is that just what's in your -- your invoicing here?
**A. Yeah, so I -- I do not write out field notes. We have conversations over the phone, most often.**
Q. All right. So I placed Exhibit 25 back on the screen. What was your first involvement -- I'm

Page 11

sorry, strike that. When was your first involvement in this claim?
**A. It would have been a contact from, most likely, Trevor LeDoyt, just letting me know that they had one -- or an inspection to do, and basically usually I have to just come back with what would be my time frame, do I have the availability, and what would be my anticipated travel time or budget for it.**
Q. Okay. And so in looking at Exhibit 25, would you say your first, excuse me, involvement was around September 26, 2020?
**A. No. I don't -- that doesn't sound correct. Let me look back at my report. No, because it looks like September 18 is when I actually performed my inspection. So it sounds like it would be too late. It would have been prior to the inspection, when they would have engaged me.**
Q. Okay. And do you know when your last involvement was?
**A. So currently, I'm still involved as -- per this conversation.**
Q. Well, you're involved in the sense, you mean, to prepare and sit for this deposition, correct?
**A. Correct.**
Q. Outside of this deposition, are you doing

Page 12

anything in the claim currently?
**A. No.**
Q. And outside of preparing -- if you eliminate your preparation and notice for deposition, and I know there was a request for documents, what was your last involvement?
**A. So it would have been the date of the report, which I don't -- I don't have in front of me.**
Q. Did you say the date of your report?
**A. I am -- the date of the report of when it went out to the client or when I uploaded it to the project folder would have been my -- my last involvement.**
Q. All right. So I'm going to place on the screen Exhibit 4, which is a copy of your report. Okay. Does that help you with -- it appears to be dated November 20, 2020. Would that be the date of your last involvement, approximately?
**A. Approximately. It would have been before that date. So typically what often happens is when I send my final report, typically with whoever the reviewer is, they maybe have it signed or it gets turned into a PDF from a Word document. And so typically my upload date is actually prior to what the date of the report is, when it goes out to the client.**

Page 13

Q. All right. So --
**A. So often --**
Q. I'm sorry. I didn't mean to interrupt you.
**A. It's okay.**
Q. Well, how about this. Have you been involved since December of 2020?
**A. No, I have not, other than --**
Q. Other than -- I'm sorry. I'll try not to cut you off. Sometimes when you are pausing, it sounds like you're done. Here, I'll ask the question again. Fair to say that your last involvement was sometime around December of 2020?
**A. That would be correct, other than my preparation for this deposition.**
Q. Okay. What was your understanding of your role in this claim?
**A. So my understanding of this role is initially it was brought to me as a hailstorm event where some -- there was claims of structural damage. So my involvement was to go out on-site, perform an on-site inspection, which is typically in the range of zero to two hours; that's typically what we'll budget. It's somewhat a preliminary initial inspection.**
**And then provide a report of findings from**

Deposition Exhibit
RUBIDOUX - 4
1.6.2022 Lori Aldrich, RMR
exhibitsticker.com

ENVISTA FORENSICS
7887 East Belleview Avenue
Suite 1100
Denver, Colorado 80111
TOLL-FREE 888.782.3473
envistaforensics.com

# REPORT OF FINDINGS

## 2505 6TH STREET LLC
## BAYMONT INN & SUITES HOTEL PROPERTY

Engle Martin & Associates File No: 1000307939
Envista Matter No: MAT-114579-W6W2
REPORT DATE: November 20, 2020

Prepared For:
Brian Rubidoux
Engle Martin & Associates
116 Inverness Dr. E
Englewood, CO 80112
brubidoux@englemartin.com

## BACKGROUND

On September 18, 2020, William J. Oviatt, P.E. Associate of Envista Forensics (Envista), inspected the property of the Baymont Inn & Suites Hotel located at 2505 6th Street in Limon, Colorado (the building). The building consisted of a two-story structure with wood stud walls cladded with stucco and masonry veneer and supported by unknown underground foundation components. The roof was a hip type roof covered with asphalt shingles. According to the Lincoln County, Colorado Property Assessor's office, the building was constructed in 1998. For the purposes of discussion within this report, the front of the building was considered to be north-facing. (Attachment A, Photographs 1 through 4)

Reportedly, the asphalt shingle roof covering was damaged from a hail storm on or about August 2, 2020.

## PURPOSE

Engle Martin & Associates retained Envista to assess the reported damage. Specifically, Envista was requested to determine if the roof covering and exterior elevations of the building were damaged by hail strike, or if the building was structurally damaged from the storm on or about August 2, 2020. Envista's scope of work included a site visit to perform an assessment of a select portion of the building based on visual observations, and provide a written report summarizing the findings.

## CONCLUSIONS

It is Envista's professional opinion that:

1. The subject building wood framing was not structurally damaged due to the reported storm on or about August 2, 2020.

2. The subject building asphalt shingle roof covering was functionally damaged due to hail impact from the reported storm on or about August 2, 2020. It is estimated that approximately 11,330 shingles were functionally damaged due to hail impact from the reported storm.

3. Exterior building elevation and roof elements were cosmetically damaged due to hail impact from the reported storm on or about August 2, 2020 in the form of small dents to soft metal roof vents, metal wall vents, and exterior metal doors.

4. Exterior building elevation elements were functionally damaged due to hail impact or wind forces from the reported storm on or about August 2, 2020 in the form of fractures in stucco siding, tears in window screens, fractured vinyl window wraps, fractured glass window panes, fractured vinyl fencing, fractured or completely removed exterior wall sconces, and three (3) racked metal door frames.

5. The subject building windows have several areas of observed damage due to over prying of window elements that were resistant to opening from either/or an installation issue, material defect, or a maintenance issue. These areas of observed damage were not consistent with a structural issue or deformation of the rough window opening due to excessive gravity or lateral loading to the underlying framing elements. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

6. The subject building exterior stucco has damage in the form cracking that has propagated due to inadequate installation of horizontal and vertical movement joints in some areas. These areas observed are inconsistent with cracking caused from lateral building racking around rough framing

openings, and is therefore not attributable to damage caused by the reported storm on or about August 2, 2020.

7. The subject building pool room has advanced deterioration to building interior finishes, wood framing members of supporting walls, and exterior finishes attached thereto from a long-term exposure to excessive interior humidity. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

## DOCUMENTS REVIEWED

The following documents and materials were reviewed and/or referenced as part of Envista's investigation, and/or contain information pertinent to the discussion and conclusions presented herein:

1. Lincoln County Property Assessor's Website: http://lincolncountyco.us/assessor/assessor.html

2. National Oceanic and Atmospheric Administration (NOAA) - Storm Events Database website: http://www.ncdc.noaa.gov/stormevents/

## PROVIDED INFORMATION

During Envista's site visit, the property manager, Ashley Pendlay was interviewed. As follows is a general understanding of the comments, which may or may not be consistent with Envista's observations or professional opinions:

- The property manager was at the subject building at the time of the reported storm on August 2, 2020. The property manager reported very strong winds coming from the southwest direction, with large hail creating widespread damage to the exterior stucco, windows, vinyl site fencing, metal doors, and roof covering.

- The property manager reported several window leaks on both the north and south side of the building. These leaks were reported as new since the reported storm.

- The property manager reported damage to a masonry block along the east side of the building as new since the reported storm.

## WEATHER DATA

The roof covering damage reportedly occurred during a storm on or about August 2, 2020. Envista researched historical weather data obtained from the National Oceanic and Atmospheric Administration (NOAA) and the National Weather Service (NWS) for the aforementioned date. The NOAA and the NWS have several reports of a hail storm in Lincoln County on August 2, 2020 producing hail stones of up to 1.75 and 1.25 inches in diameter, with wind speeds gusting up to 71 miles per hour (Attachment B Weather Data). Additional weather data may be available at a later date.

## DISCUSSION

*Hail Inspection*

In conducting this investigation, Envista inspected the peripheral building elements on the roof and around the property in an attempt to gain a better understanding of the approximate size of the hailstones that may have impacted the roofing system. Two good indicators of the size and directionality of hail are

spatter marks and indentations in soft metals. Spatter marks are formed when hail removes some oxidation or organic growth from either metal, plastic, or wooden surfaces. These marks tend to widen and propagate outward from the impact location; therefore, measurement of the width of the narrow end of spatter marks has been found to closely correlate with the actual size of the hailstones that created them. Hail-related spatter marks will eventually fade and blend in with the surrounding material surface. Although the time it takes for spatter marks to blend in is variable with weather exposure, it has been Envista's experience is that such marks commonly remain visible for approximately one year following a hailstorm event. Conversely, indentations in metal and wood surfaces do not weather away like hail spatter marks and as such the metal becomes a permanent record of all previous storms. It is important to understand that soft metals, such as lead and aluminum, are susceptible to denting even by hailstones that have insufficient size and energy to damage the roofing system. Therefore, the age and size of such indentations must be carefully considered with all other peripheral evidence when assessing hail damage to roofing systems.

Hail events are directional in nature, meaning when hail falls and strikes an object, the more perpendicular the hail strike is to the object, the greater proportion of energy (force) is transferred to the object. Thus, hail events will cause more damage on the windward side/slopes of a building opposed to the leeward side/slopes of a building. Impacts from hail on the leeward side of the roof slope will have glancing blows causing surface abrasion and will not contact the leeward side of the building due to shielding. Thus, hail damage from a single storm will cause the greatest damage on two directional elevations and roof slopes.

Functional hail damage to a shingle roof covering is defined by the industry as a reduction of the water-shedding capability and/or a reduction in the expected long-term service life of the roof covering. Hail damage to asphalt composition shingles is typically evidenced by a random distribution of roughly circular blemishes no smaller than approximately 5/8-inch diameter and characterized by granule losses, partial granule embedment into the shingle mats, and mat fractures or bruises. Areas of shingles without solid underlying support, such as ridge-cap shingles or at cantilevered shingle edges at roof rake ends, are typically the most vulnerable shingles to hail damage, and therefore are expected to sustain damage before any damage is incurred on the field shingles. Through laboratory testing and field observations, it has been generally established and accepted that the minimum hailstone size capable of damage to the asphalt composition shingles is 1-inch, although heavier asphalt shingles are typically capable of resisting larger hail, while lighter or deteriorated shingles may be damaged by smaller hailstones.

Envista inspected the subject building for evidence of the reported hail damage to the roof covering, and performed close-up and detailed examinations of test areas, following the customary protocol in the engineering profession for hail damage roofing examinations. The customary protocol was developed based on field investigation experience over decades of study that showed that hail falls randomly, and that close examination of a randomly selected roofing square (100-square feet) on unobstructed roof exposures in all of the cardinal directions is a reliable indicator, by extrapolation, of the hail strikes over an entire roof exposure. Envista observed 12 hail damaged shingles on the north test area, 127 hail damaged shingles on the south test area. The shingles determined to have damage had partial granule embedment into the shingle mats and mat fractures/bruises. Given these observations, it is Envista's professional opinion that the asphalt shingle roof covering was functionally damaged due to hail strike from the reported storm on or about August 2, 2020. Extrapolation of the hail strike counts from test squares applied over the entire roof area gives an estimate of 11,330 total damage shingles.

Envista observed spatter marking to exterior building elements such as exterior mechanical units, exterior metal light sconces, and exterior metal light poles. The spatter marking observed had well defined edges indicative of a recent storm event. The spatter marking was also consistently observed on the west and

south sides of building elements, indication of a storm direction coming from the southwest. While spatter marking will fade away with time and is therefore not considered damage, Envista observed cosmetic damage to exterior building elevation and roof elements due to hail impact in the form of small dents to soft metal roof vents, metal wall vents. and exterior metal doors. Envista also observed functional damage to exterior building elevation elements due to hail impact or wind forces in the form of fractures in stucco siding, tears in window screens, fractured vinyl window wraps, fractured glass window panes, fractured vinyl fencing, fractured or completely removed exterior wall sconces, and three (3) racked metal door frames. Given the strong indicator in spatter markings and damage, it is therefore Envista's professional opinion that the damage observed is from a single, recent storm event consistent with the reported storm on or about August 2, 2020.

*Stucco Cracking Inspection*

Envista observed multiple cracks in the stucco cladding material along the south building elevation. These locations were observed to be in correlation with long runs of stucco material installed with a lack of movement joints. For stucco applied to wood framed walls, ASTM C1063 standard requires control joints in stucco finishes to limit stucco panels on wood framed walls to control the locations and amount of cracking. ASTM C1063 states that control joints shall be installed in the stucco cover so that no panel size exceeds 144 square feet, the distance between control joints does not exceed 18 feet in either direction, or a length-to-width ratio does not exceed 2.5 to 1. The measured spacing of the control joints and panel size of the stucco covering in the areas of the observed cracking did not meet the requirements of ASTM C1063. Therefore, it is Envista's professional opinion that the subject building exterior stucco has damage in the form of cracking that has propagated due to the inadequate installation of horizontal and vertical movement joints in some areas. These areas observed are inconsistent with cracking caused from lateral building racking around rough framing openings and is therefore not attributable to damage caused by the reported storm on or about August 2, 2020.

*Window Inspection*

Observation of the reported water intrusion and damage to the vinyl window units throughout the building revealed damage on both sides, interior and exterior of the window screens, and vinyl edges supporting the windowpanes. Often, windows displayed fractures in the vinyl elements near the locking mechanisms and finger pulls of the sliding portion of the unit, indication of damage from over prying. These windows were exceedingly difficult to open; however, no indications of overloading to the window unit from either gravity or lateral loading from the structural system was observed at the time of the site visit. Therefore, it is Envista's professional opinion that the subject building windows have several areas of observed damage due to over prying of window elements that were resistant to opening from either/or an installation issue, material defect, or a maintenance issue. These areas of observed damage were not consistent with a structural issue or deformation of the rough window opening due to excessive gravity or lateral loading to the underlying framing elements. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

*Pool Room Structure Inspection*

Envista's exterior and interior inspection of the subject building's pool room revealed moisture stains, biological growth, and/or dark discoloration on gypsum wall and ceiling covering, wood wall sheathing, truss chord members and roof sheathing within the attic space. The areas of damage observed in the wall sheathing from the exterior showed advanced levels of wood decay. Wood decay is indicative of repeated and long-term exposure to moisture. Several conditions are common, in varying degrees, to support the growth of wood decay which are: a favorable temperature, adequate oxygen supply, and

adequate supply of moisture. Once wood remains wet above the fiber saturation point, the decay process will occur. As long as the moisture content (MC) remains high, the decay process will continue. Decay is a long-term process and does not occur from a single storm event. Repeated wettings, from a source of moisture intrusion, are required to maintain the wood at or above the fiber saturation point. Given these observations, it is Envista's professional opinion that the subject building pool room has advanced deterioration to the building interior finishes, wood framing members of supporting walls, and exterior finishes attached thereto from a long-term exposure to excessive interior humidity. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020. Furthermore, the single masonry veneer block observed crumbled along the east wall elevation is consistent with long term deterioration from excessive exposure to interior humidity, combined with exterior freeze-thaw process, and is also therefore not consistent with damage from a single storm event.

**CLOSURE**

This report is for the exclusive use of our client and is not intended for any other purpose. Our report is based on information made available to us at this time. Should additional information become available, we reserve the right to determine the impact, if any, of the new information on our opinions and conclusions and to revise our opinions and conclusions if necessary and warranted by the discovery of additional information. This electronic version of the report is a convenience copy and as such, an original signed and sealed copy is available to our client.

Envista Forensics

COLORADO LICENSED
WILLIAM JAMESON OVIATT
52878
PROFESSIONAL ENGINEER

William J. Oviatt, P.E.
Associate, Envista Forensics

Technical Review by:
Trevor LeDoyt
Project Manager

Attachment A, Photographs
Attachment B, Weather Data