# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01673-WJM-KMT

---

REMOTE DEPOSITION OF: JEFFREY ANDERSON
August 16, 2022

---

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the deposition of JEFFREY ANDERSON was taken remotely on behalf of the Plaintiff on August 16, 2022, at 10:05 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.

A P P E A R A N C E S

For the Plaintiff:

NATHANAEL T. ARCHULETA, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
narchuleta@merlinlawgroup.com

For the Defendants and the Deponent:

BRIAN E. DEVILLING, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
bdevilling@fgppr.com



I N D E X


| EXAMINATION OF JEFFREY ANDERSON: August 16, 2022 | PAGE |
|---|---|
| By Mr. Archuleta | 5 |

| DEPOSITION EXHIBITS: | | INITIAL REFERENCE |
|---|---|---|
| Exhibit 51 | Curriculum Vitae | 14 |
| Exhibit 52 | Defendants Rule 26(a)(2)(B) and (a)(2)(C) Affirmative Disclosures | 35 |
| Exhibit 53 | Defendants Rule 26(a)(2) Rebuttal Expert Disclosures | 42 |
| Exhibit 54 | Anderson report, 11/18/2021 | 43 |
| Exhibit 55 | Anderson rebuttal report, 7/1/2022 | 153 |

| DEPOSITION EXHIBITS: (Previously Marked) | | |
|---|---|---|
| Exhibit 24 | GRK Consulting Engineers Storm Damage Assessment (Kaszas), 4/23/2021 | 132 |
| Exhibit 36 | Raphael Field Adjusting report, 8/25/2020 | 46 |
| Exhibit 42 | Letter to Berkshire Hathaway GUARD from Engle Martin & Associates (Rubidoux), 10/6/2020 | 46 |
| Exhibit 47 | Letter to Berkshire Hathaway GUARD from Engle Martin & Associates (Rubidoux), 11/30/2020 | 174 |




WHEREUPON, the following proceedings were taken pursuant to the Federal Rules of Civil Procedure.

* * * * *

THE REPORTER: The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely. They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury. The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.

Please indicate your agreement by stating your name and your agreement on the record. And I will start with plaintiff's counsel.

MR. ARCHULETA: Nathanael Archuleta. I agree.

MR. DEVILLING: Brian Devilling, for defendants; I agree.

THE REPORTER: Mr. Anderson, do you understand that your statements in this matter today are under penalty of perjury?

THE DEPONENT: Yes, I do.

THE REPORTER: And, Nathanael, you can go



ahead.

MR. ARCHULETA: All right.

JEFFREY ANDERSON,

having verbally declared that his testimony in this matter is under penalty of perjury, testified as follows:

EXAMINATION

BY MR. ARCHULETA:

Q. Well, thanks for coming today. I want to start with -- I guess we'll just start with, please state your full name and spell your last for the record.

**A. Jeffrey Evan Anderson, A-n-d-e-r-s-o-n.**

Q. Where are you located today?

**A. Today, I'm in my house in Highlands Ranch, Colorado.**

Q. Okay. So you're also a resident of Colorado, correct?

**A. Yes, I am.**

Q. Do you also exclusively work in Colorado or other states?

**A. I, on a rare occasion, work outside of Colorado. But Colorado accounts for probably 99 percent or -- or more of my work. It's very rare that I go outside Colorado.**

# JEFFREY ANDERSON - August 16, 2022

Page 42

Q. In terms of lateral load, you intend to testify that lateral loads did not cause the damage you observed, correct?
**A. That's correct.**
Q. Okay. And you did pull wind gust data related to that opinion, correct?
**A. Yes, sir.**
Q. Okay. All right. Now I'll stop sharing this, see if I can bring it up. Do you have your report in front of you, or do you need me to share the screen so you can see your report?
**A. I have my report handy, actually. Yes, I do.**
Q. Before I do that, I'm going to bring up the rebuttal disclosure certificate, and I am going to discuss that with you, too. So I'm going to mark the rebuttal disclosure certificate as Exhibit 53.
(Exhibit 53, remotely introduced and electronically provided to the reporter.)
Q. So in terms of your rebuttal opinion -- let me see if I can get this. All right. I am just trying to bring up the last two paragraphs; it looks like it was added to the certificate. But you are offering an opinion in rebuttal to GRK's opinions, correct? Both of them, correct?

Page 43

**A. Both of GRK's reports?**
Q. That's right.
**A. I did, yes, sir.**
Q. Okay. So you did specifically make an opinion related to the first GRK report, correct, the April 23, 2021 report, correct?
**A. Yes, I did.**
Q. Okay. And then there's a rebuttal report that GRK did that's in the plaintiff's affirmative disclosures, and you did rebut that as well. You're making an opinion about both, correct?
**A. Yes, sir.**
Q. Okay. And I will probably ask you, throughout the depo today, to clarify what -- there's a lot of references to GRK, but I can't tell which report you're evaluating. So I'll have to ask you to clarify that, because I know that sometimes it gets mixed.
Now, let's go to your reports themselves. One second.
(Exhibit 54, remotely introduced and electronically provided to the reporter.)
Q. All right. You have your report?
**A. Yes, sir, I do.**
Q. Okay. So your report is dated November 18, 2021. Is that the date the report's

Page 44

finalized or drafted?
**A. That was the date it was issued.**
Q. What does that mean, "issued"?
**A. That means that that's the date that it was finalized. I stamped it, signed it that date, sent it to Matt Ponzi on that date.**
Q. Okay. But in terms of when you would have started drafting the report, would that be in the report, or on some kind of invoice somewhere?
**A. That would be on an invoice.**
Q. Okay. How long do you typically take to draft these reports?
**A. Oh, a hail claim report, it was probably two or three days.**
Q. From start to finish?
**A. Correct.**
Q. Okay. And when you are drafting the reports, are you drafting it using, like, some other document where you store data and then putting it into the report?
**A. I don't understand that question. It's -- it's drafted in Microsoft Word.**
Q. Let me clarify the question. Do you have notes when you do your observations?
**A. Yes, I do. You're talking about field**

Page 45

**notes that I took while I was at the property?**
Q. Right. I'm just assuming you didn't memorize everything.
**A. No, I -- I'm looking for my -- for my field notes here.**
MR. ARCHULETA: And, I'm sorry, Lori, this is Exhibit 54.
**A. You know, for this particular project, it was -- you know, I captured everything photographically, and I don't have -- I don't have, really, field notes, to speak of, from the dates of the site visit. I do have handwritten notes for -- that I was using kind of as a -- as a cheat sheet as I was preparing my report.**
Q. (BY MR. ARCHULETA) Are those still available?
**A. Sure.**
Q. Okay. Can you produce those after the depo?
**A. Yes, I can.**
Q. Okay. In terms of preparation for today's depo, how long did you prep for today's depo, just the length of time?
**A. Oh, four or five hours, maybe. Four hours.**

Deposition Exhibit
ANDERSON - 54
8.16.2022 Lori A. Aldrich, RM
exhibitsticker.com

JS|HELD

November 18, 2021

Matthew S. Ponzi
Foran Glennon Palandech Ponzi & Rudloff P.C.
222 North LaSalle Street
Chicago, Illinois 60601
Via email: mponzi@fgppr.com

Re: **Evaluation of Reported Hail and Wind Damage**

| | |
|---|---|
| File Name: | Baymont Inn |
| Address: | 2505 6th Street, Limon, Colorado 80828 |
| Date of Loss: | Reported as August 2, 2020 |
| Foran Glennon No.: | NEBP030396-001-001-001 |
| J.S. Held Job No.: | 21061498 |

Mr. Ponzi:

At your request, J.S. Held, LLC (J.S. Held) conducted an evaluation of the Baymont Inn & Suites hotel (Baymont) located at 2505 6th Street in Limon, Colorado. It is our understanding the property owner reported hail and wind damage related to a storm event that occurred on or about August 2, 2020. The insurance company for Baymont engaged Envista Forensics, LLC (Envista), a local engineering firm in Denver, Colorado, to evaluate the hotel facility. Envista issued their report of findings on November 20, 2020.

It is further our understanding that the property owner subsequently hired an attorney to assist with the processing and evaluation of the storm assessment and insurance claim. The property owner's attorney hired GRK Consulting Engineers, Inc. (GRK), from Sanford, Florida, to conduct a storm damage assessment of the Baymont facility. GRK issued their report on April 23, 2021. Our office has been provided with a copy of both the November 20, 2020 Report of Findings prepared by Envista and the April 23, 2021 Storm Damage Assessment report prepared by GRK.

**SCOPE**

Our investigation was conducted to evaluate the Baymont property related to a reported hail and wind event that occurred on or about August 2, 2020. We were specifically requested to evaluate the exterior components of the building envelope (roof covering, windows, EIFS wall cladding), for evidence of hail and/or wind. Additionally, we were requested to evaluate the allegations presented within the GRK report including allegations of interior moisture damage and wind/lateral force displacement of the structure.

Lastly, we were asked to provide a cost estimate to conduct any repairs to the property that, in our opinion, were created by hail and/or wind on the date of loss, August 2, 2020.

**BACKGROUND**

The Baymont facility, according to the Lincoln County Assessor's website, was originally constructed in 1998 and included 27,928 square feet of space within the two-story hotel. The front of the building faced to the northwest, towards 6th Street; however, for the purposes of this report, we have referenced the hotel as facing to the north. The building was surrounded on all four sides by an asphalt parking lot, which was accessed via 6th Street.

A shallow spread footing concrete foundation supported a traditional wood framed structure with manufactured wood floor joists and pre-engineered wooden roof trusses. The exterior walls were covered with an exterior insulation and finish system (EIFS) that had multiple finish coats. The windows were constructed with vinyl frames. The entrance doors were commercial-style storefront doors constructed with aluminum frames. The 18,071 square foot roof was a hip-style design that was covered with laminated asphalt composition shingles. The roof slopes directed drainage to roof gutters at the eaves, which conveyed the roof drainage to the ground surface via downspouts. The downspouts were designed to connect into an underground drainage pipe system; however, many of the connections were loose or were incomplete, which directed water onto the ground surface as opposed to into the partially subsurface pipe system.

The building included several appurtenances such as three rooftop cupolas and one attached tower feature located at the east edge of the hotel lobby area, where the hotel transitioned to the two-story structure with the rooms and the one-story indoor pool area. The tower was covered with EIFS as was the detached entrance porte cochere. The hotel signage included one shorter monument sign and one taller monument sign located on 6th Street. There was a smaller digital sign on the east side of the tower feature.

The hotel included 24 suites on the first and second floor levels for a total of 48 rooms. For future reference, the odd numbered room faced to the north and even numbered rooms faced to the south. The hotel also included a lobby, office, meeting rooms, indoor pool (not in service at the time of our evaluation), housekeeping/storage, hallways and stairs, and a manager's residence. The entry/lobby was located at the north/main entrance under the porte cochere. The lobby had manufactured vinyl, or similar, floor finish. Each hotel room had a packaged terminal air conditioner (PTAC) unit that was installed through the exterior wall and provided each room with conditioned air (heat and cooling). The exterior walls of each room were originally finished with vinyl wallpaper and had one window through the exterior wall. The recent restoration of each room due to possible biological growth included removal of the gypsum board on the exterior wall, including the vinyl wallpaper, which was replaced with new drywall that had a painted drywall texture.



21.10.06 JEA 01-420 shows the north and east sides of the hotel, tower, and porte cochere.



21.10.06 JEA 01-593 shows the south side of the hotel. The taller sign is visible in the background.



21.10.06 JEA 01-65 shows the interior of a second-floor room (207). The new drywall is highlighted.



21.10.06 JEA 01-251 shows the roof, cupolas, tower (background), and porte corchere (left).



21.10.06 JEA 01-443 shows the pool room.



21.10.06 JEA 01-300 shows the hotel lobby.

**SITE EVALUATION**

J.S. Held conducted our evaluation at the Baymont Inn & Suites on Wednesday, October 6, 2021, which was conducted by the following J.S. Held staff:

- Jeffrey E. Anderson, RA, AIA, LEED AP, Professional Architect III
- Mark Neufeld, Assistant Vice President (Building Consulting)
- Kyle Smith, P.E., Professional Engineer II (MEP)

During our site access, we walked around the exterior of the structure, over the entirety of the roof excluding the porte cochere, the attic, the interior of the pool, office, lobby, and into 39 of the 48 rooms (81 percent).

While we were at the property, we also met with the owner of the hotel, as well as representatives from the restoration contractor that remediated the interior moisture damage prior to our site visit, CJ Restoration (CJR) and Rocky Mountain Biohazard (RMB).

**APPLICABLE BUILDING CODE & DESIGN STANDARDS**

The Baymont Inn & Suite facility was located within the jurisdiction of the Town of Limon Building Department. According to the Town of Limon website, the current building code is the 2006 International Building Code (IBC), which would be applicable to any repairs at the property that require a permit.

Additionally, per the Town of Limon website, the design standards are:

- 85 miles per hour fastest mile wind speed; or,
- 100 miles per hour 3-second gust wind speed
- Wind Exposure C

**HISTORICAL WEATHER DATA**

Our office utilized the historic weather data provided by the Community Collaborative Rain, Hail, and Snow Network (CoCoRaHS), the Storm Prediction Center and the Storm Events Database as a part of the National Oceanic and Atmospheric Administration (NOAA), and other web-based historic hail services such as Hail-Reports.com and CoreLogic. For reference, as defined by the National Weather Service, a storm that includes hailstones of 1.0-inch or larger in diameter is classified as a severe hail event.

The CoreLogic Report for the Baymont property included 11 dates where hailstones of 0.75-inches in diameter or larger were estimated to have fallen at the property since 2009. We included the five dates where the largest hail was reported by CoreLogic below:

- August 9, 2009 (1.4 inches)
- July 4, 2010 (1.4 inches)
- July 4, 2014 (1.5 inches)
- June 4, 2015 (1.1 inches)
- August 2, 2020 (1.1 inches) – Reported Date of Loss

CoCoRaHS weather stations in Lincoln County, Colorado did not report hail in Limon on August 2, 2020, but did in other towns (Karval and Hugo, several miles to the south and southeast of Limon).

NOAA records from 1998 to 2020 through the Storm Events Database (SED) indicated hailstones up to 1.75-inches in diameter were reported within the town of Limon, Colorado on two dates and 1.5-inch diameter hail on one date. On the date of loss, within the Town of Limon the hail was between 1.0- and 1.25-inches in diameter, and up to 1.75-inches in diameter outside of town (six miles to the southeast).

Historically, the Baymont property experienced the largest hail events on the following dates:

- August 10, 2009 (up to 1.75 inches)
- July 4, 2010 (up to 1.5 inches)
- June 4, 2014 (up to 1.75 inches)

On the date of loss, a wind gust of 58 knots (67 miles per hour/mph) was reported 1.8 miles to the east-northeast of the property. Historically, the CoreLogic wind report included five dates of wind gusts over 70 mph, included below. On the date of loss, CoreLogic indicated a wind gust of 57 mph at the Baymont property.

- April 13, 2018 (71 mph)
- June 19, 2018 (77 mph)
- March 13, 2019 (76 mph)
- June 6, 2020 (72 mph)
- June 19, 2021 (78 mph)

The SED database for wind events between 1998 and 2020 included 23 dates of wind gusts over 50 knots (58 mph) in Limon, Colorado. The fastest wind speed was 67 knots (77 mph) on June 16, 2011. On the date of loss, August 2, 2020, the SED included a wind gust of 58 knots (67 mph).

We included our historic weather data under Appendix A (hail) and B (wind). We have also included several photographs within the body of this report. All of our photographs are available upon request.

**PROPERTY TOUR AND PRIOR REMEDIATION**

Our site visit started with a tour of the interior of the hotel provided by the property owner and the restoration contractor that conducted the remediation of the interior moisture damage prior to our site visit, CJR. According to CJR every room in the hotel had possible biological growth around the window and on the exterior gypsum board wall that was previously covered with vinyl wallpaper. Based on the widespread biological growth, CJR removed the interior wall finishes and gypsum wallboard on the inside of the exterior wall of every room in the hotel except the first-floor office, next to the lobby. CJR stated that the suspected path for moisture into the exterior wall assembly was through the window frames, since the glazing bead and frames were fractured by hail. Therefore, in addition to the interior gypsum repairs CJR also applied sealant to the window frames on all four sides of the structure.

CJR also described the two intrusive test cuts into the exterior wall assembly that were conducted by GRK. Per CJR, the two cuts (one north exterior wall and one south exterior wall) revealed the wall assembly had a high moisture content. The repaired cuts into the EIFS walls are shown below, taken during our site visit in October 2021.




| | |
|---|---|
| 21.10.06 JEA 01-320 shows the north wall cut. Both white and clear caulk is visible around the window, and between the frame and glazing. | 21.10.06 JEA 01-569 shows the south wall cut. White caulk is visible around the window frame. |

As of the date of this report, our office has not been provided with photographs of the intrusive test cuts to evaluate the results and conditions of the interior components of the wall assembly. On the interior of the rooms, the exterior walls consisted of newly painted textured gypsum board, which was installed by CJR in the spring/summer of 2021. The office, adjacent to the entry/lobby, was not repaired as an example of the possible biological growth that existed in each of the hotel rooms, shown below:



21.10.06 JEA 01-611 shows possible biological growth on the east office window jamb.



21.10.06 JEA 01-615 shows possible biological growth below the office window sill.

On the exterior of the windows, CJR applied white-colored and clear sealant around the window frames and between the window frame to the glazing, reportedly on multiple occasions.



21.10.06 JEA 01-342 shows clear and white sealant at the frame and glazing (north window).



21.10.06 JEA 01-541 shows multiple applications of sealant to the glazing bead on a south window.

CJR also stated they conducted repairs to the roof to cover shingles that had reportedly become detached during the wind event. Our office was provided with six invoices, three each from CJR and RMB, for remediation work conducted between October 2020 and August 2021. The total of the invoices was $179,521.

**OBSERVATIONS - HAIL**

We observed evidence of past hailstone impacts on various building components at the Baymont property. More recently, the hailstones fell from the south and southwest toward the north and northeast impacting the south- and west-facing components of the exterior walls and other various building components. Similarly, the south- and west-facing roof slopes exhibited more severe effects from hailstone impacts, but all roof slopes had been affected by hail during the service life of the roof covering. Examples of hailstone impacts to the exterior components included chipped paint, fractured vinyl fence components, spatter marks on oxidized metal light poles and a transformer, fractured window glazing bead, fractured window frames, fractured window glazing (reportedly), torn window screens, and indented HVAC condensing fins. On the roof, the hailstones had, over time, indented light gauge sheet metal vents, removed granules from the underlying asphalt layer of the shingles, and in many locations the exposed fiberglass reinforcement of the shingle was visible around the degraded asphalt material.




21.10.06 JEA 01-92 shows granule loss with exposed asphalt (west slope).



21.10.06 JEA 01-238 shows exposed fiberglass reinforcement (south slope).



21.10.06 JEA 01-264 shows indentations in the B-vent (south slope).



21.10.06 JEA 01-495 shows fractures in the vinyl fence, south facing.

The windows exhibited two different types of hailstone impacts; the glazing bead was fractured between the window frame and the glazing, and the frame itself was also fractured. In some locations the glazing bead was missing altogether. Our observations of the windows revealed all of the south- and west-facing window frames were fractured, and also had fractured and/or missing glazing bead. We observed one north-facing window frame that was fractured, and a few north windows with fractured glazing beads. The east-facing windows had fractured glazing beads, but none of the east-facing window frames were fractured.



21.10.06 JEA 01-361 shows a north-facing window that was not affected by hail.



21.10.06 JEA 01-396 shows a north-facing window that was not affected by hail.




21.10.06 JEA 01-436 shows an east-facing window with fractured glazing bead.



21.10.06 JEA 01-525 shows the top surface of the transformer with spatter marks of various sizes. The white arrow points to the north.

The site light poles provided evidence of the more recent hailstorm directionality with oxidized surfaces that faced each of the four cardinal directions (north, south, east, west). The spatter marks provided evidence for the sides of the hotel structure that were impacted by hail more recently, and which sides of the structure were protected. The evidence at the site indicates the south- and west-facing sides of the structure were primarily impacted most recently (within the past few years). Historically, there have been severe hailstorms that impacted the north and east sides, of the structure; however, these storms occurred several years ago as spatter marks fade over time (typically a few years based on size and UV exposure).



21.10.06 JEA 01-473 Light pole – north facing



21.10.06 JEA 01-479 Light pole – east facing.



21.10.06 JEA 01-466 Light pole – south facing.



21.10.06 JEA 01-470 Light pole – west facing.

The exterior wall finish was EIFS, and had been recoated with at least two layers of a new finish coat over the years. We observed the EIFS was, generally, in moderate to poor condition and exhibited evidence that the exterior finish was debonding off the substrate. The EIFS finish had distress cracks on all four sides of the structure and exhibited improper/incomplete original installation. Minor sporadic cracks were repeated in the upper and/or lower corners of openings through the exterior walls (windows, doors, PTAC units, etc.). More severe distress cracks in the EIFS were present below roof height transitions.



21.10.06 JEA 01-299 (left) shows the multiple applications of EIFS finish coat as well as an intermediate application of green paint.



21.10.06 JEA 01-227 shows the south-facing downspout and EIFS were in good condition.



21.10.06 JEA 01-213 shows a fracture through the EIFS finish (south/tower).



21.10.06 JEA 01-198 shows improper/incomplete finish of the EIFS at original construction (north).



21.10.06 JEA 01-215 shows the good condition of the horizontal EIFS accents (south tower)




21.10.06 JEA 01-377 shows an area where the EIFS finish had debonded from the substrate.



21.10.06 JEA 01-399 shows a distress crack at the north wall located below a roof height transition.

**OBSERVATIONS – WIND ON BUILDING ENVELOPE COMPONENTS**
While on the roof we observed three isolated locations where spot repairs had been conducted over hip shingles (northwest, northeast, and southwest).


21.10.06 JEA 01-103 shows a repair conducted by CJR over the northwest hip.


21.10.06 JEA 01-289 shows a repair conducted by CJR over the northeast hip.

**OBSERVATIONS – LATERAL FORCES & SOIL CONSOLIDATION**
We observed the soils within five to ten feet of the foundation walls were relatively flat or sloped towards the foundation (often referred to as negative slope). Additionally, many of the roof gutter downspouts were either not connected to the underground drainage pipe system, or were misaligned with the underground pipe stub.

Within the crawl-space we observed the perimeter concrete spread footing foundation was in overall good condition and did not exhibit evidence of cracks related to a lack of adequate support from the subsoils or differential vertical movement of the supporting soils. The interior spread footing that supported the columns had normal and expected shrinkage cracks, and the footing was uniform in height at the crack; meaning, there was not a vertical elevation change across the crack indicative of vertical foundation movement.

The interior drywall finishes at the exterior walls were new and did not exhibit cracks. The interior doorways from the hallways into the rooms were also in good condition. We opened and closed nearly all of the doors inside the facility (outside of the nine rooms we were not able to enter and the exterior pool door that was closed permanently). The evaluated doors all operated normally without binding or sticking. The building included four hollow metal storefront doors; two at the north side of the building (main entry and west), and two at the south wall (pool and hall). The north/west entrance exhibited evidence of long-term abuse, mechanical impacts, lack of maintenance, and possibly door/hinge replacement. The door did not operate correctly or close completely. The pool door was blocked and locked with a metal angle that prevented operation since the pool was closed. The main entry doors and south hall door operated normally without impediments.



21.06.09 JEA 01-518 shows the soil consolidation at the south sidewalk/south hall door.




21.06.09 JEA 01-580 shows a roof downspout was not connected and misaligned with the pipe.



21.10.06 JEA 01-640 shows the south foundation wall was smooth and was not cracked.



21.10.06 JEA 01-662 shows the north foundation wall was in smooth and was not cracked.



21.10.06 JEA 01-315 shows the damage to the door and hinge misalignment (north/west).



21.10.06 JEA 01-500 shows the south/hallway door, which operated normally.

**OBSERVATIONS – MOISTURE INTRUSION**

The indoor pool was empty and closed at the time of our site visit. Within the pool room we observed widespread evidence of high humidity, including debonding paint/interior finishes, rusted fasteners, and possible biological growth.



21.10.06 JEA 01-465 shows debonded paint and corrosion/rust stains on the pool room ceiling.



21.06.09 JEA 01-449 shows possible biological growth on surfaces within the pool storage room.

On the exterior walls we observed the wall mounted PTAC units were generally sloped towards the exterior walls, as opposed to sloped away from the walls to drain. Additionally, the EIFS finish was usually cracked and was not sealed to the top surface of the PTAC units.




21.10.06 JEA 01-550 shows negative slope towards the unsealed wall on the top of a PTAC.



21.10.06 JEA 01-362 shows the unsealed joint between the EIFS to the top of a PTAC unit.

Within the attic we observed the underside of the OSB roof sheathing was dry and in good condition including below penetrations through the roof membrane (i.e. attic vents). However, along the top of the wall framing of the north and south exterior walls minor moisture stains were visible adjacent to the continuous wall-mounted/vertical attic vent.

|  |  |
|---|---|
| 21.10.06 JEA 01-38 shows the OSB roof sheathing around and below an attic vent was dry and in good condition. | 21.10.06 JEA 01-49 shows the attic wall vent with evidence of moisture exposure on the top surface of the wood framing and interior drywall. |

**DISCUSSION**

The Baymont facility has been impacted by dozens of hailstorm events during its 23-year service life, some of which included hailstones up to approximately 1.75-inches in diameter. Based on the observed conditions at the property, the roof covering, windows, and light gauge sheet metal appear original to construction in 1998, all of which exhibit evidence of an accumulation of hail events. To this point, GRK does not provide any discussion of historical weather including when any of their observations were likely created or the directionality of the hail event(s) that resulted in various observed conditions. Considering the frequency of severe hail events along the Front Range of Colorado, it is our experience that conducting thorough historic weather research to align site observations to the reported weather event is a critical component of any storm damage assessment. Without a discussion of past severe hail events, it appears GRK's assessment is an opinion on the accumulation of severe hail impacts over time without an attempt to distinguish the effects of more recent events. Based on the severe hail events that occurred at the Baymont in 2009, 2010, and 2014, it is our opinion repairs were justified years ago to the roof covering and windows, but were not conducted, and have continued to deteriorate over time. The lack of maintenance to the property exacerbated the conditions we observed that may not have been present with a properly maintained facility. For example, a newer roof may have been able to withstand the hail and/or wind on the date of loss without justification for repairs.

Our research revealed the Baymont facility has been impacted by at least five storms with hailstones over 1.0-inch in diameter during an 11-year period, 2009 to 2020. Most recently, on the date of loss, the hailstones fell from the south- and southwest towards the north- and northeast primarily impacting the south and west sides of the structure as well as the roof covering. This hailfall directionality is consistent with the most common directionality along the Front Range of Colorado. The property also exhibited evidence of severe hailstone impacts, although to a significantly lesser frequency, to the north and east exterior walls. It is our opinion the hail on August 2, 2020, did not impact the north or the east exterior walls to a degree that would generate distress to the building components; therefore, we do not recommend repairs to the north or east exterior walls related to the hailstorm on the date of loss. We recognize the condition of the materials were similar to those we recommend be repaired on the south and west walls, but were present prior to August 2, 2020, likely by many years.

The window glazing beads were fractured on all four sides of the structure, which shows evidence of the various storms from different directions during the service-life of the windows. It is our experience that vinyl glazing bead, especially as it ages with UV exposure, becomes brittle and can be fractured during less than severe hail events (smaller than 1.0-inch in diameter). It is also our experience that glazing bead is a component of the window used to transition the frame to the glass/glazing. Although the glazing bead does block water and wind, a lack of glazing bead does not necessarily compromise the watertight integrity of the window. For example, Milgard's definition of the glazing bead stated:

*"The glazing bead is a vinyl strip along your window frame that helps block out drafts."*

The glazing bead also is used to hold the glazing in place. Meaning, a broken window pane can be removed and replaced by removing the glazing bead, replacing the broken glass, and replacing the glazing bead. This can be accomplished without a complete sash replacement. Although broken or missing glazing bead will allow more water into the window frame, a properly functioning weep mechanism will allow any water to drain out of the window frame regardless of the condition of the glazing bead.

In extreme cases, where the glazing bead is completely missing along one or more edges of the glazing unit, the increased volume of water that is allowed into the window frame could, under the right high wind/rain event, overwhelm the weep mechanism. In these rare instances, water could overtop the inside of the frame and allow water onto the windowsill. However, it is important to understand that even in this rare circumstance, water would not have a direct path into the wall cavity but into the building itself. This issue is a critical component to our later discussion on the interior moisture intrusion and mitigation efforts.

The windows with a fractured frame cannot be repaired and justify replacement due to hailstone impacts. We recommend all of the windows on the south and west exterior walls be replaced to address the effects of hailstone impacts on August 2, 2020. As a part of that repair, the EIFS will require removal around the frame to remove and replace the frames themselves, which include a nailing fin, with a new vinyl window with a nailing fin. The EIFS will require a patch around the window, and a new skim finish coat applied over the affected wall surfaces. The new finish coat will address any chips to the EIFS finish on the south and west walls that were created by hail over time, and on the date of loss.

The asphalt composition shingles exhibited evidence of impacts by severe hailstorm events that exposed the asphalt and underlying fiberglass reinforcement. Our test squares at each cardinal direction revealed the south- and west-facing slopes exhibited more impacts, but we observed similar, although less numerous, conditions on the north- and east-facing slopes as well.

It is our opinion the roof covering justifies replacement due to hailstone impacts that have accumulated during the life of the roof. The largest hailstones fell more historically, in 2009, 2010, and 2014, which have aged and exposed the shingle reinforcement to UV light. The hailstones on the date of loss, although slightly smaller, also removed granules and contributed to the conditions that justify replacement of the roof covering. Due to the widespread frequency of impacts, it is our opinion spot repairs are not a reasonable approach to address the affects of hail to the roof covering.

The wind damage to the roof was either covered and/or had been removed prior to our evaluation. As an independent issue, the localized areas where hip shingles had blown off the roof could be spot repaired. Regardless, the replacement of the roof covering due to hail will address any wind damage to the shingles.

GRK also stated the CMU blocks at the east wall were damaged/chipped by hailstone impacts. We observed isolated, random CMU blocks that were prematurely deteriorated and crumbling, which was not related to any single weather event and was likely due to either a manufacturing issue or post-installation exposure to water, ice, snowmelt chemicals, or other environmental conditions. Considering the compressive strength of CMU blocks, it is unreasonable to expect that the east-facing plexiglass signage, or east-facing vinyl window frames were not affected by hailstones, but the CMU blocks were chipped and fractured by the same hailstones. Regardless, the east wall was not significantly impacted by hailstones on the date of loss event.




21.10.06 JEA 01-439 shows crumbled CMU blocks on the east wall.




21.10.06 JEA 01-429 shows crumbled CMU blocks on the east wall.




2019 image of missing monument sign prior to the date of loss.




2012 image of Denny's sign in place.

Specific to wind, GRK stated the tall monument sign was damaged by wind, although GRK's report did not state when any alleged wind damage occurred, similar to their hail discussion, only that wind damage was present. In the case of the tall monument sign, shown above, GRK's used the missing upper sign as an indication of a damaging wind event on August 2, 2020. Historically, the sign was used for the Denny's restaurant that was located adjacent to the Baymont. GRK's assessment is inaccurate since, at some point after the Denny's restaurant closed (pre 2019), it appears the Denny's sign was removed.

GRK also stated that the north/west storefront door was damaged by wind. The north/west door exhibited damage due to mechanical impacts, improper repairs, possible improper replacement of a different door within the frame, and a general lack of maintenance. There was no evidence the door had been affected by wind, only that the door no longer closed completely or even fit into the door frame. It is inconsistent with the behavior of building components that wind forces would have been strong enough to deform the metal door frame and remove hinges without other, obvious, severe wind damage to more wind-susceptible components (i.e. the vinyl fence, roof shingles, window screens) occurring. However, the south hall door keycard reader should be repaired or replaced due to a hailstone impact that fractured the lower part of the keycard reader, although the door itself was unaffected by hail and/or wind.

**DISCUSSION – WIND/LATERAL**

The design wind speed for Limon, Colorado, was either an 85 mph fastest mile, or a 100 mph 3 second gust, which are somewhat outdated by today's standards, but remain as the applicable lateral design requirements within the Limon Building Department jurisdiction. Conceptually, the repeated wind gusts within Lincoln County, Colorado since 1998 were on the order of 60 mph up to a maximum of 78 mph, which are below the design wind speeds. From a structural design perspective, which utilizes a factor of safety of generally 2.0 or more of various loading conditions, the structure has not experienced wind gusts/lateral loads that would have been expected to generate damage to and/or permanent displacement of the lateral load resisting system. Reasonably, inflexible interior and exterior finishes will show signs of lateral distress before any lateral load resisting structural framing. Higher lateral loads associated with wind demands manifest outwardly with repeated diagonal cracks on one side of wall openings (i.e. upper right corners of windows and/or doors and mirroring cracks in the lower right corners).

Our evaluation of the Baymont structure revealed random cracks in the exterior EIFS at upper and lower east and west corners commensurate with natural aging, weathering, expansion/contraction forces, and a lack of control/movement joints, which is consistent with the installation techniques and natural material behavior for EIFS installed in the 1990's. Further, on the interior, we opened and closed nearly every door in the facility, which operated correctly without binding, rubbing, or any offset between the latch and lock. CJR indicated some of the interior doors may have been serviced to increase performance due to minor rubbing, which appears to have been conducted correctly as a part of normal property maintenance.

It is our opinion the Baymont structure has not experienced excessively high lateral loads in comparison to the design loads, and further, there is no evidence of lateral distress to the facility.

**DISCUSSION – MOISTURE INTRUSION**

Prior to our site visit, any evidence of interior moisture intrusion and/or possible biological growth had been removed and remediated, except for the first floor north-facing office. In this location, the office window would not have been impacted by hailstones on the date of loss (as previously discussed), and was protected from hailstones falling from the east and the north due to the adjacent entrance/roof and the porte cochere. We observed possible biological growth on the office exterior wall; however, it is our opinion the moisture intrusion that created conditions for biological growth were not created by a one-time weather event, or by a one-time weather event on August 2, 2020. GRK stated the following related to moisture intrusion into the structure (page 7):

> *"In our opinion, the level of widespread hail impact evidenced to the windows, combined with the EIFS damages, rise to the level such that these damages have resulted in direct openings which allow for the entrance of moisture and the outside elements. As shown, staining to the interior windowsills, microbial growth on interior drywall, and varying degrees of moisture levels behind the EIFS system (as high a 61%, relative) had been positively identified at various locations at the time of the inspection. Further, the damages evidenced to the glazing bead not only creates an opening for the entrance of moisture and the outside elements but is such that the structural integrity of the window installation, in our opinion, has been compromised."*

GRK's observations of high moisture content in the exterior walls, especially between the PTAC units and the window frames, are not surprising. We observed the top surface of the PTAC units were flat or sloped towards the exterior wall, which directs water from any precipitation event, into the unsealed gap between the PTAC unit and the EIFS. It is our experience that water penetration into exterior walls at PTAC unit openings are common in hotels such as the Baymont, and oftentimes result in similar potential biological growth. The lack of routine maintenance to the EIFS and resulting open gap has allowed water to enter into the wall assembly above the PTAC units for years, eventually manifesting the in the widespread possible biological growth and moisture remediation.

| | |
|---|---|
|  |  |
| 21.10.06 JEA 01-583 shows the non-draining screed along the bottom edge of the EIFS. | 21.10.06 JEA 01-623 shows the vinyl wallpaper in the office, which was installed on the exterior walls of all the hotel rooms prior to remediation. |

The original installation of EIFS included an acrylic finish coat, and the interior wall was finished with vinyl wallpaper. Both the acrylic EIFS finish and vinyl wallpaper are vapor impermeable materials. Once inside the wall, any moisture could not weep out of the assembly, or evaporate since EIFS includes a waterproof acrylic finish on the exterior and the interior walls were covered with vinyl wallpaper. Additionally, the EIFS installation included a solid/nondraining weep along the bottom of the EIFS, which, although common for the time of original construction, further contributed to the accumulation of moisture within the EIFS wall assembly over time.

Historically, EIFS and inner wall moisture intrusion have been problematic for decades. In the 1990's national lawsuits were filed for widespread moisture damage under EIFS-clad wall claddings. Functionally, EIFS acts as a barrier system, where the water protection of the wall assembly was reliant on the waterproof acrylic finish coat, unlike a drainage plane type system. Over time, any fracture or opening through the finish coat allows water into/under the EIFS assembly without a means to drain out or evaporate. Based on our experience designing with EIFS in the 1990's the exterior wall assembly at the Baymont is consistent with the installation techniques used during that time period. Additionally, the proper installation of a weather resistive barrier between the EIFS and the wall sheathing was rare in the 1990's. The combination of moisture trapped within the wall assembly and a lack of water/moisture protection to the wood wall framing/sheathing leads to the high levels of moisture measured by GRK and is consistent with EIFS installed in Colorado, and nationally, in the 1990's that experienced similar moisture damage unrelated to a one-time weather event.

More recently, EIFS assemblies have incorporated different components to allow moisture to drain out of the assembly, such as grooved EPS boards that allow water to drain downward on the surface of a weather resistive barrier to a weep screed located above any window and door and at the bottom of the wall. Today's standards, as required by the newer versions of the building code from when the Baymont was originally constructed, also include a requirement to provide a means to drain water out of a wall assembly regardless of the wall cladding material.

It is our opinion GRK's identification of high levels of moisture content within the walls is an inditement of the 1990's EIFS technology and is not representative of any one-time weather event that occurred at the Baymont.

Secondarily, we observed where moisture has, over time, penetrated through the wall-mounted attic ventilation vents resulting in minor moisture stains on the ceiling drywall of second-floor rooms immediately adjacent to the exterior wall. Generally, the lower attic vents are located under the roof eave within the horizontal soffit, which are more protected from precipitation events. At the Baymont, the roof trusses terminated even with the outside edge of the exterior wall framing without an overhang; therefore, the attic vents were installed vertically/continuously along the top of the wall. It appears that over the life of the structure, during more severe precipitation and wind events, that some moisture blows through the vent and onto the top of the second-level wall framing. The moisture has not compromised the structural integrity of the wood framing, but has created moisture stains on the wood surface and top edge of the gypsum wallboard. The amount of moisture at the top of the second-level walls was minor, and could not have wetted the full height of the wall down to below the first-level windows.

The fact that GRK's two intrusive tests revealed similar moisture content within the interior of the north and south wall assemblies is further evidence the moisture intrusion was not related to a one-time hail event on August 2, 2020, since the hail on that date only impacted the south and west exterior walls as has been evidenced by the observations discussed throughout this report. Considering the interior moisture damage and possible biological growth was present in every room of the hotel, both first and second level, both north and south facing, is nonsensical. Hailstones from a single event do not impact the north and south sides of a building with the same force, and it is our experience, only one of the two would be primarily impacted during a single hail event (north or south, but not both).

It is our opinion the interior moisture damage and possible biological growth were the result of openings throughout the historic application techniques for EIFS consistent with the 1990's, which were proven to create conditions that foster the accumulation of moisture within the wall assembly over time, in combination with the use of a water vapor impermeable interior vinyl wallpaper. The deteriorated condition of the EIFS finish coat, debonding EIFS finish coat, distress cracks through the EIFS finish, unsealed gaps in the EIFS at any penetration (window, door, vent, light, etc.), and gap above the flat and negatively sloped PTAC units, none of which were related to a one-time weather event on August 2, 2020, allowed water to seep into the wall assembly for years. Once inside the wall assembly, the water/moisture could not drain out of the wall or evaporate, leading to the widespread moisture damage and reported biological growth. This condition was inevitable once the EIFS and vinyl wallpaper were originally installed in the 1990's and justified the repairs conducted by CJR and RMB regardless of any weather event on the date of loss since the components necessary for moisture intrusion and biological growth were in place and occurring years prior to August 2, 2020.

| | |
|---|---|
|  Photo 27: Close-up of water intrusion damage to Unit 108, south elevatior |  |
| GRK photo showing possible interior biological growth between the PTAC unit and a window. | 21.10.06 JEA 01-559 shows a commonly occurring distress crack that allows water through the EIFS. |

**REPAIR RECOMMENDATIONS**

To address the affects of hailstone impacts on the date of loss, we recommend conducting the following:

1. Remove and replace the entirety of the asphalt composition shingle roof covering, including on the detached shed.
2. Remove and replace the south- and west-facing vinyl windows, including new screens. As a part of the window replacement, the south- and west-facing EIFS will receive a new finish coat.
3. Repaint the south- and west-facing exposed wood (trim, shed, etc.).
4. Replace one south-facing keycard reader on a storefront door.
5. Replace the vinyl fence located on the south side of the facility.
6. Comb the condensing fins on the HVAC units.

**SUMMARY AND CONCLUSIONS**

The Baymont facility has experienced several severe hailstorms over the life of the structure since it was constructed in 1998. It appears the affects of the largest hailstones, up to 1.75-inches in diameter on multiple occasions, were not repaired or addressed by the property owner. Therefore, prior hail damaged components of the property existed before the date of loss event on August 2, 2020. The engineer hired by the property owner's attorney discussed hail and wind effects to the property as a whole, without identifying or differentiating between older, historic events versus the recent August 2, 2020, hailstorm event.

Reasonably, the hailstorm on August 2, 2020, was a severe event that fractured window frames, tore window screens, fractured the vinyl fence, removed granules from the shingles, and exposed the underlying fiberglass reinforcement. These conditions justify repair. However, the hailstorm on August 2, 2020, was directional, as hailstorms in Colorado often are, and appear to mainly affect the south- and west-facing sides of the structure. Historically, any similar hail impacts to the north and east sides of the building would be related to older storms from years ago.

We observed the exemplar possible biological growth within the north-facing first floor office, which was not repaired and open for observation. We disagree any of the interior water and/or potential biological growth and subsequent remediation was related to a one-time weather event, or to the date of loss. 1990's installation of EIFS was known to have created conditions that trap moisture within the wall assembly, which in combination with the vapor impermeable vinyl wallpaper on the inside of the walls, did not allow any moisture within the exterior walls to drain or to evaporate, even in the dry climate of Limon, Colorado. A lack of maintenance to the EIFS barrier assembly created widespread openings through the waterproof finish, eventually creating the possible biological growth as alleged in every room of the hotel. We disagree repairs to address the biological remediation were related to the August 2, 2020, hail event.

Lastly, there is no evidence the wood framed structure and less flexible finishes have experienced lateral loading eventscapable of creating distress to these building components. The wind gusts recorded in Lincoln County, Colorado over 50 knots since the hotel was constructed (over 20 years) were lower than the design wind speeds. Further, the wind gusts on August 2, 2020, were not unusual and have been experienced by the structure many times during its service life.

We agree repairs are justified to address the affects of hail from a severe event that occurred on August 2, 2020. We disagree repairs are justified on all four exterior sides of the structure. We disagree repairs are justified to address wind/lateral loading. We disagree repairs are justified to address any interior moisture/possible biological growth.

**[END OF REPORT]**

**CLOSING**
Thank you for the opportunity to provide professional services. The opinions and conclusions in this report have been formulated within a reasonable degree of professional certainty. Please note that J.S. Held opinions are based on the information provided and/or obtained as well as our training, knowledge and experience. To the extent that hidden conditions exist, and/or additional information is made available, J.S. Held reserves the right to revise or update any of the observations, assessments, and/or opinions as conditions change or additional information is provided for our review.

This document is to inure to the benefit of the addressee only and may not be relied upon, used by, or referenced by any third party without the written consent of J.S. Held. If clarification or additional information is required, please do not hesitate to contact us.

Respectfully,

**J.S. Held, LLC**

STATE OF COLORADO
JEFFREY E. ANDERSON
ARC 400595
LICENSED ARCHITECT

Jeffrey Anderson

Digitally signed by Jeffrey Anderson
DN: CN=Jeffrey Anderson + E=janderson@jsheld.com, O=J.S. Held LLC, L=Jericho, S=New York, C=US
Date: 2021.11.18 21:17:51-07'00'

Jeffrey E. Anderson, RA, AIA, LEED AP
Professional Architect III
Colorado License No. ARC 400595 (Expires 10/31/23)

Appendices: (A) – EagleView Report for 2320 North Lincoln Avenue, Loveland, Colorado
(B) – Historic Weather Data
(C) – J.S. Held Repair Cost Estimate