# EXHIBIT 18

**IN THE UNITED STATES DISTICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-CV-01673-KMT

2505 6TH STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

**AFFIDAVIT OF KEARSON STRONG**

---

The undersigned, being duly sworn upon oath, does hereby swear and affirm that the

following facts are true and correct to the best of my knowledge:

1.      The attached document is a true and correct copy of the Report I issued in the

above-referenced action, and I hold all opinions expressed therein to a reasonable degree of

certainty.

FURTHER, AFFIANT SAYETH NAUGHT.

KEARSON M. STRONG

Subscribed and sworn before me on this 16th
day of September, 2022

NOTARY PUBLIC

KATRINA R WILLIAMS
Notary Public
Alabama State at Large

2505 6th Street Limon, LLC d/b/a Baymont by Windham Limon

v.

Westguard Insurance Company and Amguard Insurance Company
United States District Court for the District of Colorado
Case No. 1:21-CV-01673-KMT

## Rebuttal Report by Kearson M. Strong

Kearson M. Strong is President and CEO of Strong Consulting headquartered in Castle Rock, Colorado. She has been engaged by Foran, Glennon, Palandech, Ponzi & Rudloff for the purpose of reviewing documents and providing feedback with regard to the opinion reports presented by the in the case of 2505 6th Street Limon, LLC d/b/a Baymont by Windham Limon v. Westguard Insurance Company and Amguard Insurance Company.

A full description of background and experience is included in the curriculum vitae attached to this report.

As of March 1, 2022, Ms. Strong's fee for deposition is $325.00 and trial is $375.00 per hour.

### Documents Reviewed

Raphael File – Part 1 Corrected
Raphael File – Part 2
Raphael File – Part 3 Corrected
Raphael File – Part 4
Gary T. Fye Company report dated May 19, 2022
RAL Forensics report dated May 20, 2022
GRK Consulting Engineers Inc. report dated April 23, 2021
GRK Consulting Engineers Inc. report dated May 18, 2022
Gregory R. Kaszas, P.E., C.G.C. curriculum vitae
Victory Construction report dated May 20, 2022
Reservoirs Environmental, Inc. report dated June 29, 2021
Defendant's Initial Disclosures
Defendant Documents – GUARD 000001 – GUARD 001366
Defendant Documents – GUARD_SUPP 000001 – GUARD_SUPP 000008
2506 6th STREET 00001 - 2506 6th STREET 01494
EngleMartin Documents - EM_000001 – EM000779

I have reviewed the documents listed above. Following a review of those documents I have the following comments. In my review, I have relied upon my 33 years of experience in the insurance industry. During that time, I have personally been involved with hundreds of wind and hail damage claims beginning in 1990, both commercial and residential. I have been involved in the supervision and handling of insurance claims; interacting with insurance companies, contractors and insureds in their evaluation of wind and hail

damage claims; review of open and closed files involving wind and hail damage claims; and teaching classes regarding wind and hail damage claims. My opinions are based upon the custom and practice of the insurance industry as it relates to wind and hail damage claims.

If additional materials are presented for my review, I reserve my right to amend or expand my comments. The following are my comments:

## Gary T. Fye Company

Mr. Fye was retained to provide an analysis of the claims handling on the above referenced matter by counsel representing 2505 6th Street Limon, LLC d/b/a Baymont by Windham Limon. The following are my comments regarding his report.

Mr. Fye opines on the general condition of the insurance industry, both from an adjustment standpoint and a financial system. He opines the insurance industry's main focus is to make money and the decisions reached in claims handling are all completed in order to make money. Although I do not disagree that insurance companies are there to make money for their investors (shareholders or mutual investors), the job of the insurance industry to make sure they provide the service they are selling, indemnity for covered losses incurred. It is my experience from both an independent adjuster, forensic engineer and an insurance company employee that I have never been asked, nor do I have any knowledge of anyone on a personal level has been asked, to modify a payment to an insured in order to make more money for the insurer. In fact, the opposite has been true. The focus has always been on properly evaluating a claim and encouraged to make a supported and correct assessment on the amount owed for covered damages.

Mr. Fye's generalized statements regarding the insurance industry are biased, unfair and incorrect. The following are some of his comments with my response.

- Background Opinions: A. Claims Financial Information:
  - Mr. Fye states, "...Economic conditions and the quality of claim processes vary directly at some insurers as they chase improved economic outcomes through use of improper practices, including programs that call for ud3eerperformance of the claim functions. Delay and denial are the most common improper drivers of revenue increases, since the insurer can recapture or retain assets that would otherwise satisfy the claim obligations. Retained assets produce investment income, a form of revenue production sometimes referred to as "the float"."

    **Response:** Mr. Fye's statement implies there is a generalized view of promoting improper handling of claims throughout the insurance industry. This is simply not true. Mutual and stock-based insurance companies have the fiduciary duty to properly supervise and manage the funds that are paid on claims as insurers have a duty to those parties that have invested in their company through premium dollars or stock purchases. Every payment issued on a claim can and will impact insureds through the potential of increased premiums to ensure proper funding is available to make indemnity payments on future covered

claims. This fiduciary duty does not automatically relate to proper or improper handling of claims. These are mutually exclusive in my opinion and experience. Mr. Fye is correct that insuranace companies do make investment purchases to assist in revenue development which help to offset expenses.

o   Mr. Fye states, "Since claims expense and indemnity payments are the insurer's largest outflows, some have re-purposed their claim processes to produce revenues that are sometimes called "leakage," "savings," or "shortfall" under the generalized rubric "Loss Economic Opportunity" ("LEO"). Claim handlers are taught in such situations that claim payments are excessive and claim processes should seek lower payment outcomes that claim handlers are told more accurately reflect societal values for injuries or losses. Sometimes the new processes are designed with the intent of dashing society's hope of benevolent claim evaluations, which also has the effect of lowering claim outcomes. The insurance company's economic outcome goals can drive improper claim-handling techniques, so the claim-practices analyst must be aware of an insurer's organizational attempts to reverse the flow of claim payments through delay and denial. It is reprehensible that executives in some distant office calculate methods of converting funds owed to the insuring public to the company's benefit, but the fact that the redesign and methods are covert and perpetuated by questionable non-disclosure agreements makes the conduct even more egregious.

    **Response:** I disagree with this statement. Mr. Fye makes statements in this section that are hypotheticals without providing any citations or proof. In my experience, both as an independent adjuster and a company claims handler, insurance companies work hard to make sure they are providing proper and complete analyses of claims as well as issuing correct payments to their insureds when appropriate. In addition, insurance companies have internal quality assurance departments to review the claims handling and the amount paid on all claims. The quality assurance department identifies any over or under payments on a claim and provides that feedback to the claims department in order to improve the outcome of claims.

•   Mr. Fye states, "Claims from first-party losses should be accepted or rejected, not "settled." The insured owns the claim, and the insurer should not substitute its own method of quantifying the claim if the insured requests reasonable assistance in repair and/or presentation of the loss."

    **Response:** I disagree with Mr. Fye. Mr. Fye's statement implies that the insured is either 100% correct or 100% incorrect in their analysis of quantifying the loss. The insurance company's role is to investigate and assist in determining the value of the loss. The process is called adjusting a loss and this means there can be times where the insured may have included or missed items that are not appropriate to include in their calculation of the loss. The settlement is when the insured and the insurer come to an agreement on the value of the loss and payment is issued, provided the loss is covered under the policy. Mr. Fye's statement is a very black and white statement.

- Mr. Fye states, "At the time of the loss, the Baymont property was insured under AmGuard policy #NEBP030396, an all-risk, replacement cost policy covering direct physical loss of or damage to the property resulting from hail, and subject to a $7,500 deductible.."

**Response:** Mr. Fye is incorrect in his statement regarding the deductible. The deductible is listed as $5,000 per occurrence for general claims. The wind/hail deductible is 2% of the limit of liability for each line of coverage. In this instance the wind/hail claim on a $3,000,000 limit of liability for the scheduled building is $60,000.

- Mr. Fye states, "WestGuard's/AmGuard's claim-handling conduct was both remarkable and not reasonable. If its claim handlers were trying to adjust a commercial property loss, there is almost no evidence of an effective effort to do so. There was no concern with the use and occupancy of the insured property, a hotel, and no time urgency in fulfilling the coverage grants in the face of a significant storm loss. Normally, assignment to an independent adjuster would cure the insurer's apathy, but here the independent adjusters were told in advance the damage was "0" and had no authority to use professional judgment in assessing the damage. They and the engineer hired for the insurer were only to look at the areas of damage the insured's manger might think to point out. They were not told to obtain an agreed scope of loss for all of the hail and wind effects, and they were limited in creating repair estimates.5 And they were not directed to disclose their findings to the insured."

**Response:** AmGuard initially assigned the claim to TPA Raphael & Associates. An inspection was completed by Ted Miller and information was provided to AmGuard on the observed damages. Approximately five weeks later, AmGuard chose to bring the adjustment of the claim back into the company for handling and assigned the investigation to Engle Martin adjuster Brian Roubidoux. Mr. Roubidoux was immediately provided approval to engage Envista Forensics to assist him with his initial inspection of the property. Envista Forensics engineer, Mr. William J. Oviatt, completed an independent engineering evaluation of the damage on September 18, 2020, and prepared a report which was forwarded to AmGuard for their review. The engineering report determined the following conclusions:

"It is Envista's professional opinion that:

1. The subject building wood framing was not structurally damaged due to the reported storm on or about August 2, 2020.
2. The subject building asphalt shingle roof covering was functionally damaged due to hail impact from the reported storm on or about August 2, 2020. It is estimated that approximately 11,330 shingles were functionally damaged due to hail impact from the reported storm.

3. Exterior building elevation and roof elements were cosmetically damaged due to hail impact from the reported storm on or about August 2, 2020 in the form of small dents to soft metal roof vents, metal wall vents, and exterior metal doors.

4. Exterior building elevation elements were functionally damaged due to hail impact or wind forces from the reported storm on or about August 2, 2020 in the form of fractures in stucco siding, tears in window screens, fractured vinyl window wraps, fractured glass window panes, fractured vinyl fencing, fractured or completely removed exterior wall sconces, and three (3) racked metal door frames.

5. The subject building windows have several areas of observed damage due to over prying of window elements that were resistant to opening from either/or an installation issue, material defect, or a maintenance issue. These areas of observed damage were not consistent with a structural issue or deformation of the rough window opening due to excessive gravity or lateral loading to the underlying framing elements. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020.

6. The subject building exterior stucco has damage in the form cracking that has propagated due to inadequate installation of horizontal and vertical movement joints in some areas. These areas observed are inconsistent with cracking caused from lateral building racking around rough framing openings, and is therefore not attributable to damage caused by the reported storm on or about August 2, 2020.

7. The subject building pool room has advanced deterioration to building interior finishes, wood framing members of supporting walls, and exterior finishes attached thereto from a long-term exposure to excessive interior humidity. Therefore, this damage is not consistent with damage from the reported storm on or about August 2, 2020."
[*See* GUARD 000116 – 000117]

Mr. Oviatt identified many of the areas which showed damages were unrelated to the cause of the loss, the hail and windstorm on August 2, 2020. This inspection was completed within two months after the loss with no repairs completed to the property. AmGuard appropriately reviewed this information and applied the policy advising and removing these unrelated damages from the covered loss.

The insured did not complete emergency repairs to eliminate ongoing damages and was made aware of this requirement through communication with the hotel manager, Ashley Pendley, the agent Rick Cline and the insured's contractor CJ Restoration. All of these individuals were communicating directly with AmGuard during the initial phases of the claim on behalf of the insured. Specifically, the following details emails which were sent to the insured to place them on notice that repairs should begin:

- September 29, 2020 – An email from William Ardoline of AmGuard to Mr. Cline advising the insured needs to protect the property from additional damage.

- <u>October 15, 2020</u> – An email from Mr. Ardoline to Baymont stating, "...Since the engineer inspection is complete you need to start repairs per your policy's conditions to protect the property against further damage. ..." [*See* GUARD000334]
- <u>December 2, 2020</u> – An email from Mr. Ardoline to CJ Restoration stating "Jeff, please keep in mind the insured has a duty to mitigate their damages and repairs need to begin as long as the expert and IA don't need any further inspections which to my knowledge I don't believe they do." [*See* GUARD000336]

These repairs were not started by the insured, and the delay on their part caused additional damages to the building which could have been, and should have been, prevented with prompt and appropriate action on the part of the insured. Under the policy, the insured has a duty to protect the property from further damage as stated in the Conditions portion of the policy. In addition to the damages sustained by the wind and hail storm, the engineer detailed damages which preceded the event and date of loss. The insured made no attempt to remedy those pre-existing problems in order to protect the property from further damage.

On February 1, 2021, the insured signed an Assignment of Insurance Claim with CJ Restoration.

The insured, many months later in March 2021, engaged GRK Engineers to complete an investigation into the damages the insured was claiming as a result of the hail and windstorm on August 2, 2020. It is not surprising, with the seven months of delay in making any temporary or permanent repairs, GRK identified additional damages to the property.

The insurer has a duty to promptly and thoroughly review and investigate the claim. The insurer completed their investigation timely and with the assistance of an independent third-party engineer, Envista Forensics. AmGuard evaluated the covered damages and provided feedback to the insured of the concerns regarding coverage. The insured significantly delayed moving forward with any repairs and did not supply an estimate for the repairs until February 1, 2021, when an Assignment of Insurance Claim form was signed with CJ Restoration. This estimate included repairs for items that were unrelated to the loss per the engineering investigation completed by Envista Forensics.

The insurance industry regularly relies upon consultants and experts in specific fields to assist in the evaluation, valuation, and determination of repair or replacement within claims. In this claim, AmGuard's engagement of Envista Forensics was reasonable and within the standard of the insurance industry in their investigation of the claim.

**RAL Forensics**

RAL Forensics is an accounting company retained to evaluate the business income loss due to the hail and windstorm loss of August 2, 2020. I have no information to review other than this report with respect to the business income loss.

In general, an insured is only entitled to business income loss for the necessary and reasonable period of time to repair the covered damages and return their income to a level prior to the loss. The covered damages caused by this hail and windstorm were limited to the roof and some minor stucco repair work. The additional damages caused by the significant delay on the part of the insured in completing any preventative or permanent repairs would not result in the coverage for business income loss.

## GRK Consulting

I have reviewed the engineering report completed by GRK Consulting Engineers dated April 23, 2021. Their investigation was completed on March 29, and March 30, 2021, almost eight months after the date of loss of August 2, 2020. This report is in conflict to the engineering report prepared by Envista Forensics. I have no other comments on this report.

I have reviewed the engineering supplement completed by GRK Consulting Engineers dated May 18, 2022.

## Victory Construction

I have reviewed the report prepared by Victory Construction Dated May 20, 2022. Mr. Mike Hunecutt of Victory 6 Enterprises LTD was engaged to provide an estimate for repairs based upon the damages identified by GRK Consulting Engineering, Raphael & Associates, Inc., JS Held, Engle Martin & Associates, and Envista Forensics. Although his estimate is based upon all damages identified by the previously listed companies, the estimate does not represent the damages which have been determined to be covered by the policy. This is an estimate that could be used as a basis for adjusting the claim in conjunction with AmGuard. I am not prepared to provide an opinion on the accuracy of the estimate.

## Reservoirs Environment, Inc.

I have reviewed the materials in the Reservoirs Environment, Inc. report dated June 29, 2021. The data for this report was collected on June 29, 2021, almost 11 months after the initial date of loss of August 2, 2020 and with no repairs completed to the property to my knowledge. I have no other comment on this report.

## OPINION OF KEARSON M. STRONG

In my review of the documents listed above, it is my opinion AmGuard acted within the standard and custom of the insurance industry in its investigation, coverage review, and overall handling of the claim submitted by 2505 6th Street, LLC. ("Baymont").

Baymont submitted a claim to AmGuard for a wind and hail event which occurred on August 2, 2019. AmGuard assigned the claim to Raphael & Associates to investigate the claimed damages to the property. A field inspector completed an inspection and identified hail damage to the dwelling and those findings were provided to AmGuard for consideration. AmGuard reassigned the claim to independent adjuster

Brian Roubidoux from Engle Martin for handling to completion. Immediately upon this reassignment, AmGuard provided instruction and approval for the involvement of an engineer from Envista Forensics to complete an independent assessment of the claimed damages. Mr. Roubidoux completed his inspection with engineer William J. Oviatt on September 18, 2020. Mr. Oviatt prepared a report which detailed his findings as detailed above on page 4 of my report. AmGuard properly and reasonably relied upon the expertise of Mr. Oviatt in forming its coverage position under the policy.

Baymont carried a $60,000 deductible under their policy. The amount to repair the damages covered under the policy did not exceed that deductible per AmGuard. Subsequently, Baymont did not receive a payment for damages under this policy for the wind and hail event of August 2, 2019. AmGuard properly assessed the coverage under the policy, applied the deductible appropriately and determined no payment was due under the policy.

Baymont acted unreasonably by not protecting the property from further damage as required by the policy and as encouraged on several occasions by AmGuard. Baymont's failure to follow the guidelines of the policy allowed pre-existing, as well as damages related to the wind and hail event, to become exacerbated. Any additional costs to covered damages that are exacerbated due to the inaction of the insured would not be covered under the policy.

If additional materials are presented for my review, I reserve my right to amend or expand my comments.

July 18, 2022

_____          _____
Kearson M. Strong                                                    Date



## STRONG CONSULTING
### Kearson (Malmgren) Strong
**Property Insurance Claims Consultant**

## Curriculum Vitae

### Property Insurance Claims Consultant

- ❖ Insurance Consultant
- ❖ Appraiser
- ❖ Umpire
- ❖ Expert Witness
- ❖ Property Subrogation Consultant

### Employment History

| | |
|---|---|
| Aug 2021 – present | **Owner / Property Insurance Claims Consultant**<br>Strong Consulting, Castle Rock, Colorado |
| Aug 2017 – July 2021 | **Homeowner Large Loss Claims Manager**<br>**Homeowner Subrogation Manager**<br>CSAA Insurance Company, Colorado Springs, Colorado |
| Aug 2013 – Aug 2017 | **Claims Manager/Property Repair Network Manager**<br>Nationwide Insurance Company, Denver, Colorado |
| Dec 2008 – Aug 2013 | **Executive Vice President / Executive General Adjuster & Consultant**<br>Malmgren & Strong - Claims Consultants Group, Sacramento & Fresno, California |
| Apr 2004 - present | **President and CEO**<br>Claims Training Institute, Castle Rock, Colorado |
| Jan 1995 – Dec 2008 | **Senior General Adjuster / Project Manager / Team Leader / Consultant**<br>Malmgren Group & Claims Consultants Group, Sacramento & Fresno, California |
| Jun 1994 – Dec 1994 | **Civil Engineer**<br>Failure Analysis Associates, Menlo Park, California |
| Oct 1992 – Jun 1994 | **Project Manager and Business Manager**<br>Forensic Technologies International, San Francisco, California |
| May – Oct 1992 | **Insurance Adjuster**<br>Malmgren Group / Claims Consultants Group, Emeryville, California |
| Jan – May 1992 | **Field Engineer**<br>Hensel Phelps Construction Company, Santa Clara, California |
| Jun – Dec 1989<br>Jun – Aug 1990 | **Civil Engineering Intern**<br>Failure Analysis Associates, Palo Alto and Menlo Park, California |

**Kearson M. Strong**
Page 2 of 2

## Educational History

| | |
|---|---|
| 2021 | Property Claims Law Associate |
| 2021 | Associate in Claims – in progress. |
| 1992 | Coursework completed, University of Colorado, Boulder, Colorado<br>Master of Science, Structural Engineering, |
| 1990 | Graduate of University of the Pacific, Stockton, California<br>Bachelor of Science, Civil Engineering |

## Licenses / Certifications

| | |
|---|---|
| Insurance Adjuster | Oklahoma, Connecticut, Delaware, Kentucky, West Virginia, Wyoming |
| Xactimate | Certified Level 2 User |

## Memberships

National Association of Subrogation Professionals – 2017 – present

California Association of Independent Insurance Adjusters –
   Vice President – 2012-2013; Secretary/Treasurer - 2011-2012;
   Board of Directors – 2008 – 2011

Loss Executive Association – Associate Member in waiting

Combined Claims Conference of Northern California – Committee Member on behalf of CAIIA 2009

CUREE (Consortium of Universities for Research in Earthquake Engineering) – Contributor

Western Construction Consultants (WestCon) (no longer an active group) – Charter Member

## Seminars & Lecture Presentations

Fair Claims Settlement Practices Regulations Certification Program
   Developed and presented first program in 1988
   Recertification programs offered and presented annually for Claims Training Institute
   Recertification Instructor for CAIIA

Prepared & presented materials for Claims Training Institute (CTI)

   Earthquake Education Certification Program

Prepared and moderated a panel presenting Green Building Coverage at the Claims Conference of Northern
   California - 2011

Prepared & presented materials for the Property Loss & Research Bureau
   Building Code Issues and Adjustments – Regional Seminars 2010

Presentation to International Institute of Loss Adjusters (IILA)
   Earthquake Claims and Catastrophe Fires

Prepared & presented materials for the Sacramento Claims Association
   Engineering Investigation and Demonstrative Evidence

CNA Insurance Company
   Presented Assessment of Bodily Injury Claims, Phoenix, Denver, San Francisco

v. 08/01/2021

| Kearson (Malmgren) Strong | | | | |
| --- | --- | --- | --- | --- |
| Listing of Testimony (Prior Four Years) | | | | |
| **Case Name:** | **Retained By:** | **Court and Case Number** | **Deposition Date:** | **Trial Testimony Date:** |
| Howell Tractor and Equipent LLC v. Alliance Tank Service LLC; Alliance Tank Service, LLC v. Great American Insurance Company of New York. | Matthew Ponzi Thomas Gozdziak Foran Glennon Chicago, IL 60601 | US District Court Northern District of Indiana Hammond Division  Case No: 2:14 CV 302 RL JEM | 04/29/22 | |