**IN THE UNITED STATES DISTICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:21-cv-01673-WJM-MDB

2505 6TH STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

**COMES NOW** Plaintiff, 2505 6th Street Limon, LLC, d/b/a Baymont By Windham Limon (hereinafter "Plaintiff"), pursuant to F.R.C.P. 56 and D.C.COLO.LCivR 56.1, hereby refiles its Motion for Partial Summary Judgment, and as grounds therefore states as follows:

## I. INTRODUCTION

On August 2, 2020, a severe storm caused hail and wind damage to Plaintiff's Hotel Property. Plaintiff promptly reported its claim. AmGUARD in turn assigned an independent adjuster to evaluate the loss. The independent adjuster conducted an inspection within days of the storm event and placed AmGUARD on notice of extensive damage throughout the Hotel Property caused by the storm. AmGUARD abruptly discharged its first independent adjuster and retained a second independent adjuster and a professional engineer to evaluate the extent of damage. Both confirmed the same extensive hail and wind damage to the Hotel Property previously reported by

the initial independent adjuster. AmGUARD did not instruct its adjusters to prepare an estimate of the scope and cost to repair the damages identified during his inspection.

Unaware of the findings and reports prepared by AmGUARD's three consultants, and having received no communication or payment from AmGUARD for several months, Plaintiff retained its own professional engineer who documented the same widespread and extensive damage previously reported to AmGUARD. Plaintiff provided AmGUARD with its engineering report and an estimate of the scope and cost to repair the damage. AmGUARD failed to acknowledge numerous communications, pleas for assistance, and notices of ongoing harm to the Hotel Property, prompting Plaintiff to file this lawsuit on May 18, 2021. AmGUARD subsequently issued a coverage payment in November 2021 for the same damage reported to AmGUARD by the two independent adjusters and two engineers.

Plaintiff moves for partial summary judgement relating exclusively to unreasonably delayed payment made in November 2021. The undisputed record evidence demonstrates conduct that runs afoul of numerous industry standards, including Sections 10-3-1104(1)(h)(II)-(IV), (VI), (VII) of the Unfair Claims Practices Act and Colorado Division of Insurance Regulation 5-1-14. There is no genuine issue of material fact that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of Colorado Revised Statutes Section 10–3–1115. Accordingly, Plaintiff is entitled to partial summary judgement for its claim under C.R.S. §§ 10–3–1115; 10–3–1116, relating to the delayed payment of $208,237.98.[1]

[1] Plaintiff's Motion for Partial Judgement is related solely to the delay of payment of covered insurance benefits totaling $208,237.98 in November 2021. Plaintiff does not move for summary judgement on its remaining claims for breach of contract and statutory bad faith relating to the

## II. MOVANT'S STATEMENT OF MATERIAL FACTS[2]

### A. Background

1. AmGUARD issued an insurance policy (Policy No. NEBP030396) to Plaintiff with effective dates of November 1, 2019 to November 1, 2020 (the "Policy") which provides coverage for commercial property located at 2505 6th Street, Limon, Colorado 80828, subject to the terms and conditions of the Policy (the "Property"). (**Exhibit 1**, Policy Excerpt, GUARD SUPP 000006; **Exhibit 2**, Policy Declarations, GUARD SUPP 000012.)

2. The Policy provides coverage for direct physical loss or damage to the Property caused by hail. (ECF No. 1-1, Complaint at ¶ 20; ECF No. 22, Answer at ¶ 20.)

3. The Property is a two-story Baymont Inn & Suites Hotel with wood stud walls cladded with stucco and masonry veneer. The roof of the Property is a hip type roof covered with asphalt shingles. (**Exhibit 4**, Envista Engineering Report – Background, RAPHAEL 000984).

4. Prior to issuing the Policy, Sedgwick, on behalf of AmGUARD, conducted an inspection of Property on January 8, 2020. Sedgwick did not report any conditions of damage (**Exhibit 3** - GUARD 001227-001229).

5. On August 2, 2020, during the Policy period, the Property experienced a hail event (the "Storm"). **Exhibit 4**, Envista Engineering Report – Weather Data, RAPHAEL 000985).

6. The Storm caused damage to the asphalt roofing shingles, soft metal roof vents, metal wall vents, exterior metal doors, stucco siding, window screens, vinyl window wraps, glass

---

remaining disputed amount of loss; common law bad faith; or its pending claim for exemplary damages. (ECF No. 63).

[2] References to Movant's Statement of Material Facts (MSMF) throughout this Motion are by the paragraph number.

window panes, vinyl fencing, exterior wall sconces, and three (3) metal door frames at the Property. (**Exhibit 4**, Envista Engineering Report – Conclusions at ¶¶ 2-4, RAPHAEL 000984).

7. AmGUARD received notice of loss from Plaintiff for damage to windows, screens, siding, lights, and roof. (**Exhibit 5**, Independent Adjuster Assignment, RAPHAEL 000009).

8. Plaintiff's Claim was assigned to AmGUARD's Property Adjuster II, William Ardoline. (**Exhibit 6**, Claim Notes, GUARD SUPP 000006; **Exhibit 7**, Deposition of William Ardoline, July 8, 2022, at 39:23-40:9; 40:23-41:2). As a Property Adjuster II, William Ardoline would handle on average between 150 to 250 open claims and, at times, up to 300 open claims. (**Exhibit 7**, Deposition of William Ardoline, July 8, 2022, at 30:4-16).

9. William Ardoline had previously notified AmGUARD that he had "too many cases to handle timely." (**Exhibit 7**, Deposition of William Ardoline, July 8, 2022, at 201:20-202:2).

### B. AmGUARD Placed on Notice of Confirmed Damage to the Property Caused By The Storm By Its First Independent Adjuster in September 2020.

10. On August 3, 2020, AmGUARD retained Raphael & Associates to investigate damage to the property caused by the Storm. (**Exhibit 6**, Claim Notes, GUARD SUPP 000006).

11. On August 6, 2020, Raphael & Associates adjuster, Thoedore Miller, inspected the Property. (**Exhibit 8**, Theodore Miller Report – Adjustment & Claims Details, RAPHAEL 000091; **Exhibit 9**, Theodore Miller Deposition, March 21, 2022, at 131:4-10).

12. During his inspection, Theodore Miller identified hail damage to the shingle roof covering, stucco siding, dryer vents, wood fascia, more than 30 window frames, window screens, vinyl fencing, four door enclosures, and 11 exterior lights. (**Exhibit 8** – Scope of Damage, RAPHAEL 000092-93).

13. During his inspection, Theodore Miller identified non-cosmetic damage to the shingle roof coverings which he concluded would require replacement. (**Exhibit 8** – Scope of Damage, RAPHAEL 000092; **Exhibit 9**, Deposition of Theodore Miller, March 21, 2022, at 132:24-133:5; 135:13-16).

14. On August 25, 2020, 2020, Theodore Miller prepared an inspection report. (**Exhibit 8**, RAPHAEL 000090-154).

15. Miller's inspection report memorialized the hail damage he identified during his inspection of the Property. (**Exhibit 8** – Scope of Damage, RAPHAEL 000092-93).

16. Miller's inspection report included one-hundred sixty-six (166) photographs illustrating the condition of the Property. (**Exhibit 8** – Photo Sheet, RAPHAEL 000096-000154).

17. Miller's inspection report confirmed that the "cause of loss has been verified as a hail and wind loss from 08/02/2020." (**Exhibit 8** – Cause of Loss, RAPHAEL 000092; **Exhibit 9**, Deposition of Theodore Miller, March 21, 2022, at 132:11-15).

18. Miller's inspection report estimated an initial reserve of approximately $150,000. (**Exhibit 8** – Estimate/Reserves, RAPHAEL 000090).

19. On September 2, 2020, AmGUARD was provided with a copy of the report prepared by Theodore Miller. (**Exhibit 10**, Danielle Chilcote E-Mail to William Ardoline, RAPHAEL 000088).

20. While capable of creating a repair estimate for damage observed at the Property, Theodore Miller was never asked to create a repair estimate for the damages he identified within his inspection report. (**Exhibit 9**, Deposition of Theodore Miller, March 21, 2022, at 145:7-14).

21. Theodore Miller did not provide a copy of his inspection report or communicate the findings of his inspection to Plaintiff. (**Exhibit 9**, Deposition of Theodore Miller, March 21, 2022, at 145:15-17; 145:25-146:3).

**C. AmGUARD Placed on Notice of Confirmed Damage to the Property Caused By The Storm By Its Second Independent Adjuster in October 2020.**

22. On September 9, 2020, AmGUARD retained an independent adjusting company, Engle Martin & Associates, to complete a "Full Adjustment" of the Claim. (**Exhibit 11**, GUARD E-Mail to Engle Martin, EM_000007).

23. On September 14, 2020, Plaintiff's General Manager, Ashley Pendlay, reported that damage to the Property from the Storm was worsening. (**Exhibit 12**, Ashley Pendlay E-Mail to Jerry Kukuchka; Rick Cline, GUARD 000775). Ms. Pendlay further reported that hotel guests had "*left and went elsewhere because of the damage to [the] building and them not feeling safe.*" (*Id.*).

24. On September 14, 2020, AmGUARD received a copy of the report of damage and interruption to the business communicated by Ashley Pendlay. (**Exhibit 12**, Rick Cline E-Mail to Mark Concklin, GUARD 000774). The message was then forwarded to William Ardoline. (**Exhibit 12**, Mark Concklin E-Mail to William Ardoline, GUARD 000774).

25. On September 18, 2020, AmGUARD's second independent adjuster, Brian Rubidoux, inspected the Property. (**Exhibit 13**, Brian Rubidoux Report, RAPHAEL 000947).

26. During his inspection, Brian Rubidoux observed hail impact damage to the southern elevation of the Property, broken windows, damaged window cladding on several windows, damaged PVC fence, and damage to three commercial doors. Brian Rubidoux also observed hail damage to the shingle roof coverings. (**Exhibit 13**, Brian Rubidoux Report – Building, RAPHAEL 000949).

27. On October 6, 2020, Brian Rubidoux prepared an inspection report. (**Exhibit 13** – RAPHAEL 000947-976).

28. The inspection report prepared by Brian Rubidoux memorialized the hail damage he identified during his inspection of the Property. (**Exhibit 13**, RAPHAEL 000947-976).

29. The inspection report prepared by Brian Rubidoux included fifty photographs illustrating the condition of the Property. (**Exhibit 13**, RAPHAEL 000952-976).

30. The hail damage identified by Brian Rubidoux was consistent with the damage identified by AmGUARD first adjuster, Theodore Miller. (**Exhibit 13**, RAPHAEL 000947-976; Cf **Exhibit 8**, RAPHAEL 000090-154).

31. On October 6, 2020, AmGUARD received a copy of the inspection report prepared by Brian Rubidoux. (**Exhibit 14**, Gabriella Armster E-Mail to GUARD, RAPHAEL 000946).

### D. AmGUARD Receive Estimate of The Scope and Cost To Repair Confirmed Hail Damage To The Property Caused By The Storm.

32. On October 20, 2020, AmGUARD received an estimate of the scope and cost to repair hail damage to the Property caused by the Storm prepared by general contractor, CJ Restoration. (**Exhibit 15**, CJ Restoration Estimate, RAPHAEL 001117- 1129).

33. The estimate prepared by CJ Restoration included an estimate of the scope and cost to repair functional hail damage to the shingle roof covering at the Property. (**Exhibit 15**, CJ Restoration Estimate – Lines 9-31, RAPHAEL 001120).

34. The estimate prepared by CJ Restoration included an estimate of the scope and cost to repair hail damage to the commercial sign, stucco siding, light fixtures, windows, and vinyl fencing. (**Exhibit 15**, CJ Restoration Estimate – Lines 32, 35-96, RAPHAEL 001118-1129).

### E. AmGUARD Placed on Notice of Confirmed Damage To The Property Caused By The Storm By Its Professional Engineer in November 2020.

35. On September 15, 2020, Brian Rubidoux, on behalf of AmGUARD, engaged a professional engineer, William Oviatt, from Envista Forensics. (**Exhibit 16**, Brian Rubidoux Letter to Envista Forensics, EM_000620-621).

36. On September 18, 2020, William Oviatt conducted an inspection of the Property. (**Exhibit 4**, Envista Engineering Report – Background, RAPHAEL 000984).

37. During his inspection, William Oviatt identified approximately 11,330 roofing shingles which were functionally damaged due to hail impact from the Storm. (**Exhibit 4**, Envista Engineering Report – Conclusions at ¶ 2, RAPHAEL 000984).

38. During his inspection, William Oviatt identified functional damage from the Storm to exterior building elevation elements, including fractures in stucco siding, tears in window screens, fractured vinyl window wraps, fractured glass window panes, fractured vinyl fencing, fractured or completely removed exterior wall sconces, and three metal door frames at the Property. (**Exhibit 4**, Envista Engineering Report – Conclusions at ¶ 4, RAPHAEL 000984).

39. During his inspection, William Oviatt identified damage from the Storm to soft metal roof vents, metal wall vents, and exterior metal doors at the Property. (**Exhibit 4**, Envista Engineering Report – Conclusions at ¶ 3, RAPHAEL 000984).

40. On November 19, 2020, William Ardoline, requested the status of the engineering report. (**Exhibit 17**, William Ardoline E-Mail to Brian Rubidoux, RAPHAEL 000190). William Ardoline, further notified Brian Rubidoux that the "*restoration estimate totals $434,949.90 from CJ [Restoration] so we will need to review this ASAP!*" (*Id*.).

41. On November 20, 2020, William Oviatt prepared an inspection report outlining his findings and conclusions from his inspection of the Property. (**Exhibit 4**, Envista Engineering Report, RAPHAEL 000983-001014).

42. Oviatt's inspection report memorialized the hail damage he identified during his inspection of the Property. (**Exhibit 4**, Envista Engineering Report, RAPHAEL 000983-000988).

43. Oviatt's inspection report distinguished unrelated conditions at the Property from damage caused by the Storm. (**Exhibit 4**, Envista Engineering Report – Conclusions at ¶¶ 1-7, RAPHAEL 000984-985).

44. Oviatt's inspection report included forty photographs illustrating the condition of the Property. (**Exhibit 4**, Envista Engineering Report, RAPHAEL 000990-001009).

45. The hail damage identified by AmGUARD's professional engineer, William Oviatt, was consistent with the damage previously reported by its adjusters, Theodore Miller and Brian Rubidoux. (**Exhibit 4**, Envista Engineering Report, RAPHAEL 000983-001014; Cf **Exhibit 8**, RAPHAEL 000090-154; **Exhibit 13**, RAPHAEL 000947-976).

46. On November 30, 2020, AmGUARD received a second report from its adjuster, Brian Rubidoux. (**Exhibit 18**, Gabriella Armster E-Mail to GUARD, RAPHAEL 000978; **Exhibit 4**, Second Brian Rubidoux Report, RAPHAEL 000978-982). The second report from Brian Rubidoux included a copy of the inspection report prepared by engineer, William Oviatt. (**Exhibit 4**, Second Brian Rubidoux Report – Enclosures, RAPHAEL 000982).

47. William Oviatt did not provide a copy of his inspection report or communicate the findings of his inspection to Plaintiff. (**Exhibit 19**, Deposition of William Oviatt, March 8, 2022, 72:22-73:5).

48. AmGUARD's independent adjuster, Brian Rubidoux, did not provide Plaintiff with a copy of the inspection report prepared by William Oviatt or notify Plaintiff that William Oviatt had identified approximately 11,330 roofing shingles which were functionally damaged due to hail from the Storm. (**Exhibit 20**, Deposition of Brian Rubidoux, January 6, 2022, 49:21-50:11; 52:17-22).

49. Brian Rubidoux did not prepare an estimate for the damage observed because he was not authorized to or requested by AmGUARD to complete an estimate. (**Exhibit 20**, Deposition of Brian Rubidoux, January 6, 2022, 74:13-20; 122:6-10).

50. On January 4, 2021, AmGUARD independent adjuster, Brian Rubidoux, provided AmGUARD with a third report which notified AmGUARD that no further handling instruction had been received since providing his second report. (**Exhibit 21**, Third Brian Rubidoux Report – Building, EM_000220). Mr. Rubidoux further notified AmGUARD that the file would be retired should he not receive a response within 20 days. (*Id*.; **Exhibit 20**, Deposition of Brian Rubidoux, January 6, 2022, 132:6-133:2). Mr. Rubidoux closed Plaintiff's file due a lack of further instruction from AmGUARD. (**Exhibit 20**, Deposition of Brian Rubidoux, January 6, 2022, 133:3-7).

### E. AmGUARD Placed on Notice of Confirmed Damage To The Property By Plaintiff's Professional Engineer in May 2021.

51. On April 8, 2021, Plaintiff requested that AmGUARD immediately address hail damage to the exterior stucco system, windows, and shingle roofing covering. (**Exhibit 22**, Jonathan Bukowski E-Mail to William Ardoline; AmGUARD Insurance Company, GUARD 001156).

52. On April 8, 2021, Plaintiff requested that AmGUARD provide availability to meet on site to discuss the unpaid damages. (**Exhibit 22**, Jonathan Bukowski E-Mail to William Ardoline; AmGUARD Insurance Company, GUARD 001156).

53. Plaintiff engaged a professional engineer, Gregory Kaszas, to perform an assessment of damage to the Property caused by the Storm. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00351-398).

54. On March 29 and 30, 2021, Gregory Kaszas performed an inspection of the Property. (**Exhibit 23**, GRK Engineering Report – Basis of Report, 2505 6th STREET 00353).

55. During his inspection, Gregory Kaszas, observed evidence of hailstone impacts on the order of 1.75 to 2.0-inches in diameter. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00359).

56. Mr. Kaszas observed hailstone impacts to the shingle roof coverings resulting in significant granule displacement, exposed the bare asphalt and fiberglass scrim to UV light, tore fiberglass, and caused through fracturing. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00359).

57. Mr. Kaszas observed between 25 and in excess of 59 hailstone impacts to the shingle roof coverings within each of his six 10'x10' test square samples. (**Exhibit 23**, GRK Engineering Report – Test Square Results, 2505 6th STREET 00358).

58. Mr. Kaszas observed hailstone impact damage to the exterior EIFS wall system, window frames, window glass, vinyl fencing, and entry card reader system. (**Exhibit 23**, GRK Engineering Report – Engineering Findings at ¶¶ 2-6; 2505 6th STREET 00357-358 – Conclusions at ¶¶ 2-6, 2505 6th STREET 00397-398).

59. On April 23, 2021, Gregory Kaszas prepared an inspection report outlining the findings and conclusions from his inspection of the Property. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00351-398).

60. The inspection report prepared by Gregory Kaszas memorialized the hail damage he identified during his inspection of the Property. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00351-398).

61. The inspection report prepared by Gregory Kaszas included seventy (70) photographs illustrating the condition of the Property. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00362-396).

62. The hail damage identified by Gregory Kaszas was consistent with the damage previously reported to AmGUARD by its adjusters, Theodore Miller and Brian Rubidoux, and its engineer, William Oviatt. (**Exhibit 23**, GRK Engineering Report, 2505 6th STREET 00351-398; Cf RAPHAEL 000983-001014; Cf **Exhibit 8**, RAPHAEL 000090-154; **Exhibit 13**, RAPHAEL 000947-976; **Exhibit 4**, Envista Engineering Report, RAPHAEL 000983-001014; Cf **Exhibit 8**, RAPHAEL 000090-154; **Exhibit 13**, RAPHAEL 000947-976).

63. On May 7, 2021, AmGUARD received a copy of the report prepared by Plaintiff's professional engineer, Gregory Kaszas. (**Exhibit 24**, Jonathan Bukoski E-Mail to Cora Routh; AmGUARD Insurance Company, GUARD 001157-1159).

### E. Plaintiff Compelled to File Legal Action to Recover Insurance Coverage Benefits For Confirmed Damage to the Property Caused By The Storm.

64. On May 7, 2021, Plaintiff notified AmGUARD that water was entering the Property through openings caused by the Storm. (**Exhibit 24**, Jonathan Bukoski E-Mail to Cora Routh; AmGUARD Insurance Company, GUARD 001159).

65. AmGUARD did not respond to the communications sent by Plaintiff on April 23 and May 7. (Exhibit 25, Jonathan Bukowski E-Mail to Cora Routh; AmGUARD Insurance Company, GUARD 001155).

66. On May 11, 2021, Plaintiff requested a response to the messages sent on April 8 and May 7 to allow it to work towards the repair of the exterior and interior of the Property. (**Exhibit 25**, Jonathan Bukowski E-Mail to Cora Routh; AmGUARD Insurance Company, GUARD 001155).

67. On May 18, 2021, Plaintiff filed this lawsuit. (ECF No. 1-1, pp. 5-26).

68. On July 1, 2021, Plaintiff was sued by its property managers for alleged injuries caused by the reported moisture which had penetrated through the hail caused openings from the Storm. (ECF No. 17; **Exhibit 26** – *Clay, Ashley et al. v. 2505 6th Street LLC*, 2021CV030009 (Lincoln Dist. Ct. December 3, 2021)).

69. AmGUARD retained a third independent adjusting company, J.S. Held., to evaluate the Property for damage from the Storm. (**Exhibit 27**, J.S. Held Report).

70. On October 6, 2021, J.S. Held conducted an inspection of the Property. (**Exhibit 27**, J.S. Held Report – Site Evaluation, page 3).

71. On November 18, 2021, J.S. Held prepared an inspection report outlining the findings and conclusions from its inspection of the Property. (**Exhibit 27**, J.S. Held Report).

72. The J.S. Held inspection report confirmed hail damage from the Storm to window frames, window screens, vinyl fencing, and the shingle roof covering. (**Exhibit 27**, J.S. Held Report – Summary and Conclusions, page 21).

73. The hail damage identified by J.S. Held was consistent with the damage identified twelve months earlier by Theodore Miller, Brian Rubidoux, and William Oviatt. (**Exhibit 27**, J.S. Held Report – Summary and Conclusions, page 21; Cf RAPHAEL 000983-001014; Cf **Exhibit 8**, RAPHAEL 000090-154; **Exhibit 13**, RAPHAEL 000947-976; **Exhibit 4**, Envista Engineering Report, RAPHAEL 000983-001014; Cf **Exhibit 8**, RAPHAEL 000090-154; **Exhibit 13**, RAPHAEL 000947-976).

74. To address the hailstone impacts from the Storm, J.S. Held recommended (1) replacement of the shingle roof covering; (2) replacement of the south and west facing vinyl windows, including new screens; (3) new finish coat to the south and west facing EIFS; (4) repainting of the south and west facing exposed wood (trim, shed, etc.); (5) replacement of one south-facing keycard reader on a storefront door; (6) replacement of the vinyl fence; and (6) combing of the condensing fins on the HVAC units. (**Exhibit 27**, J.S. Held Report – Summary and Conclusions, page 21).

75. The repair recommendations made by J.S. Held were consistent with the recommendations repair made six months earlier by Gregory Kaszas. (**Exhibit 27**, J.S. Held Report – Summary and Conclusions, page 21; Cf **Exhibit 23**, GRK Engineering Report – Engineering Recommendations, 2505 6th STREET 00396-397).

76. J.S. Held. prepared an estimate for the replacement of the roof covering, windows, vinyl fence, and stucco totaling $315,796.44.17 replacement cost value and $268,237.98 actual cash value. (**Exhibit 28**, J.S. Held Repair Estimate).

77. On November 15, 2021, AmGUARD issued an actual cash value payment to Plaintiff totaling $208,237.98. (**Exhibit 29**, 2505 6TH STREET 01500).

78. AmGUARD's actual cash value payment totaling $208,237.98 was the first payment AmGUARD made on Plaintiff's Claim. (Exhibit 29, 2505 6TH STREET 01500; ECF No. 1-1, Complaint, ¶ 84; ECF No. 22, Answer, ¶ 84).

79. AmGUARD's actual cash value payment was based upon the actual cash value damages outlined in the J.S. Held Estimate less the Policy deductible. (**Exhibit 28**, J.S. Held Repair Estimate**; Exhibit 29**, 2505 6TH STREET 01500; **Exhibit 1**, GUARD SUPP 000007).

## III. LEGAL STANDARDS

### A. Summary Judgment Standard.

Plaintiff adopts Judge Martinez' standard for resolving summary judgment motions, as set forth in *Sigstedt v. Colo. Mt. Local Coll. Dist.*, Civil Action No. 20-cv-2704-WJM-GPG, 2022 U.S. Dist. LEXIS 137255, at *2 (D. Colo. Aug. 2, 2022)(granting in part summary judgment):

> *Summary judgment is warranted under Federal Rule of Civil Procedure 56 "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–50 (1986). A fact is "material" if, under the relevant substantive law, it is essential to the proper disposition of the claim. Wright v. Abbott Labs., Inc., 259 F.3d 1226, 1231–32 (10th Cir. 2001). An issue is "genuine" if the evidence is such that it might lead a reasonable trier of fact to return a verdict for the nonmoving party. Allen v. Muskogee, 119 F.3d 837, 839 (10th Cir. 1997).*
>
> *In analyzing a motion for summary judgment, a court must view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). In addition, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. See Houston v. Nat'l Gen. Ins. Co., 817 F.2d 83, 85 (10th Cir. 1987).*
>
> *If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. Scott v. Harris, 550 U.S. 372, 380 (2007) (citing Matsushita, 475 U.S. at 586–587).*

**B. Partial Summary Judgment.**

Summary judgment may be sought for a particular claim or part of a claim. A party may move for summary judgment on a particular claim or claims, or even on just a "part of" a particular claim or claims. Fed. R. Civ. P. 56(a). The first sentence of Rule 56(a) "make[s] clear . . . that summary judgment may be requested . . . as to a claim, . . . or part of a claim." R. 56 Advisory Committee Notes to 2010 Amendment. This motion seeks partial summary judgment on Plaintiff's claim for unreasonable delay of covered insurance benefits relating exclusively to unreasonably delayed payment made in November 2021 totaling $208,237.98.

**C. Statutory Bad Faith Standard.**

Colorado Revised Statutes Section 10–3–1115 prohibits an insurance company from unreasonably delaying or denying payment of a claim for benefits owed to a first-party claimant. C.R.S. § 10–3–1115(1)(a). Section 10–3–1116 further provides that "[a] first-party claimant as defined in section 10–3–1115 whose claim for payment of benefits has been unreasonably delayed or denied may bring an action in a district court to recover reasonable attorney fees and court costs and two times the covered benefit." C.R.S. § 10–31116(1). An insurer's delay is unreasonable "if the insurer delayed or denied authorizing payment of a covered benefit without a reasonable basis for that action." C.R.S. § 10–3–1115(2) (emphasis added). Furthermore, an insurer must generally continue to make prompt payments of undisputed claims even during litigation with the insured. *United States Gen., LLC v. Guideone Mut. Ins. Co.*, 2022 U.S. App. LEXIS 34066, at *14 (10th Cir. Dec. 12, 2022).

The statutes at issue create a different cause of action from the common law tort of bad faith breach of an insurance contract and the "burden of proving th[e] statutory claim is less

onerous than that required to prove a claim under the common law for breach of the duty of good faith and fair dealing." *Kisselman v. Am. Fam. Mut. Ins. Co.*, 292 P.3d 964, 975 (Colo.App.2011). That is because, whereas a common law claim requires proof that the insurer acted unreasonably and that it knew or recklessly disregarded the fact that its conduct was unreasonable, "the only element at issue in the statutory claim is whether an insurer denied benefits without a reasonable basis." *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 848 (Colo. 2018) (quoting *Vaccaro v. Am. Family Ins. Grp.*, 275 P.3d 750, 760 (Colo. App. 2012)); *see also* Colo. Jury Instr., Civil 25:4 (2022 Edition). The reasonableness of an insurer's conduct is measured objectively based on industry standards. *Schultz*, 429 P.3d at 847. Although expert testimony concerning industry standards is often helpful, "expert testimony is not required where the defendant's standard of care does not require specialized or technical knowledge ... [n]or is expert testimony required to establish the standard of care when a legislative enactment or administrative rule establishes the standard of care." *Am. Family Mut. Ins. Co. v. Allen*, 102 P.3d 333, 343 (Colo. 2004) (en banc).

In insurance cases, "the Unfair Claims Practices Act regulates the conduct of the insurance industry . . . [and] sets forth standards for when the commissioner of insurance may find that an insurance company is engaged in an unfair or deceptive trade practice." *Id.* at 344. Specifically, Section 10-3-1104(1)(h) of the Act defines certain acts of unfair claims settlement practice. C.R.S. § 10-3-1104(1)(h). "While the Unfair Claims Practices Act does not establish a standard of care actionable in tort, it may be used as valid, but not conclusive, evidence of industry standards." *Allen*, 102 P.3d at 344. Furthermore, since Section 10-3-1104(1)(h) provides examples of conduct that violates of insurance industry standards, it is within the common knowledge and experience ordinary persons to determine whether defendant engaged in such practices. *See TBL Collectibles,*

*Inc. v. Owners Ins. Co.*, 285 F.Supp.3d 1170, 1203–04 (D. Colo. 2018) (citing *Leeper v. Allstate Fire & Cas. Ins. Co.*, 2016 WL 1089701, at *6 (D. Colo. Mar. 21, 2016)

While Colorado Division of Insurance Regulation 5-1-14 is similarly not conclusive of the statutory standard of reasonableness under § 10-3-1115, it provides further evidence of industry standards, and therefore of the reasonableness of an insurer's conduct. *Goodman v. State Farm Mutual Automobile Insurance Company*, No. 13-cv-1376-WJM-MJW, 2014 U.S. Dist. LEXIS 146866, at *12 (D. Colo. Oct. 15, 2014). More specifically, Colorado Division of Insurance Regulation 5-1-14, entitled Penalties for Failure to Promptly Address Property and Casualty First Party Claims, was adopted by the Colorado Commissioner of Insurance for the purpose of describing "the procedure and circumstances under which penalties will be imposed for failure to make timely decisions and/or payment on first party claims." 3 Colo. Code. Regs. § 702-5:5-1-14 § 2. The regulation provides that insurers can face a monetary penalty if they fail to make a decision on the payment of benefits within sixty days after receipt of a valid claim, provided there is no reasonable dispute between the parties and the insured has complied with the policy. *Id*. at § 4(A)(1)(b). The regulation lists factors the Commissioner will consider when determining if a penalty is warranted. *Id*. at § 4(A)(2). The regulation also states that "[w]hen an investigation is incomplete or is otherwise continued and the insurer has not paid the claim within the time required . . . the insurer shall immediately notify the insured . . . of the reason(s) the claim has not been paid." *Id*. at § 4(B)(3). When an insurer cannot immediately complete an investigation, the insurer must send the insured a letter every 30 days setting forth any reasons the investigation cannot be completed. *Id*. "This requirement is not intended to alter any terms of the contract between the

insurer and insured regarding its respective rights, duties, and obligations and the law involving such matters." *Id*.

An insured may also prove the unreasonableness of an insurer's conduct "through evidence of, for example, among other things:

- total failure to investigate the claim, *see* 14 Couch on Insurance § 207:24 (3d ed.);
- failure to conduct a reasonable investigation based on all available information, *see Allen*, 102 P.3d at 344; see also 14 Couch on Insurance § 207:25 ("Implicit in the duty to investigate is the requirement that the investigation be adequate and fair.");
- "not providing a reasonable explanation of a denial of a claim," *Allen*, 102 P.3d at 344-45 (affirming bad faith verdict because, among other things, the evidence showed that the insurer "concluded its investigation without exploring [certain] conflicting statements . . . or by talking with [a relevant witness]"); or
- in-house policies that reward employees for defeating claims, *see Zolman*, 261 P.3d at 500; *see also Zilisch v. State Farm Mut. Auto. Ins. Co*., 196 Ariz. 234, 995 P.2d 276, 279 (Ariz. 2000)."

*Sandoval v. Unum Life Ins. Co. of Am.*, No. 17-cv-0644-WJM-KMT, 2018 U.S. Dist. LEXIS 147184, at *31 (D. Colo. Aug. 29, 2018).

While the issue of what constitutes reasonableness is ordinarily a question of fact for the jury, reasonableness may be decided as a matter of law in appropriate circumstances, as when there are no genuine issues of material fact. *Bankr. Estate of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 524 (Colo. App. 2008) (citations omitted); *Vaccaro*, 275 P.3d at 759. The burden to establish unreasonableness lies with Plaintiff. *See Williams v. Owners Ins. Co*., 621 F. App'x 914, 919 (10th Cir. 2015).

## IV. ARGUMENT

The undisputed evidence on record demonstrates that AmGUARD has acted inconsistent with industry standards establishing the standard of care required for the handling of first party property insurance claims. The sampling of actions in violation of Colorado's Unfair Claims

Practices Act and Colorado Division of Insurance Regulation 5-1-14 detailed below provide overwhelming evidence of the unreasonableness of AmGUARD's conduct in delaying the authorization of payment of covered insurance benefits to Plaintiff. These actions are sufficient to demonstrate, as a matter of law, that AmGUARD delayed the payment of $208,237.98 in covered insurance benefits without a reasonable basis in violation of C.R.S. § 10–3–1115.

**A. Section 10-3-1104(1)(h)(II).**

Section 10-3-1104(1)(h)(II) of the Unfair Claims Practices Act provides that is in an unfair or deceptive act to fail to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies. C.R.S. § 10-3-1104(1)(h)(II). As detailed in Movant's Statement of Disputed Facts, AmGUARD failed to acknowledge numerous communications, e-mails, and letters throughout the Claim. AmGUARD ignored information submitted on behalf of Plaintiff as well as numerous pleas for assistance from Plaintiff. (MSMF, ¶ 65). AmGUARD concedes that it failed to acknowledge or contact Plaintiff, or its representatives, to help in rebuilding the Property. (ECF No. 1-1, Complaint, ¶ 85; ECF No. 22, Answer, ¶ 85). The ability to act reasonably promptly was made impossible due to the number of claims assigned to William Ardoline. (MSMF, ¶¶ 8-9). If one assumes that thirty-minutes is spent reviewing each claim, it will take two- and one-half weeks to review the approximately two hundred separate claims that were regularly assigned to William Ardoline. (*Id.*).

Despite receiving numerous communications, none are documented as received or responded to within AmGUARD's internal claim notes between December 2, 2020, and its receipt of the lawsuit on May 25, 2021. (**Exhibit 6**, GUARD SUPP 000003-4). Numerous communications from AmGUARD's own independent adjuster, Brian Rubidoux, were similarly

ignored. (**Exhibit 4**, at RAPHAEL 000981; **Exhibit 21**, at EM_000220). Despite requesting direction on whether an estimate should be prepared (**Exhibit 4**, at RAPHAEL 000981), Brian Rubidoux did not prepare an estimate for the damage observed because he was not authorized to by AmGUARD. (MSMF, ¶ 49). AmGUARD's continued neglect of communications even led Brian Rubidoux to prematurely close his investigation of Plaintiff's Claim. (MSMF, ¶ 50).

The undisputed evidence on record demonstrates that AmGUARD's conduct runs afoul of Section 10-3-1104(1)(h)(II) of the Unfair Claims Practices Act and its own prescribed requirements. AmGUARD's failure to act promptly upon receipt of the communications, is evidence of the unreasonableness of its conduct. AmGUARD's failure to act promptly upon receipt of communications, coupled with the accumulation of acts outlined herein that were inconsistent with industry standards, supports a determination by this Court, as a matter of law, that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of C.R.S § 10–3–1115.

**B. Section 10-3-1104(1)(h)(III), (IV), (VI).**

Section 10-3-1104(1)(h)(III) of the Unfair Claims Practices Act provides that it is in an unfair or deceptive act to fail to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies. C.R.S. § 10-3-1104(1)(h)(III). Section 10-3-1104(1)(h)(IV) further instructs that is in an unfair or deceptive act to refuse to pay claims without conducting a reasonable investigation based on all available information. *Id.*, at C.R.S. § 10-3-1104(1)(h)(IV); s*ee also Allen*, 102 P.3d at 344; 14 Couch on Insurance § 207:25 ("Implicit in the duty to investigate is the requirement that the investigation be adequate and fair."). Similarly, Section 10-3-1104(1)(h)(VI) provides that is in an unfair or deceptive act to not attempt in good

faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear. C.R.S. § 10-3-1104(1)(h)(VI).

The undisputed record evidence demonstrates that AmGUARD confirmed the presence of extensive hail and wind damage from the Storm no later than September 2, 2020. (MSMF, ¶¶ 10-21). AmGUARD was notified by its initial adjuster, Theodore Miller, of damage from the Storm to the shingle roof covering, stucco siding, dryer vents, wood fascia, more than 30 window frames, window screens, vinyl fencing, four door enclosures, and 11 exterior lights. (MSMF, ¶¶ 12-19). Miller provided AmGUARD with photographs illustrating the observed Storm damage, and initially estimated a reserve of $150,000. (MSMF, ¶ 16, 18). Miller further confirmed that the observed loss was verified to have been caused by the Storm. (MSMF, ¶ 17). While its first adjuster was more than capable of generating an estimate of the scope and cost to repair the confirmed damage, AmGUARD never acted upon the information or otherwise instructed him to prepare an estimate for the damages he identified within his report. (MSMF, ¶ 20). Instead, AmGUARD instructed Miller to close his file without explanation. (**Exhibit 9**, Deposition of Theodore Miller, March 21, 2022, at 128:7-15).

AmGUARD was further placed on notice of the amount of damage and detrimental impact it was having on the Property less than two weeks later by Plaintiff's General Manager. (MSMF, ¶¶ 23-24). Yet no payments were released to assist Plaintiff. (MSMF, ¶ 78). On October 6, 2020, just over sixty days after the Storm, AmGUARD was provided with further confirmation of extensive damage to the Property caused by the Storm from its second adjuster, Brian Rubidoux. (MSMF, ¶¶ 22, 25-31). Rubidoux, similar to Miller, notified AmGUARD of hail damage to window glass, window cladding, PVC fencing, doors, and the shingle roof covering. (MSMF, ¶¶

26-31). While Rubidoux informed Plaintiff in October 2020 that an "*[i]temized repair estimate*" was being prepared, AmGUARD took no action to authorize Brian Rubidoux to prepare an estimate for the scope and cost to repair damage observed or otherwise authorize payment to Plaintiff. (**Exhibit 30**, Engle Martin Letter – October 9, 2020; MSMF, ¶¶ 49, 77). AmGUARD did receive an estimate outlining the scope and cost to repair hail damage to the Property caused by the Storm two weeks later on October 20, 2020. (MSMF, ¶¶ 32-34). Similarly, no payment was issued on the estimate, nor was the estimate provided to Rubidoux for review. (MSMF, ¶ 50, 78).

On November 30, 2020, less than four months after the Storm, AmGUARD was placed on notice, *for a third time*, of the amount of damage caused by the Storm to the Property upon receipt of a report from its professional engineer. (*emphasis added*) (MSMF, ¶¶ 35-46). AmGUARD's professional engineer, William Oviatt, prepared a comprehensive report detailing the amount of damage while also separating out observed conditions that were unrelated to the Storm. (MSMF, ¶¶ 41-46). Oviatt's detailed separation of hail caused damage from the Storm left no doubt as to the amount of loss caused by the Storm. The report included photographs and reported over 11,000 functionally roofing shingles; fractures in stucco siding; tears in window screens; fractured vinyl window wraps; fractured glass window panes; fractured vinyl fencing; fractured or completely removed exterior wall sconces; racked metal door frames; and additional damage to soft metal roof vents, metal wall vents, and exterior metal doors at the Property. (MSMF, ¶¶ 37-39, 41-44). The findings reported by Oviatt in November 2020 were consistent with those previously reported to AmGUARD by Miller in September 2020, and Rubidoux in October 2020. (MSMF, ¶ 45).

The uncontroverted evidence demonstrates that AmGUARD had overwhelming evidence of hail and wind damage to the Property within four months of the Storm. (MSMF, ¶¶ 19, 31, 46).

AmGUARD also had an estimate of the scope and cost to repair the hail damage confirmed by its three consultants (MSMF, ¶¶ 32-34 ), and were directly aware of the dire circumstances caused by the Storm. (MSMF, ¶¶ 23-24). Brian Rubidoux even recommended AmGUARD retain a forensic account to evaluate the amount of interruption to Plaintiff's hotel business. (**Exhibit 13**, Brian Rubidoux Report, at RAPHAEL 000950). Those reported, but ignored, circumstances eventually led to an avoidable lawsuit against Plaintiff less than one year later. (MSMF, ¶ 68). No payment would be issued until one year later in November 2021. (MSMF, ¶¶ 77-78). AmGUARD had no basis, let alone one that is arguably reasonable, for its failure to authorize the payment of covered insurance benefits to Plaintiff for another year. The Court should determine that the actions of AmGUARD within the first ninety days of the Storm, alone, demonstrate unreasonableness as a matter of law. *See Bankr. Estate of Morris*, 192 P.3d at 524.

Notwithstanding, AmGUARD was provided with a *fourth* confirmation of extensive hailstone impact damage to the Property from professional engineer, Gregory Kaszas, in May 2021. (*emphasis added*) (MSMF, ¶¶ 53-63). The report and photographs provided by Kaszas documented the same damage reported to AmGUARD by Theodore Miller, Brian Rubidoux, and William Oviatt in 2020. (MSMF, ¶ 62). Despite numerous pleas, AmGUARD did not acknowledge or otherwise act upon Plaintiff's production of the Kaszas report, leading to the filing of this lawsuit. (MSMF, ¶¶ 63-67). AmGUARD issued an actual cash value payment *six months* later based on the same damages that were documented and reported by Miller, Rubidoux, and Oviatt in 2020; and by Kaszas in May 2021. (*emphasis added*) (MSMF, ¶¶ 62, 71-78).

The undisputed evidence on record demonstrates that AmGUARD's conduct runs afoul of Sections 10-3-1104(1)(h)(III), (IV), and (VI) of the Unfair Claims Practices Act. The undisputed

evidence demonstrates that AmGUARD failed to implement any reasonable standards for the prompt investigation of the scope and cost to repair confirmed Storm damage to the Property. The undisputed record evidence further demonstrates that AmGUARD failed to conduct a reasonable investigation based on all available information, including, but not limited to, the estimate and engineering information produced by Plaintiff. The undisputed record evidence demonstrates that AmGUARD woefully failed to effectuate a prompt, fair, and equitable settlement of the Claim despite the reasonable clarity of liability for the loss. Even when ignoring the evidence of obvious damage reported by Plaintiff and its engineer, it is undisputed that coverage had become absolutely clear to AmGUARD within four months of the Storm through the reports and photographs provided by its own consultants. Based on the foregoing, coupled with the accumulation of actions inconsistent with industry standards outlined herein, the Court should determine, as a matter of law, that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of C.R.S. § 10–3–1115.

**C. Section 10-3-1104(1)(h)(VII).**

Section 10-3-1104(1)(h)(VII) of the Unfair Claims Practices Act provides that is in an unfair or deceptive act to compel an insured to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insured. C.R.S. § 10-3-1104(1)(h)(VII). The undisputed evidence on record demonstrates that AmGUARD undoubtedly knew that it owed Plaintiff coverage benefits for hail damage caused by the Storm within four months of the Storm. (MSMF, ¶¶ 10-46). Notwithstanding its knowledge of the undamaged condition of the Property just months prior to the Storm (MSMF, ¶ 4), AmGUARD's professional engineer further separated out conditions caused by the Storm

from those that were unrelated in his inspection report. (MSMF, ¶ 43). AmGUARD was provided with further confirmation and evidence of extensive storm damage to the Property by a second professional engineer in May 2021. (MSMF, ¶¶ 54-63). Plaintiff, through its representatives, persistently pleaded with AmGUARD to release the insurance coverage benefits to allow it to complete repairs and minimize the detrimental impact on its business operations. (MSMF, ¶¶ 24, 63-66). AmGUARD refused to release one cent of coverage until long after this lawsuit was commenced. (MSMF, ¶¶ 67, 77-78). Finally, on November 15, 2021, AmGUARD released an actual cash value payment totaling $208,237.98. (MSMF, ¶ 77).

The undisputed evidence on record demonstrates that the conduct of AmGUARD runs afoul of Section 10-3-1104(1)(h)(VII) of the Unfair Claims Practices Act. Based on the foregoing, coupled with the accumulation of actions that were inconsistent with industry standards outlined herein, the Court should determine, as a matter of law, that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of C.R.S. § 10–3–1115.

**D. Colorado Division of Insurance Regulation § 702-5:5-1-14.**

**1. Section 4(A)(1)(b).**

Section 4(A)(1)(b) of Colorado Division of Insurance Regulation 5-1-14 provides that an insurer can face a monetary penalty if they fail to make a decision on the payment of benefits within sixty days after receipt of a valid claim and complete claim, provided there is no reasonable dispute between the parties concerning the claim and the insured has complied with the policy.

The undisputed evidence on record demonstrates that by November 30, 2020, AmGUARD had three separate reports from three separate consultants each confirming extensive damage to

the Property caused by the Storm. (MSMF, ¶¶ 19, 31, 44-46). Prior to November 30, 2020, AmGUARD had also received an estimate of the scope and cost to repair confirmed damage to the Property caused by the Storm. (MSMF, ¶¶ 32-34). Apart from AmGUARD's inexplicit failure to release insurance coverage benefits under the Policy, there was no reasonable dispute between the Parties concerning the Storm damage confirmed by AmGUARD's three consultants. Rather, Plaintiff was completely unaware of the substantial amount of damage AmGUARD's had confirmed and was led to believe that an "*[i]temized repair estimate*" was being prepared. (**Exhibit 30**). That is because the findings and reports of AmGUARD's three consultants were never discussed or provided to Plaintiff. (MSMF, ¶¶ 22, 48). The undisputed evidence on record demonstrates that payment was not issued until November 15, 2021 – three hundred fifty days after AmGUARD's receipt of the valid and complete Claim. (MSMF, ¶¶ 77-78).

The undisputed evidence on record demonstrates that the conduct of AmGUARD runs afoul of Section 4(A)(1)(b) of Colorado Division of Insurance Regulation 5-1-14. Based on the foregoing, coupled with the accumulation of actions that were inconsistent with industry standards outlined herein, the Court should determine, as a matter of law, that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of C.R.S. § 10–3–1115.

**2. Section 4(B)(3).**

Section 4(B)(3) of Colorado Division of Insurance Regulation 5-1-14 provides that "[w]hen an investigation is incomplete or is otherwise continued and the insurer has not paid the claim within the time required . . . the insurer shall immediately notify the insured . . . of the reason(s) the claim has not been paid." Section 4(B)(3) further provides that when a claim is not

paid within the time requirement of Section 4(A)(1), the insurer must send the insured a letter every 30 days setting forth any reasons the investigation cannot be completed.

Assuming arguendo that AmGUARD's investigation was incomplete or otherwise continued as of November 30, 2020, the undisputed evidence on record demonstrates a lack of communication from AmGUARD regarding the reason for not authorizing the payment of insurance coverage benefits on the Claim. There are no communications documented as received or responded to within AmGUARD's internal claim notes between December 2, 2020, and its receipt of the lawsuit on May 25, 2021. (**Exhibit 6**, at GUARD SUPP 000003-4). The claim file is equally devoid of any communications, let alone communications "every 30 days setting forth any reasons the investigation cannot be completed." *See* Colo. Code. Regs. § 702-5:5-1-14 (4)(A)(1). AmGUARD's failure to provide direction or otherwise communicate with its own independent adjuster led him to close his investigation of Plaintiff's Claim. (MSMF, ¶ 50). The lack of communication and release of any payment of insurance coverage benefits for confirmed Storm damage compelled Plaintiff to file this lawsuit. (MSMF, ¶ 67).

The undisputed evidence on record demonstrates conduct that runs afoul of Section 4(B)(3) of Colorado Division of Insurance Regulation 5-1-14. Based on the foregoing, coupled with the accumulation of actions that were inconsistent with industry standards outlined herein, the Court should determine, as a matter of law, that AmGUARD delayed the authorization of payment of covered insurance benefits totaling $208,237.98 without a reasonable basis in violation of C.R.S. § 10–3–1115.

**E. Additional Industry Standards.**

Plaintiff's claims handling expert, Gary T. Fye, has further detailed industry standards within his report relating to the handling of a first party property insurance claim. (**Exhibit 31**, Fye Report – Claim Handling Standards, at pp. 6-7). Such standards include assisting the insured with the claim to achieve the purpose of the coverage; reviewing and analyzing the insured's submissions; fairly and promptly evaluate and resolve the claim, making payments or defending in accordance with applicable law and policy language; provide written explanation of any full or partial claim denial, pointing to the facts and policy provisions supporting the denial; not denying a claim or any part of a claim based upon insufficient information, speculation, or biased information; and not engaging in stonewalling or economic coercion leading to unwanted litigation that shows the unreasonableness of the company's assessments of coverage. The undisputed facts, as detailed within Movant's Statement of Facts, demonstrates conduct that was inconsistent with these additional industry standards.

AmGUARD's assigned adjuster, William Ardoline, described that his goal as a property claims adjuster was to "*[r]eview claims and documents and provide the best service that I can and then pay a claim if it was a legitimate claim, and deny it if it needed to be denied*." (**Exhibit 7**, Deposition of William Ardoline, July 8, 2022, at 37:17-22). Ardoline further explained that an insurance company has to pay what is owed "*[i]f there is coverage and we owe it, and the policy limits and terms and conditions of the policy provide for [] payment...*" (*Id.*, at 37:23-38:2). AmGUARD concedes that it failed to acknowledge or contact Plaintiff, or its representatives, to help in rebuilding the Property. (ECF No. 1-1, Complaint, ¶ 85; ECF No. 22, Answer, ¶ 85). The undisputed evidence on record further demonstrates not only a failure to promptly evaluate and

resolve the Claim, but a complete disregard for the information that was received by AmGUARD's own consultants and Plaintiff. AmGUARD's delay in the authorization of payment on confirmed damage from the Storm was inconsistent with industry standards and defeated "the fundamental protective purpose of the insurance contract to assure the insured and the general public that liability claims will be paid up to the policy limits for which premiums were collected." *Miller v. Marcantel*, 221 So. 2d 557, 559 (La. Ct. App. 1969)

## V. CONCLUSION

It is undisputed that AmGUARD owed Plaintiff for hail damaged caused by the August 2020 Storm, that AmGUARD confirmed Storm damage to the Property within four months of the Storm, and that AmGUARD did not pay anything on the Claim until November 2021 – nearly twelve months after three of its consultants identified covered damage and six months after this lawsuit was filed. The record evidence demonstrates no reasonable basis for AmGUARD's failure to release coverage benefits for the undisputed damages confirmed in 2020. The undisputed evidence on record further demonstrates conduct that runs afoul of numerous industry standards, including Sections 10-3-1104(1)(h)(II)-(IV), (VI), (VII) of the Unfair Claims Practices Act and Colorado Division of Insurance Regulation 5-1-14. Under these circumstances, AmGUARD's failure to make any decisions or provide communications on the Claim could not possibly meet any standard of reasonable claims handling set forth in law or industry standards. AmGUARD has no reasonable basis, as a matter of law, for its delay in authorizing payment of covered insurance benefits to Plaintiff. Accordingly, Plaintiff is entitled to partial summary judgement for its claim under C.R.S. §§ 10–3–1115; 10–3–1116, relating to the delayed payment of $208,237.98.

Dated: January 13, 2023

Respectfully submitted,

*s/ Jonathan Bukowski*
Jonathan E. Bukowski
Larry E. Bache, Jr.
Merlin Law Group, P.A.
1001 17th Street, Suite 1150
Denver, CO 80202
Telephone: 720.665.9680
Facsimile: 720.665.9681
E-Mail: jbukowski@merlinlawgroup.com
E-Mail: lbache@merlinlawgroup.com
*Attorneys for Plaintiff 2505 6th Street Limon, LLC d/b/a Baymont by Windham Limon*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on January 13, 2023, a true and correct copy of the foregoing **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** was electronically filed with the clerk of Court using the CM/ECF system which will send notifications to the following email addresses:

- Brian E. Devilling
  bdevilling@fgppr.com

- Matthew S. Ponzi
  mponzi@fgppr.com

*s/ Agnieszka Karcz*
Agnieszka Karcz, Paralegal to
Jonathan E. Bukowski