IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

REMOTE VIDEOTAPE DEPOSITION OF:
WILLIAM ARDOLINE - July 8, 2022

---

Civil Action No. 1:21-cv-01673-WJM-KMT

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

Civil Action No. 1:21-cv-02136-RMR-NYW

WOODSIDE VILLAGE II CONDOMINIUM ASSOCIATION, INC. AND
CLAIM & CONSTRUCTION MANAGEMENT GROUP, LLC,

Plaintiffs,

v.

AMGUARD INSURANCE COMPANY and
WESTGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the videotape deposition of WILLIAM ARDOLINE, was taken remotely on behalf of the Plaintiffs, on July 8, 2022, at 6:51 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.



**EXHIBIT 7**

## A P P E A R A N C E S

For the Plaintiffs:

JONATHAN E. BUKOWSKI, ESQ.
NATHANAEL ARCHULETA, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com
narchuleta@merlinlawgroup.com

For the Defendants:

BRIAN E. DEVILLING, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
bdevilling@fgppr.com

Also Present:

Debi Boblitt, Videographer

Q. And do you recall when you became a Property Adjuster II?
A. No.
Q. Now, the pending caseload of a Property Adjuster II is between 150 and 220 claims, right?
A. 220?
Q. 220.
A. I've handled more than that.
Q. What would you say, on average, the number of open claims you handled at a time as a Property Adjuster II at GUARD was?
A. Between 150 and 250. Sometimes getting to 3.
Q. Okay. So you've handled up to 300 open claims at one time?
A. Correct.
Q. And did you supervise any adjusters as a Property Adjuster II?
A. No.
Q. Do you recall what your authority level was as a Property Adjuster II?
A. No.
Q. Okay. And I understand your direct report, as of April 2021, was Marc Dellario?
A. It may have been. I don't recall.



EXHIBIT 7

Q. Okay. And you were trained on that manual, correct?
A. I believe so.
Q. And it would be discussed in various presentations, including the Claims Summit?
A. Most likely.
Q. Okay. Do you recall, that claim guideline -- you were trained that it would provide a -- strike that.
Do you recall GUARD expecting you to follow what was outlined in that guideline when handling claims?
A. I don't recall.
Q. Did you try to handle all your claims consistent with GUARD's property and claim guidelines?
A. Yes.
Q. Okay. Well, in your own words, what was your goal as a property claims adjuster?
A. I -- my own words. Review claims and documents and provide the best service that I can and then pay a claim if it was a legitimate claim, and deny it if it needed to be denied.
Q. Okay. And you were trained that an insurance company has to pay what is owed?
A. If there is coverage and we owe it, and --



**EXHIBIT 7**

and the policy limits and terms and conditions of the policy provide for that payment, then, yes.
Q. What do you recall of the 2505 6th Street claim?
A. I don't know. Is there something you need me to look at, a document to refresh my memory?
Q. I do have several documents as we go. I'm just curious, before we do that, is there anything that comes to mind, as you think about that claim?
A. No.
Q. Do you -- as you sit here now, do you recall anything of the property?
A. No.
Q. And there's nothing -- nothing that stands out about the 2505 claim?
A. I don't recall, no.
Q. Okay. Well, would you have investigated that claim fairly?
A. Yes.
Q. And would you have investigated this claim impartially?
A. Yes.
Q. Would you have investigated the claim with all reasonable dispatch?
A. Can you rephrase that?

Q. Sure. Well, at all times, did you attempt to effectuate a fair and equitable settlement of the 2505 claim?

(At this time Mr. Archuleta was present.)

A. If there is coverage, then yes.

Q. Okay. Now, would you agree you have an obligation to be fair and reasonable with policyholders?

A. Yes.

Q. Do you believe you acted in a fair and reasonable manner with your policyholder here at 2505?

A. Yes.

Q. And you wouldn't mislead a policyholder, right?

A. No.

Q. And you wouldn't lie to a policyholder?

A. No.

Q. Do you recall your first involvement in the 2505 claim?

A. No.

Q. All right. I've placed on the screen Exhibit 35, the claim notes.

There is a claim note, Friday, August 7, William Ardoline. Do you see that?

A. Yes.

Q. Okay. And that appears to be the first claim note from you. Is it fair to say August 7 would be your first involvement?

A. If you can't scroll down any more, then yes.

Q. Okay. Let's see. This appears to be underwriting. So the note preceding you is August 3, 2020. Can you see that?

A. Yes.

Q. And do you recall exactly when you left GUARD?

A. April of 2021.

Q. Do you recall -- do you recall having your review in April 2021?

A. What kind of review?

Q. An annual review.

A. I don't recall.

Q. Do you -- do you know the date that you left in April 2021?

A. It was towards the end. I think it was like April 19 or something, 21st. Something around there.

Q. Now, you -- you were assigned, as the Property Adjuster II, to the 2505 6th Street Limon claim, correct?

A. Yes, but there was a TPA on it, so they handled most of it.
Q. Okay. What does that mean, TPA?
A. Third-party adjuster. It's when we were getting inundated with claims and didn't have enough staff, we'd hire a third-party adjuster to basically handle the whole claim, and then just go by what they say.
Q. Okay. And would there be a time where you'd let the third-party administrator go, and bring the claim back in-house?
A. If management said to, then yeah.
Q. Okay. Could you make that decision, or just management?
A. Mostly management.
Q. And when a claim comes back in-house or the third-party administrator is dismissed, do you become the decision-maker?
A. Yeah.
Q. Are you still the decision-maker if a third-party administrator is involved?
A. Yes.
Q. Okay. So whether or not a third-party administrator is involved, you have the ultimate authority to accept estimates or information?

(Exhibit 31, remotely introduced and electronically provided to the reporter.)

Q. So Exhibit 31 looks like an email from Heidi Higdon at Haag to you, with the report. Do you see that?

A. Yes.

Q. Okay. Would -- so you would agree you had received the report by May 21, 2020, correct?

A. Yeah.

Q. Okay. And was it your standard practice to review the reports timely when they came in?

A. As best I can.

Q. Okay. With a caseload of 300, is it sometimes difficult to do?

A. Definitely.

Q. Okay. Is there any kind of feedback you ever gave to any --

MR. DEVILLING: Object to -- object to the form on the last question, I'm sorry. Go ahead.

Q. (BY MR. ARCHULETA) Is there any kind of feedback you gave to GUARD that you had too many cases?

A. I mean, I've expressed, in team meetings -- I had different ideas, and so does everybody.

Q. Sure. Like, specifically, did you ever

say, I have too many cases to handle timely?
A. I've said things like that, yeah.
Q. Do you recall when you would have had those conversations?
A. No.
Q. Was it more than once?
A. Yes.
Q. Would it have been in 2020?
A. Yeah.
Q. 2021?
A. Yeah.
Q. 2019?
A. Yeah.
Q. Did they increase your caseload between 2019 and 2021?
A. I think it did.
Q. Can you ballpark how many cases you had in 2019?
A. No. I don't recall.
Q. Okay. Was it less than 300?
A. Probably.
Q. Okay. So 300 is the --
A. I mean --
Q. Okay.
A. It depends; if there is a CAT with a