IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

---

REMOTE DEPOSITION OF: THEODORE LYNDON MILLER, JR.
March 21, 2022

---

Civil Action No. 1:21-cv-01673-WJM-KMT

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

Civil Action No. 1:21-cv-02523-CMA-SKC

PACIFIC OCEAN ALAMEDA, LLC,

Plaintiff,

v.

AMGUARD INSURANCE COMPANY and
WESTGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the deposition of THEODORE LYNDON MILLER, JR., was taken remotely on behalf of the Plaintiffs, on March 21, 2022, at 10:02 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.



**EXHIBIT 9**

A P P E A R A N C E S

For the Plaintiffs:

JONATHAN E. BUKOWSKI, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com

For the Defendants:

MATTHEW S. PONZI, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
mponzi@fgppr.com

that. You submitted one report related to your involvement with the Baymont Hotel?

A. I believe that's true.

Q. Did -- do you recall having any other involvement after submitting that single report?

A. Can you define "involvement"?

Q. Well, you prepared for your deposition today. But with the exception of this, have you done anything else on the Baymont Hotel after submitting your report?

A. After submitting my initial report, my involvement, I would have to say, is somebody advising me that the file has been returned back to GUARD.

Q. Okay.

A. And to close the file.

Q. Do you know who your supervisor was on this claim?

A. I don't know who the supervisor is, or was.

Q. And you don't know who -- strike that. Do you know who the claims examiner was?

A. No.

Q. What did you do to prepare for the -- your deposition on this 2505 6th Street property?

A. I discussed the file with the -- with --

Q. Can you recall who you spoke with or what was discussed?

A. No.

Q. And then you also -- it indicates, Conducted an inspection on August 6, 2020, correct?

A. Inspected on August 6, 2020, correct.

Q. And you -- from your recollection, you believe that was the only date that you inspected this property, correct?

A. Yes. Yep.

Q. Can you walk me through your -- what you recall of your inspection of August 6, 2020 at the Baymont Hotel?

A. I believe it's out in Limon, Colorado. And so I drove out there, pulled up, took a picture -- overview picture of the structure. Took a picture verifying the location.

And then I don't remember -- I don't remember the roofer at all. I remember certain aspects. You know, I remember getting on the roof, inspecting the roof. I remember going around the building, searching for hail damage. I recall there being -- I recall damage on the roof and some minor damage, what I consider minor damage to stucco.

Q. All right. Do you recall inspecting the

interior of the property at all?

A. I requested if there was interior damage, and I was advised that there wasn't any.

Q. So is it fair to say you did not inspect the interior of the property?

A. I did not. At least, I don't believe so.

Q. And, again, it's not a guessing game, so if there is something in here you want to see, just let me know.

A. Right. Thank you.

Q. Okay. Page 3, the cause of loss. You confirmed that the cause of loss was hail from a storm on August 2, 2020, correct?

A. Yeah, I believe it was confirmed with a hail history or report.

Q. And the next section on page 3, Expert Involvement, you indicated, There is no concerns which require an expert at this time, correct?

A. Yes.

Q. What type of concerns on a property like this, in your experience, would warrant bringing in an expert?

A. None.

Q. Okay. On page 3, next is a scope of damage where -- this is where you outline your

observations of damage, correct?
A. Yes.
Q. In terms of the roof, you indicate that you observed functional damage, correct?
A. Yes.
Q. Okay. What -- what is that -- what is the difference between cosmetic-in-nature damage versus functional damage to a shingle roof like the one at the Baymont Hotel?
A. The mat material, the membrane is affected to where the elements will eventually eat at it, and the roof would -- could possibly leak at some time. Whereas, cosmetic -- the term "cosmetic," as far as I'm concerned, should not even apply to a shingle roof, but I guess it would be if you want to say granule loss.
Granule loss happens naturally, but also some granules could be knocked off of a shingle roof. So perhaps -- that would be the functional damage -- or non-functional damage, I'm sorry.
Q. Okay. When you say "elements," what do you mean by "elements"?
A. Rain, snow, wind. Normal wear and tear.
Q. Would the element of sunshine or UV light also affect a shingle?
A. Yes.

the asphalt waterproofing material to the elements, correct?

A. Yes.

Q. And if --

A. But there are -- there is an excess of granules.

Q. Well, if you have acute or new removal of granules from a hailstone impact that removes the granules and the asphalt waterproofing material, you've now exposed the fiberglass base mat to the elements, correct?

A. You have a functional damage situation.

Q. Would -- the damage that you observed to the roof of the Baymont property, you believed that it required replacement, correct?

A. Yes.

Q. Did you perform any sort of test squares?

A. Yes.

Q. Just for the benefit of the jury, what is a test square and what is the purpose?

A. A test square is a -- is a 10-foot-by-10-foot area marked off with chalk, usually. And within that test square, you -- you circle a certain amount of hail hits, functional damage, and you get to a certain point where it -- it is sufficient to

guesstimate.

Q. Okay. So you were trying to get this report quickly over to Amguard Insurance Company to notify them of the large loss?

A. Yes.

MR. PONZI: Object to the form.

Q. (BY MR. BUKOWSKI) Are you capable of creating a repair estimate for the damage you observed at the Baymont Hotel?

A. At the time, I could.

Q. Were you ever asked by Amguard Insurance Company to create a repair estimate for the damages you identified in this report, marked as Exhibit 22?

A. No.

Q. Did you provide a copy of this report, Exhibit 22, to Baymont Hotel?

A. No.

Q. Did you provide a copy of this report, Exhibit 22, to the insurance agent, Rick Cline, for Baymont Hotel?

A. No.

Q. Did you provide a copy of this report, Exhibit 22, to the contractor for Baymont Hotel?

A. No.

Q. Did you communicate any of the findings or

information contained within this report, Exhibit 22, to Baymont Hotel?
A. No.
Q. All right. Did you communicate any of the findings in this report, Exhibit 22, to the insurance company --
A. Let's go back to the last question, if you don't mind.
Q. Sure.
A. As I'm going around, I am explaining to the contractor, their representative, or the -- or the insured or the manager what I have found as to what I feel is -- is hail damage.
Q. Okay. Do you recall, during your inspection of the Baymont Hotel, who accompanied you?
A. No. I mean, it -- it clearly states that a contractor was there. So the contractor was aware of my findings, because we -- if he's there, then we would have inspected together.
Q. Do you recall what you represented to the contractor, during the inspection, that was damaged from the August 2020 hailstorm?
A. Everything that's listed there.
Q. So you believe that you communicated to the contractor or a Baymont representative that there