IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:21-cv-01673-WJM-KMT

---

REMOTE DEPOSITION OF: BRIAN LOUIS RUBIDOUX
January 6, 2022

---

2505 6th STREET LIMON, LLC d/b/a
BAYMONT BY WINDHAM (sic) LIMON,

Plaintiff,

v.

WESTGUARD INSURANCE COMPANY and
AMGUARD INSURANCE COMPANY,

Defendants.

---

PURSUANT TO NOTICE, the deposition of BRIAN LOUIS RUBIDOUX was taken remotely on behalf of the Plaintiff on January 6, 2022, at 9:02 a.m., before Lori A. Aldrich, Registered Merit Reporter, Certified Realtime Reporter, and Notary Public within Colorado.



EXHIBIT 20

A P P E A R A N C E S

For the Plaintiff:

JONATHAN E. BUKOWSKI, ESQ.
Merlin Law Group, PA
1001 17th Street
Suite 1150
Denver, Colorado 80202
jbukowski@merlinlawgroup.com

For the Defendants and the Deponent:

MATTHEW S. PONZI, ESQ.
Foran Glennon Palandech Ponzi & Rudloff, PC
222 North LaSalle Street
14th Floor
Chicago, Illinois 60601
mponzi@fgppr.com

Q. Give me one second. I want to readjust this. So I'm on page 4 of Mr. Oviatt's report marked ENV 15, and this -- the second full paragraph, Functional hail damage to a shingle roof covering is defined by the industry as a reduction of the watershedding capability and/or a reduction in the expected long-term service life of the roof covering.

Do you see that?

A. I do.

Q. Okay. Is that your understanding of the term "functional damage" as used in an insurance claim evaluation?

A. It depends on the policy, I guess. Some policies have its own definition of what functional damage may be. That may be his, in the engineering world; and if that's what he says, I defer you to him.

Q. Well, this sentence that I've highlighted, that's a definition you've seen used in the engineering world, correct?

A. Yes.

Q. Now, did you ever notify Baymont Hotel that the roof was functionally damaged?

A. No.

Q. So, I'm sorry, I didn't catch your answer. Did you notify the insured, Baymont Hotel, that the

roof was functionally damaged due to hail?

A. I did not.

Q. Did you notify the insured, Baymont Hotel, that the Envista engineer believed the roof was functionally damaged due to hail caused by the August 2020 storm?

A. I did not.

Q. Why not?

A. I wasn't requested to contact the insured to relay the engineer's information, by the insurance company.

Q. Had you been requested by the insurance company, would you have relayed that information?

A. Had they requested that, or authorized it.

Q. Okay. And so fair to say you also didn't notify the contractor that the engineer determined the roof was functionally damaged due to the August 2020 storm?

A. I did not.

Q. Now, this second part of this conclusion 2. It is estimated that approximately 11,330 shingles were functionally damaged due to hail impact from the reported storm.

Do you see that?

A. Yes.

why you would want to know how many impacts were within a 10-by-10 area?

A. Just to determine the extent of the exposure or the extent of the damage to the roof.

Q. Are you aware of how large the roof is on the Baymont hotel?

A. Not off the top of my head.

Q. Would you agree that 11,000 functionally damaged shingles would require replacement of this roof?

MR. PONZI: Object to the form.

A. I -- based on -- based on what he's stating there, 11,330 total damages -- total damaged shingles, I'm assuming, which I don't want to do, or presume, is that would potentially be the entire roof -- roof covering.

Q. (BY MR. BUKOWSKI) And I'm assuming -- assuming, if you didn't provide the report, is it fair to say that you never notified the insured that the engineer found over 11,000 functionally damaged shingles on the roof?

A. I never notified them.

Q. Okay. And did you ever notify the insured's agent, Rick Cline, that the engineer found over 11,000 functionally damaged shingles on the roof

elevation elements had hail damage from the August 2020 storm?

A. No -- no. And like I've told you before, we never contacted the insured or the contractor, the -- that was not in our purview at that time. Whether it be about any of these things that you're going to discuss, no, we never contacted the insured. Never contacted the contractors, never contacted the agent about the engineer's report.

Q. Okay. And I --

A. We submitted our report to the insurance company, and that was what we did.

Q. And at the time you received the engineering report, you again did not prepare an estimate for repair to the exterior building and roof elevation elements that were identified as damaged by this engineer?

A. We did not, because we were not authorized to, or requested by the insurance company to complete an estimate.

Q. Okay. And -- and in looking at conclusion 4, do you agree that the engineer reported that there were functionally damaged building elevation elements due to the August 2020 storm?

A. I don't know about the -- I mean, I didn't

Envista's findings. I didn't know at that time, but I did ask him to get me an estimate of his repair recommendations resultant from this loss. But I never received anything further from his office. The contractor, that is.

Q. And, again, you had plenty of experience estimating for shingle roofs, stucco, vinyl, metal components, but you didn't do it because you weren't instructed here?

A. That's correct.

Q. And we touched upon Xactimate earlier. You're familiar with the program, right?

A. I am.

Q. Would you agree that Xactimate is the standard estimating program for property insurance claims?

A. It appears to be.

Q. And would -- would you agree it provides fair and reasonable pricing?

A. I would assume that it does. That's why it's being utilized.

Q. And are you familiar with the term "commercial supervision" in -- in the context of a repair scope and estimate?

A. Correct.

A. Correct.
Q. All right. I've placed on the screen Exhibit 16, which is a third report to GUARD, dated January 4, 2021. Can you see that?
A. I do.
(Exhibit 16, remotely introduced and electronically provided to the reporter.)
Q. And this is a report that you prepared, right?
A. Yes.
Q. What was the purpose of this report?
A. Go down to assignment -- or -- there you go.
Q. Okay.
A. It was to advise that we made a recommendation, we haven't received any further instructions, and if we don't hear from you within 20 days, we're assuming our handling has been concluded, and we'll retire our file at that time.
Q. Okay. So between the time that you sent your second report, on November 30, through this third report, January 4, 2021, you had not received any further direction, right?
A. Correct.
Q. And "retire the file," that just means to

close it out, correct?
A. Right.
Q. And did you eventually close out the file?
A. Yes.
Q. Okay. And that was due to a lack of communication or direction?
A. Lack of further instructions.
Q. Okay. Exhibit 17.
(Exhibit 17, remotely introduced and electronically provided to the reporter.)
Q. Exhibit 17 is an email chain marked EM 626, and you can see this is an email from Raphael and Associates, dated April 24, 2021, to you. Do you see that?
A. I do.
Q. Okay. And then you wrote back on April 28, 2021. Do you see that?
A. I do.
Q. Okay. Did you -- what's your understanding of Cora Routh or Routh (pronouncing) and her involvement?
A. Just basically what she put there and that she'd been recently assigned from Berkshire Hathaway.
Q. And then you were just responding to the information being requested, right?