Gary T. Fye Company
CLAIM PRACTICES ANALYSIS

**May 19, 2022**

## DISCLOSURE OF PLAINTIFF'S CLAIM PRACTICES[1] EXPERT

***2505 6th Street LLC d/b/a Baymont by Wyndam Limon v. WestGuard Insurance Company and AmGuard Insurance Company***
**District Court of Lincoln County**
**State of Colorado**
**Case No. 1:21-cv-01673-KMT**
**My File: C-54501**

## QUALIFICATIONS:

I have been retained as a national claim-handling expert or consultant in about forty states, including Colorado. I have given testimony as an expert in insurance claim practices on 160 or more occasions in State or Federal courts in Alaska, Arizona, Arkansas, California, Colorado, Florida, Hawai'i, Illinois, Kansas, Kentucky, Louisiana, Nevada, New Mexico, Oklahoma, South Dakota, Texas, Utah, Washington, and Wyoming. My curriculum vitae is attached *(see Exhibit A)*, which reflects my continuous involvement in claim handling or review since 1962. Also attached are a list of recent testimony *(see Exhibit B)* and a small packet of affidavits attesting to my qualifications *(see Exhibit C)*.

My work as a claim-practices litigation consultant spans the years from 1977 to the present. I retired from fieldwork and adjusting in 1998, as my work in claim-practices consulting gradually required my complete focus. From consulting and testifying in cases, developing and presenting seminars on claim-practices trends, and studying claim-practices subjects, I have specialized experience and training in insurance claim practices and the practices of the insurance industry (*see Exhibit D*).

I have spoken on insurance claim-practices subjects to lawyer groups and at various bar association CLE seminars in Alaska, Arizona, Colorado, Florida, Georgia, Hawai'i, Iowa, Kentucky, Maine, Mississippi, Nevada, New Mexico, South Dakota, Texas, Utah, Washington, and Wyoming from 1985 to the present (*see Exhibit E*).

[1] I am not an attorney, and if any advocacy is found in these pages, it is to support fair claim practices only. There are no legal opinions, case citations, or judgments about violations of regulations so as to not invade the Court's control over such matters. Legal precepts, if discussed at all, will be general commentary about the claim industry's published understanding thereof.

## PUBLICATIONS:

None. My work and views in a significant insurance case have been described in the Thomson-West law text *Litigation Road: The Story of Campbell v. State Farm,* by Jeffrey Stempel, J.D., professor at UNLV's Boyd School of Law.

## COMPENSATION:

My consulting guide is attached as Exhibit F.

## LIST OF TESTIMONY IN OTHER CASES:

A list of testimony is attached as Exhibit B.

## ENCLOSURES:

A. Curriculum vitae – Gary T. Fye
B. List of recent testimony
C. Copies of affidavits of Mssrs. Burke, Erwin, Harris, and Carman
D. List of courses
E. List of presentations
F. Consulting Guide – Gary T. Fye Co.

## DATA & INFORMATION CONSIDERED:

1. 2505 6th Street documents (#1 – 1494)
2. Agent e-mails
3. Biohazard #1 – 5615
4. Complaint and Answer
5. Defense responses
6. Deposition exhibits
7. Deposition: Loftus, Nona (9/30/21)
8. Deposition: Miller, Ted (3/21/22)
9. Deposition: Oviatt, William (3/8/22)
10. Deposition: Rothermel, Barbara (9/29/21)
11. Deposition: Rubidoux, Brian (1/6/22)
12. Disclosures by Defense



EXHIBIT 31

13. Disclosures by Engle Martin
14. Disclosures by Envista
15. Disclosures by Plaintiff
16. GRK #1 – 1024
17. GRK-SDT #1 - 1413
18. Policy
19. Warren Buffett Letter to Shareholders (2/22/20)
20. Generally available training literature on insurance and management, articles, news media reports, and ads from generally available sources. Examples are:
    a. *Best's Key Rating Guide* – A.M. Best Company
    b. *Claim Handling Principles and Practices* – Popow
    c. *Aggressive Good Faith* – Rokes
    d. *Organizational Behavior in Insurance* – White, et al
    e. *How Insurance Works* – Smith & Wiening
    f. *The Claims Environment* – Markham, et al (1st Edition)
    g. *The Claims Environment* – Hoopes (2nd Edition)
    h. *Property Loss Adjusting* – Popov
    i. *Adjustment of Property Losses* – Thomas/Reed

## METHODOLOGY:

With concentration on reliable principles and methods, my basic approach involves examining insurer records, researching and cross-checking the origins of evolving claim practices, and writing rule-conforming reports of findings and conclusions. These are almost the same methods I used in my work after 1964 when I was supervising other adjusters and reviewing and investigating their work on multi-line claims. I started an archive and library of documents from the insurance industry – related to insurers, claim practices, organizational changes, and the like - in about 1978. Those documents provide the accumulated knowledge required for a scientific approach; the opinions and conclusions rendered are grounded by years of work with many foundational documents. My approach more specifically involves:

- **Analyzing file materials provided to understand and explain events in the insurance company's documentation.** This work involves learning the order of events to illustrate what and when things happened, and then explaining why they happened.

- **Listing and comparing nationally recognized claim practices generally accepted by insurers.** Claim handling is a technical part of a complex business with other moving parts, and adjusters must be trained to elicit standard-conforming claim-handling behaviors. The information involved can be arcane, and the expert's role is to identify and explain the claims environment as it impacts the specific



EXHIBIT 31

instance of claims work under review.

- **Measuring the extent to which appropriate claim practices were or were not applied.** I apply the same principles, methods, and practice standards I have learned since I began claims work in 1962 to the documentation provided for the purpose of rendering opinions about whether those practice standards were met in the matter being studied.

## BACKGROUND OPINIONS:

**A. <u>Claims Financial Information</u>**: Due to extensive redesign and re-engineering over the last twenty-five years, insurance claim practices are indivisible from the economic realities of the competitive industry in which they occur. Economic conditions and the quality of claim processes vary directly at some insurers as they chase improved economic outcomes through use of improper practices, including programs that call for underperformance of the claim functions. Delay and denial[2] are the most common improper drivers of revenue increases, since the insurer can recapture or retain assets that would otherwise satisfy the claim obligations. Retained assets produce investment income, a form of revenue production sometimes referred to as "the float."

Since claims expense and indemnity payments are the insurer's largest outflows, some have re-purposed their claim processes to produce revenues that are sometimes called "leakage," "savings," or "shortfall" under the generalized rubric "Loss Economic Opportunity" ("LEO"). Claim handlers are taught in such situations that claim payments are excessive and claim processes should seek lower payment outcomes that claim handlers are told more accurately reflect societal values for injuries or losses. Sometimes the new processes are designed with the intent of dashing society's hope of benevolent claim evaluations, which also has the effect of lowering claim outcomes. The insurance company's economic outcome goals can drive improper claim-handling techniques, so the claim-practices analyst must be aware of an insurer's organizational attempts to reverse the flow of claim payments through delay and denial. It is reprehensible that executives in some distant office calculate methods of converting funds owed to the insuring public to the company's benefit, but the fact that the redesign and methods are covert and perpetuated by questionable non-disclosure agreements makes the conduct even more egregious.

In insurance-practices analysis, it is important to know both what happened and why it happened. Insurers seek competitive advantages and greater enterprise value through strategic initiatives, disruptive innovations, enterprise awareness training, relentless measurement of progress toward goals, and the use of redesigned methods or tactics that

[2] In claim handling, adjusters are taught that delay is equivalent to denial in most circumstances because it brings down the economic consequences of the insured occurrence on the people insurance is meant to assist.



EXHIBIT 31

challenge accepted ways of performing the functions of the insurance business. Profit-sharing, variable-pay, and performance-based compensation are common methods of remuneration that help desensitize the claims workforce to the conflicts of interest and other ethical dilemmas the company has adopted with redesign elements. Such performance measurement and targeting are invisible to the insuring public, and usually beneath regulatory radar, but can exert powerful effects on claim department employees and their supervisory chain, all to influence the way the public's claims are handled. Insureds and claimants are entitled to independent judgment from people handling their claims, so insurance-practices analysis includes studying these covert financial issues that impinge on the delivery of proper, ethical claim handling.

Claim analysts are familiar with the principles of insurance accounting and reporting in order to understand the influence economic conditions can have on claim-handling behaviors. Insurers use goal setting, measurement, and incentive rewards because they work: they help managers achieve the company's desired outcomes through the staff they manage. Since part of insurance-practices analysis concerns explaining how the hidden pressures of goal setting and measurement distort claims work, the analyst also explains combined ratio goals and the limited ways claim employees can help lower them. *Loss ratio* is the sum of indemnity costs (losses) and loss expenses divided by earned premium; *combined ratio* is the sum of indemnity costs (losses), loss expenses, and enterprise expenses divided by written premium. The figures in those calculations are published in *Best's Key Rating Guide* for use by any insurance professional. It only requires a simple explanation for the claim analyst to assist in quantifying disgorgement or deterrence amounts.

**B.** **General Principles of Insurance**: Insurance is a social device for reducing risk. By combining a sufficient number of similar or homogenous exposure units - like homes, lives, or cars - losses are predictable, not individually but collectively. People value their lives, health, and property, so they are able to buy insurance to soften the financial impact of losses and accidents. Insurance is intended to provide peace of mind and to fulfill financial requirements of its varied beneficiaries. For that reason, insurance is a special business imbued with the public trust, and policies have unwritten but widely understood requirements to provide good faith and fair dealing in claims transactions. The adoption of covert or clandestine programs to undermine the indemnification concept of insurance is unethical and fraught with deception and misrepresentation. It is also actionable misconduct that shouldn't be defended by pointing to its banality. Insurance benefits are meant to be delivered in a prompt and fair manner, not low and slow to conform to a hidden agenda.

**C.** **Role of Insurance Companies:** Insurance companies receive Certificates of Authority to sell policies in states where they are licensed. Since insurance as an economic activity is imbued with the concept of public trust, it is presumed that insurers will conduct their activities legally and with a high degree of good faith and fair dealing. Insurers are



**EXHIBIT 31**

often said to have "special" or "fiduciary-like" duties to insureds, and they must affirmatively address and accomplish the purposes of the insurance policy, rather than remain passive or attempt to prevent insureds from obtaining the benefits purchased.

By statute, regulation, commercial practice, and common law requirements, insurers must adopt and implement systems, instructions, and guidelines for the prompt investigation and settlement of claims. In the broad sense, insurance indemnifies (makes whole) an insured to soften the financial consequences of an insured accident. Sometimes this involves both first-party and third-party coverages. When payment for a covered claim is delayed or withheld, the insured suffers the financial and emotional consequences insurance is bought to lessen or avoid. The claim handler's job is to give life to the insurance contract by working with the various claimants and beneficiaries to facilitate its use following notice of the accident. It is a personal contract for the specific insured or claimant, not for some generic or mathematical model of one. Insurers should be prompt, responsive, and capable and ensure their practices don't undercut the public's confidence in the insurance mechanism, an important part of America's financial landscape.

**D. <u>Claim-Handling Standards</u>:** National insurers expect their claims staff to adhere to uniform standards of behavior, so claim-handling standards have only slight variation from state to state. Insurers sometimes must move adjusters from their home states to another to handle losses on short notice; this can be accomplished within hours because claim-handling standards are widely understood in the United States. Additionally, the National Association of Insurance Commissioners (NAIC) has published claim-handling guidelines (commonly called NAIC Models), which were derived from industry codes of ethics, to enable the enactment of regulations in place in some form in most states. These concepts are discussed in the foundational texts listed above.

In seminars and workshop presentations, I explain national claim-handling standards that are fundamental to the delivery of insurance contract promises. Claim handlers commonly understand these principles, and that following the underlying precepts of claims work both before and after the onset of litigation is crucial to providing fair claim practices. For example, an insurer:

- Must treat its insured's interests with equal regard as it does its own, without turning the claim handling into an adversarial or competitive process.
- Must assist the insured with the claim to achieve the purpose of the coverage.
- Must disclose all benefits, coverages, and time limits that may apply to the claim.
- Must review and analyze the insureds' and claimants' submissions.
- Must conduct a full, fair, and prompt investigation of the claim at its own



**EXHIBIT 31**

expense, keeping the insured on equal footing with disclosure of the facts.

- Must fairly and promptly evaluate and resolve the claim, making payments or defending in accordance with applicable law and policy language.

- Must not deny a claim or any part of a claim based upon insufficient information, speculation, or biased information.

- Must give a written explanation of any full or partial claim denial, pointing to the facts and policy provisions supporting the denial.

- Must not engage in stonewalling or economic coercion leading to unwanted litigation that shows the unreasonableness of the company's assessments of coverage.

- Must not misrepresent facts or policy provisions or make self-serving coverage interpretations that subvert the intent of the coverage.

As a minimum standard, Colorado claim handlers should also adhere to the State's Unfair Claims Practices Act requirements, the fair claims practices standards outlined in the texts listed above, and each insurer's adopted internal standards to accomplish good faith and fair dealing.

**E. <u>Nature of Property Coverages</u>**: A Businessowner's property policy provides first-party coverage designed and intended to pay the insured the difference in value of the insured property before and after the covered loss. At worst, adjusters forget this and treat the policy as a repair contract and see their job as stage-managing the insured's claim. Claim handlers cause distress when the adjustment effort is focused on self-serving outcomes instead of providing the assistance and indemnity the insured needs after a loss; such handling not only undercuts the insured's claims for benefits but undermines public confidence in the insurance mechanism. This does not always cause harm, but when it does, the insurer must accept the consequences of not appropriately assisting the insured in the proof process.

Claims from first-party losses should be accepted or rejected, not "settled." The insured owns the claim, and the insurer should not substitute its own method of quantifying the claim if the insured requests reasonable assistance in repair and/or presentation of the loss. Good claim-handling training, claim manual instructions, or other procedural guidelines generally prevent errors.

An insured is entitled to all benefits of the policy when the initial reporting requirement is fulfilled. It is the insurer's burden to disclose coverages and help the insured use the policy in every way possible to soften the economic consequences of the loss. The duty to

investigate and evaluate claims arises before the insured understands and claims benefits, and the claim-handling process should not impair the insured's reasonable attempts to get help from the policy. After all, the insurance policy is a contract of indemnity.

**F. <u>The 2505 6th Street LLC Hail Loss:</u>** On August 20, 2020, a storm that produced 1.75 to 2-inch hail and high winds damaged the Baymont by Wyndam hotel located at 2505 6th Street in Limon, Colorado. The property, a two-story wood framed building clad with a painted exterior insulation and finish system (EIFS), included forty-eight guest rooms, an indoor pool, fitness center, meeting room, laundry facility, and dining area. Hail struck and damaged the architectural composition shingle roof, porte cochere, siding, roof vent caps, windows, gutters, and storage shed. The exterior damage created ways for moisture to enter the building. Moisture damage and mold were found in about thirty-four of the forty-eight guest rooms.

**G. <u>The WestGuard/AmGuard Claim Handling:</u>** At the time of the loss, the Baymont property was insured under AmGuard policy #NEBP030396, an all-risk, replacement cost policy covering direct physical loss of or damage to the property resulting from hail, and subject to a $7,500 deductible. The loss was reported promptly, and AmGuard assigned the claim to William Ardoline. He set in motion an assignment that led to an inspection by an experienced adjuster, Ted Miller. Mr. Miller reported a significant loss to the insurer but revealed nothing to the insured.[3] Mr. Ardoline also retained independent adjuster Brian Rubidoux of Engle Martin & Associates to inspect the loss and authorized him to hire Envista and accompany its engineer to assess the loss. Engle Martin's adjuster and the engineer identified broken windows, hail strikes to the EIFS cladding, and widespread hail strikes to the roof shingles, but neither quantified all the storm damage nor did they disclose their findings to the insured. They reported that their work was limited to damage reported by the insured or specifically claimed.

It should be noted that the independent adjuster assignment form had a curious entry: in the damage categorization, Mr. Ardoline or his staff apparently entered "0."[4] It is not surprising that this initial work focused on documenting prior conditions, wear and tear evidence, and any evidence that would defeat a claim for repairs. The adjustment went nowhere, there was marked lack of appropriate communication and disclosure to the insured and its representatives, and the adjusting effort led to neither payment nor to accurate determination of the hail damage and its consequences to the insured's business.

On October 1, 2020, the insured retained a contractor to estimate the cost of repairing the storm damage. The initial estimate dated October 12, 2020 was $346,580.36 replacement cost value (RCV) and $271,586.63 actual cash value (ACV) for repairs to the roofs, siding,

---

[3] Mr. Miller destroyed his field notes as his customary practice.
[4] Some adjusters would construe that entry as "marching orders."

windows, gutters, doors, hotel sign, paint, light fixtures, air conditioning units, and fencing. On October 20, 2020, the contractor submitted a supplemental estimate with line-item entries related to cleaning, general demolition, drywall, equipment use and rental, finish hardware, glass, glazing, storefronts, painting, stucco and exterior plaster, temporary repairs, window treatments, and windows totaling $434,949.90 RCV and $343,811.81 ACV. The contractor also completed emergency services, including placing tarps over roofs, covering broken windows, and other mitigation to prevent further damage and for security and safety issues.

On December 2, 2020, Adjuster Ardoline told the insured AmGuard was waiting for an expert report. He reminded the insured of the duty to mitigate damages by protecting the property. In an equivocal instruction designed to both order repairs to begin and not to order them to begin, Mr. Ardoline indicated repairs needed to begin but advised it was not accepting the claim or meant as a confirmation of coverage. The insured's agent asked for an explanation, but no substantive adjusting responses followed.

The insured retained GRK Engineering to assess storm damage, and inspections took place on March 29 and 30, 2021. The engineer documented significant storm-related damage including fractures and chipping in the EIFS cladding and damage to the roofing systems, vinyl window units and glass, metal-framed passage doors and their bracket/hinge system, masonry veneer, vinyl fencing, entry card reader system, flashing, and grills covering the air conditioning units. On April 8, 2021, the insured requested an on-site meeting with the insurer's representatives to discuss the unaddressed claims, but did not receive a response.

WestGuard/AmGuard has not approved or rejected the estimates submitted, acknowledged or contacted the insured's representatives to help rebuild the property, provided complete documentation from its own adjusters or experts, or to made payment for the loss. 2505 6th St. retained counsel and filed suit on May 18, 2021.

## CONCLUSIONS BASED ON THE RECORDS TO DATE:

- WestGuard's/AmGuard's claim-handling conduct was both remarkable and not reasonable. If its claim handlers were trying to adjust a commercial property loss, there is almost no evidence of an effective effort to do so. There was no concern with the use and occupancy of the insured property, a hotel, and no time urgency in fulfilling the coverage grants in the face of a significant storm loss. Normally, assignment to an independent adjuster would cure the insurer's apathy, but here the independent adjusters were told in advance the damage was "0" and had no authority to use professional judgment in assessing the damage. They and the engineer hired for the insurer were only to look at the areas of damage the insured's manger might think to point out. They were not told to obtain an agreed scope of loss for all of the hail and wind effects, and they were limited in creating



EXHIBIT 31

repair estimates.[5] And they were not directed to disclose their findings to the insured.

- Property loss adjustments start with an agreed scope of loss. Experienced adjusters understand repair issues and the difficulty of replacing and matching existing finishes. They can help an insured see beyond the obvious issues of the loss and assist in developing a scope of loss that restores the property to pre-loss condition and value – the goal of the adjustment. Reaching an agreed scope of loss can involve intensive work and even expensive procedures when specialists are needed to assist the adjuster and the insured in reaching agreement on the scope of the damage. That's the nature of commercial property loss adjusting when it is performed in a proper manner, which is not in any way in evidence in this case. In this case, WestGuard's/AmGuard's adjusters started assessing exposure in telephone conversations and withheld effective claim handling resources. Mr. Rubidoux and Mr. Oviatt went to "inspect" the loss, but were trying to stay within a budget of time and expense. They could not perform a thorough commercial loss inspection within two hours and said so in their depositions. They felt constrained from telling the insured what they found, as a legitimate commercial property adjuster and licensed engineer would do if this were an actual loss adjustment rather than a token display of interest on the part of an uninterested insurer. The insured's agent voiced concerns about WestGuard/AmGuard ignoring its obligations to the insured to no avail. There was no agreed scope of loss, so there couldn't be an accurate repair estimate. The adjustment that followed proved to be both unreasonable and an outrageous example of insurance company non-feasance.

- Supervision of the adjusting functions are missing or ineffective. It was handled as WestGuard/AmGuard intended, because the company had many chances to get it right but didn't. WestGuard's/AmGuard's coverage entitles the insured to a strong and effective adjusting effort, and that was not provided. The insurer should adjust at its expense to fulfill the purposes of the coverage, but here the insured was forced to hire counsel and experts with no help from the insurer. The insured was not given the reports, scopes of loss, or estimates created by the insurer's inspectors, and one inspector destroyed his notes. An insured should not have to pay for and to provide loss adjustment services for a covered loss like this one. An insured in these circumstances should expect prompt and thorough investigation of the loss, careful inspections to arrive at an accurate scope of loss, and the insurance company's acceptance of the economic consequences of the loss as minimum services under the policy.

- Claim handlers know that the insurance policy is not a repair contract. Adjusting sometimes means determining the cost to put the property back to pre-loss condition, but commercial property adjusting is more than that. It's about assuring the smooth restoration off a business entity where the property is the capital investment that drives the business revenues. Rapid response, rapid assessment, rapid agreement, and rapid payment as agreed

[5] The records show that "waste" could not be added; nor could interior damage or elements of overhead and profit for a contractor. This was unusual and unreasonable.



**EXHIBIT 31**

fulfill the commercial insuring agreement and provide the peace of mind and good service the insurance company is supposed to deliver. WestGuard/AmGuard didn't provide fundamental claim services, nor did it seek to indemnify the insured. In underhanded ways, it sought to limit inspection costs, limit the scope of loss and repairs, and undermine the insured's recovery of policy benefits of service and indemnity. WestGuard/AmGuard knows that delay is the same as denial - it increases business difficulties for the insured. WestGuard's/AmGuard's work was below standard for Colorado - an example of improper claim handling and indifference to the policyholder's claims.

- WestGuard's/AmGuard's obvious goals to undermine the insured's claims by not providing appropriate assistance and indemnity make me wonder how many other commercial insureds had to watch WestGuard/AmGuard gain improperly from similar unreasonable conduct.

Gary T. Fye



**EXHIBIT 31**